**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

|  |  |  |
|---|---|---|
| UNITY08 et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No.1:07-cv-00053 (RWR) |
| | ) | |
| FEDERAL ELECTION COMMISSION, | ) | |
| | ) | |
| Defendant. | ) | |

---

### MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56 and Local Rule 7, Plaintiffs respectfully move this Court for summary judgment against Defendant Federal Election Commission ("FEC").

For the reasons stated in Plaintiffs' Complaint, and the accompanying Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment, summary judgment is appropriate in favor of Plaintiffs because there are no material facts in dispute, and as a matter of law, the FEC's interpretation of the Federal Election Commission Act, and the imposition of its restrictions on Plaintiffs, were unlawful.

Plaintiffs request that this Court enter an Order declaring that Unity08's activities prior to candidate selection do not subject it to regulation as a political committee, and enjoin the FEC from initiating enforcement actions relating to those activities.

Respectfully submitted,

Robert E. Jordan III (D.C. Bar No. 15784)
John J. Duffy (D.C. Bar No. 170936)
Rhonda M. Bolton (D.C. Bar No. 455005)
Anthony A. Onorato (D.C. Bar No. 482074)
STEPTOE & JOHNSON LLP
1330 Connecticut Ave., NW
Washington, D.C.  20036
Tel:  (202) 429-3000
Fax:  (202) 429-3902
rjordan@steptoe.com
jduffy@steptoe.com
rbolton@steptoe.com
tonorato@steptoe.com

*Counsel for Plaintiffs*

March 21, 2007

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

UNITY08 et al.,

    Plaintiffs,

        v.

FEDERAL ELECTION COMMISSION,

    Defendant.

    )
    )
    )
    )
    )    No.1:07-cv-00053 (RWR)
    )
    )
    )
    )
    )

---

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................................................... ii

I.    SUMMARY OF THE CASE ............................................................................................1

II.   STATEMENT OF FACTS ...............................................................................................2

    A.    Unity08 Is A New Form Of Political Organization .................................................2

    B.    Unity08's Request For An Advisory Opinion .........................................................5

    C.    Unity08 Needs To Obtain Loans From Individuals Greater Than $5,000
        To "Kick Start" Its Ballot Access And Convention Planning Efforts ...................8

III.  ARGUMENT .....................................................................................................................8

    A.    Unity08 Does Not Meet The Definition Of Political Committee Because It
        Has No Candidate ..................................................................................................10

        1.    FEC regulation as a "political committee" requires that there be a
               specific candidate ...................................................................................12

        2.    The Administrative Order is inconsistent with the Commission's
               prior support for the "candidate" limitation on regulation........................21

    B.    Unity08's Ballot Access Activities And Convention Planning Activities
        Cannot Be Lawfully Regulated Because They Are Core Political Speech
        And There Has Been No Finding of Corruption....................................................23

IV.   CONCLUSION................................................................................................................25

i

## TABLE OF AUTHORITIES

### CASES

Akins v. FEC, 101 F.3d 731 (D.C. Cir. 1996) ............................................................................21

Buckley v. American Constitutional Law Foundation, 525 U.S. 182 (1999)................................24

Buckley v. Valeo, 424 U.S. 1 (1976) .................................................................................. passim

Citizens Against Rent Control v. Berkeley, 454 U.S. 290 (1981) ...........................................11, 24

FEC v. Machinists Non-Partisan Political League,
655 F.2d 380 (D.C. Cir. 1981) ...................................................................................15, 16, 17, 18

FEC v. Malenick, 310 F. Supp. 2d 230 (D.D.C. 2004)...............................................16, 17, 18, 20

FEC v. Massachusetts Citizens for Life, 479 U.S. 238 (1986) ......................................................19

FEC v. GOPAC, Inc., 917 F. Supp. 851 (D.D.C. 1996)...................................................17, 18, 19

McConnell v. FEC, 540 U.S. 93 (2003) .......................................................................... 11, 13-14

Meyer v. Grant, 486 U.S. 414 (1988) ..........................................................................................24

### STATUTES

2 U.S.C. § 431 (2000) & Supp. IV (2004)...............................................................2, 10, 11, 13

### MISCELLANEOUS

11 C.F.R. § 100.5 (2006) .....................................................................................................11, 19

69 Fed. Reg. 68,056 (Nov. 23, 2004).............................................................................................22

I.    **SUMMARY OF THE CASE**

This case involves a challenge to a ruling of the Federal Election Commission ("FEC" or

the "Commission"). Because of the threat of enforcement action based on the ruling, Unity08, a

new, centrist political movement, is severely hampered in its efforts to obtain access to the ballot

in fifty states and the District of Columbia in time for the 2008 Presidential Election. The two

major political parties already have automatic access to the ballot in all fifty-one of these

jurisdictions. They are also free to solicit contributions from donors for their organizing efforts

and political activities with a limit more than five times greater than the $5,000 limit that the

FEC seeks to apply to Unity08.[1]

Unity08 wishes to solicit loans in excess of the $5,000 limit in order to finance Unity08's

efforts to obtain access to state ballots as an organization. Unity08 needs to accept such loans, if

it is to achieve its goals. The FEC has ruled, in effect, that Unity08 may not receive from any

individual donations or loans beyond $5,000 per year to pay for ballot access. This ruling – from

a body composed of representatives of the two established parties – threatens to choke this

incipient and innovative political movement at its birth. Unless overturned by this Court, the

ruling will prevent Unity08 from obtaining sufficient ballot access to become a meaningful

participant in the 2008 Presidential Election.

Plaintiffs thus seek declaratory and injunctive relief from the threat of prosecution raised

by the FEC's ruling. Because Unity08 does not now have a candidate, and will not have a

_____

[1] In Advisory Opinion 2006-20, the FEC indicated that Unity08 had to comply with the restrictions imposed by the Federal Election Campaign Act of 1971, but did not specifically indicate that it considered Unity08 a non-connected political committee, which would subject it to the $5,000 annual limitation. Since Unity08 does not have a candidate and, consequently, could not be a candidate committee, we have assumed that the non-connected committee limitation would apply. The FEC's rationale that Unity08 is a "placeholder" for a candidate could be interpreted, however, to limit Unity08 to the $2,300 contribution applicable to a candidate committee.

1

candidate until after it completes its on-line convention in the summer of 2008, the FEC's

determination conflicts with the constitutionally-mandated construction of the Federal Election

Campaign Act of 1971, as amended (the "FECA" or the "Act")[2], laid down by the Supreme

Court in the landmark case of Buckley v. Valeo, 424 U.S. 1 (1976) (per curium), and confirmed

by decisions in this Circuit, and this Court.  As interpreted by the Commission, the Act would

limit the Plaintiffs' ability to join together to raise and expend money on core political speech,

and would thereby infringe on Plaintiffs' speech and associational rights under the First

Amendment to the United States Constitution.

II.    **STATEMENT OF FACTS**

    A.    **Unity08 Is A New Form Of Political Organization**

       Plaintiff Unity08 is a political organization created by voters who believe that the major

political parties have focused too much attention on "wedge" issues that appeal primarily to each

parties' "base" of voters.  See Declaration of Douglas L. Bailey ("Bailey Decl.") ¶ 8, attached

hereto as Ex. 1 (all Exhibits referenced in Plaintiffs' Memorandum of Law and in Plaintiffs'

Statement of Material Facts As To Which There Is No Genuine Issue In Dispute are true and

correct copies attached hereto as Exhibits 1-20.)

       In their view, political discussion in recent times has largely ignored the truly critical

issues that face our country.  Id.  The individual Plaintiffs, who organized Unity08 and now

direct its operations, are registered voters with various party affiliations.  See, e.g., Bailey Decl.

¶¶ 2-3; Declaration of Roger M. Craver ("Craver Decl.") ¶ 2 (Ex. 2).  They have been involved

for many years in political campaigns and governance at the state and national levels.  See Bailey

Decl. ¶ 5; Craver Decl. ¶¶ 3-4; Pls.' Statement of Material Facts As To Which There Is No

---

    [2] 2 U.S.C. §§ 431 et seq. (2000) & Supp. IV (2004).

Genuine Issue In Dispute ¶¶ 61-64 ("Pls. Statement of Facts"). They formed Unity08 in an attempt to jolt the two major parties out of the current partisan political deadlock that stands in the way of meaningful change in the governance of our country. Bailey Decl. ¶ 8. Unity08 does not plan to become a permanent political party, but success in the 2008 election and the reaction of the two major parties to that event might change this. Id. ¶ 12.

Unity08's ultimate goal is to facilitate the creation of a unified ticket composed of one Republican and one Democrat on the ballot for President and Vice President of the United States in the 2008 election, and have that ticket on the ballot in all 50 states and the District of Columbia. Id. ¶ 10. To achieve this ultimate goal, Unity08 plans to pursue ballot access activities to get access as an organization in those 37 states and the District of Columbia that permit that to be done in the absence of actual candidates. Id. ¶ 20. To select candidates, Unity08 plans to hold a convention, via the Internet, in the summer of 2008 at which any registered voter can be registered as a delegate and vote. Id. ¶¶ 38-39. Every individual who steps forward as a candidate, and who meets the constitutional requirements to be President, will be entitled to compete for the Unity08 on-line nomination. Id. ¶ 40. Unity08 does not now have candidates for the 2008 Presidential Election and will not have candidates until they are selected by the delegates at the on-line convention. Id. ¶ 42.

The political architecture of Unity08 differs significantly from that of the two major parties. Id. ¶ 34. It is designed to take advantage of the Internet as a modern organizational tool. Id. The Internet allows interaction between large numbers of people at relatively little cost. As Unity08 intends to show, it has the potential to revolutionize political dialogue in this country. Id. Unity08 intends to create the technology that will permit the voters of this country to create an alternative Unity ticket for the 2008 elections at far less cost than the candidate selection

3

process of the two major parties. Unity08 has received extensive favorable media coverage not only for its efforts to create a Unity ticket, but also for its innovative proposals to use the Internet to provide an opportunity for greater access for ordinary voters in the political process. Id. ¶ 36 and Ex. 3.

Phase One, the effort to qualify for the ballot in 37 jurisdictions that allow this to be done without having a specific candidate, has begun in only a limited fashion.[3] See Bailey Decl. ¶ 32. Qualifying in the states is labor-intensive and will require substantial resources to succeed in having hundreds of thousands of voters sign petitions. See id. ¶¶ 22-28. Once Unity08 qualifies for ballot access in a state, the candidates for President and Vice-President that it chooses at the on-line convention will have access to the ballot in that state. If Unity08 succeeds in this effort, its candidates in these 37 states will stand in these states on an equal footing – at least with respect to ballot access – with the candidates of the two major parties, whose candidates have automatic ballot access in all 51 jurisdictions without having to go through this laborious process. At the present time, Unity08 has not qualified to appear on the ballot for the 2008 presidential election in any state.[4] Id. ¶ 33.

Phase Two, Unity08's on-line virtual convention, will take place in the summer of 2008. Id. ¶ 38. At that time, voter-delegates from across the country will select candidates for the office of President and Vice-President for the 2008 election from those constitutionally-qualified candidates who have put themselves forward. Id. ¶¶ 39-40. All persons who have signed up on

_____

[3] The remainder of the states would not permit Unity08 to obtain ballot access as an organization; they restrict such access to established parties whose affiliated candidates have achieved a certain percentage of the vote in prior elections, or only permit candidates from major parties to obtain ballot access.

[4] Unity08 does not intend to promote, attack, support, or oppose candidates for Congress, or State and local elections at any time. See Bailey Decl. ¶ 14.

the Internet with Unity08 as delegates will be eligible to vote during the virtual convention for the candidates they want to constitute the Unity08 ticket. Id. Unity08 thus will not – cannot – have candidates until the convention has concluded, and Unity08 will not provide financial support to its candidates after the convention.[5] Id. ¶¶ 42-43. Unity08's candidates will themselves have to form candidate committees under the federal election laws, register with the FEC, and file reports like any other candidate committee. Id. ¶ 43. Unity08 has not to date contracted for any of the technical services necessary to create the on-line convention and related voting mechanism. See id. ¶ 48.

Since its inception in the Spring of 2006, Unity08 has sought to finance its efforts to qualify as an organization for a position on state ballots by soliciting small donations from individuals. Id. ¶ 49. Unity08 has decided to restrict donations from individuals to $5,000 per year. Id. ¶ 50. Unity08 has used personal requests for donations, telephone solicitations, email solicitations, personal letters and solicitations on its website to raise money. See id. ¶ 56. Unity08 has voluntarily decided not to accept donations from corporations, foreign nationals, or government contractors. Id. ¶ 51. Furthermore, Unity08 chose to register for tax exempt status as a "section 527" organization. Id. ¶ 13. As a consequence, under the Internal Revenue Code, Unity08 must report for public disclosure its donations over $200 and its expenses over $500, requirements similar to some of the reporting requirements contain in the FECA.

**B.**     **Unity08's Request For An Advisory Opinion**

From the outset, Unity08 realized it was breaking new ground, and sought advice from the FEC.

_____

[5] Unity08 believes candidates for its nomination will have to register with the FEC and raise money pursuant to the restrictions of the federal election laws. See Bailey Decl. ¶ 43.

On May 30, 2006, Unity08 requested an advisory opinion seeking a determination by the Commission that, inter alia, Unity08 was not subject to the laws and regulations governing political committees until such time as it was supporting or opposing a candidate for federal office.  On July 13, 2006, the Office of the General Counsel ("OGC") issued the first draft of Advisory Opinion 2006-20, which argued that Unity08 was a political committee under the Act., 2 U.S.C. §§ 431 et seq.

On July 20, 2006, the FEC held a public meeting to consider Unity08's request and the proposed draft opinion.  After a discussion of the uniqueness of issues raised by Unity08 in its request and its response to the draft opinion,[6] the Commissioners requested that Unity08 give it an extension of the mandatory 60 day time limit for responding to advisory opinion request to further consider all of the issues raised.  Unity08 agreed to a 30-day extension until August 30, 2006, for the FEC to issue its opinion.

On August 16, 2006, Unity08 supplemented its original request for an advisory opinion in order to rectify some of the misconceptions contained in the initial draft advisory opinion.  Unity08 explained that its current activities were centered on establishing an organization and exploring the viability of a third-party alternative ticket in 2008, not supporting a particular candidate.  Indeed, Unity08 added a disclaimer to its website and mailings making clear to all donors that any money raised now would not be used to support a candidate, but would be used

---

[6] As Commissioner Mason stated during the July 20, 2006 hearing on Draft Advisory Opinion 2006-20, the FECA and the regulations promulgated thereunder were designed to address the major parties, party organizations that were candidate-driven, or parties built from the local level up, so that the organizations were clearly either functioning in support of an actual candidate or were established political parties by the time they participated in federal elections. See http://www.fec.gov/audio/2006/20060720_02.mp3 (audio recording of meeting on FEC's website).  Unity08, however, is an organization seeking first to form at the national level and with ballot access as a party in the maximum possible number of states before it will have candidates for President or Vice President.

solely for party-building activities.  Unity08 also clarified that it did not seek to qualify any

candidates for ballot access after they had been identified through the nomination process, but

sought only to gain ballot access as an organization in those states that allow it to do so

Upon further request by the FEC, Unity08 agreed to another extension until October 10,

2006 for the FEC to issue its opinion.

On September 29, 2006, the OGC reissued Draft Advisory Opinion 2006-20 with very

minor changes.  At a public meeting on October 4, 2006, the FEC rejected its General Counsel's

argument that Unity08 was receiving "contributions" under 11 CFR § 100.57 (2006), finding that

the organization's reference to a Unity Ticket was not sufficient to meet the definition of a

"clearly identified candidate."  Yet, in complete contradiction to this conclusion and with no

supporting analysis, the Commissioners (with the exception of Commissioner von Spakovsky,

who dissented), voted to adopt the remainder of Draft Advisory Opinion 2006-20, determining

that Unity08 must register as a political committee because:  "Monies spent by Unity08 to obtain

ballot access through petition drives will be expenditures.  An 'expenditure' is a 'purchase,

payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any

person for the purpose of influencing any election for Federal office.'"  Advisory Opinion 2006-

20 at 3 (emphasis added) (Ex. 4).  The Commission conceded that "Unity08 plans to qualify for

ballot access for itself as an organization, but not yet for any named candidates," yet argued that

"Unity08 is, in effect, using its name as a placeholder for its candidates' names on the ballot."

Id. at 4 (emphasis added).  In addition, the Commission held: "Moreover, unlike organizations

that secure ballot access for themselves in order to field a slate of Federal and non-Federal

candidates, Unity08 has announced that it will field only candidates for the offices of President

and Vice President – in the 2008 election only.  Thus, in promoting itself through petition drives

to obtain ballot access, Unity08 is promoting its presidential and vice-presidential candidates,
and any payments by Unity08 for these activities will constitute expenditures." Id. (emphasis
added). The Commission cited no support for this proposition.

In addition, the Commission found that because "Unity08's self-proclaimed major
purpose is the nomination and the election of a presidential candidate and a vice-presidential
candidate," the party's "major purpose" is campaign activity, meaning Unity08 is a political
committee covered by the FECA. Id.

### C. Unity08 Needs To Obtain Loans From Individuals Greater Than $5,000 To "Kick Start" Its Ballot Access And Convention Planning Efforts

As noted, since its inception in 2006, Unity08 has limited its fundraising to $5,000 per
year from individuals. Unity08 has now recognized that to meet its ballot access goals it must
raise several million dollars on a rapid timetable, in part because a number of states are moving
up the date of presidential primaries. Bailey Decl. ¶¶ 52-53; Craver Decl. ¶¶ 10-12. It proposes
to do so though loans from individuals, which loans would be paid back through subsequent
small donations. See id. Faced with this need, Unity08 seeks declaratory and injunctive relief
from the threat of prosecution by the FEC. If it cannot pursue such loans, the chances that
Unity08 will not succeed in pursing its objectives are greatly increased. See Bailey Decl. ¶¶ 19,
52-55; Craver Decl. ¶ 10.

## III.    ARGUMENT

Plaintiffs are entitled to summary judgment because Unity08 does not fit the definition of
political committee as that definition has been constrained for First Amendment reasons by the
courts. In short, the FECA cannot be constitutionally applied to Unity08's actions at this time.
Unity08 filed its request for an advisory opinion to confirm its conclusion that the federal
election laws would not apply to it until it had selected its candidates in the on-line convention.

FEC Advisory Opinion 2006-20 makes clear that, in the FEC's view, Unity08 can take no action

to advance its innovative political ideas, including seeking ballot access as an organization,

without complying with the restrictions of the federal election laws, restrictions that should apply

only after Unity08 has selected its candidates.

The Plaintiffs' position is quite simple, and we contend, quite solidly founded.  There is

no question that Unity08 is seeking through its processes to produce candidates for President and

Vice President.  Under a succession of court decisions, starting with the landmark case of

Buckley, 424 U.S. 1, and followed by decisions in this Circuit and this District, it has been

determined that the First Amendment does not permit federal regulation of those election-related

activities that do not involve corruption, the risk of corruption, or the appearance of corruption.

Since corruption, actual or potential, has been deemed to be related to the existence of actual

candidates who have declared themselves as running for elected office, regulation of donations

or expenditures is not constitutionally permissible in the absence of such actual candidates.

Unity08 has no such candidates, and indeed cannot have until its on-line convention is complete

in the summer of 2008.  Hence it is not subject to regulation at this time.

State laws provide the major parties with guaranteed ballot access for their candidates for

President and Vice President. State laws require new political organizations, on the other hand,

to navigate a quagmire of regulations and to demonstrate sufficient support, via petition

signatures, to justify its appearance on the ballot.

Neither Congress nor the FEC has identified any potential for corruption or the

appearance of corruption where an organization seeks ballot access in its own name without

supporting a specific candidate.  Without some nexus to corruption or the appearance of

9

corruption, neither Congress nor the FEC can limit Unity08's ability to obtain the loans it intends to seek from individual citizens of the United States.

Since Advisory Opinion 2006-20 considers all funds raised or expended by Unity08 to be subject to the restrictions of the FECA, funds to be raised by Unity08 to obtain ballot access and develop and operate its innovative on-line virtual convention would be subject to the limitations of the federal election laws.  Again, these expenses would be incurred before the identification of a candidate, and would not be made to a candidate or to those supporting a particular candidate, or made in support of any specific candidate.  See Bailey Decl. ¶¶ 57-62.  Consequently, no corruption or the appearance of corruption would be present.

### A.    Unity08 Does Not Meet The Definition Of Political Committee Because It Has No Candidate

Because of the potential unconstitutional overreach of the FECA, the Supreme Court and the D.C. Circuit have required that there be a candidate seeking federal election before limitations can be imposed on that candidate, or the candidate's party.  The concern that contributions to the candidate could result in quid pro quo corruption or its appearance is what justifies the impingement on protected speech.  Without a candidate, there is no prospect for corruption, thus no adequate justification for impairing First Amendment rights.  That is exactly the situation in this case.  Unity08 has no candidate, therefore the FEC cannot treat it as a "political committee" and impose limitations.  There is no corruption rationale or other justification for impairing the free speech and associational rights of Plaintiffs – and the FEC did not assert any in its Advisory Opinion.  As Unity is not supporting or opposing a candidate, it is not engaging in activities which threaten corruption and thus might justify regulation.

The Act and Commission regulations, with certain exceptions, define a "'political committee'" as "any committee, club, association, or other group of persons which receives

contributions aggregating in excess of $1,000 during a calendar year or which makes

expenditures aggregating in excess of $1,000 during a calendar year. . . ."  2 U.S.C. § 431(4)(A);

11 CFR § 100.5(a) (2006).  An "'expenditure'" is a "purchase, payment, distribution, loan,

advance, deposit, or gift of money or anything of value, made by any person for the purpose of

influencing any election for Federal office. . . ."  2 U.S.C. § 431(9)(A)(i).  Likewise, a

"'contribution'" is made "for the purpose of influencing any election. . . ."  2 U.S.C. §

431(8)(A)(i).  In order for an expenditure or contribution to be made for the purpose of

"influencing" any election, the Supreme Court has required that it be made in support or

opposition to a specific candidate.  <u>Buckley</u>, 424 U.S. at 79-80 (holding Act only encompasses

expenditures by organizations under "control of a candidate or the major purpose of which is the

nomination or election of a candidate" or funds used to "expressly advocate the election or defeat

of a clearly identified candidate") (footnote omitted); <u>McConnell v. FEC</u>, 540 U.S. 93, 190-92

(2003).

     In a later case, the Supreme Court summarized the key holding in <u>Buckley</u>:  "<u>Buckley</u>

identified a single narrow exception to the rule that limits on political activity were contrary to

the First Amendment.  The exception relates to the perception of undue influence of <u>large</u>

<u>contributors to a *candidate*</u>. . . ."  <u>Citizens Against Rent Control v. Berkeley</u>, 454 U.S. 290, 296-

97 (1981) (italics in original; emphasis added).

     Because Unity08 has no candidate, it cannot be making "expenditures" and therefore

cannot be a "political committee" under the Act and Commission regulations.  Similarly,

donations to Unity08 are not "contributions" because Unity08 is not a political committee.[7]

---

[7] This is particularly relevant because <u>Buckley</u> applied "exacting" scrutiny, which has
been regarded as a somewhat lesser level of constitutional scrutiny than strict scrutiny to
"contributions."  Contributions presupposes a political committee, which presupposes support or

Further, monies spent on ballot access are not expenditures, as they are not in support of or in opposition to a specific candidate. Nor are expenses for creating and operating an online convention up to the point where the ultimate candidates are selected. Unity08 simply is not a "political committee" under the definition.

<h4>1.    FEC regulation as a "political committee" requires that there be a specific candidate</h4>

Contribution and expenditure limits by their nature impair core political discourse protected by the First Amendment. That is why the Supreme Court, beginning with Buckley, has been reluctant to approve, in the face of First Amendment challenges, congressional efforts to regulate those forms of political speech. The Supreme Court, this Circuit, and this District have made clear that limitations on core political speech are only justifiable: (1) in response to evidenced corruption or the appearance of corruption in the electoral process, or (2) where the limitation relates to support for a specific candidate. Neither of these elements is present in this case, and therefore the FEC's Advisory Opinion cannot be sustained. Further, without a specific candidate, the question of what is a "contribution" and what is a "donation" and what the limit is on either, is entirely irrelevant. Without a specific candidate in the mix, those terms and the FECA's restrictions are simply not applicable. In short, without a candidate – an actual, individual, person – anywhere to be seen as Unity's candidate, the FEC cannot lawfully regulate Unity as a political committee.

---

opposition for a federal candidate – a context in which Congress found the possibility of corruption, and in which First Amendment rights could therefore be regulated. Where "contributions" are not involved, but rather donations to a political organization not yet a political committee, limitations on core First Amendment freedoms of speech and association should be measured against a strict scrutiny standard for expressive association. See, e.g., Boy Scouts of Am. v. Dale, 530 U.S. 640, 657-59 (2000); Roberts v. United States Jaycees, 468 U.S. 609, 623 (1984).

The Supreme Court first prescribed the analytical framework applicable here in <u>Buckley</u>. There, the Supreme Court identified concerns with corruption and the appearance of corruption as the constitutional justification for regulation of political speech. 424 U.S. at 28 ("The Act's $1,000 contribution limitation focuses precisely on the problem of large campaign contributions -- the narrow aspect of political association where the actuality and potential for corruption have been identified. . . ."). To avoid the vagueness and potential overbreadth of the statutory definitions, <u>Buckley</u> adopted a narrowing construction of the Act's definition of "political committee" and "expenditure." The Court said:

> To fulfill the purposes of the Act [political committees] need only encompass organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate. Expenditures of candidates and of "political committees" so construed can be assumed to fall within the core area sought to be addressed by Congress. They are, by definition, campaign related.

<u>Id.</u> at 79-80. Congress defined "candidate" in the Act as "an individual who seeks nomination or election to a federal office. . . ." 2 U.S.C. § 431(2) (including in definition of "candidate" an individual who "has given his or her consent to another person to receive contributions or make expenditures on behalf of such individual"). The Court's use of the term here carries a similar meaning. Because Unity08 does not have as its purpose the nomination or election of any specific individual it is not a "political committee" as <u>Buckley</u> has defined that term.

Furthermore, the <u>Buckley</u> Court stated that:

> When the maker of the expenditure is . . . an individual other than a candidate or a group other than a "political committee" . . . we construe "expenditure" . . . to reach only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate. This reading is directed precisely to that spending that is unambiguously related to the campaign of a particular federal candidate.

424 U.S. at 80.

Subsequently, in McConnell v. FEC, the Supreme Court dealt with a later round of congressional efforts to regulate campaign activities, in the context of limiting "soft money" support for candidates, but continued the limitations of Buckley on federal regulation of core First Amendment activity relating to elections.  540 U.S. at 126.

The Commission did not, therefore, write on a clean slate when it decided to apply the Act to Unity08.  The Commission's conclusions that Unity08 is a "political committee" and that the expenses Unity08 incurs to obtain ballot access as an organization are "expenditures" extend the Act beyond the scope found acceptable in Buckley and its progeny.  Based on these findings, the Commission went on to impose upon Unity08 the strict statutory contribution limits approved in Buckley for presidential campaigns even though it admitted that Unity08 did not presently have a specific candidate.  In doing so, it extended those strict limits to a situation in which it did not and could not identify any potential for corruption, and it conceded that there was no candidate to corrupt.

The Commission's conclusions plainly conflict with Buckley and thirty years of cases applying Buckley.  The Commission provides no explanation or justification for its decision.  That decision deviates not only from Buckley and its progeny limiting the scope of the Act, but also from the Commission's prior administrative determinations applying the Act.

Congress cannot, consistent with the First Amendment, regulate the amount of money individuals can give to a new political organization's efforts to obtain a position on the ballot for an as-yet-unidentified candidate.  Such regulation of core political speech – i.e., petitioning, voter interaction, dissemination of political dialogue, expenditures of money to broadcast ideas into the political forum – is subject to exacting or strict scrutiny, and no justification for such

14

regulation exists. The corruption rationale that supports limitations on contributions to identified candidates does not support the limitations on donations where no candidate has been chosen.

Moreover, the Commission's application of the Act to Unity08, which seeks to provide a ballot alternative to the candidates of the two major parties, should be evaluated with due consideration to the composition of the Congress that passed the Act and the composition of the Commission created by it. The Congress that passed the Act consisted entirely of members from the two major parties, and the Commission it established to interpret the Act consists of three Republicans and three Democrats. The Commission's decisions concerning regulations that impact all parties, including the Republican and Democratic parties, fall into a different category than decisions that impact only a potential competitor to the major parties. The Commission's decision to impose restrictions on Unity08's ability to raise and spend money to qualify for state ballot positions has the practical economic effect here of preventing a challenge to the two major parties that automatically, without spending a dime, have access to ballots in all fifty states without qualification expenses. Thus Unity08 and its supporters find themselves the chickens in a chicken coop controlled by "red" foxes and "blue" foxes.

Buckley and McConnell limit regulation, with the result that a donation is not a "contribution" unless it is used in support or opposition of a specific candidate. When it does so, because the money going to the candidate poses a threat of corruption (as found by Congress), some limitations on First Amendment freedoms may be justified. However, in each and every case, a candidate – a person running for office – is required; otherwise, the countervailing government interest would not be substantial enough or well-supported enough to permit infringing on core First Amendment speech and associational rights.

15

This Circuit has applied the limitations of <u>Buckley</u> in a case whose facts are particularly pertinent to this matter. In <u>FEC v. Machinists Non-Partisan Political League</u>, 655 F.2d 380, 394 (D.C. Cir. 1981), the FEC claimed that payments made by the Machinists Union's separate segregated fund to various groups that had as their announced goal persuading Senator Ted Kennedy to run for President were "contributions" in excess of the amounts allowed under the Act. <u>Id.</u> at 390. The Court rejected the FEC position, holding that monies given to such groups were not "contributions" or "expenditures" because the groups' activities were "not related in any way <u>to a person who has decided to become a candidate</u>. . . ." <u>Id.</u> at 392 (emphasis added). The court reasoned, "[d]raft groups . . . have one thing in common . . . they aim to produce some day a candidate acceptable to them, but they have not yet succeeded. Therefore, none are promoting a 'candidate' for office, as Congress uses that term in the FECA." <u>Id.</u>

<u>Machinists</u> is controlling precedent in this Circuit, and the FEC position here cannot stand up to examination in light of it. If <u>Machinists</u> governs, <u>a fortiori</u> Unity08's current contributions and expenditures cannot be regulated, because they are even further removed from support of an identifiable candidate than were those of the Machinists group. Until such time as specific candidates have been linked to the Unity08 party, donations received and the expenses incurred in the pursuit of Unity08's goals do not constitute "contributions" or "expenditures" under the Act.[8]

Cases in this Court, too, have recognized that a "clearly identified candidate" must mean a particular, individualized, identifiable, living, breathing "person" – a "'person who has decided to become a candidate' for federal office" – not a party "placeholder." <u>See</u> <u>FEC v. Malenick</u>,

_____

[8] Because ballot qualification is a prerequisite to the possibility of candidacy, the Commission has not, to our knowledge, ever considered money spent by a political party to qualify for ballot access as an organization, including money spent for litigation to get on the ballot, to be an "expenditure" under the Act.

310 F. Supp. 2d 230, 234-35 (D.D.C. 2004) (citation omitted) (discussing Machinists, 655 F.2d
at 392).

 Malenick relied in part on another case in this Court that stressed the importance of clear
limitations on regulation in instances where there is no demonstrable candidate.  In FEC v.
GOPAC, Inc., 917 F. Supp. 851, 859 (D.D.C. 1996), this Court held that the "major purpose test"
requires as a prerequisite an actual candidate.  GOPAC's stated mission was: "'to create and
disseminate the doctrine which defines a caring, humanitarian, reform Republican Party in such a
way as to elect candidates, capture the U.S. House of Representatives and become a governing
majority at every level of government.'"  Id. at 854 (citations omitted).  Although GOPAC's sole
purpose was to advocate the election of Republicans as a class of candidates, the court held that
the definition of "political committee" was limited by Buckley to groups whose major purpose
was the election of a particular federal candidate or candidates.  The Court concluded, id. at 859,
that "even if the organization's major purpose is the election of a federal candidate or candidates,
the organization does not become a 'political committee' unless or until it makes
expenditures . . . to support a 'person who has decided to become a candidate' for federal office."
Id.  The Court rejected the Commission's attempt to broaden the definition of political
committee to include all organizations engaged in "'partisan politics'" or "'electoral activity'."
See id.  The GOPAC court noted that, where First Amendment values are at stake, it is important
to establish a "'bright-line'" rule.  Id. at 861.  The rule laid down in GOPAC drew a distinction
"between an organization whose major purpose was to support a particular federal candidate"
and an organization "whose major purpose did not involve support for any particular federal
candidate, either because there was no candidate running at the time or because the support was
not directed to the election of any particular candidate but was more in the nature of general

party support." Id. at 862 (emphasis added, citations omitted) (citing Machinists, 655 F.2d at 392).

Nothing has changed since the "bright-line" test for a "political committee" was laid down in GOPAC. In a more recent decision this Court stated that, while an "'organization's purpose may be evidenced by its public statements of its purpose or by other means, such as its expenditures in cash or in kind to or for the benefit of a particular candidate or candidates'," "'circuit precedent indicates . . . that even if the organization's major purpose is the election of a federal candidate or candidates, the organization does not become a 'political committee' unless or until it makes expenditures in cash or in kind to support a 'person who has decided to become a candidate' for federal office.'" FEC v. Malenick, 310 F. Supp. at 234-35 (alterations in original) (quoting GOPAC, 917 F. Supp. at 859, and discussing Machinists, 655 F.2d at 392) (emphasis added).[9]

Reading all these cases together makes it clear that the courts have made great efforts to avoid permitting regulation to be imposed in situations involving merely hypothetical or potential candidates because to do so would unconstitutionally limit political speech of the group or party.

In reaching its conclusion that Unity08's ballot access expenses were "expenditures," the Commission inexplicably relied on two of its own prior Advisory Opinions (1994-05 and 1984-11) (Exs. 5 and 6), both of which involved actual candidates seeking ballot access as "independent" candidates. The Commission's conclusions that the expenses in those cases for

-------

[9] In Malenick the court found that Triad, a GOP political consulting and fundraising firm, was a political committee because it funneled money directly to individual candidates, sent fax alerts advocating the election of named candidates, and had no other purpose other than to support such candidates (e.g., no plan to engage in principled issue debate or increase public participation). 310 F. Supp. 2d at 235-37. Unity08 has none of these features.

ballot access constituted "expenditures" were unexplained, but appeared to rest on the idea that

monies spent on ballot access by a candidate are expenditures or "qualified campaign expenses"

because of the attendant publicity. Unity08 disagrees that expenses incurred by candidates to

obtain ballot access for themselves as independent candidates constitute an "expenditure," but

the point is that neither of these prior Advisory Opinions support the Commission's conclusion

that Unity08's expenses are expenditures – because there is no candidate identified with Unity08.

The Commission also ruled that Unity08 is a political committee because it satisfies the

so-called "major purpose test." Advisory Opinion at 4-5. That test limits the reach of political

committee status under the FECA to organizations whose major purpose is the support or

opposition of a candidate. That additional constraint on political committee status has received a

limiting construction pursuant to Buckley: it has been construed to apply where there is an

"identified candidate." See, e.g., GOPAC, 917 F. Supp. at 859. The definition of "political

committee" – an organization that makes expenditures or receives contributions in excess of

$1,000 in a year[10] – is the same definition that Buckley construed as vague and overbroad and,

accordingly, limited to "only encompass organizations that are under the control of a candidate

or the major purpose of which is the nomination or election of a candidate." 424 U.S. at 79. The

Buckley "major purpose test" was reaffirmed, and expanded, by the Supreme Court in FEC v.

Massachusetts Citizens for Life, 479 U.S. 238, 263 (1986). In that case, a non-profit advocacy

corporation whose "central organizational purpose" was issue advocacy had, nevertheless, paid a

substantial amount of money for the preparation and public distribution of a newsletter that

advocated the election or defeat of particular candidates for federal offices. Id. at 253. The

---

[10] See 11 C.F.R. § 100.5 (2006). The regulation also states that the term includes separate segregated funds established by political committees, certain local committees of a political party, and individual campaign committees. There is no dispute that none of these categories are applicable to Unity08.

Supreme Court held that the organization did not meet the definition of a political committee,

notwithstanding that it was not engaged "solely" in issue advocacy – because its "major purpose"

was not the nomination or election of specific candidates. Id. at 252-53 & n.6. Thus, the Court

found that expenditures that helped some particular candidates were not enough to make a

"political committee" out of an organization, as long as advocacy of a particular candidate was

not its major purpose. Thus, it is not simply enough even to be supporting or opposing a specific

candidate – there is the added requirement that such support or opposition must emanate from an

organization whose major purpose is the election of a particular candidate for federal office. At

this time, given the activities that Unity08 is undertaking – voter petitioning, dissemination of its

message, organization of its online convention and voting process, and promotion of an issue

agenda focusing on critical issues – and given that Unity has no candidates, it is manifest that

Unity's major purpose is not the election of a particular candidate for federal office.

  The efforts of the FEC to extend the scope of activities that trigger political committee

status have simply been out of step with controlling judicial decisions.

  In an apparent effort to avoid the clear thrust of the "specific candidate" requirement, the

FEC claims Unity08's major purpose is "campaign activity" because the party is promoting itself

as a "placeholder" for candidates yet to appear on the scene, and is thus a "political

committee."[11]  Advisory Opinion at 4-5.  But the question is, "placeholder for whom?"  Here

---

[11] The FEC cited Malenick in Advisory Opinion 2006-20, but its description of the case is not entirely accurate.  The Commission's parenthetical states "(finding the organization evidenced its 'major purpose' through its own materials which stated the organization's goal of electing Republican Party candidates for Federal office and through efforts to get prospective donors to considering supporting Federal candidates)."  Advisory Opinion at 5.  The Malenick court did not make its finding based on the vaguely-stated goal of electing Republican candidates, but instead pointed directly to specifics such as payment of money directly to individual candidates, and solicitation and promotion of named, individual candidates for specific offices.  310 F. Supp. 2d at 235-37.

there is no "whom"; in Buckley the Supreme Court stated that the major purpose must be the nomination or election of a candidate, and only an individual person can be nominated or elected. Until the summer of 2008, there will be no person for whom the major purpose of Unity08 is that person's election. The Commission's reasoning puts the cart before the horse. Until the summer of 2008 no amount of "placeholder" rationale by the Commission can convert Unity08's ballot access efforts into support for an actual individual candidate, and until that time the FEC cannot constitutionally, under governing judicial "narrowing" interpretations of the Act, regulate its expenditures and contributions.

A key point in Buckley is that the Supreme Court noted it was narrowing the FECA's definition of "political committee" specifically to prevent issue advocacy groups from being deemed political committees, an interpretation that would have made the provision unconstitutional. See Buckley, 424 U.S. at 79. In a similar vein, this Circuit has held that the "'major purpose' test" was constitutionally required because "[i]ndependent expenditures are the most protected form of political speech. . . ." See Akins v. FEC, 101 F.3d 731, 741 (D.C. Cir. 1996) (en banc) (emphasis added) (citing Buckley, 424 U.S. at 19-23), vacated on other grounds, 524 U.S. 11 (1998)). Against this background of judicial interpretations keeping the FECA within constitutional limits by protecting First Amendment speech to the fullest extent from misguided and excessively expansive application of the FECA, the Commission was simply wrong in cavalierly branding Unity08 as political committee.

**2. The Administrative Order is inconsistent with the Commission's prior support for the "candidate" limitation on regulation**

The Commission has not always been so insensitive to First Amendment values and has previously given support to the judicial interpretations noted above. Since 1996, the Commission has concluded, consistently with the holding in GOPAC, that the definition of

21

political committee requires finding efforts to support or oppose an actual candidate. <u>See</u> Advisory Opinion 2003-1 (Ex. 7). For example, in Matter Under Review ("MUR") 395, a commission enforcement action, the Commission declined to continue proceedings against the College Republican National Committee for failure to register as a political committee. In so doing, Commissioners Mason, Smith and Wold stated that "we think <u>GOPAC</u> is correct in holding that general expressions of support for candidates of a party do not, absent direct contributions to federal candidates or the presence of 'express advocacy,' qualify as 'expenditures' under the Act." Statement of Reasons for Pre-MUR 395 at 3-4 (2002) (Ex. 8). Indeed, the Commission found that "[t]he idea that a group can be considered a political committee solely because its major purpose is campaign activity has no basis in law." <u>Id.</u> at 4; <u>see also</u> Statement of Reasons by Chairman Smith and Commissioners Mason and Toner for MUR 5024 (2004) (failing to find reason to believe that Council for Responsible Government was a political committee because its brochures referencing candidate Tom Kean, Jr. did not constitute express advocacy and, therefore, were not expenditures under Act) (Ex. 9).

 In 2004, the Commission again declined to expand the scope of the definition of "political committee." After a proposed Bipartisan Campaign Reform Act rulemaking (involving receipt or expenditure of so-called "soft money" for political purposes by groups not controlled by a candidate) – in which it received over 100,000 comments and, after holding hearings – the Commission decided against revising the definition of political committee along the lines recommended by its General Counsel and reaffirmed its application of the major purpose test, stating:

> The "major purpose" test is a judicial construct that limits the reach of the statutory triggers in FECA for political committee status. The Commission has been applying this construct for many

22

years without additional regulatory definitions, and it will continue
to do so in the future.

69 Fed. Reg. 68,056, 68,065 (Nov. 23, 2004). As noted by a commentator during the hearings,

"[t]he major purpose gloss that the Supreme Court imposed or clarified, which neither Congress

nor the Commission has ever encoded in the statute [or] in [the] regulations is an effort to limit

the reach of the statute, not to expand it." Tr. of Public Hearing at T82:3-7 (Apr. 14, 2004)

(comments by Mr. Gold of the AFL-CIO) (excerpt at Ex. 10). Thus, the Commission's advisory

opinion with regard to Unity08 is inconsistent even with its own prior precedents.

The bottom line is that Buckley, Machinists, and GOPAC limit the scope of the Act to the

receipt and expenditure of monies for the purpose of influencing the election or defeat of a

specific candidate and therefore that the Commission's application of the Act to Unity08's

efforts to finance its qualification as an organization for access to the ballot in various states and

organization of a convention is inconsistent with the constitutionally-mandated interpretation laid

down in those cases.

**B.      Unity08's Ballot Access Activities And Convention Planning Activities
Cannot Be Lawfully Regulated Because They Are Core Political Speech And
There Has Been No Finding of Corruption**

There is overwhelming authority, cited above, barring activities not associated with

support for specific candidates from being subject to regulation on the theory that the sponsor is

a "political committee." It therefore seems unnecessary to develop in detail the large body of

First Amendment law about the permissible government regulation of core political speech. It is

useful to note, however, that at this stage of its activities, and until the nomination of actual

candidates is achieved, Unity08 activities are more akin to those activities having to do with

ballot initiatives and other activities in which there are substantial efforts to communicate

directly with members of the public on matters relating to governance and political philosophy

than they are to political campaigning. The difference, of course, is that unlike some of these other activities (recalls, referenda, initiatives), Unity08 does hope at the very end of its process to produce two candidates, one for President and one for Vice President – but at that point, when campaigning takes over, Unity08 is out of the picture.

First Amendment law outside the campaign setting – relating to initiatives, referenda, recalls and the like – is consistent with the First Amendment concerns that drove <u>Buckley</u> to its limitations on the federal election law. Among the leading cases are <u>Buckley v. American Constitutional Law Foundation</u>, 525 U.S. 182, 199-200 (1999), which found that restrictions on petition circulation severely burdens speech, and <u>Meyer v. Grant</u>, 486 U.S. 414, 422-23 (1988), holding that prohibitions on paid petition circulators restricts political speech. As the Supreme Court held in <u>Meyer</u>, petition circulation "of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change." 486 U.S. at 421. Regulation of the sort imposed here burdens Unity08's ability to organize and compete in the political arena and should therefore be subject to strict scrutiny as it burdens core rights beyond contribution limits, without in any way preventing corruption. The courts look for some compelling government interest that would override a restriction on speech or association in the political arena. Prevention of actual or potential corruption, or the appearance of corruption is the primary focus, but as noted, there is no evidence that either Congress or the Commission has found that the kinds of activities Unity08 wishes to pursue are in any way connected with corruption. <u>See</u> <u>Citizens Against Rent Control v. Berkeley</u>, 454 U.S. 290, 297 (1981) (explaining "<u>Buckley</u> does not support limitations on contributions to committees formed to favor or oppose ballot measures"; finding limitation violated speech and associational rights because no fear of undue influence when contributions made to ballot questions and not a

particular person). Here, there is simply no case for government regulation that would justify thwarting Unity08's unique effort to bring reform to the American political process at the presidential level.

## IV.    CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' motion for summary judgment, enter an Order declaring that Unity08's activities prior to candidate selection do not subject it to regulation as a political committee, and enjoin the FEC from initiating enforcement actions relating to those activities.

Respectfully submitted,

Robert E. Jordan III (D.C. Bar No. 15784)
John J. Duffy (D.C. Bar No. 170936)
Rhonda M. Bolton (D.C. Bar No. 455005)
Anthony A. Onorato (D.C. Bar No. 482074)
STEPTOE & JOHNSON LLP
1330 Connecticut Ave., NW
Washington, D.C. 20036
Tel: (202) 429-3000
Fax: (202) 429-3902
rjordan@steptoe.com
jduffy@steptoe.com
rbolton@steptoe.com
tonorato@steptoe.com

*Counsel for Plaintiffs*

March 21, 2007

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
UNITY08 et al.,                            )
)
     Plaintiffs,                        )
)
          v.                           )     No.1:07-cv-00053 (RWR)
)
FEDERAL ELECTION COMMISSION,               )
)
     Defendant.                         )
_____)

## PLAINTIFFS' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE IN DISPUTE

In support of their Motion for Summary Judgment and pursuant to Rule 56(a) of the Federal Rules of Civil Procedure and Local Rule 7(h), Plaintiffs submit the following Statement of Material Facts As To Which There Is No Genuine Issue In Dispute.

1.      Unity08 is a nascent political movement of voters who believe that the major political parties have focused too much attention on "wedge" issues – like abortion and gay marriage – that appeal primarily to their "base" of voters to the detriment of the "crucial" issues – like energy independence and health care reform – that face our country today. See Bailey Decl. ¶ 8 (Ex. 1). (All Exhibits referenced herein are true and correct copies attached to Plaintiffs' Memorandum of Law as Exhibits 1-20.)

2.      Unity08 seeks to: (1) ensure that an alternative ticket for President and Vice-President is available to the American voters on the November 2008 ballot, which ticket offers a choice to independent voters and those in the middle in both of the major parties; and (2) select candidates for that ticket in June 2008 in an on-line convention that will be open to every

registered voter who also properly registers as a delegate to the convention. <u>See</u> Deposition of Douglas Bailey ("Bailey Dep.") at 10, line 21-p. 11, line 22 (excerpts at Ex. 11).

3.    Unity08 seeks to jolt the two major parties out of the current partisan political deadlock that stands in the way of meaningful change in our country's governance. <u>See</u> Bailey Decl. ¶ 8.

4.    Unity08 requested an advisory opinion from the Federal Election Commission ("FEC" or "Commission") on May 30, 2006 seeking a determination that Unity08 was not a political committee at the present time and would not become a political committee until such time as it was supporting or opposing a candidate for federal office. <u>See</u> Request by Unity08 for an Advisory Opinion (May 30, 2006) (Ex. 12).

5.    The Office of the General Counsel released on July 13, 2006, a draft of Advisory Opinion 2006-20, which concluded that Unity08 was a political committee under the Federal Election Campaign Act of 1971, *as amended*, 2 U.S.C. §§ 431 *et seq*. <u>See</u> Draft Advisory Opinion (July 13, 2006) (Ex. 13).

6.    On July 20, 2006, the FEC held a public meeting to consider the proposed draft opinion. <u>See</u> Minutes of July 20, 2006 Open Meeting (Ex. 14). After a discussion of the uniqueness of issues raised by Unity08 in its request and in its response to the draft opinion, the Commissioners requested Unity08 to grant the Commission an extension of the mandatory 60 day time period for a response to an Advisory Opinion Request to enable the Commissioners to further consider all of the issues raised. <u>See</u> http://www.fec.gov/audio/2006/20060720_02.mp3 (audio recording of meeting on FEC's website).

7.    Unity08 granted the FEC a 30-day extension until August 30, 2006, to issue its advisory opinion. <u>See</u> Request for Extension (July 31, 2006) (Ex. 15).

8.    On August 16, 2006, Unity08 supplemented its request for an advisory opinion. Unity08 explained in the supplement that its current activities were centered on establishing an organization and exploring the viability of a third-party alternative ticket in 2008, not supporting a particular candidate. See Supplement to Advisory Opinion Request 2006-20 (Aug. 16, 2006) (Ex. 16). Unity08 explained that it had added a disclaimer to its website and mailings making clear to all donors that any money raised will not be used to support a candidate, but would be used solely for organizational activities, including ballot access. See id. Unity08 stated that it did not seek to qualify any candidates for ballot access, but sought only to gain ballot access as an organization in those states that allow it to do so. See id. Unity08 further supplemented its request on September 21, 2006. See Supplement to Advisory Opinion Request 2006-20 (Sept. 21, 2006) (Ex. 17).

9.    Unity08 agreed to a request by the FEC for another extension until October 10, 2006. See Request for Extension (Aug. 22, 2006) (Ex 18).

10.    The Office of General Counsel issued its second draft advisory opinion (Ex. 19) on September 29, 2006, again concluding the Unity08 was a political committee.

11.    The Commission held a public meeting on October 4, 2006, to consider the second draft opinion. The Commission rejected its General Counsel's conclusion that Unity08 was receiving "contributions" under 11 CFR § 100.57, finding that the organization's reference to a Unity Ticket was not sufficient to meet the definition of a "clearly identified candidate." See http://www.fec.gov/audio/2006/20061004_02.mp3.

12.    The Commissioners (with the exception of Commissioner von Spakovsky, who dissented) voted to adopt the remainder of Draft Advisory Opinion 2006-20.

13.    The Commission concluded in Advisory Opinion 2006-20 that Unity08 must register as a political committee, because the "[m]onies spent by Unity08 to obtain ballot access through petition drives will be expenditures. An 'expenditure' is a 'purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office.'" Advisory Opinion 2006-20 at 3 (Ex. 4). The Commission stated that "Unity08 is, in effect, using its name as a placeholder for its candidates' names on the ballot and that in promoting itself through petition drives to obtain ballot access, Unity08 is promoting its presidential and vice-presidential candidates, and any payments by Unity08 for these activities will constitute expenditures." Id. at 4.

14.    The Commission also stated that because "Unity08's self-proclaimed major purpose is the nomination and the election of a presidential candidate and a vice-presidential candidate," the party's "major purpose" is campaign activity, and consequently Unity08 is a political committee covered by the FECA. Id. at 4-5.

15.    Unity08 did not support or oppose candidates in the 2006 elections. See Bailey Decl. ¶ 14.

16.    Unity08 does not intend to support or oppose candidates in any congressional, State, or local election at any time. See Bailey Decl. ¶ 14; see also Bailey Dep. at 12, lines 6-8.

17.    Unity08 has no candidates for the office of President and Vice President at this time, and will not until after its June 2008 convention. See Bailey Decl. ¶ 15, 42.

18.    None of the money now being raised will support the election or defeat of any candidate. See Bailey Decl. ¶ 58.

19.    No donations to Unity08 have been nor will be used to support or oppose any identified candidate for federal office. See Bailey Decl. ¶ 59.

20.    No contributions will be made by Unity08 to any identified candidate for federal office.  *See* Bailey Decl. ¶ 60.

21.    Unity08 will not provide financial support to its candidates after the convention. See Bailey Decl. ¶ 43; see also Bailey Dep. at 62, lines 12-14.

22.    Unity08 does not plan to transfer any of its funds to the Unity08 nominees for use in their campaign after the nomination process.  See Bailey Decl. ¶ 44; see also Bailey Dep. at 132, lines 2-7.

23.    To the extent the Unity08 nominees wish to solicit money from Unity08 delegates, Unity08 will not become involved in that process.  Unity08 may, however, consider renting or selling its delegate list to the nominees so that they may solicit the funds themselves from Unity08 delegates if that would be permitted under the federal election laws.  See Bailey Decl. ¶ 45; see also Bailey Dep. at 113, line 21-p. 114, line 8.

24.    Unity08 must act very quickly to obtain ballot access as an organization in order to present potential candidates with a realistic opportunity to compete nationwide.  See Craver Decl. ¶¶ 6, 7, 8 (Ex. 2).

25.    Unity08 must raise money quickly and commence its ballot qualification efforts promptly because qualifying requires a substantial amount of time and money, and Unity08 needs to qualify in these states quickly to establish the credibility of its proposed Unity ticket. See Bailey Decl. ¶ 18; Craver Decl. ¶ 24.

26.    Since the issuance of the Advisory Opinion 2006-20 on October 10, 2006, Unity08 has had to alter its plans to scale back and delay its ballot access effort.  See Bailey Decl. ¶ 32; See also Bailey Dep. at 43, lines 19-20; 118, lines 1-2.

27.    Unity08 believes that it can more rapidly raise the $10-12 million estimated to be needed to fund its American Agenda, Ballot Access Program, and Convention Hall Project by obtaining loans of greater than $5,000 from individuals, which loans would be paid back through subsequent donations of $5,000 or less.  <u>See</u> Bailey Decl. ¶¶ 52-53.

28.    The contribution limitations applicable to a "political committee" have prevented Unity08 from raising loans in large amounts from individuals because such loans would be considered excess contributions under the Act as interpreted by the FEC in Advisory Opinion 2006-20.  <u>See</u> Bailey Decl. ¶ 55.

29.    Unity08's efforts have had to be reduced, and unless money can be raised now from individuals in larger sums than would be permitted to a political committee under the Act, the achievement of its goals is seriously threatened.  <u>See</u> Bailey Decl. ¶¶ 32, 48, 52.

30.    Unity08 needs to qualify on the ballot quickly to gain credibility.  If it cannot qualify in many states quickly, qualified candidates may be deterred from seeking the nomination of the Unity08 convention.  <u>See</u> Bailey Decl. ¶ 24; Craver Decl. ¶ 7.

31.    Prior to the convention, Unity08 intends to qualify as a party in the approximately 37 states that will allow it to qualify as an organization that does not have a candidate.  <u>See</u> Bailey Decl. ¶ 20; Craver Decl. ¶ 5.

32.    Qualification for a ballot position as an organization will enable Unity08 to nominate candidates who will appear on the ballot in a state as the Presidential and Vice Presidential candidates of Unity08.  <u>See</u> Bailey Decl. ¶ 21.

33.    Qualifying in the states requires intensive labor and substantial resources to petition hundreds of thousands of voters, educate them on Unity08's issue positions, and secure

their signatures so that it may offer to the voters a party meeting state requirements that can ultimately offer candidates. <u>See</u> Bailey Decl. ¶¶ 21-22, 26-28; Craver Decl. ¶¶ 5, 7, 8.

34.    At the present time, Unity08 has not qualified to appear on the ballot for the 2008 presidential election in any state. <u>See</u> Bailey Decl. ¶ 33.

35.    The requirements for ballot access as an organization vary from state to state. In a few states the process is simple, but in most states it is complex. Generally, to qualify for ballot access as an organization, Unity08 must present petitions containing the signatures of a substantial number of registered voters who support its place on the ballot. Unity08 must start this process immediately if it hopes to complete the process prior to the 2008 election. <u>See</u> Bailey Decl. ¶¶ 22-23.

36.    The major parties have guaranteed ballot access, whereas Unity08's most recent estimate of the cost for qualifying as a new party in every state is approximately $7 million. <u>See</u> Bailey Decl. ¶¶ 28-29.

37.    Unity08 has been prevented from pursuing a number of essential activities, including web development and delegate recruitment because the $5,000 limitation has resulted in limited funds. <u>See</u> Bailey Dep. at 44, lines 6-20.

38.    Organizing for ballot access has been slowed due to lack of access to more funding resulting from the FEC limitations. <u>See</u> Bailey Decl. ¶ 32; <u>see also</u> Bailey Dep. at 44, lines 15-20; 119, lines 8-19.

39.    The $5,000 limitation has lessened Unity08's ability to get its message out. <u>See</u> Craver Decl. ¶ 6; <u>see also</u> Bailey Dep. at 45, line 17-p. 46, line 5.

40.     Unity08 has made progress toward its goals, with the exception of ballot access which it has begun but only to a limited degree, and cannot ramp up without adequate funding. See Bailey Dep. at 119, line 20-p. 120, line 5.

41.     At this time, because of the contribution limitation directly resulting from the FEC's ruling, Unity08 has delayed and scaled back its ballot access initiative due to inadequate funding.  More specifically, Unity08 has been severely hampered in its effort to finalize and distribute its ballot access materials, and its efforts to train and deploy volunteers to the states where it needs petition signatures to get on the ballot.  For the same reasons, Unity08 has also delayed hiring state ballot access directors and regional coordinators.  See Bailey Decl. ¶ 32.

42.     Limited funding has hampered Unity's plan to deploy volunteers in the states to petition face-to-face.  See Bailey Dep. at 107, lines 11-16.

43.     The funds requirements for Unity08, particularly in relation to ballot access, are significant.  See Bailey Decl. ¶ 28; see also Bailey Dep. at 41, lines 1-5.  One significant cost involves defending against legal challenges anticipated from both parties.  See Bailey Dep. at 41, lines 6-12.  Challenges would also impede efforts at ballot access.  See Bailey Dep. at 42, line 19-p. 43, line 2.

44.     Another significant factor and expense in ballot qualification is the fact that ballot access is determined by differing laws in each jurisdiction.  See Bailey Dep. at 41, line 1-p. 42, line 2.

45.     Another significant factor and expense in ballot qualification is that a number of states have moved up or are planning to move up their primaries to February or March 2008, which in some states such as California, will move up the date by which signatures must be

obtained.  See Bailey Decl. at ¶ 25; Bailey Dep. at 41, line 13-p. 42 line 1; 130, line 22-p. 132,

line 1; Craver Decl. ¶ 7.

46.    Unity08 must hire paid ballot access directors in each state, hire seven to ten paid

regional ballot access coordinators, retain and employ counsel to fend off legal challenges to our

ballot access by the major parties, and build a sophisticated and extensive citizen effort on a fast-

moving mobilization schedule if Unity08 is to be competitive in 2008 with the established

political parties.  See Bailey Decl. at ¶ 26.

47.    Sufficient money to defray these expenses will be impossible to raise on a timely

basis under the limitations applicable to a political committee.  See Bailey Decl. ¶ 31; Craver

Decl. ¶ 10.

48.    Loans to be repaid by contributions are essential to raising the needed money.

See Bailey Dep. at 42, lines 1-4.

49.    Unity08 could raise sufficient money to fund its efforts through loans of more

than $5,000 from individuals, which could then be repaid with contributions of $5,000 or less.

See Bailey Decl. ¶¶ 52-53; Craver Decl. ¶ 12.

50.    Contributions are expended for the ballot access project, the technology

infrastructure and secure systems to hold the online nominating convention, the web systems

needed to implement the New American Agenda to define the crucial issues facing our nation,

and for general operating infrastructure to support all programs and the grassroots community of

delegates.  See Bailey Decl. ¶¶17-18.

51.    Unity08 does not permit contributions to be earmarked to support any eventual

nominee.  Such contributions would be returned.  See Bailey Decl. ¶ 62.

52.     The FEC's ruling that signature-gathering, party-qualifying expenses are "expenditures," and that these "expenditures" make Unity08 a "political committee" subject to the fund raising restrictions of the FECA, means that Unity is substantially inhibited in raising the funds on the schedule required to achieve ballot access in the states that allow it to do so. See Bailey Decl. ¶ 30.

53.     Unity08 plans in or around June 2008, to host an on-line nominating convention. See Bailey Decl. ¶38; see also Bailey Dep. at 87, lines 6-8.

54.     At the convention, voters who have registered as delegates will select the nominees for a Unity08 presidential ticket from among candidates vying for the nomination. See Bailey Decl. ¶¶ 11, 39; see also Bailey Dep. at 88, line 12-p. 90, line 1.

55.     The on-line convention would be held before the conventions of the two major parties, but after the likely nominees of the other parties have been identified however, thus leaving enough time for other potential candidates to survey the field and make a decision as to whether they wish to seek the Unity nomination. See Bailey Dep. at 87, lines 9-18.

56.     Unity08 as an organization has no plans to draft any candidate. See Bailey Dep. at 90, lines 2-11.

57.     Unity08 will not in any way assist any potential candidates for the Unity08 nomination with raising money prior to the convention. See Bailey Dep. at 94, lines 17-21.

58.     Prior to and during the convention, Unity08 intends to provide all candidates an equal opportunity via the website and weblog to communicate to the delegates so as to answer questions that the delegates have specified. See Bailey Dep. at 95, line 4-p. 96, line 14. The candidate can respond and the response will be available on the website. See id. It is also Unity's expectation to provide candidates the opportunity to communicate to delegates for

support by emailing the delegate list in some controlled fashion without giving them the list.  See id.

59.    Unity08 is a non-profit corporation in the District of Columbia.  It has tax exempt status under Section 527 of the Internal Revenue Code.  See Bailey Decl. ¶ 13.

60.    Unity08 was formed by Roger Craver, Hamilton Jordan, Jerry Rafshoon, and Douglas Bailey.  See Bailey Decl. ¶8.

61.    Jerry Rafshoon was the director of communications for the Carter presidential campaign in 1976.  See Bailey Dep. at 13, line 14-p. 14 line 1.  He serves as a volunteer for Unity08, working to support the cause, fund raising, planning, and meeting with the media.  See id.

62.    Roger Craver was the founder of the Craver Matthews Smith company.  See Bailey Dep. at 14, lines 2-14; Craver Decl. ¶¶ 3-5.  He is expert in fundraising via direct mail, telephone, on-line and via web operations.  See id.  He is helping to oversee the effort to recruit delegates via the web site and in other ways, and to convert delegates and other supporters to small dollar contributors.  See id.

63.    Doug Bailey is Unity08's unpaid chief executive officer and a member of its Board of Directors.  See Bailey Decl. ¶ 2.  He has been active participant in politics his entire career, since he was a Congressional staffer in the late 1960's, through the Carter years in the 1970's, to his time as founder in 1987 of The Hotline, a business-daily news source for politics. He served as its publisher until to 1999.  See Bailey Decl. ¶¶ 4, 5.  Most recently, prior to Unity08, he was authoring a book with Freedom's Answer which was a non-profit effort that he founded to engage young people into politics.  See Bailey Dep. at 9, lines 6-9.

- 11 -

64.     Hamilton Jordan served as White House Chief of Staff from 1979-80 and was a key advisor and strategist for President Carter.  See http://www.unity08.com/founderscouncil.

65.     Unity08 has voluntarily refused to accept contributions from corporations, labor unions, foreign nationals or government contractors.  See Bailey Decl. ¶ 51.

66.     Unity08 has since shortly after its inception in May 2006 limited individual contributions to $5,000.  See Bailey Decl. ¶ 49-50; see also Bailey Dep. at 40, lines 2-3.

67.     Unity08 has almost exclusively raised funds through its Internet site, www.unity08.org, and personal visits.  See Bailey Decl. ¶ 56; see also Bailey Dep. at 16, lines 1-7.

68.     Fundraising limitations hamper Unity08's ability to utilize traditional, proven fundraising channels other than personal visits and the Internet, such as direct mail and phone solicitation, because it takes money to raise money via those methods (for example, to pay postage costs for mailings and to pay banks of professional third-party telephone solicitors).  See Craver Decl. ¶ 11.  As a consequence, Unity08's efforts to raise money through direct mail and telephone solicitations have been severely limited.  See id.

69.     Unity08 has not used print or TV ads to raise funds.  See Bailey Dep. at 17, lines 2-8.

70.     Fundraising requires seed money, and the most effective method to quickly obtain seed money is to raise it in large increments.  See Bailey Decl. ¶ 52.

71.     Through January 2007, Unity has raised approximately $500,000.  See Deposition of Daniel Radek at 8, lines 13-16, p. 11, lines 14-19, p. 14, lines 15-20 (excerpt at Ex. 20).

72.     Unity08 is soliciting $5,000 contributions from approximately 200 potential donors to a "bridge fund" to help fund the time period between now and a point where there are

sufficient delegates to then be able to convert a portion of those delegates to small dollar contributors and fund the operation with much smaller contributions.  See Bailey Dep. at 23, lines 2-16.

73.    Unity08 has not held traditional fundraising events.  Unity has held a series of small meetings.  See Bailey Dep. at 26, lines 3-11.

74.    Unity08 has used an electronic presentation at some of its meetings to list the names of approximately 60 individuals who might become candidates.  See Bailey Dep. at 28, line 20-p. 29, line 8; 32, line 1-p.33. line 11.

75.    Voters have recommended candidates to Unity08, see Bailey Dep. at 29, lines 2-8, but Unity08 has encouraged anyone to seek its nomination.  See Bailey Dep. at 81, lines 20-22.

76.    No person who has recommended a candidate to Unity08 has expressed an interest in donating more than $5,000.  See Bailey Dep. at 30, lines 14-17.

77.    Unity08 has not asked any Presidential candidate to run, or to consider running, for Unity08's nomination.  See Bailey Decl.¶ 16.  Unity08 has briefed many potential Presidential candidates on its process so they can fully and accurately understand Unity08's purpose.  See id.

78.    The cost of setting up the convention, including the technology infrastructure so that all registered delegates may vote only once, and have that vote authenticated, and to maintain a secure system against attacks, will be several million dollars.  See Bailey Dep. at 97, lines 16-12.

79.    Successfully establishing the convention infrastructure and attaining ballot access in turn cause candidates to want to seek the Unity08 nomination.  See Bailey Dep. at 37, lines 8-22. Potential candidates considering seeking the nomination will look at progress that Unity08 is

making in achieving a significant body of delegates to hold the a convention and progress in

achieving ballot access.  See *id.*

        Respectfully submitted,

        *Robert E. Jordan III*

        Robert E. Jordan III (D.C. Bar No. 15784)
        John J. Duffy (D.C. Bar No. 170936)
        Rhonda M. Bolton (D.C. Bar No. 455005)
        Anthony A. Onorato (D.C. Bar No. 482074)
        STEPTOE & JOHNSON LLP
        1330 Connecticut Ave., NW
        Washington, D.C.  20036
        Tel:  (202) 429-3000
        Fax:  (202) 429-3902
        rjordan@steptoe.com
        jduffy@steptoe.com
        rbolton@steptoe.com
        tonorato@steptoe.com

        *Counsel for Plaintiffs*

March 21, 2007

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITY08 <u>et al</u>., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )     No.1:07-cv-00053 (RWR) |
| | ) |
| FEDERAL ELECTION COMMISSION, | ) |
| | ) |
| Defendant. | ) |

## <u>ORDER</u>

Pursuant to Fed. R. Civ. P. 56 and Local Rule 7, and upon consideration of Plaintiffs'

Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment, and all pleadings

and papers submitted therewith, it is, hereby:

ORDERED that Defendant's Advisory Opinion 2006-20 is unlawful, and Plaintiffs'

activities prior to candidate selection do not subject Unity08 to regulation as a political

committee;

IT IS FURTHER ORDERED that the Defendant is enjoined from enforcing its

determination in AO 2006-20 that Unity08 is a political committee, and from initiating

enforcement actions relating to Plaintiffs' activities prior to candidate selection.

SO ORDERED.

_____
United States District Court Judge

DATED: _____

# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

UNITY08, et al.,

    Plaintiffs,

         v.

FEDERAL ELECTION COMMISSION,

    Defendant.

No. 1:07-cv-00053 (RWR)

---

## DECLARATION OF DOUGLAS L. BAILEY

I, Douglas L. Bailey, state that:

1.    I am over the age of twenty-one, and I am fully competent to testify to the matters set forth in this Declaration.

2.    I was one of the founders of Unity08. I am now its unpaid chief executive officer and a member of its Board of Directors.

3.    I am registered to vote in Virginia, and I am registered as a member of the Republican Party.

4.    In 1987, I founded The Hotline, a business-daily news source for politics. I sold it to National Journal in 1996, and continued as its publisher until 1999.

5.    I have been an active participant in politics all my adult life. As a Congressional staffer in the late 1960's I helped formulate policy proposals which became law. I was co-founder/owner of one of the original political consulting firms, Bailey/Deardourff, which helped win more than fifty statewide election campaigns for Republican candidates in the 1960's, 70's and 80's and handled the general election advertising for President Ford's campaign in 1976.

6.    We helped elect Senators Mathias of Maryland (twice), Brooke of Massachusetts (twice), Percy of Illinois (twice), Schweiker of Pennsylvania (twice), Danforth of Missouri, Bond of Missouri, Pressler of South Dakota, John Chafee of Rhode Island, and Lugar of Indiana. We also helped elect Governors Milliken of Michigan (three times), Rhodes of Ohio (twice), Thornburgh of Pennsylvania (twice), DuPont of Delaware (twice), Bond of Missouri (twice), Snelling of Vermont (4 times), Thompson of Illinois (4 times), Bowen of Indiana, Orr of Indiana (twice), Clements of Texas, Quie of Minnesota, Ray of Iowa, Cahill of New Jersey, Kean of New Jersey (twice), and Alexander of Tennessee (twice).

7.    After the <u>Hotline</u> experience, I organized the non-profit Freedom Channel (for video on-demand on the Internet) in 2000, the non-profit Youth-e-Vote (an unofficial online vote of 1.3 million high school students for President in 2000, at the time the largest online vote ever held), and the non-profit, non-partisan Freedom's Answer online program that engaged over one million students at 2500 different high schools with each securing ten adult pledges to vote. I have been a frequent commentator and guest on political news and discussion programs for PBS, Fox News, CNN, MSNBC, and all three of the traditional national networks. And I filed a friend-of-the-court brief which the Supreme Court cited extensively in the findings in <u>McConnell</u> <u>v. FEC</u>, 540 U.S. 93 (2003).

**Description of Unity08 and Its Goals**

8.    Unity08 is a nascent political movement of voters who believe that the major political parties have focused too much attention on "wedge" issues – like abortion and gay marriage – that appeal primarily to their "base" of voters, to the detriment of the "crucial" issues – like energy independence and health care reform – that face our country today. Unity08 seeks to jolt the two major parties out of the current partisan political deadlock that stands in the way

of meaningful change in our country's governance. Unity08 was formed by Roger Craver, Hamilton Jordan, Jerry Rafshoon, and me.

9.      Unity08 aims to first form an organization at the national level, as opposed to the state or local level, and by design not to have a candidate until voters later choose the ticket.

10.      Unity08's ultimate goal is to facilitate the creation of a unified ticket composed of one Republican and one Democrat on the ballot for President and Vice President of the United States in the 2008 election, and have that ticket on the ballot in all fifty states and the District of Columbia. An independent may also seek the nomination if he or she presents a Unity Team drawn from both major parties. Unity08 will empower the people to select the Unity ticket – one that focuses on the crucial issues and offers a choice to independent voters and centrists in both of the major parties.

11.      Nominees for the Unity ticket will be selected in the summer of 2008 in the first-ever online nominating convention, which will be open to every voter who registers as a Unity08 delegate. During the convention Unity08 delegates will vote via the Internet for their choice among a variety of candidates vying for the nomination. Unity08's efforts will cease after the nomination of the Unity ticket (except for conducting some ministerial activities, such as providing the names of its candidates that may be required in states where Unity08 has achieved ballot access).

12.      Unity08 does not plan to become a permanent political party, but success in the 2008 election and the reaction of two major parties to that event might change this.

13.      Unity08 has incorporated as a non-profit corporation in the District of Columbia. It has tax exempt status under Section 527 of the Internal Revenue Code.

- 3 -

14.    Unity08 did not support or oppose candidates in the 2006 elections and does not intend to support or oppose candidates in any congressional, State, or local election at any time.

15.    Unity08 has no candidates for the office of President and Vice President at this time.  In fact, it welcomes a contest among many candidates for the nomination and endorsement of its convention.

16.    Unity08 has not asked any Presidential candidate to run, or to consider running, for Unity08's nomination.  Unity08 has briefed many potential Presidential candidates on its process so they can fully and accurately understand Unity08's purpose.

17.    The focus of Unity08's activities at this time consists of:  (1) ballot access programs to recruit delegates, volunteers, and petitioners to secure the needed signatures on ballot access petitions in the states ("Ballot Access Program"); (2) the operation and development of its website to communicate its ideas about the need for the political system to focus on issues critical to the long-term safety and welfare of the country (the "American Agenda"); and (3) developing the technology infrastructure and secure systems to hold the first-ever online nominating convention in the summer of 2008 ("Convention Hall Project").

18.    All of these activities, as well as the very significant startup costs that are associated with any new organization, will require substantial financial resources.  Unity08 plans to fund its operations and activities through contributions from supporters.

19.    The Federal Election Commission ("FEC")'s ruling that Unity08's activities involve "expenditures" under the Federal Election Campaign Act ("FECA"), and that Unity08 accordingly qualifies as a "political committee" subject to the FECA's $5,000 per individual annual contribution limit, has at best delayed, and at worst will prevent, Unity08 from engaging in its planned political activities.

- 4 -

**Unity08's Activities**

Ballot Access Program

20.     Unity08's ultimate goal is to facilitate the creation of a unified ticket composed of one Republican and one Democrat on the ballot for President and Vice President of the United States in the 2008 election, and have that ticket on the ballot in all 50 states and the District of Columbia.  To achieve this ultimate goal, Unity08 plans to pursue ballot access as an organization in the approximately 37 jurisdictions that allow organizations access in the absence of actual candidates.

21.     Qualification for a ballot position as an organization will enable Unity08's delegates to nominate candidates who can appear on the ballot in a jurisdiction as the Presidential and Vice Presidential candidates of the Unity08 ticket.

22.     The requirements for ballot access as an organization vary from one jurisdiction to another.  In a few states the process is simple, but in most states it is complex and time-consuming.  Generally, to qualify for ballot access as an organization, Unity08 must present petitions containing the signatures of a substantial number of registered voters (typically numbering in the tens of thousands) who support its place on the ballot.

23.     Obviously, Unity08 must start this process immediately if it hopes to gather all the necessary signatures in time to obtain ballot access for the 2008 election.

24.     Unity08 needs to qualify on the ballot in a number of states quickly to provide credibility; otherwise people may conclude that its goal of qualification in all fifty states and the District of Columbia cannot be achieved.  And that in turn may deter qualified candidates from seeking the nomination of the Unity08 on-line convention.

25.    The fact that several states have recently decided to move their Presidential primaries earlier in 2008 only adds to the sense of urgency that Unity08 commence its ballot access initiatives without further delay.  In some of these states, such as California, an accelerated primary date means that Unity08 will have to complete its signature gathering process earlier than originally anticipated.

26.    Unity08's ballot access drive will require us to hire paid state directors in each state as well as seven to ten paid regional ballot access coordinators.  Unity08 must also employ legal counsel in each state to fend off challenges to our ballot access petitions by the major parties and to challenge a state's refusal to qualify Unity08 for the ballot if necessary.  While we hope that we can secure counsel on a volunteer basis, realistically we expect that we will have to pay for some of the legal help we will need.  In the broad experience I have gained working with fifty state-wide campaigns and a Presidential campaign, I believe it is almost certain that Unity08 will have to contend with such legal challenges, and it would be poor planning on our part not to anticipate them.

27.    Unity08 also needs the time and resources to create materials to educate and prepare our signature gatherers for the ballot access effort.  We must, in short, build a sophisticated and massive grass-roots citizen effort on a fast moving mobilization schedule if we are to be competitive in 2008 with the established political parties.

28.    Very significant financial resources will be required for Unity08 to mount its ballot access efforts.  Our most recent estimate of the cost of qualifying as a new party in every state is approximately $7 million.  And we must obtain these resources rapidly for the reasons I have explained.

- 6 -

29.     The major parties, in contrast, do not face this financial burden because they have guaranteed ballot access in every state.

30.     The FEC's ruling that signature-gathering, organization-qualifying expenses are "expenditures" under FECA, and that Unity08 qualifies as a "political committee" subject to the $5,000 per individual annual contribution limit may delay, or even prevent, Unity08 from achieving nation-wide ballot access.

31.     Unity08 is a new organization.  It does not have a large or long-established base of existing donors to whom it can immediately turn for funds.  Given that Unity08 needs to build an organization from the ground up, and that it has a very short time period in which to qualify for ballot access, Unity08 has concluded that it cannot raise sufficient monies to defray the cost of qualifying for ballot access as an organization in 37 jurisdictions in time for the 2008 Presidential election if it must limit its donations, including loans from individuals, to $5,000 a year.

32.     At this time, because of the contribution limitation directly resulting from the FEC's ruling, Unity08 has delayed and scaled back its ballot access initiative due to inadequate funding.  More specifically, Unity08 has been severely hampered in its effort to finalize and distribute its ballot access materials, and its efforts to train and deploy volunteers to the states where it needs petition signatures to get on the ballot.  For the same reasons, Unity08 has also delayed hiring state ballot access directors and regional coordinators.

33.     Unity08 has not qualified yet to appear on the ballot for the 2008 Presidential election in any state.

<u>The American Agenda</u>

34.    The political architecture of Unity08 differs significantly from that of the two major parties – it is designed to take advantage of the Internet as a modern organizational tool. Unity08 currently disseminates its views through Internet means including its website, web logs, and YouTube.  This gives Unity08 the opportunity to reach voters nationwide.  The Internet allows interaction between large numbers of people at relatively little cost, and, as Unity08 plans to show, has the potential to revolutionize political dialogue in this country.

35.    Unity08 intends to develop technology that permits the voters of this country to use the Internet to identify, discuss and reach a consensus about what are the most crucial issues facing the country.  And with this technology we plan to enable the voters to decide what questions should be addressed to Presidential candidates concerning those issues rather than having the candidates' handlers and advisors dictate the topics candidates will discuss with voters.  This list of questions we expect candidates to answer about the issues that many voters agree are crucial is what Unity08 has dubbed the "American Agenda."

36.    Unity08 has received extensive favorable media coverage not only for its efforts to create a Unity ticket, but also for its innovative proposals to use the Internet to provide an opportunity for greater access for ordinary voters in the political process through efforts such as the development of the American Agenda.  <u>See</u> <u>e.g.</u>, Ex. 3 to Plaintiffs' Memorandum of Law.

37.    While Unity08 has set up its website to help voters begin the dialogue on the American Agenda, our development of the technology necessary to really encourage that dialogue to flower has been slowed by the fact that we are not able to take in as much money as we need to fund the development in a timeframe that will maximize its effectiveness.

- 8 -

Convention Hall Project

38.     To select candidates, Unity08 plans to hold a virtual convention, via the Internet, in the summer of 2008.

39.     Any registered voter who has signed up on the Internet with Unity08 to be a Unity08 delegate will be eligible to vote during the virtual convention for the candidates they want to constitute the Unity08 ticket.

40.     Every individual who steps forward as a Presidential candidate, and who meets the constitutional requirements to be President, will be entitled to compete for the Unity08 online nomination.

41.     Currently, Unity08 is primarily recruiting delegates to the convention and communicating its political message to voters through its website, and will transition into direct person to person contact once it has the funding in place – a process dramatically slowed by fundraising restraints.

42.     Unity08 does not now have candidates for the 2008 Presidential election and will not have candidates until they are selected by the delegates at the online convention.

43.     Unity08 will not provide financial support to its candidates after the convention. Unity08 believes candidates for its nomination will have to register with the FEC and raise money pursuant to the federal election laws.  Unity08's candidates will themselves have to form candidate committees under the federal election laws, register with the FEC and file reports like any other candidate committee.

44.     Unity08 does not plan to transfer any of its funds to the Unity08 nominees for use in their campaign after the nomination process.

45.    To the extent the Unity08 nominees wish to solicit money from Unity08 delegates, Unity08 will not become involved in that process. Unity08 may, however, consider renting or selling its delegate list to the nominees so that they may solicit the funds themselves from Unity08 delegates if that would be permitted under the federal election laws.

46.    Unity08 has not spent any of the money raised to date directly on its Convention Hall Project. Unity08 has spent money on initial development of its website as previously mentioned, and while that will indirectly help lay the groundwork for development of the technological tools to run the convention, making an online convention a reality will take a very significant additional investment. This is so largely because of the sheer size and innovative nature of the convention. Technological systems must be developed that will allow tens of millions of people to have an effective dialogue about issues and the candidates.

47.    Security will be of paramount importance. The system must allow our delegates to vote in a fair fashion, one vote to a person. This is not "American Idol." We recognize that the integrity of our effort depends upon development of a system that minimizes the chance for voter fraud. It is also important that we keep our delegates' personal information secure.

48.    Very few companies are qualified to take on a project of this size and complexity. While we have had initial conversations with some potential developers, our planning and implementation process has been considerably slowed by the present lack of funds to pay for the necessary technology to build our online convention site.

**Unity08's Fundraising**

49.    Since its inception in the spring of 2006, Unity08 has sought to finance its efforts by soliciting small donations from individuals.

- 10 -

50.     More specifically, Unity08 voluntarily decided to restrict donations from individuals to $5,000 per year.

51.     Unity08 has also voluntarily refused to accept contributions from corporations, labor unions, foreign nationals or government contractors.

52.     Although Unity08 voluntarily restricted its individual donations to $5,000 per year, Unity08 has now recognized the reality that to meet its ballot access goals it must raise several million dollars on a more rapid timetable than is possible if it is limited to $5,000 annual donations from individuals.  It also takes money to raise money.  Fundraising requires seed money, and the most effective method to quickly obtain seed money is to raise it in large increments.

53.     Unity08 believes that it can more rapidly raise the $10-12 million estimated to be needed to fund its American Agenda, Ballot Access Program, and Convention Hall Project by obtaining loans of greater than $5,000 from individuals, which loans would be paid back through subsequent donations of $5,000 or less.

54.     Unity08 is now preparing to solicit loans of more than $5,000 from individuals.

55.     Due to the $5,000 individual contribution limit that resulted from the FEC's ruling, however, Unity08 has not obtained loans in excess of $5,000.  (In fact, Unity08 has obtained no loans of any amount.)  It is for this reason that Unity08 seeks declaratory and injunctive relief from the FEC's ruling.

56.     Unity08 is currently soliciting funds using primarily personal contacts and through our website at www.unity08.org.  Unity08 has only used direct mail solicitations on a very limited basis because of the money required to facilitate such fundraising.  These direct mail solicitations were not intended, and did not, raise any significant amount of money for Unity08.

- 11 -

57.     Not a single dollar has been raised or given in support of a specific identified candidate.

58.     None of the money now being raised will support the election or defeat of any candidate.

59.     No donations to Unity08 have been nor will be used to support or oppose any identified candidate for federal office.

60.     No contributions will be made by Unity08 to any identified candidate for federal office.

61.     Contributions can be earmarked for a specific purpose, including the Ballot Access Project, the technology infrastructure and secure systems for the online nominating convention, the web systems needed to implement the American Agenda to define the crucial issues facing our nation, or for general operating infrastructure to support all programs and the grassroots community of delegates.

62.     Contributions cannot be earmarked to support any eventual nominee.  Such contributions would be returned to the contributor.

63.     Overall, the threat of enforcement of the FEC's ruling causes uncertainty in Unity's fundraising, communications, voter outreach, administration, and reporting efforts, each of which is directly affected by the restrictions imposed by the Commission.  These restrictions impair our operations and interfere with our ability to promote the party and its values.

64.     I have contributed $5,000 to Unity08.  I would loan Unity08 more than $5,000 this year, and in subsequent years, if I could do so without fear of prosecution and criminal and civil penalties.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 21, 2007.

Douglas L. Bailey

# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITY08, et al.,          ) | |
|                ) | |
|      Plaintiffs,     ) | |
|                ) | |
|         v.          ) | No. 1:07-cv-00053 (RWR) |
|                ) | |
| FEDERAL ELECTION COMMISSION,  ) | |
|                ) | |
|      Defendant.     ) | |
|                ) | |

## DECLARATION OF ROGER M. CRAVER

I, Roger M. Craver, state that:

1.    I am over the age of twenty-one, and I am fully competent to testify to the facts set forth in this Declaration.

2.    I am registered to vote in Massachusetts as a member of the Democratic Party.

3.    I have worked actively in politics for more than 35 years.  During my professional career I have served as the direct response fundraising consultant and strategist for the Democratic National Committee, the Democratic Senatorial Campaign Committee, and the Democratic Congressional Campaign Committee.  I have provided fundraising consulting services for the presidential campaigns of Morris Udall, John Anderson, and Edward Kennedy. And I have provided fundraising counsel and services for the United States Senate campaigns of George McGovern, Birch Bayh, John Culver, Frank Church, Jay Rockefeller, and Christopher Dodd.

4.    My work has not been limited to the campaigns of individuals.  I have also been deeply involved in raising funds and building membership and communications programs for

advocacy organizations with more than a passing interest in American politics: Common Cause, Public Citizen, The Brady Campaign, the Sierra Club, the League of Conservation Voters, the American Civil Liberties Union, and The League of Women Voters.

5.      I was one of the founders of Unity08.  The other founders and I formed Unity08 because we believe that the major political parties have focused too much attention on "wedge" issues that appeal primarily to each party's "base" of voters, and pay too little attention to the truly critical issues we face as a nation.  Our desire is to jolt the two major parties out of the present partisan political deadlock that prevents meaningful and effective change in our country's governance.  We plan to achieve this aim by ultimately placing on the ballot in all fifty states and the District of Columbia, a unified Republican and Democratic ticket for President and Vice President of the United States in the 2008 election.  This "Unity ticket" will be selected by registered voters during an online convention Unity08 plans to hold in the summer of 2008.  In the meantime, Unity08 plans to obtain ballot access as an organization in the approximately thirty-seven jurisdictions that allow organizations to qualify so that we can present potential candidates with a realistic opportunity to compete nation-wide.

6.      Our success will depend upon our ability to quickly build our organization and disseminate our political ideas, which in turn depends upon our ability to raise enough money to fund our efforts.  The $5,000 annual cap imposed by the Federal Election Commission on the amount of individual donations and loans we can receive hinders us in each of these endeavors

7.      Based on my extensive experience in the field of political fundraising, there is no question in my mind that Unity08 must raise money, get organized, and commence its ballot qualification efforts promptly because the logistics of qualifying in thirty-seven jurisdictions will require a substantial amount of time and resources.  Speed is also important to establish the

credibility of our proposed Unity ticket, because unless Presidential and Vice-Presidential candidates appear on the ballot, they cannot be elected.

8.      Unity08 will have to hire paid ballot access directors in each state, hire seven to ten paid regional ballot access coordinators, retain and employ counsel to fend off legal challenges to our ballot access by the major parties, and build a sophisticated and mass-based citizen effort on a fast moving mobilization schedule if Unity08 is to be on the ballot to compete in 2008 with the established political parties.

9.      The short time we have for ballot access also means Unity08 may have to hire paid signature gatherers to help with its petition drives because the less time we have, the less we will be able to rely solely on volunteers.

10.      Unity08 is a new organization.  It does not have a large or long-established base of existing donors to whom it can immediately turn for funds.  Given that Unity08 needs to build an organization from the ground up, and that it has a very short time period in which to qualify for ballot access, I have concluded, based on my professional fundraising experience, that Unity08 cannot raise sufficient monies to defray the cost of qualifying for ballot access as an organization in thirty-seven jurisdictions in time for the 2008 Presidential election if it must limit donations, including loans from individuals, to $5,000 a year.

11.      Fundraising limitations also hamper our ability to utilize traditional, proven fundraising channels other than personal visits and the Internet, such as direct mail and phone solicitation, because it takes money to raise money via those methods (for example, to pay postage costs for mailings and to pay banks of professional third-party telephone solicitors).  As such, our efforts to raise money through direct mail and telephone solicitations have been severely limited.

- 3 -

12.     Unity08 could, however, raise sufficient money to fund its efforts through loans of more than $5,000 from individuals, which could then be repaid with contributions of $5,000 or less.  Unity08 would accept loans of more than $5,000 per year from individuals if it could do so without fear of prosecution and criminal and civil penalties.

13.     In sum, money is the key ingredient to successful campaigning for federal office. The fact that the major party candidates often forego public financing to use unlimited funds – hundreds of millions of dollars – illustrates how, in my experience, it is clear that fundraising caps improperly applied prevent competition in the political arena, and how money is critical to organizing a political movement and disseminating a political message.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on March 20, 2007.

Roger M. Craver

# EXHIBIT 3

Dismayed by the system
they helped to create,
some veteran political
strategists are out to
subvert it—and create a
better choice for 2008.

BY JOSHUA GREEN

**SPACE COWBOYS** from left: Jerry Rafshoon, Doug Bailey, and Roger Craver

# Surprise Party

The unelected professionals who run campaigns compete in a fiercely Darwinian system. Most can expect a career arc and professional longevity similar to the latest Hollywood starlet's, and even the best are routinely replaced. Ideology and technology change with election cycles, and failure can strike suddenly. It's a cut-throat calling—and when you're finished, and everyone else has moved on, you may well harbor lingering regrets about the tactics you've used to win races. If you've worked in national politics at almost any point in the last forty years, chances are things got worse, not better, on your watch. That can gnaw at you.

It certainly gnawed at three diners gathered in a downtown Washington restaurant on a chilly October evening just before the 2005 elections, as an unlikely scene unfolded. Over dinner, some of the best political minds of the 1970s, Republican and Democratic, reached bipartisan consensus: none could any longer recognize the political parties in which they had once been major players. The cynical focus on divisive "wedge" issues and the ferocious negativity of recent campaigns, which fed in to an inability to govern once elected, dismayed everyone at the table.

Doug Bailey had pioneered modern political consulting, working with his late partner John Deardourff on behalf of Gerald Ford and other Republicans. Joining him were Jerry Rafshoon and Hamilton Jordan, Jimmy Carter's brain trust in the 1976 election that deposed Ford. Graying now, each successful in a career after politics, the

three had assembled to discuss plans to produce a book and a documentary film about television's impact on the political process—something each had helped bring about, and each had found cause to regret. During the course of a year spent researching their project, even these veterans had been alarmed to discover just how dysfunctional the system had become.

As the evening wore on, a sense of frustration pervaded the gathering, until finally Jordan exclaimed, "Why are you guys just writing a book? Can't we do something about this? The country is in serious trouble here!" And then came the leap. The three decided on the spot that they would create a third party to represent the center in the 2008 presidential election. To guarantee that it would, they decided that the ticket itself would be bipartisan: one Democrat and one Republican. And if independents with bipartisan tendencies were interested, they'd be welcome, too. They called their new party "Unity08" and resolved that it would operate on the Internet. That way everyone could join the party online and participate as a delegate, helping to build the party's platform collectively rather than ceding that task to interest groups, as both major parties tend to do. Ultimately, they hoped, these delegates would select a presidential and vice-presidential candidate in an online convention to be held in 2008, just after the major-party primaries determined the Republican and Democratic nominees. This will be a period of maximal importance to Unity08's founders, who believe that many voters will be dissatisfied with the available choices, and that ambitious candidates—Republicans and Democrats who didn't quite make it, as well as independents—will seriously consider a third-party alternative.

Bailey had been experimenting for years with the Internet applications of politics, in a series of civic-minded youth projects he'd embarked on after retiring from politics. All of the founders recognized that this new technology was poised to transform politics, just as greatly as television had in their own era. They had seen television's effect on the political process grow more and more pernicious as the years went by, poisoning the dialogue while forcing candidates to raise ever-greater sums of money to pay for it. They recognized that the Internet, in its political infancy, was a force that could still be shaped for good.

The three parted ways that evening scarcely believing what they'd decided to do. But in the months ahead, as they studied the feasibility of their plan, they became convinced it could work. Being political consultants, they commissioned a national poll to examine the mood of the electorate and gauge its willingness to accept an independent party. The nation appeared willing indeed: 82 percent of respondents agreed that the country was too polarized to make progress solving problems, and three-quarters wanted more choices than just the Democratic and Republican candidates. The three persuaded Roger Craver, a pioneer in the field of cause-oriented fund-raising, to join them with the object of financing the effort through online donations, and they recruited an executive committee to raise a $1 million bridge fund. They also hired the prominent Washington law firm of Steptoe and Johnson to advise them on ballot access in all fifty states. To establish the appearance of sober competence, they enlisted the actor Sam Waterston, a friend of Rafshoon's best known for his role as a principled district attorney on the television show *Law & Order*, to appear in Internet promotions. "I'm one of those people who have been watching politics from the outside with a typical mix of horror and fascination," Waterston told me recently. "The idea is so simple, yet if it works, it's one of those things that will change the direction of the river."

The timing seemed auspicious, less because of the originators' own career stages than because of the current evolutionary stage of the Internet itself. "During the 2004 election," George Vradenburg, a former general counsel for America Online who is advising Unity08, told me, "people's perception of the Internet started shifting dramatically, from the idea that it is an information source to the idea that it is an empowerment tool through which they can impact politics. The Internet has democratized American society in a number of ways. But it has not yet democratized our democracy."

Vradenburg explains that the Internet is a "disruptive technology," meaning one that upsets an existing system in the way that cars replaced horses and digital images are replacing film. Vradenburg and other theorists argue that in the case of the Internet, the disruption occurs in two distinct phases. In the first, the technology mimics a function that already exists, only faster and better (accountants can work from home). In the next, it transforms that function outright (accounting moves to India). He suggested how this might apply to politics: "Howard Dean showed that the Internet can be a great tool for fund-raising and organizing—existing functions performed in a political campaign. The next step is rethinking entirely how you go about the whole functionality you're talking about. That's what's happening here: How do you transform the entire nominating process?"

The creators of Unity08 believe that the answer is to open the process to the Internet masses, causing a tectonic shift powerful enough to disrupt the two-party system. They have not, however, lost faith in that system—merely in its power to correct itself. "The two-party system has worked well for 200 years and can continue to do so," Bailey says, "but only when elections are fought over the middle. Our goal is to jolt the two parties into recognizing this, by drawing them into a fight over the middle rather than allowing them to keep maximizing the appeal to their bases at the extremes."

UNI__ 00374

Bailey and his confederates envision their enterprise not as the establishment of a permanent third party but as a one-shot affair—a dose of medicine strong enough to bring the two parties to their senses. Only then, they believe, can things truly improve. In other words, they are attempting nothing less than to rescue American politics and put the country back on the right track.

Of course, Unity08's formal launch this month also promises its founders the rare shot at a second act on the national political stage and a chance, all these years later, to atone for the past. "They were the first political consultants to grasp the power of the tube to both convince and convert," says Dick Wirthlin, a contemporary who was Ronald Reagan's pollster and chief strategist. "But I would attribute at least part of the tremendous cynicism we're experiencing today to the way politicians and campaigns exploit the dark side of television." The Unity08 principals seem to feel this way, too, which may explain their eagerness to once again harness a powerful new technology to political ends—this time with the wisdom of experience.

"We didn't recognize it at the time," Bailey told me, "but television just ran over us all: it changed our culture, our habits, our mores, our politics—it changed everything. None of us ever asked how we could use this wondrous new technology to improve our democracy. Well, we have another new technology that is going to change everything. If you recognize that right now our politics is as empty as at any point in my adult lifetime, and the issues are as serious as at any point in my adult lifetime, what choice do you have but to try to do something about it?"

One of the many things that differentiate Unity08 from earlier third-party movements is that its founders aren't putting forward their own candidate. What they have in mind might instead best be thought of as the "Field of Dreams" model: build a mechanism whereby qualified individuals of insufficient partisanship to win the Republican or Democratic nomination gain a legitimate shot at the White House, and trust that the best candidates will come. The beauty of the whole thing, Rafshoon explained one day over lunch in a Georgetown restaurant, is that it completely upends the way Americans currently choose their presidential nominees. "The 2004 presidential election cost $2.2 billion, and the parties left choosing their candidates to a handful of voters in Iowa and New Hampshire!" he exclaimed. "If we do it over the Net and succeed—we think it'll cost less than $10 million to set up—then we'll have proved that you don't need $2.2 billion to win the presidency, and we'll have thrown open the process to an online army of millions." As soon as frustrated citizens have that kind of power, the possibilities for electoral upheaval are practically limitless. "It's the perfect vehicle for voters to start a draft movement," Rafshoon said.

During our lunch, Rafshoon spotted Bob Shrum, the manager of John Kerry's failed presidential campaign, peacocking across the room in an expensive suit and a fine silk tie. Shrum has grown rich through politics—his firm is believed to have pocketed $5 million from the Kerry campaign alone—even though he's lost every presidential race he's been associated with. Rafshoon, by contrast, wore a bright-red sweater and flashed a sly grin as he laid out his plans, resembling nothing so much as a mischievous grandpa about to pull off some bit of deviltry with his cronies at the expense of swells like Shrum (whose job Rafshoon performed for Carter, it bears noting, successfully and for a lot less money). There is something touching about the civic-minded impulse behind Unity08—about its founders' faith, even after a lifetime in politics, that given the means, a kind of ordinary human decency will prevail over the cynical forces that are inflicting such damage on the polity.

There's something touching, as well, about the spectacle of a flock of wise old owls coming out of retirement for one last shot at greatness. It sounds like a Hollywood movie—and was one, if you substitute astronauts for political consultants. Several years ago, Clint Eastwood, Tommy Lee Jones, and Donald Sutherland starred in *Space Cowboys*, whose unlikely plot bears a healthy resemblance to the story of Unity08. The movie concerns a group of hotshot young test pilots in the 1950s—the Air Force's top guns—who are poised to become the first astronauts, until their brash break-all-the-rules attitude gets them replaced (by a monkey). Flash forward forty years, and the buddies are in dissatisfied retirement when fate comes knocking. The monkeys running NASA have bollixed things royally, and a rogue satellite strapped with nukes threatens life on Earth. The astronauts alone possess the wisdom to save it. So, aging and ornery but giddy at having one more chance, they blast off into space.

What has propelled the principals of Unity08 to a launch this month is not fate so much as lifetimes spent innovating for their vision of the greater good. Evident throughout this grand experiment are the career threads of its primary participants and the aspirations that brought them together. After Jimmy Carter lost, Hamilton Jordan returned to his native Georgia, where he became a business consultant (specializing in start-up companies) and a noted author. In his memoir of battling cancer, *No Such Thing as a Bad Day*, he attributes his survival through three bouts with cancer to his own aggressive intervention, undertaken when he lost faith in his doctors' approach. Jordan displayed an early tendency toward the third-party solution when he co-managed Ross Perot's presidential campaign in 1992. Jerry Rafshoon, though he has remained in Washington, left politics with Jimmy Carter to become a Hollywood producer, making documentaries and movies for television; his 1995

film *Joseph*, starring Ben Kingsley, won him the Emmy for best miniseries.

Roger Craver is reputed to have raised more than $6 billion in small-dollar donations during a career in which he helped start or build many grassroots organizations, including Common Cause, Handgun Control, Inc., the National Abortion and Reproductive Rights Action League, and the National Organization for Women. He is famous among his friends for periodically selling his fund-raising firm to his employees and retiring to Martha's Vineyard, only to be lured back into ownership and activism by the latest cause.

Doug Bailey enjoyed an uncommonly long career as a consultant to moderate Republicans, even as the species grew endangered in the 1980s. He quit in 1987 to co-found, with Craver, *The Hotline*, a political tip sheet zapped to subscribers each morning through the then-innovative technology of the fax, and later over the Internet. (It is now owned by Atlantic Media.) A classic early adopter, Bailey was among the first to marry politics and the Web. In 1999, again with Craver, he founded the Freedom Channel, the first attempt to provide online video-on-demand campaigning by offering candidates for the House, Senate, and presidency the opportunity to post clips of themselves speaking directly to the camera about a list of issues the channel provided—an early experiment in dictating the agenda. Through various youth programs, Bailey also experimented with online elections. In 2000, he held a Web-based presidential vote for 1.3 million high-school students, at the time the largest online vote ever taken. He followed that with an effort designed to involve students from 2,500 high schools in the political process by getting them each to obtain voting pledges from ten adults. Several of the students, now in college, have joined one of Unity08's roughly 200 campus affiliates (listed at collegeunity08.com), which are expected to double in number by next year.

If things go according to plan, the next two years will unfold something like this: When Unity08 formally launches its Web site this month, it will begin signing up delegates online. Any registered voter can be a delegate, and can join without having to give up a prior political affiliation. At the same time, the new party's leaders will begin the process of qualifying Unity08 on all fifty ballots for the 2008 presidential election. The requirements for ballot access vary dramatically from state to state, so delegates and other volunteers will perform the work of gathering the necessary signatures. The party hopes to qualify for twenty-five ballots by June.

Intermediate goals like this one are crucial to the movement, because its success will depend on building and sustaining momentum—much as Howard Dean's momentum in the last presidential primary carried him from dark horse to Democratic front-runner in a matter

STATE OF **POLITICS**

## NEITHER/NOR

*Historically, twenty-seven states and the District of Columbia have had party registration for voters. The ranks of voters who are neither Republicans nor Democrats have grown dramatically over the years.*

**Percentage of voters registering as unaffiliated or with a third party, election years 1986–2006**

| 1986 | → | 2006 | | CHANGE (pct. points) |
|---|---|---|---|---|
| 11 | | 27 | Arizona | +16 |
| 4 | | 20 | North Carolina | +16 |
| 7 | | 22 | Florida | +15 |
| 12 | | 25 | Oregon | +13 |
| 8 | | 21 | Louisiana | +13 |
| 45 | | 58 | New Jersey | +13 |
| 11 | | 23 | California | +12 |
| 6 | | 18 | New Mexico | +12 |
| 7 | | 19 | Nevada | +12 |
| 33 | | 44 | Connecticut | +11 |
| 33 | | 43 | New Hampshire | +10 |
| 40 | | 50 | Massachusetts | +10 |
| 7 | | 17 | Nebraska | +10 |
| 2 | | 12 | West Virginia | +10 |
| 8 | | 16 | Maryland | +8 |
| 3 | | 10 | Oklahoma | +7 |
| 12 | | 19 | District Of Columbia | +7 |
| 20 | | 26 | New York | +6 |
| 6 | | 12 | Pennsylvania | +6 |
| 8 | | 14 | South Dakota | +6 |
| 36 | | 41* | Maine | +5 |
| 57 | | 61 | Alaska | +4 |
| 34 | | 38 | Iowa | +4 |
| 3 | | 6 | Kentucky | +3 |
| 21 | | 24 | Delaware | +3 |
| 10 | | 13 | Wyoming | +3 |
| 36 | | 34 | Colorado | –2 |
| 30 | | 27 | Kansas | –3 |

* As of November 2004; latest data available.

UNI · 000376

of months. The hope is that the online participatory element will turn Unity08 into a cultural phenomenon. "Younger people, especially, gravitate toward technology, and if it's married to political reform, so much the better," Craver says. "At the risk of drawing too close a comparison to *American Idol*, it's a voting process that will take place technologically, rather than in some smoke-filled back room."

Bailey is drawing on his experience teaching young activists to organize online, and he hopes to set off a viral effect through a "One-a-Week Club," whose members will commit to signing up one new member a week for six months. (Nobody expects this to happen, but if every pledge were to be fulfilled, one delegate would become 34 million delegates in those six months.)

By the time of their convention, a year and a half from now, the founders hope, the party will have signed up as many as 10 million delegates and will be well on its way to qualifying for all fifty ballots, making Unity08 a formally viable path to the presidency. Candidates could gauge their support, and lobby for more, by making traditional appeals and by participating online. As was the case with the Freedom Channel, an important intention of the new party will be to wrest control of the agenda from the candidates and turn it over to the delegates, who will collectively hash out an "American Agenda"—a party platform that Bailey says will be a list not of answers but of questions. This agenda-building process, like all of the party's activities, will be refereed by an internal rules committee. "If we do it right," he says, "these questions will get addressed to candidates on the Unity08 Web site, and the candidates will post a video answer." Bailey is betting that the media will seize on these same questions and put them to all candidates—thereby injecting the American Agenda into the national debate.

Unity08's online convention will be the first party convention since 1952 to feature runoff balloting for a presidential candidate. The rules committee is still nailing down specifics, but the working plan calls for interested candidates—including those who have been the subject of a draft—to declare themselves at the outset of the convention. Once the balloting has winnowed the field to four, each of the remaining candidates will have to choose a running mate from the opposite party: Democrats must choose Republicans they can work with, and vice versa. Independents can choose someone from either party, but in the spirit of unity, they must also name a senior Cabinet officer from the remaining major party—for instance, a Democratic running mate and a Republican secretary of state. Whoever is slated on the official Unity ticket will take on the Democratic and Republican tickets in November. "We're not in this to play around," Bailey vows. "We intend to elect the first truly bipartisan presidential ticket in American history."

For plenty of reasons, this idea might not work. It's never been tried before, for one thing, and the history of third-party candidates is not encouraging. The whole thing may fail to gather speed, and its founders acknowledge that without momentum it won't work. "Third parties are like organ transplants—they're not tolerated well and are often rejected," says Lance Tarrance, a veteran Republican consultant working for John McCain. "These are good people, but they have been relegated to the sidelines by the new American politics, which is more ideological, more partisan, and certainly has created a new generation of operatives. I can only assume that they're trying to influence the system rather than take it over."

Even if the Unity ticket doesn't win, its creators insist, the mere fact of its presence could force the other parties to return to the vast, forgotten middle or risk losing the next election. The Rovian strategy of division might disappear. Or it might not: partisan strategists might instead decide simply to cede the middle and ratchet up partisanship to excite their bases, on the assumption that with Unity08 on the ballot, they'll need only a little more than one-third of the vote. "Once you put the tool out there, it's going to take twists and turns that nobody can predict," Vradenburg admits. "That's some of what the excitement is about."

But it's also possible to envision scenarios—quite a few, in fact—in which the Unity ticket might work, or might at least become a significant force in the 2008 campaign. If the parties can't work together on Iraq by then, despite the new Democratic Congress, voters might see Unity's fusion ticket as a way to make them. Centrists in both parties, from Joe Lieberman to Chuck Hagel, are known to harbor presidential ambitions that have little chance of being fulfilled along current paths. If Michael Bloomberg really is considering a self-financed run as an independent, he couldn't possibly prevail in a four-way race against the Democratic, Republican, and Unity contenders—and he's already been a Democrat and a Republican, so why not pursue the Unity nomination? If John McCain loses the Republican nomination, he'll be too old to try again in four or eight years and would loathe waiting around—why not take a final shot at the White House? If Barack Obama concludes that his time is now and yet can't stop the Hillary juggernaut, might he cash in his chips before his popularity wanes? And isn't Jack Welch looking for something to do? Or—heaven forbid—Donald Trump?

It will be a while longer before anyone knows whether Unity08 can live up to its founders' ambitious hopes. But here's how the Hollywood version ends: the aging astronauts become overnight media sensations, and on their final mission, against very long odds, they save the world from certain doom. ∎

*Joshua Green is an Atlantic senior editor.*



# Excerpts from Op-Ed Coverage, May-June 2006



### "A New Open-Source Politics" by Jonathan Alter (May 28, 2006 issue)

To begin busting up the dumb system we have for selecting presidents, a bipartisan group will open shop this week at Unity08.com.... Their hope: to get even a fraction of the 50 million who voted for the next American Idol to nominate a third-party candidate for president online and use this new army to get him or her on the ballot in all 50 states. The idea is to go viral—or die. "The worst thing that could happen would be for a bunch of old white guys like us to run this," Jordan says.

The Unity08 plan is for an online third-party convention in mid-2008, following the early primaries. Any registered voter could be a delegate; their identities would be confirmed by cross-referencing with voter registration rolls (which would also prevent people from casting more than one ballot). That would likely include a much larger number than the few thousand primary voters who all but nominate the major party candidates in Iowa and New Hampshire.



### "Politics For the Disengaged" (Washington Post, June 4, 2006)

Their hope is to harness the power of the Internet -- already demonstrated as a fundraising and recruiting tool in the 2004 campaigns of Howard Dean and others -- to mobilize the vast numbers of Americans who say they dislike their current political choices. A poll they commissioned found that 70 percent of Americans are dissatisfied

with politics today and a similar percentage think politicians do not care about the views of people like themselves.

To provide an outlet for those alienated people, the Unity08 sponsors plan an Internet nominating convention in 2008. People who sign on can vote for the bipartisan ticket of their choice -- or an independent who would present a slate for a bipartisan administration....

The practical difficulties facing the venture are enormous. Persuading prominent figures to submit their names for consideration will not be easy. King suggested to me that if such a mechanism had been in place in 2000, Colin Powell might have run for president as an independent and been elected....

There may more than a whiff of elitism in the Unity08 manifesto, which explicitly puts down social issues, such as abortion and gay marriage, that are important to many voters, while emphasizing education, the environment, health care and energy. But there undoubtedly is a hunger in the land for consensus and an end to partisanship.

# ROLL CALL

### "Fed Up With Partisan Warfare? Unity08 Could Be an Alternative"
### by Morton M. Kondracke (June 8, 2006)

The Unity08 poll, conducted by Princeton Survey Research Associates, found that 82 percent of U.S. adults agree that "America has become so polarized between Democrats and Republicans that Washington can't seem to make progress solving the nation's problems."

Seventy-four percent say they are "dissatisfied" with the way things in the country are going, the highest in 13 years, and 72 percent say they'd like a wider choice than just the GOP and Democrats in 2008.

Asked which issues they deem "crucial," only 22 percent identified gay marriage; 30 percent, abortion; 39 percent, guns. By comparison, 72 percent called education "crucial," 71 percent said so for terrorism, 68 percent for health care and 62 percent for the increasing national debt....

... according to the University of Michigan's American National Election Study, only 33 percent of voters identified themselves as "strong partisans" in 2004. Twenty-eight percent said they were "weak partisans," 29 percent "lean independent" and 10 percent were "independent or apolitical."

That's a good base to start with. Maybe Unity08 can sound the call for action.



June 1 (Bloomberg) -- On ``American Idol'' last week, the host kept repeating the dispiriting statistic that 63 million votes were cast for a lounge singer, more than have ever been cast for a president. Wouldn't it be nice if we could surpass that in the next presidential election?

Enter Unity08, which is advancing the most romantic of notions, an alternative universe, if not a third party, that does away with 30-second ads, motorcades and smoke-filled backrooms. In fact, it does away with rooms altogether, existing almost entirely in cyberspace as unity08.com....

Unity08 aims to raise issues but also, ambitiously, aims to win. Ironically, its founders hold two clashing ideas at the same time: disgust with the system and idealistic faith that it can be made to work. Maybe they're arriving in the nick of time before the electorate gives up, finally, on itself.

# ☉CBS NEWS

### "A Third Way In '08?" by CBSNews.com's Dick Meyer, June 8, 2006

The idea of Unity08 is to have citizens enroll in the movement online and nominate a unity slate by Internet voting. The goal is for this to happen in the first part of 2008 so that the organization can be sure to get on all state ballots.

What makes a unity slate? The presidential and vice presidential nominees must be from different parties or be independent. The Web-enabled newly active citizens would provide the foot soldiers and dollars for the campaign. It's pretty simple.

UNI - 00384

Their goal, unlike mine, is not to create a third party. They want this unity ticket to run and win in 2008 to give electroshock therapy to a polarized, petty, ineffectual party duopoly incapable of addressing serious issues in effective ways. If the movement lasts beyond 2008, fine, but that's not their primary concern at all....

Unity08 does not have an issues platform, which bugs some people. Not me. How could it? Is there any American who believes that parties' platforms have been important documents for government anytime in the past 30 years? Presumably, the candidates who compete for the Unity08 nomination will express their views, positions and basic worldviews and that's what people will vote for or against.

# OpinionJournal
### *from* THE WALL STREET JOURNAL *Editorial Page*

## "Third Time: America may be ready for a new political party."
## by Peggy Noonan (June 1, 2006)

Something's happening. I have a feeling we're at some new beginning, that a big breakup's coming, and that though it isn't and will not be immediately apparent, we'll someday look back on this era as the time when a shift began....

Unity seems to me to have America's growing desire for more political options right. But I think they've got the description of the problem wrong.

Their idea is that the two parties are too polarized to govern well. It is certainly true that the level of partisanship in Washington seems high.... Nancy Pelosi seems to be pretty much in favor of anything that hurts Republicans, and Ken Mehlman is in favor of anything that works against Democrats. They both want their teams to win. Part of winning is making sure the other guy loses, and part of the fun of politics, of any contest, of life, can be the dance in the end zone.

But the dance has gotten dark.

Partisanship is fine when it's an expression of the high animal spirits produced by real political contention based on true political belief. But the current partisanship seems sour, not joyous. The partisanship has gotten deeper as *less* separates the governing parties in Washington. It is like what has been said of academic infighting: that it's so vicious because the stakes are so low.

# comment is free...

## "Together in Electric Dreams: Democrats and Republicans have joined forces in an internet campaign that could make both parties history." By Joe Trippi (June 2, 2006)

Unity08's founders are a group of respected Democrats, Republicans and independents - none of whom are known for radical ideas. Which should suggest to the leaders of the Republican and Democratic parties that something different may be at work here. Alarm bells should ring loud at both party headquarters in Washington if thousands of Americans begin to join together at Unity08 to work around the two party system and nominate their own candidate for president.

Will Unity08 succeed? The great thing about a democracy is that this is a question the people get to decide. And while I continue to work for change within the Democratic party, I will make this prediction - if neither party makes its way to the high ground of rallying the American people to the common good of the nation - the people will get there themselves. May Unity08 will force my party to that ground or help provide the American people with the tools to get there on their own.

3



### "Building a New Political Party, Byte by Byte" by Ron Brownstein

June 5, 2006.... The initiative faces immense hurdles — no new party has established itself as a sustained force in American politics since the Republicans emerged during the struggle over slavery in the 1850s.

But Unity08 sponsors contend that they can succeed where others have failed largely because the Internet makes it easier and less expensive to reach and organize potential supporters.

"Why now? Because the technology allows it," said another organizer, Angus King, who as an independent served two terms as Maine's governor.

If nothing else, the effort could help answer two questions: Is there a substantial constituency of moderate voters alienated from the highly partisan and polarized politics that defines Washington? And can a centrist political movement be organized through the Internet, which so far has been used more by partisan and ideological voices?

# National Journal

### "Political Pulse - A Bipartisan Ticket in 2008?" by Bill Schneider

June 10, 2006.... Where will Unity08 get the money to run a presidential campaign? That's where the Internet comes in. "What we learned in the last election cycle is that a lot of money can be raised from a lot of people in a hurry using that medium," King said.

Unity08 contenders will also campaign on the Internet. Voters will choose the ticket by voting online. But what about the problem that the Internet seems to be dominated by shrill voices from the Right and the Left? King's response: "There are 85 million people who are regular users of the Internet. We don't think they can all be extremists."

.... Does Unity08 have a horse -- a candidate for president whom voters can rally behind? "The horse is hopefully coming to us," King said. "We are not starting with a horse." Unity08 is relying on the fact that America is an entrepreneurial society. If there's a market -- in this case, for a new kind of political voice -- there's bound to be a product.

# The Hill

### "The Coming Independent Wave" by Ben Goddard, June 22, 2006

[Peter] Hart says that in his forty years of polling this is the first time he has ever seen both parties held in such low esteem. Usually when Democrats are down Republicans are up, and vice versa. Not this year....

Voters are quite clearly not getting the government they want from the two major parties. They are faced with false choices, consultant-packaged candidates and campaigns pitched to narrow constituencies. The founders of Unity08 believe voters have had enough of such nonsense, and I believe they may be right.

The genius of their plan is that it is pitched to the center, to the voters who once determined the direction of the nation. There are clear signs those voters want to take charge again.

Unity08's online campaign just may be the medium to deliver that message to both established parties and rewrite political history in the process.

4

# EXHIBIT 4



FEDERAL ELECTION COMMISSION
Washington, DC  20463

October 10, 2006

<u>CERTIFIED MAIL</u>
<u>RETURN RECEIPT REQUESTED</u>

ADVISORY OPINION 2006-20

John J. Duffy, Esq.
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC 20036-1795

Dear Mr. Duffy:

　　　　We are responding to your advisory opinion request on behalf of Unity 08, concerning the application of the Federal Election Campaign Act of 1971, as amended (the "Act"), and Commission regulations to Unity 08's status as a political committee. The Commission concludes that Unity 08 will have to register as a political committee once it makes expenditures in excess of $1,000, and therefore will be subject to the amount limitations, source prohibitions, and reporting requirements of the Act.

*Background*

　　　　The facts presented in this advisory opinion are based on your letter received on May 30, 2006, your comments received on July 19, supplemental submissions received on August 16, September 18 and 22, telephone conversations with you, and information from Unity 08's website.[1]

　　　　Unity 08 is organized under the laws of the District of Columbia as a not-for-profit corporation and under Section 527 of the Internal Revenue Code.  Unity 08 describes itself as a "nascent political party" that "will act to assure that an alternative ticket is presented to the American voters in 2008." Unity 08 was founded by individuals who have been involved in political campaigns at the State and national levels, including political consultants and media advisors, and by individuals who have served in high

---

[1] *See* <http://www.unity08.com> (last visited 9/18/06).

AO 2006-20
Page 2

government positions, including a former State Senator, former White House Chief of Staff, former White House communications director, former State Governor, and former heads of State agencies. Unity 08 aims to build a "solidly-funded movement of up to 20,000,000 Americans . . . in order to nominate a Unity Ticket of their choice for 2008."

Unity 08 states that it has three goals: (1) "to elect a Unity Ticket for President and Vice-President of the United States" in 2008; (2) "for the American people to pick that Unity Ticket in the first half of 2008" through an online nominating convention; and (3) a "*minimum* goal" of "effect[ing] *major* change and reform in the 2008 national elections" by "organizing a group of voters who comprise at least 20% of the national electorate" and whose commitment to the Unity 08 agenda will have to be accounted for by the major parties if they are to be successful in the 2008 presidential election. (Emphasis in the original). The Unity 08 nominees may consist of candidates from either or both of the two major political parties, or of independent candidates. Although Unity 08 may support the candidates offered by one of the two major parties, it plans to hold an online nominating convention in the summer of 2008, during which Unity 08 delegates will vote via the Internet to nominate candidates for the Unity 08 ticket.[2] Unity 08 does not intend to support or oppose candidates in the 2006 elections or in any congressional, State, or local election at any time.

Unity 08 will finance its activities with solicitations of funds and sales of t-shirts, mugs, pens, bumper stickers, and other similar items. Unity 08 is currently soliciting funds using the Internet and intends to make solicitations using telephone banks and mass mailings. Unity 08's website proposes that supporters give specific monetary amounts ranging from ten dollars to $5,000, with an option to give any amount of the supporter's choosing. Unity 08's online solicitation form includes the following language: "To succeed we don't have to match the massive war chests of either party. And, like other successful citizens' movements before us, we can raise the funds we need to build a lean and effective movement if each of us simply does our part. . . . Please do your part. The stakes for our country have never been higher." The movement for which Unity 08 is soliciting money is to "Select and Elect a Unity Ticket in the 2008 Presidential Race," which also appears as the header on the online solicitation form. Elsewhere on the website, this language is repeated: "Unity 08 is a citizens' movement to get our country back on track by nominating and electing a Unity Ticket in the '08 presidential election to promote leadership, not partisanship. Every day – with your support – we're making progress toward this goal." The phrase "with your support" is a hyperlink to the online solicitation form. A disclaimer was recently added to Unity 08's online solicitation form, stating that: "Donations made on this website will not be used to support or oppose any federal candidates, but will be used to support Unity08's organizational building efforts."

---

[2] In your supplemental submission, you indicated that Unity 08 will hold the online nominating convention only if necessary, and if it does become necessary you will file another advisory opinion request. Accordingly, the Commission does not address Unity 08's activities regarding an online nominating convention.

AO 2006-20
Page 3

Unity 08 does not accept money or any other thing of value from "any 'prohibited source,'" including corporations, foreign nationals, or government contractors. Although Unity 08 did not initially place a limit on the amount of donations it solicits or accepts, it recently imposed a $5,000 limitation on donations from individuals.

In attempting to elect presidential and vice-presidential candidates in 2008, Unity 08 plans to purchase access to mass media and commission polls, and to "qualify for ballot positions in certain key states for the offices of President and Vice President of the United States through petitions, and if required, litigation." Specifically, Unity 08 plans to obtain "ballot access as a 'party'" in approximately 37 States.

### Questions Presented

1. *Will Unity 08 make "expenditures"such that Unity 08 must register as a political committee?*
2. *May Unity 08 incorporate for liability purposes only?*

### Legal Analysis and Conclusions

*Question 1: Will Unity 08 make "expenditures" such that Unity 08 must register as a political committee?*

Yes, for the reasons stated below, Unity 08 will make "expenditures" as defined under the Act and Commission regulations, and Unity 08 must register as a political committee when it makes more than $1,000 in expenditures.[3]

### I.    Expenditures

Monies spent by Unity 08 to obtain ballot access through petition drives will be expenditures. An "expenditure" is a "purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office."[4] 2 U.S.C. 431(9)(A)(i); 11 CFR 100.111(a).

---

[3] Unity 08 does not ask and the Commission does not address whether Unity 08 qualifies as a "political party" under the Act and Commission regulations. The Commission notes, however, that to be a "political party," an organization must "actually obtain ballot access for one or more Federal candidates." Advisory Opinion 2004-34 (Libertarian Party of Virginia); *see* 2 U.S.C. 431(16) and 11 CFR 100.15.

[4] The only exception in the Act from the definition of "expenditure" for ballot access costs applies to "payments received by a political party committee as a condition of ballot access which are transferred to another political party committee or the appropriate State official." 2 U.S.C. 431(9)(B)(xx); *see also* 11 CFR 100.150. The purpose of this exception is to prevent a candidate or a candidate's authorized committee from having to exceed the limits on contributions to a State party committee in order to gain ballot access. *See FECA Amendments: Hearing Before the Committee on Rules and Administration, United States Senate*, 96th Cong. 4-25, app. at 21 (July 13, 1979) (Statement of Robert Tiernan, Chairman, Federal Election Commission).

AO 2006-20
Page 4

The Commission has previously determined that expenses incurred in gathering signatures to qualify for a ballot for Federal office are expenditures. *See* Advisory Opinion 1994-05 n.1 (White) ("[E]xpenditures to influence your election would include amounts you spend . . . to promote yourself for the general election ballot by seeking signatures on nomination petitions"); *see also* Advisory Opinion 1984-11 (Serrette) (determining that expenses made to collect petition signatures for the general election ballot are expenditures, and therefore are, "qualified campaign expenses," which are expenses made in connection with a candidate's campaign for nomination, *see* 11 CFR 9032.9).

Although Unity 08 plans to qualify for ballot access for itself as an organization, but not yet for any named candidates, Unity 08 is, in effect, using its name as a placeholder for its candidates' names on the ballot. Moreover, unlike organizations that secure ballot access for themselves in order to field a slate of Federal and non-Federal candidates, Unity 08 has announced that it will field only two candidates – for the offices of President and Vice President – in the 2008 election only. Thus, in promoting itself through petition drives to obtain ballot access, Unity 08 is promoting its presidential and vice-presidential candidates, and any payments by Unity 08 for these activities will constitute expenditures.[5]

## II.    *Political Committee Status*

The Act and Commission regulations, with certain exceptions, define a "political committee" as "any committee, club, association, or other group of persons which receives contributions aggregating in excess of $1,000 during a calendar year or which makes expenditures aggregating in excess of $1,000 during a calendar year." 2 U.S.C. 431(4)(A); 11 CFR 100.5(a). Under the Act and Commission regulations, political committees are subject to certain registration and reporting requirements, as well as limitations and prohibitions on contributions received and made, and on expenditures made. As the Commission stated previously, "[a]ny funds that are 'contributions' by operation of new section 100.57 are contributions for purposes of the 'political committee' definition in 2 U.S.C. 431(4)(A) and 11 CFR 100.5(a) . . . ." *Political Committee Status Final Rules*, 69 Fed. Reg. at 68058. Once Unity 08 receives over $1,000 in contributions, or makes over $1,000 in expenditures, it will satisfy the statutory definition of "political committee," *see* 2 U.S.C. 433.

The Supreme Court has held that, "[t]o fulfill the purposes of the Act," and to avoid "reach[ing] groups engaged purely in issue discussion," only organizations whose major purpose is campaign activity can be considered political committees under the Act. *See e.g.*, *Buckley v. Valeo*, 424 U.S. 1, 79; *FEC v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 262 (1986). An organization's "major purpose" may be established

---

[5] The Commission's conclusion is restricted to the facts presented here: Unity 08 intends to support only two candidates, one for the office of President of the United States and one for the office of Vice President; it "does not intend to support or oppose candidates for Congress or State and local elections at any time"; and it is "not looking to build a new and permanent party."

AO 2006-20
Page 5

through its own public statements. *See e.g., FEC v. Malenick*, 310 F. Supp. 2d 230, 234-36 (D.D.C. 2004) (finding the organization evidenced its "major purpose" through its own materials which stated the organization's goal of supporting the election of Republican Party candidates for Federal office and through efforts to get prospective donors to consider supporting Federal candidates); *FEC v. GOPAC, Inc.*, 917 F. Supp. 851, 859 (D.D.C. 1996) (finding that the "organization's [major] purpose may be evidenced by its public statements of its purpose or by other means. . . .").

Unity 08's self-proclaimed major purpose is the nomination and the election of a presidential candidate and a vice-presidential candidate.[6] Unity 08 clearly states this goal in its advisory opinion request and on its website. While Unity 08 has a subsidiary objective of influencing the major parties to adopt, in connection with the 2008 national elections, the core positions of Unity 08 supporters, your letters of May 30 and August 16, as well as Unity 08's website, state that Unity 08's first goal is the election "of a Unity Ticket for President and Vice-President of the United States in 2008."

Therefore, given that Unity 08 is making "expenditures" under the Act and Commission regulations, Unity 08 will become a political committee once it makes more than $1,000 in expenditures.[7] Unity 08 must register with the Commission by filing a statement of organization within ten days after becoming a political committee, and it will be subject to the provisions of the Act and Commission regulations applicable to political committees.[8] *See* 2 U.S.C. 433, 11 CFR 102.1 and 102.2.

*Question 2: May Unity 08 incorporate for liability purposes only?*

Yes, Unity 08 may incorporate for liability purposes only, once it becomes a political committee. Under Commission regulations, a political committee may incorporate for liability purposes only without running afoul of the Act's prohibitions on corporate contributions and expenditures. *See* 11 CFR 114.12. Thus, Unity 08 may incorporate for liability purposes without being subject to the corporate prohibitions in 2 U.S.C. 441b and 11 CFR part 114.

---

[6] *See Buckley v. Valeo*, 424 U.S. 1, 79 (the term "political committee" encompasses organizations "the major purpose of which is the nomination or election of a candidate").

[7] The Commission notes that Unity 08 must also register as a political committee if it accepts more than $1,000 in contributions. The Commission has made no determination as to whether Unity 08 will accept contributions under the facts presented here.

[8] In its advisory opinion request, Unity 08 cites *FEC v. Machinists Non-Partisan Political League*, 655 F.2d 380 (D.C. Cir. 1981), to support its assertion that Unity 08 is not a political committee. In *Machinists,* the Court of Appeals for the D.C. Circuit held that so-called "draft groups" were not political committees under the Act. 655 F.2d at 392. Unity 08, however, is not a draft group. Draft groups do not promote the election of certain candidates for Federal office, but have the more limited aim of convincing individuals who are not yet candidates to run for office. By contrast, the declared purpose of Unity 08 is not to "draft" candidates but to get its chosen presidential candidate and vice-presidential candidate on the ballot, and to raise and spend funds in support of its two candidates. Moreover, *Machinists* expressly left open the question of whether draft groups could be treated as political committees for purposes of the Act's contribution limits after Congress's 1979 amendments to the Act. 655 F.2d at 395-96.

AO 2006-20
Page 6


   This response constitutes an advisory opinion concerning the application of the Act and Commission regulations to the specific transaction or activity set forth in your request. *See* 2 U.S.C. 437f. The Commission emphasizes that, if there is a change in any of the facts or assumptions presented, and such facts or assumptions are material to a conclusion presented in this advisory opinion, then the requestor may not rely on that conclusion as support for its proposed activity.

        Sincerely,

        (signed)

        Robert D. Lenhard
        Vice Chairman


Enclosures (Advisory Opinions 2004-34, 1994-05, and 1984-11)

# EXHIBIT 5

Case 1:07-cv-00053-RWR     Document 17-7     Filed 03/21/2007     Page 2 of 6
Federal Election Commission Advisory Opinion Number 1994-5

Page 1 of 5

# Federal Election Commission Advisory Opinion Number 1994-5

<u>Back to Federal Election Commission Advisory Opinions Search Page</u>

<u>Federal Election Commission Main Page</u>

April 18, 1994

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

ADVISORY OPINION 1994-5

William D. White
16 E. Manilla Avenue
Pittsburgh, PA 15220

Dear Mr. White:

This responds to your letters dated March 12 and March 2, 1994, which request an advisory opinion concerning application of the Federal Election Campaign Act of 1971, as amended ("the Act"), and Commission regulations to your status as a 1994 candidate for the United States Senate in Pennsylvania.

You state that you have publicly announced your intent to be a candidate in Pennsylvania for the 1994 U. S. Senate election cycle. Your announcement was made on or about November 5, 1993, and you filed a Statement of Candidacy (FEC Form 2) which was stamped as received by the Secretary of the Senate on December 15, 1993. With this filing you also submitted a Statement of Organization (FEC Form 1) designating your principal campaign committee under the name "Bill White for U.S. Senate." This statement identifies you as the treasurer and the chairman of the committee. It further indicates that the committee does not have any bank account or other depository account to receive, hold, and disburse committee funds.

Your request explains that you will be seeking office as an independent (no political party affiliation) in the November 1994 general election. You expect to obtain ballot access in the general election by gathering the "nominating signatures" of qualified electors on "Nomination Paper" forms prepared by Pennsylvania election officials. You expect to begin circulating these forms as soon as allowed under state law, and you believe the circulation period began on March 2, 1994. You also assert that you meet all applicable requirements of the United States Constitution with respect to qualifications for election to the office of U. S. Senator.

You request an advisory opinion from the Commission "determining if I am a legally qualified candidate for the United States Senate within the meaning of 2 U.S.C. §431(2)." You also ask whether an opinion to this effect supersedes "any similar determination by any other State or Federal Agency, and if these other agencies are legally bound by the determination of the FEC on this matter."

The question of whether you are a candidate under the Act and Commission regulations depends upon the amount of financial activity by you or by any person, including a campaign committee, you authorize to conduct campaign activity on your behalf. When financial activity to influence your election exceeds $5,000 in either contributions received or expenditures made, you are required to file as a Senate candidate.1/

This means that you would become a candidate under the Act if you and your campaign committee, and any other person you authorize to conduct campaign activity on your behalf, receive a total amount that exceeds $5,000 in contributions. Similarly, you would become a candidate under the Act if you, your committee, and any other person you authorize, make a combined total of over $5,000 of expenditures to influence your election. 2 U.S.C. §431(2), 11 CFR 100.3(a).2/ Conversely, you are not a candidate for purposes of the Act and Commission regulations if neither your total of campaign contributions received, nor your total of campaign

expenditures made, exceeds $5,000 for the 1994 Senate election cycle.

Once you are required to file as a Senate candidate, the required filings must be made with the Secretary of the Senate, as custodian for the Commission. In addition, a copy of each document in the filing must be filed with the appropriate state office which in your State is the Bureau of Commissions, Elections and Legislation in Harrisburg, PA. The filing of the Statement of Candidacy (FEC Form 2) which designates a principal campaign committee must be made no later than 15 days after you become a Federal candidate. Within 10 days of its designation by you, the principal campaign committee must register by filing a Statement of Organization (FEC Form 1). As noted above, you have filed these documents even though you have not yet indicated that over $5,000 of financial activity has occurred with respect to your 1994 Senate campaign.

Commission regulations explain that individuals who are not required to file as candidates under the Act may voluntarily register and file reports, but a person who does so does not become a candidate solely by voluntarily filing. 11 CFR 104.1(b). This regulation is based upon 1979 legislative history explaining the intent of Congress when it first prescribed the $5,000 threshold for mandatory candidate filing.3/ Addressing the $5,000 candidate status threshold,

the report of the Committee on House Administration states:

> The purpose of the change in this definition
> [of the term "candidate"] is to reduce the number
> of candidates who are required to register and
> report under the Act.
> An individual does not become a candidate
> until he or she has received $5,000 or spent $5,000
> or a person authorized by the individual receives
> $5,000 or spends $5,000 on behalf of the
> individual.
> * * * *
> It is [the] clear intent of the Committee to
> relieve individuals who do not meet the definition
> of candidate of any registration and reporting
> requirements under the Act even if such individuals
> appear on the ballot. . . . [A]ppearance on the
>
> ballot no longer creates a presumption that the
> individual has a registration or reporting
> obligation.
> On the other hand, individuals who do not meet
> the legal definition of candidate may file reports
> voluntarily. The Clerk, Secretary, or Commission,
> as appropriate, must make any report voluntarily
> filed with it public. However, an individual who
> is voluntarily filing a report is not subject to
> the nonfiling provisions of this Act until he or
> she becomes a candidate. * * *

H. R. Rep. No. 96-422, 96th Cong., 1st Sess. 5,
(1979).

As the foregoing discussion and citations indicate, the
Commission does not make any determination of the type you
have requested; namely, whether you are a "legally qualified
candidate" for Federal office. The Act and the Commission do
require that if you become a Federal candidate by virtue of
receiving over $5,000 in campaign contributions or making
over $5,000 in campaign expenditures, as more fully described
above, you must file as a candidate in a timely manner and
must otherwise comply with all provisions of the Act and
Commission regulations.

You also ask whether Commission determinations of a
person's candidacy for Federal office are binding on other
State or Federal Government agencies. The Commission notes
that the fact one is a candidate under the Act does not
determine his or her qualifications for the election ballot
in any State. Ballot access requirements are governed by
State law, assuming such law comports with the requirements
of the United States Constitution as interpreted and applied
by the United States Supreme Court and lower Federal courts.
See, for example, Munro v. Socialist Workers Party, 479 U.S.
189 (1986); Anderson v. Celebrezze, 460 U.S. 780 (1983);
Lubin v. Panish, 415 U.S. 709 (1974); Jenness v. Fortson, 403

U.S. 431 (1971); Williams v. Rhodes, 393 U.S. 23 (1968). The Commission further notes that Federal preemption under 2 U.S.C. §453 does not extend to State ballot access requirements. Commission regulations provide that state laws, which prescribe the manner of qualifying as a candidate, are not preempted or superseded by the Act or Commission regulations. 11 CFR 108.7(c)(1).

You may also wish to review relevant provisions of the Communications Act of 1934, as amended, that impose certain duties on broadcast stations "to allow reasonable access to or to permit purchase of reasonable amounts of time for the [campaign] use of a broadcasting station by a legally qualified candidate" for Federal elective office. 47 U.S.C. §312(a)(7). Under some circumstances this statute also requires broadcast licensees to give "equal opportunities" for use of its station to "a legally qualified candidate" for any public office. 47 U.S.C. §315(a). These provisions are interpreted in the rulings and regulations of the Federal Communications Commission, not by the Federal Election Commission.

This response constitutes an advisory opinion concerning application of the Act, or regulations prescribed by the Commission, to the specific transaction or activity set forth in your request. See 2 U.S.C. §437f.

For the Commission,

(signed)

Trevor Potter
Chairman

ENDNOTES

1/ For example, expenditures to influence your election would include amounts you spend from your personal funds (before you receive any contribution from any other person) to promote yourself for the general election ballot by seeking signatures on nomination petitions.

2/ Once you become a candidate under the Act, the first report required to be filed must include disclosure of all funds, including all contributions of money or other things of value, received by you or your committee or by other persons you authorized to conduct campaign activity. It must also disclose all disbursements for your campaign. 11 CFR 101.2(b), 101.3, 104.3(a), 104.3(b). Assuming you become a candidate under the Act in 1994, any receipts or disbursements made in 1993 for your Senate campaign would have to be disclosed in your first report, but should be submitted in a separate set of FEC forms filed at that time. This is because several disclosure categories require the filing of receipt and disbursement data with calendar year totals or aggregates. 11 CFR 104.3(a)(3), 104.3(a)(4),

Federal Election Commission Advisory Opinion Number 1994-5                    Page 5 of 5

104.3(b)(2), 104.8(b), 104.9(b).

3/ Before 1980, each Federal office candidate, who took the action necessary under State law to qualify for the ballot, was required to file with the Commission regardless of the amount of funds received or spent. 2 U.S.C. §431(b)(1) (1976).

# EXHIBIT 6

# Federal Election Commission Advisory Opinion Number 1984-11

Back to Federal Election Commission Advisory Opinions Search Page

Federal Election Commission Main Page

May 3, 1984
CERTIFIED MAIL
RETURN RECEIPT REQUESTED
ADVISORY OPINION 1984-11
Harry Kresky, Esq.
Kresky, Sinawski & Hollenberg
19 W. 44th Street
Suite 1000
New York, New York 10036
Dear Mr. Kresky:
This responds to your letter of February 29, 1984,
requesting an advisory opinion on behalf of Dennis Serrette, a
1984 presidential candidate, and Independents for
Dennis Serrette, his principal campaign committee, with respect
to his eligibility for matching funds under the Presidential
Primary Matching Payment Account Act ("Matching Payment Act"),
26 U.S.C. SS SS 9031-9042.
You state that Mr. Serrette is seeking the nomination of
various independent political parties in an attempt to place his
name on the ballot for the Office of President of the United
States in the 1984 general election in as many states as
possible. You add that Mr. Serrette has made plans to: enter
the presidential primary and take other steps necessary to obtain
the nomination of the Peace and Freedom Party in California;
enter the preferential primary and take other steps necessary to
seek the nomination of the Liberty Union Party in Vermont; seek
the nomination of the Consumer Party in Pennsylvania; seek ballot
position as the Presidential candidate of the New Alliance Party
in New York; seek the nomination of the Labor Farm Party in
Wisconsin; and obtain signatures on nominating petitions in
approximately 29 other states to insure that his name appears on
the ballot in the general election for the Office of President.
You note that the requisite number of signatures have already
been collected in Ohio, Mississippi, Alabama, Maryland and Iowa.
You have asked whether, by engaging in these activities,
Mr. Serrette would be entitled to receive matching funds,
assuming he meets all of the other eligibility requirements of 26
U.S.C. SS 9033 and Commission regulations at 11 CFR Part 9033. In
addition, you ask whether Mr. Serrette's participation in these
activities would enable him to certify that he is seeking
nomination by a political party to the Office of President is
more than one state. You also ask whether, if the answer to the
above question is no, Mr. Serrette would qualify for matching
funds if the various parties, individuals, and organizations
supporting him held a national convention for the purpose of
nominating a candidate of a national political party to be formed
at the convention. Finally, you have inquired as to what is the

last day of the matching payment period pursuant to 11 CFR
9032.6, and what is the last date on which contributions that
would qualify as matchable contributions can be received.
Under 26 U.S.C. SS 9032(2), the term "candidate" is defined as
"an individual who seeks nomination for election to be President
of the United States", and does not include "any individual who
is not actively conducting campaigns in more than one State."
With respect to a candidate's eligibility to receive payments,
the Matching Payment Act requires that the candidate certify that
he or she "is seeking nomination by a political party." 26
U.S.C. SS 9033(b)(2). The regulations implementing this provision
state that the term "political party" means "an association,
committee or organization which nominates an individual for
election to the office of President." 11 CFR 9033.2(b)(1). The
Commission concludes that, in light of these provisions, assuming
Mr. Serrette meets all of the other eligibility requirements of
26 U.S.C. SS 9031 et seq., he would not be barred from receiving
matching payments solely because he is seeking the nomination of
different political parties in different states. By
participating in various primary elections and nominating
conventions and by actively conducting a campaign with respect to
those events, Mr. Serrette would be able to certify that he is
seeking nomination by a political party to the Office of
President in more than one state.
Because the answers to the above questions are in the
affirmative, the Commission does not reach the issue of whether
Mr. Serrette would qualify for matching funds if the various
parties, individuals, and organizations supporting him held a
national convention for the purpose of nominating a candidate of
a national political party to be formed at the convention. See
Advisory Opinion 1983-47, copy enclosed.
With respect to your question regarding the matching payment
period, the end of the matching payment period for
Mr. Serrette would be the earlier of (1) the last date when
Mr. Serrette is nominated by any political party on the state
level, or (2) the last day of the last national convention held
by a major political party in 1984.*/ See 26 U.S.C. SS 9032(6) and
11 CFR 9032.6. The date when the matching payment period may end
appears to be of limited significance since the principal factor
is the candidate's continuing eligibility for matching payments
once threshold eligibility is established. 11 CFR 9033.5(c).
Although not specifically asked in your questions, the
matching payment period has some relevance with respect to the
types of expenses that would be viewed as qualified campaign
expenses of Mr. Serrette's campaign, assuming he becomes eligible
for matching payments. Your request indicates that Mr.
Serrette's campaign expenses will, in part, include expenses to
obtain signatures for nominating petitions in several states so
that his name will appear on the general election ballot as a
presidential candidate.
The Matching Payment Act and Commission regulations require
that matching payments, as well as all disbursements of an
eligible candidate's campaign committee(s), be used only for
qualified campaign expenses. 26 U.S.C. SS SS 9032(9), 9033, 9038,
9042; 11 CFR 9032.9, 9033.1, 9034.4. Qualified campaign expenses
may only be incurred with respect to the period in which a

Federal Election Commission Advisory Opinion Number 1984-11          Page 3 of 4

candidate is eligible for matching payments. 11 CFR 9034.4. The date when the candidate becomes ineligible coincides with the last day of the matching payment period for that candidate. 11 CFR 9033.5(c). Accordingly, campaign expenditures made (or campaign obligations incurred) within the matching payment period would satisfy the timeliness requirement for a "qualified campaign expense." In addition, such expenses must also be made in connection with the candidate's campaign for nomination. 11 CFR 9032.9. In Mr. Serrette's situation, expenditures will apparently be made to collect petition signatures for the general election ballot. The Commission is of the opinion that these expenses, to the extent they are paid or incurred within what would be Mr. Serrette's matching payment period if he becomes eligible for matching funds, would be qualified campaign expenses for purposes of the Matching Payment Act.

The Commission bases this conclusion on analogous provisions (limited to independent or nonmajor party candidates) of its regulations defining primary election for contribution limit purposes. The regulations recognize that for nonmajor party candidates the requirements of State law governing qualification

*/ The Commission notes that none of the political party organizations identified in your request have been recognized by the Commission as having established a national committee of a political party. 2 U.S.C. SS 431(14). Accordingly, the Commission assumes for purposes of this opinion that conventions of those organizations would not be national conventions.

for a position on the general election ballot serve purposes similar to a primary election or other nominating process. See 11 CFR 100.2(c)(4). Moreover, in Advisory Opinion 1975-44 (copy enclosed) the Commission addressed contribution limit issues with regard to the presidential candidate of a nonmajor party and held that such a candidate could receive contributions with respect to a nomination/primary election until the date on which the last major party to do so nominates its presidential candidate. The Commission emphasizes that this opinion reaches the qualified campaign expense issue only with respect to the ballot petition expenses of the Serrette campaign; the Commission is not herein addressing any other expense category.

Finally, you have asked what is the last day on which funds can be collected by Mr. Serrette's campaign which would qualify as matchable contributions. This question is not posed in a specific factual context and is thus more in the nature of a general inquiry than a proper request for an advisory opinion. Accordingly, the Commission refers you to relevant provisions of its regulations. The regulations indicate that otherwise matchable contributions may be received by an eligible candidate as long as he or she remains eligible and has net outstanding campaign obligations; however, in no event could matchable contributions be received after December 31 of the Presidential election year. See generally Commission regulations at 11 CFR Parts 9033 and 9034; and, in particular, 11 CFR 9033.5 and 9034.5. Of course, to establish entitlement to matching payments at any time, a candidate must become eligible and must maintain eligibility. 11 CFR 9034.1. In addition, the public financing

statutes and Commission regulations have separate definitions of qualified campaign expenses incurred to further a candidate's election and those incurred in connection with a campaign for nomination for election. See 26 U.S.C. SS 9002(11) and compare 26 U.S.C. SS 9032(9); also, see 26 U.S.C. SS 9012(c), SS 9042(b). This response constitutes an advisory opinion concerning application of the Act, or regulations prescribed by the Commission, to the specific transaction or activity set forth in your request. See 2 U.S.C. SS 437f.

# EXHIBIT 7

# Federal Election Commission Advisory Opinion Number 2003-1

Back to Federal Election Commission Advisory Opinions Search Page

Federal Election Commission Main Page

March 7, 2003

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

ADVISORY OPINION 2003-1

Mitchell J. Eichen
Treasurer
NORPAC
P.O. Box 5595
Englewood, N.J. 07631

Dear Mr. Eichen:

This responds to your letters on behalf of NORPAC
dated November 18, 2002, and December 28, 2002, requesting
an advisory opinion concerning the application of the
Federal Election Campaign Act of 1971, as amended ("the
Act"), and Commission regulations to NORPAC's annual
mission to Washington.

Background

The Statement of Organization, as amended, filed by
NORPAC indicates that it is a nonconnected committee and
qualifies as a multicandidate committee. Reports filed
with the Commission indicate that NORPAC makes
contributions in connection with Federal elections, and has
also made donations to non-Federal candidates using Federal
funds.

You state that each year "participants" from NORPAC
make an annual mission to Washington, where they meet with
Members of Congress to discuss issues in support of Israel.
You state that participants act solely as individuals. You
state that these issues can include bills that have been
introduced or that NORPAC would like to have introduced.
You further state that no discussions of support for any
Member of Congress are held at these meetings. You state
that:
1. During the mission, no campaign contributions are
delivered to anyone at anytime;

2. During the mission, no receptions or similar events
are held for any Member of Congress or candidates for

Federal office;

3. NORPAC seeks no assistance from Members of Congress or candidates for Federal office for fundraising activities;

4. Participants do not meet with political party officials as part of the mission;

5. To the best of your knowledge, no Member of Congress or candidate for Federal office has ever signed a fundraising letter for NORPAC, or otherwise participated in fundraising for NORPAC;

6. No contributions of any sort (e.g., to political party committees or to PACs) are made as part of the annual mission; and

7. As a result of these meetings, subsequent decisions about candidate support may be made.

You provide the following examples of expenses incurred in connection with the annual mission to Washington: bus travel; food; rental of meeting space; supplies for participants (pens, folders, pads, etc.); informational packets regarding issues to be discussed; and Congressional directories. You state that payments are made to NORPAC by annual mission participants in the form of an attendance fee to participate in the mission, and that the attendance fee is based in large part on the prior year's fee, and is intended to allow NORPAC to recover the direct costs of its mission.

You state that, until now, all the attendance fees related to the annual mission were deposited into NORPAC's Federal account, and all the disbursements made in connection with the annual mission were made from NORPAC's Federal account. In December 2001, NORPAC established a non-Federal bank account.

Question Presented

You ask whether the attendance fees related to the annual mission may be deposited into NORPAC's non-Federal account and whether the disbursements for the annual mission may be made from NORPAC's non-Federal account, or whether the annual mission expenses must be allocated between NORPAC's Federal and non-Federal accounts.

Analysis and Conclusion

In brief, the Commission concludes that NORPAC may either allocate disbursements for the expenses about which you inquire between NORPAC's Federal and non-Federal accounts, or it may make these disbursements solely from NORPAC's Federal account.

NORPAC has chosen to organize and operate as a Federal political committee. Under 2 U.S.C. 434(a), such a political committee must file reports of receipts and disbursements. Under 2 U.S.C. 434(b)(4), these reports must include "the total amount of all disbursements, and all disbursements" in several categories, such as expenditures, independent expenditures, contributions, loans, transfers and "any other disbursements." Given these statutory reporting requirements and given that NORPAC exists in legal form as a Federal political committee, disbursements for the expenses about which you inquire must be viewed in light of NORPAC's status as a political committee. The major purpose of a political committee is material to the reporting of receipts and disbursements even if those receipts and disbursements are not directly in connection with a federal election.1

Since 1977, Commission regulations have required political committees active in both Federal and non-Federal elections to allocate their administrative expenses between the committee's Federal and non-Federal accounts "in proportion to the amount of funds expended on Federal and non-Federal elections, or on another reasonable basis." See Explanation and Justification to the Final Rules on Methods of Allocation Between Federal and Non-Federal Accounts; Payments; Reporting, 55 FR 26058, 26059 (June 26, 1990). For purposes of this opinion, these rules were not changed by the Bipartisan Campaign Reform Act of 2002, Pub. L. 107-155, 116 Stat. 81 (March 27, 2002). The cited Explanation and Justification notes that the purpose of these rules is to implement the contribution and expenditure limitations and prohibitions established by 2 U.S.C. 441a and 441b. 55 FR at 26058.

Commission regulations at 11 CFR 106.6 set forth the procedures to be followed by nonconnected committees that make disbursements in connection with both Federal and non-Federal elections. Under 11 CFR 106.6(a), nonconnected committees may make such disbursements in one of two ways: they may make them entirely from funds raised subject to the prohibitions and limitations of the Act; or, if they have established separate Federal and non-Federal accounts pursuant to 11 CFR 102.5, they may allocate them between these accounts. If a nonconnected committee elects to allocate, then it should allocate these disbursements pursuant to the funds expended method described at 11 CFR 106.6(c). Section 106.6(b) provides that "nonconnected committees that make disbursements in connection with federal and non-federal elections shall allocate expenses for the following categories of activity":

1. Administrative expenses including rent, utilities, office supplies, and salaries, except for such expenses

Federal Election Commission Advisory Opinion Number 2003-1                    Page 4 of 5

directly attributable to a clearly identified candidate.
11 CFR 106.6(b)(2)(i);

2. The direct costs of a fundraising program or event
including disbursements for solicitation of funds and for
planning and administration of actual fundraising events,
where federal and non-federal funds are collected through
such program or event. 11 CFR 106.6(b)(2)(ii); and

3. Generic voter drives including voter identification,
voter registration, and get-out-the-vote drives, or any
other activities that urge the general public to register,
vote or support candidates of a particular party or
associated with a particular issue, without mentioning a
specific candidate. 11 CFR 106.6(b)(2)(iii).

The expenses about which you inquire are of the type
listed in 11 CFR 106.6(b)(2)(i) (e.g., office supplies,
rental of meeting space, etc.). Thus, the Commission finds
that these are administrative expenses. Therefore, the
Commission further finds that the expenses about which you
inquire must be allocated between Federal and non-Federal
funds under 11 CFR 106.6, unless they are paid solely from
NORPAC's Federal account.2

You ask whether payments to NORPAC by participants in
the annual mission to Washington are exempt from the
general contribution limitations to a political committee.
The attendance fees for the mission to Washington may be
deposited in either NORPAC's Federal or non-Federal
account. Contributions by participants to NORPAC's Federal
account are contributions to NORPAC, and thus are subject
to the Act's contribution limitations, prohibitions, and
reporting requirements. 2 U.S.C. 434 and 441a. However,
donations by participants to NORPAC's non-Federal account
are not subject to the Act's contribution limitations. See
11 CFR 106.6. If participants are merely reimbursing
NORPAC at cost for specific earmarked individual expenses
(i.e., room deposits), such transfers are not limited as
contributions or expenditures and may pass through the
nonfederal account. Similarly, funds advanced by NORPAC
for such specific individual expenses need not be
allocated, but may be paid from the nonfederal account.

The Commission expresses no opinion concerning any
possible application of Federal lobbying statutes (e.g.,
the Lobbying Disclosure Act of 1995, codified at
2 U.S.C. 1601 et. seq.) since those issues are not within
its jurisdiction. For the same reason the Commission also
expresses no opinion as to the implications of NORPAC's
annual mission activities under the Internal Revenue Code,
and in particular expresses no opinion as to NORPAC's
status as a political organization under 26 U.S.C. 527.

This response constitutes an advisory opinion
concerning the application of the Act and Commission

regulations to the specific transaction or activity set
forth in your request. See 2 U.S.C. 437f. The Commission
emphasizes that, if there is a change in any of the facts
or assumptions presented, and such facts or assumptions are
material to a conclusion presented in this opinion, then
the requestor may not rely on that conclusion as support
for its proposed activity.

Sincerely,

(signed)

Ellen L. Weintraub
Chair

---

1 See, e.g., FEC v. GOPAC, Inc., 871 F.Supp. 1466, 1470-71
(D.D.C. 1994) ("Buckley (424 U.S. 1 (1976)) authoritatively
establishes that any payment of $1,000 or more by an
organization whose major purpose has been determined to be
the nomination or election of an identified candidate for
federal office . . . is, `by definition, campaign
related' and hence, constitutes an `expenditure' by a
`political committee.'").
2 You also ask whether certain disbursements in connection
with NORPAC's annual mission to Washington constitute "non-
Federal activities" and are therefore exempt from reporting
under the Act. As discussed above, disbursements in
connection with NORPAC's annual mission to Washington
should be allocated between NORPAC's Federal and non-
Federal accounts, unless these disbursements are solely
made from the Federal account.

# EXHIBIT 8

**FEDERAL ELECTION COMMISSION**
WASHINGTON, D C. 2046J

## MEMORANDUM

**TO:**      **The Commissioners**
             **Staff Director**
             **Deputy Staff Director**
             **General Counsel**

**FROM:**    **Office of the Commission Secretary**

**DATE:**    **February 27, 2002**

**SUBJECT:** **Statement Of Reasons for Pre-MUR 395**

Attached is a copy of the Statement Of Reasons for Pre-MUR 395

signed by Chairman David M. Mason, Commissioner Bradley A. Smith,

and Commissioner Darryl R. Wold.

This was received in the Commission Secretary's Office on

Tuesday, February 26, 2002 at 4:17 p.m.

cc: Vincent J. Convery, Jr.
    OGC Docket (5)
    Information Division
    Press Office
    Public Disclosure

Attachment



**FEDERAL ELECTION COMMISSION**
WASHINGTON, D.C. 20463

### Pre-MUR 395 (College Republican National Committee)

### Statement of Reasons of
### Chairman David M. Mason, Commissioner Darryl R. Wold,
### and Commissioner Bradley A. Smith

Normally we would not consider it necessary to write a statement explaining our decision to approve the recommendation of the Office of General Counsel, routinely closing a case pursuant to the Commission's Enforcement Priority System ("EPS"). However, in light of Commissioner Thomas's Statement of Reasons of November 9 in this matter, we believe it is worthwhile to put forth for the public record our reasons for approving the General Counsel's recommendation in our own words, rather than through the filter of Commissioner Thomas. Further, we note that this matter arose as an agency referral rather than through an outside complaint, so that the designated respondent, College Republican National Committee ("CRNC"), has had no chance to respond to the alleged violations, and but for Commissioner Thomas's statement, there would be no public release of this matter.[1] Thus, left unanswered we believe that Commissioner Thomas's Statement of Reasons, with its strong language suggesting that CRNC has violated the law, needlessly and unfairly impugns the CRNC.[2]

In his aforementioned Statement of Reasons, Commissioner Thomas first explains why he believes that this case should have been left on the Commission docket despite having grown "stale" under the Enforcement Priority System. He explains his belief that there is a "strong likelihood that the major purpose of the College Republican National Committee is campaign activity," and suggests that despite the staleness problem this case should be exempted from the EPS because the group has a sizeable budget and because a similar complaint against the group (MUR 3826) was also dismissed as stale under the EPS in 1996. He does not suggest that the case be activated, but merely that it be allowed to languish on the docket so that it might later be activated, "should resources

---

[1] *See* 2 U.S.C. § 437g(a)(12); 11 C.F.R. §§ 111.9, 111.20-21.

[2] For example, Commissioner Thomas writes at different points: "the materials provided [in the referral] ... demonstrate the strong likelihood that the major purpose of the group is campaign activity;" "[a] large group that is avoiding disclosure of hundreds of thousands of dollars...;" "a large, well-connected group that should be reporting declines to do so...;" "where a case presents a fairly significant apparent violation - in this case the failure to disclose hundreds of thousands of dollars spent on hard-edged partisan communications;" and "Commissioners should be looking for opportunities to enforce the law where it matters most." Statement of Reasons, Commissioner Scott E. Thomas, Pre-MUR 395, p. 1, 3, 5, 6 (hereinafter "Thomas SOR").

1

permit,"[3] though there is no indication that the Office of General Counsel expects that to happen.

The purpose of the Enforcement Priority System is to focus the Commission's resources on those cases that are most important to effectively carrying out our duties. As noted by Commissioner Thomas,[4] the system involves rating each case on a point system. Most cases dismissed under the EPS without investigation are dismissed because they are deemed "low priority," so that pursuing them would not be an effective use of resources. However, a small number of cases which do not fall in the "low priority" category are nonetheless dismissed as "stale," meaning that Commission resources have not permitted the case to be activated after a number of months.[5] The presumptions behind dismissing cases for staleness include that citizens ought not have the threat of an investigation hanging over them for a lengthy time if it is unlikely that the investigation will actually take place, and that the Commission should focus resources on important cases of more recent vintage, with fresher evidence and more importance to current campaigns.[6]

Pre-MUR 395 came to the Commission not through any complaint by the public, but as a referral by the Pennsylvania Bureau of Charitable Organizations, which was investigating whether the CRNC had properly registered to solicit contributions in Pennsylvania pursuant to that Commonwealth's laws on solicitation.[7] The referral was received at the FEC on June 19, 2000, by which time it appears that all of the activity that served as the basis for the referral was already more than two years old.[8] In fact, by the time the Commission prepared to drop this case as "stale," all of the activity referenced in the referral appears to have been at least three years and seven months old, and some of it as much as four years old. Since there was no evidence that the Office of General Counsel anticipated that it could activate the case in the near future (nor did Commissioner Thomas ask it to), it is very doubtful that the case could have been activated until all of the underlying behavior was at least four years old, and much of it even older. Given the five year statute of limitations, the statutory requirement that a

---

[3] *Id.* at 1-2.

[4] *Id.* at 2, fn. 3.

[5] There were five such cases in fiscal year 2001.

[6] We note that Commissioner Thomas does not have a generic objection to dismissing cases as "stale," though he has sought to have specific cases held or activated beyond the stale dismissal date, *see* MURs 4491; 4519; 4563.

[7] It appears that the Commonwealth was upset that the CRNC had not responded to its requests for information. *See* Letter from Lisa Sandoe, Special Investigator, Commonwealth of Pennsylvania to Lois Lerner, Associate General Counsel for Enforcement, June 5, 2000 (explaining that the Commonwealth had received no response from the CRNC, and so checked to see if the organization was registered with the FEC; and finding it was not, referring the matter to the Office of General Counsel.) From the materials submitted by the Commonwealth, this referral appears to have been made more than two years after the last letter from the Commonwealth to the CRNC.

[8] The CRNC material attached to the referral, which serves as the basis for the referral, is undated. However, most or all of it presumably took place before February 13, 1998 when the Commonwealth's Bureau of Charitable Organizations first wrote to the CRNC. (Letter from Karl Emerson to Adam Brohimer dated Feb. 13, 1998, attached to referral). The referral itself states that the CRNC had solicited a Pennsylvania resident "during the period November 1997 through March 1998." Letter from Lisa Sandoe to Lois Lerner, June 5, 2000. Much of the material refers to current events of January and February, 1998.

respondent be given at least 15 days to respond to any "probable cause" brief by the General Counsel, 2 U.S.C. 437g(a)(3), and the statutory requirement that the Commission engage in conciliation efforts for at least thirty days prior to filing an enforcement action, 2 U.S.C. 437g(a)(4), any investigation would have had to be conducted in a hasty and less than thorough fashion in order to beat the statute of limitations. Even assuming that a full and thorough investigation would support a finding that the Act had been violated, it is doubtful that such a thorough investigation could be completed in time remaining. In short, because of the lengthy time between the activity underlying the referral and the date of the referral itself, this case is unusually "stale," even by EPS standards.

This is important because Commissioner Thomas ridicules us for not supporting his motion because, to use his caricature of our position, "this might prove to be a difficult case to resolve." Noting that "any case of significance might be difficult to resolve," he argues that "the Commission should never simply 'cave'...."[9] But Commissioner Thomas does not dispute that the nature of the allegations in this Pre-MUR would require a substantial investigation to resolve. In a recent law review article, Commissioner Thomas himself discussed the difficulties of completing FEC investigations within short time frames: "a fairly routine matter can easily take one year if the matter proceeds to probable cause ... [o]f course, if a matter is factually complex and requires an extensive investigation, the resolution of cases can take much longer.... A factually complex case with extensive discovery and investigation may take three or four years."[10] For these very reasons, we believe that a case which would indisputably require extensive investigation, and where some of the activity is already four or more years old and all or almost all of it would be at least that old before there would be any chance of the case being activated for investigation, is a particularly poor case to withdraw from the EPS system for dismissing stale cases.

Tied to the complexity of the case is that the legal theory on which it appears the Commission would have to rely has already been rejected by the U.S. District Court for the District of Columbia in *FEC v. GOPAC,* 917 F. Supp. 851 (D.D.C. 1996). Again, Commissioner Thomas does not reject our suggestion that *GOPAC* is an applicable precedent, and that it suggests a lower than usual likelihood that the Commission could win this case in court. Rather, he simply dismisses the Court's decision in *GOPAC* as "goofy," "misguided," and "nonsensical."[11]

We do not share Commissioner Thomas's view of *GOPAC.* Commissioner Thomas argues that GOPAC, the defendant in that case, should have been considered a political committee subject to regulation by the Commission because it's "major purpose" was "campaign activity."[12] The idea that a group can be considered a political committee

---

[9] Thomas SOR, p. 2-3.

[10] Scott E. Thomas & Jeffrey H. Bowman, *Obstacles to Effective Enforcement of the Federal Election Campaign Act,* 52 Admin. L. Rev. 575, 589 (2000).

[11] Thomas SOR at 3. We cannot help but note that in another recent MUR Commissioner Thomas urged us to defer to non-binding decisions of Article III courts even when the decisions at issue were reversed by higher courts, albeit on other grounds. *See* MUR 4994, Statement of Reasons of Commissioner Scott E. Thomas, at 9.

[12] *Id.*

solely because its major purpose is campaign activity has no basis in law. The Act defines a "political committee," in pertinent part, as "any committee... which receives contributions aggregating in excess of $1000 during a calendar year or which makes expenditures aggregating in excess of $1000 during a calendar year...." Thus, major purpose alone, however defined, is not enough to subject a group to the Act. The group must also take in contributions or make expenditures in excess of $1000. The Act defines both "expenditure" and "contribution" in terms of activity made "for the purpose of influencing any election for Federal office," 2 U.S.C. 431(8)(A) and (9)(A). In *Buckley v. Valeo*, 424 U.S. 1, 79 (1976), the Supreme Court made clear that the phrase "for the purpose of influencing any election for Federal office" suffers from constitutional vagueness problems, and that therefore the definition of "political committee" must be limited only to committees that are "under the control of a candidate or the major purpose of which is the nomination or election of a candidate." *Id.* A candidate, under the Act, is an "individual who seeks... Federal office," 2 U.S.C. 431(2), not any candidate for any office whatsoever. Applying *Buckley*, the *GOPAC* Court found that for the years in question the FEC had failed to prove that GOPAC had made any expenditures to support or oppose the nomination or election of a candidate for federal office. GOPAC had made substantial expenditures for state and local Republican candidates, in the hope that doing so would eventually help the Republican Party take control of the U.S. House of Representatives, but the Court noted that these were nonetheless expenditures for state and local candidates, not for federal candidates. 917 F. Supp at 861-62, 864-67. We do not see much that is "nonsensical" or "goofy" here, nor do we see how *GOPAC* fails to follow "the approach used by the Supreme Court," as our colleague puts it.[13]

Part of Commissioner Thomas's difficulty may be that he seems to assume, without saying so, that the CRNC's generic support for candidates of a particular party constitutes "express advocacy" of the election of specific federal candidates, and therefore meets the $1000 expenditure requirement.[14] This position, however, was specifically rejected in GOPAC, 917 F. Supp. at 866-67, and we think GOPAC is correct in holding that general expressions of support for candidates of a party do not, absent direct contributions to federal candidates or the presence of "express advocacy" that would qualify the communication as an "independent expenditure" as defined in 2 U.S.C. §431(17), qualify as "expenditures" under the Act.[15] The types of activities that we are being asked to investigate in this MUR seem to be similar to the types of activities in which GOPAC engaged. Certainly on the face of the complaint there is no sign that

---

[13] *See* Thomas SOR at 3.

[14] *Id.* at 1-2, 3-4

[15] Thus Commissioner Thomas is clearly wrong in suggesting that under *GOPAC*, "none of the national or state political parties would have to register and report with the Federal Election Commission." *Id.* at 3. The holding in *GOPAC* was based on the fact that "GOPAC did not make any direct contribution to any particular federal candidate." 917 F. Supp. at 858. The national and state committees with which we are familiar would not be in this position. What the Court specifically rejected is the argument that Commissioner Thomas seems to make here, that "an organization need not support the 'nomination or election of a candidate,' but only need engage in 'partisan politics' or 'electoral activity,'" to be subject to the Act. 917 F. Supp. at 859. The Court noted that such terms as "'partisan electoral politics' and 'electioneering' raise virtually the same vagueness concerns as the language 'influencing any election for Federal office,' the raw application of which the Buckley Court determined would impermissibly impinge on First Amendment values." *Id.* at 861.

4

CRNC made expenditures that would qualify it as a "committee" required to report under the Act. Thus, on the basis of the facts and apparent legal theories of this referral, it does not appear that there is reason to believe that the Act had been violated in any case.[16]

We recognize that we are not bound in all future cases by the decision of a single district court. However, even if we shared Commissioner Thomas's view that *GOPAC* incorrectly interpreted *Buckley*, we would not be inclined to ignore it in carrying out our duties. We cannot expect the courts to give proper deference to our interpretations of the Act, as part of a co-equal branch of government, if we cavalierly dismiss judicial decisions with which we disagree as "goofy." Moreover, we cannot help but note that the *GOPAC* Court is apparently not the only "goofy" court out there. In addition to *GOPAC*, since Commissioner Thomas took his seat on the FEC the Commission has lost several other cases when it has tried to stretch the definition of express advocacy.[17] We believe that a minimum of proper respect for the judicial branch requires that we at least take even non-binding court opinions seriously and consider them in our own interpretations of the law.

Nor, as a practical matter, could we possibly subscribe to Commissioner Thomas's apparent view that in deciding whether or not to devote resources to a case, we should simply ignore the probability of success on the merits, as reflected by the results in prior, similar cases. Dismissing a case as "goofy" or "nonsensical" does not make the precedent go away. Concern for the viability of our legal theory in the courts should be especially important where we would be launching an investigation of a case outside of the normal guidelines of the Enforcement Priority System,[18] and on a timetable that would make a

---

[16] It appears that this case could only succeed if the Commission were willing to launch a legal challenge to the limits on the definition of "political committee" laid down by the Supreme Court in *Buckley* and followed in *GOPAC*. We are not interested in challenging the Supreme Court's twenty-five year old *Buckley* decision on this issue. The point has already been once reaffirmed by the Supreme Court in *FEC v. Massachusetts Citizens for Life*, 479 U.S. 238 (1986), and in light of our experience on this Commission and elsewhere, we believe *Buckley* was correct on this point. We also note that the Supreme Court has twice in the last two years rejected opportunities to revisit other portions of *Buckley's* core holdings. *See FEC v. Colorado Republican Federal Campaign Committee*, 533 U.S. 432 (2001); *Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377 (2000). Alternatively, we could hope that an investigation, if launched, would yield evidence which is not in the referral in support of legal theories which do not appear in the referral, i.e. that CRNC directly supported for candidates for federal office. But we do not believe that it is proper for this Agency to go forward based on facts and legal theories in referrals or complaints which do not state violations of the Act, even if taken as true. For more on this point, *see* Statement of Reasons of Commissioner Darryl R. Wold in MUR 4994, New York Senate 2000 et al.

[17] *See* Virginia Society for Human Life, Inc. v. FEC, 263 F.3d 379 (4th Cir. 2001); FEC v. Christian Action Network, 110 F.3d 1049 (4th Cir. 1997); FEC v. Maine Right to Life Committee, 98 F.3d 1 (1st Cir. 1996), *cert. denied* 522 U.S. 810 (1997); Faucher v. FEC, 928 F.2d 468 (1st Cir.), *cert. denied* 502 U.S. 820 (1991); FEC v. Freedom's Heritage Forum, No. 3:98CV-549-S (W.D. Ky. Sept. 29, 1999); Right to Life of Duchess County, Inc. v. FEC, 6 F.Supp. 2d (S.D.N.Y. 1998); FEC v. Survival Education Fund, 1994 U.S. Dist. Lexis 210 (S.D.N.Y. Jan. 12, 1994), *aff'd in part and rev'd in part on other grounds*, 65 F.3d 285 (2d Cir. 1995); FEC v. Colorado Republican Federal Campaign Committee, 839 F.Supp. 1448 (D. Colo. 1993), *rev'd on other grounds* 59 F.3d 1015 (10th Cir. 1995) and *vacated on other grounds*, 518 U.S. 604 (1996); FEC v. National Organization for Women, 713 F. Supp. 428 (D.D.C. 1989).

[18] We recognize that Commissioner Thomas's motion would merely have left the case on the docket for the time being, without yet opening an investigation. Presumably, however, the only reason to leave it on the docket would be in the hope of eventually opening an investigation.

thorough, effective investigation prior to bringing suit exceedingly difficult. We note that Commissioner Thomas also uses his Statement of Reasons in this case to argue that the Commission needs more resources from Congress.[19] Perhaps. But we are unpersuaded that the resources we have are well spent pursuing cases under legal theories that run contrary to precedent and which cannot be investigated and evaluated properly due to statute of limitations constraints. *See* 28 U.S.C. § 2462.

Commissioner Thomas also misunderstands our objection to using a long dismissed complaint against the CRNC, MUR 3826, closed as stale over five years ago, as a basis for proceeding on this matter. MUR 3826 does nothing to change the stale nature of the evidence and events in this case, nor does it change the *GOPAC* precedent.[20] This case is not like other MURs Commissioner Thomas mentions, wherein the Commission has looked at evidence from other investigations.[21] In those MURs, the other investigations pertained to the same activity under investigation by the FEC, not to activity many years gone by and not the subject of the matter at hand. All of the events mentioned in this referral took place after MUR 3826 was closed.

Commissioner Thomas similarly fails to differentiate between cases when he chides us for deferring to the recommendation of the General Counsel in this case while "vot[ing] against the General Counsel's recommendations regarding seven of the twelve matters on the November 6 agenda," all of which pertained to case closing under the EPS.[22] Those other cases all involved matters in which a violation, or lack thereof, was plain from the face of the complaint, so that the Commission could make substantive determinations without the need for an investigation using up Commission resources. In each case, the Commission rejected the General Counsel's recommendation to close the case solely on grounds that it was "low priority" under the EPS, in order to make a substantive determination on the merits and close the file. Thus the cases were handled substantively without opening an investigation and draining the General Counsel's resources. In each of the seven cases, Commissioner Thomas joined a unanimous Commission vote.[23] Commissioner Thomas argues that the standard used to pull those cases out of EPS was "subject only to a standard similar to mine."[24] But there is a very substantial difference, which Commissioner Thomas does not even note, let alone dispute - each of those cases could be, and was, disposed of within minutes and without

---

[19] Thomas SOR at 4, n. 12.

[20] *GOPAC* was decided after MUR 3826 was dismissed.

[21] Thomas SOR at 4, n. 9.

[22] *Id.* at 4, and n. 10. He actually refers to just one (unnamed) Commissioner, presumably Commissioner Smith, given that Commissioners Wold and Mason voted against the General Counsel's recommendation in eight of the twelve matters.

[23] Commissioner Thomas also complains that the Commission has held one case open involving a foreign national, although the violations are over five years old. *Id.* at 5, n. 14. In that case the respondent has fled the country to avoid prosecution. Because the Commission believes that the statute of limitations does not run when the respondent purposely flees the country to avoid prosecution, and because the facts have largely been investigated already in connection with other respondents, the Commission has voted to hold the matter open.

[24] *Id.* at 5, n.15.

investigation, whereas this case, were it activated, would require a substantial investigation and resources.[25]

Ultimately, even if we were not of the belief that the referral in this matter did not include either facts or legal theories which, if true, would indicate a violation of the Act, or that the probability of success were so low, we simply would not agree with Commissioner Thomas that this is a case warranting "different treatment" than that provided for by the EPS.[26] It is clear that Commissioner Thomas considers this an extremely important case. He argues that we should ignore the EPS in such a case because, "not a lot of subjective thought goes into OGC's EPS case closing calculations."[27] We believe that this is as it should be. However, the process is not totally rote. Under the System, this case scored just one point above the cut-off used to dismiss cases as low priority. It did so because in at least one important category, OGC scored the maximum possible points, even though the system's scoring guide states that "[one-half the maximum] are generally assessed here." In another category, OGC awarded added points for criteria that did not appear and could not be determined from the face of the referral. This was apparently done by considering the earlier closed MUR 3826 when scoring this referral. In short, this case stayed on the docket as long as it did, and was eligible for activation in the normal course of business at all, only because in scoring the case OGC did account for the old MUR, as Commissioner Thomas wanted, and also rated the case more highly than usual on other criteria as well. Even so, the case received the lowest score possible to avoid automatic dismissal as a low priority case.

The final portion of Commissioner Thomas's Statement of Reasons is devoted to explaining that his desire to keep this case open is not motivated by partisan considerations, accusing others of partisanship, and citing to a number of votes that he has made in the past as evidence of his own lack of partisanship.[28] We take Commissioner Thomas at his word and note that whatever his motivations, they would not alter our votes in this matter.

When we consider that this case would have to be based on a legal theory that runs counter to the law as correctly stated in *GOPAC*; is low rated under the EPS; is extremely dated and difficult to investigate within the statute of limitations; would require the commitment of substantial resources; and appears to have a low probability of success in court even if pursued on the legal theories advanced by Commissioner Thomas, and with which we disagree; we consider it particularly ill-suited to be withdrawn from normal treatment pursuant to the EPS, and believe the dismissal for

---

[25] In light of our above discussion of *GOPAC* and the referral in this matter, another alternative might have been to move to dismiss this case with a finding of "No RTB" because the referral fails to put forward facts or legal theories that would indicate a violation of the Act. We believe, however, that such a motion would not have been successful at garnering the four votes needed to pass. If true that the Commission could not muster four votes for a finding of either "No RTB" or "RTB," that is further reason to let this case simply be closed on the staleness grounds recommended by the General Counsel, following the EPS.

[26] *Id.* at 5.

[27] *Id.* at 5, n. 13.

[28] *Id.* at 5-6.

staleness, as called for by the EPS and recommended by the General Counsel, was appropriate.


_____          _____
David M. Mason, Chairman                  2/21/02
                                          Date


_____          _____
Bradley A. Smith, Commissioner            2/11/02
                                          Date


_____          _____
Darryl R. Wold, Commissioner              2/21/02
                                          Date

8

# EXHIBIT 9

**FEDERAL ELECTION COMMISSION**
WASHINGTON, D.C. 20463

**SENSITIVE**

## BEFORE THE FEDERAL ELECTION COMMISSION

In the matter of )
)    **MUR 5024**
Council for Responsible Government, Inc., et al. )
)

### STATEMENT OF REASONS
### CHAIRMAN BRADLEY A. SMITH AND
### COMMISSIONERS DAVID M. MASON AND MICHAEL E. TONER

I.    Background

In this matter the Commission considered a complaint alleging that the Council for Responsible Government, Inc. ("CRG" or "Respondents") violated the prohibition on corporate contributions by funding and mailing brochures referencing Tom Kean, Jr., a candidate in New Jersey's June 2000 Republican primary. As explained below, because the brochures did not contain express advocacy, the undersigned voted not to find reason to believe that a violation had occurred. Therefore, after a vote of 3-3 on the recommendations made by the General Counsel in the First General Counsel Report, the Commission voted unanimously to dismiss this matter.[1]

---

[1] The Commission considered the matter on November 4, 2003. After discussion, an updated tally vote reflected that the Commission failed by a vote of 3-3 to take the following actions with respect to MUR 5024:  Find reason to believe that the Council for Responsible Government, Inc. and its Accountability Project violated 2 U.S.C. § 433; Find reason to believe that the Council for Responsible Government, Inc. and its Accountability Project violated 2 U.S.C. § 434; Find reason to believe that the Council for Responsible Government, Inc. and its Accountability Project violated 2 U.S.C. § 441b(a); Find reason to believe that the Council for Responsible Government, Inc. and its Accountability Project violated 2 U.S.C. § 441d(a); Find reason to believe that William "Bill" Wilson violated 2 U.S.C. § 441b(a); Find reason to believe that Gary Glenn violated 2 U.S.C. § 441b(a). Federal Election Commission, Minutes of an Executive Session, November 4, 2003 at 4-6 (Commissioners McDonald, Thomas, and Weintraub voted affirmatively; Commissioners Mason, Smith, and Toner dissented). Commissioner Mason then moved to close the file in MUR 5024 and send the appropriate letters and the motion carried on a vote of 6-0. *Id.* at 6.

Kean for Congress Committee filed a complaint in the United States District Court for the District of Columbia on September 18, 2001 challenging the Commission's alleged delay in reviewing MUR 5024 under 2 U.S.C. § 437g(a)(8)(A). *Kean for Congress v. FEC*, Civ. No. 01cv01979 (D.D.C., filed Sept. 18, 2001). On February 4, 2002, Kean for Congress Committee filed a notice of dismissal to which the Commission did not object.

Statement of Reasons
MUR 5024
Page 2

II.    <u>Factual and Legal Analysis</u>[2]

A. <u>The Law</u>

The Act prohibits corporations from making expenditures.[3]  Expenditures that are communications must contain express advocacy to be subject to this prohibition.[4]  The first part of the Commission's express advocacy regulation tracks the Supreme Court's opinion in *Buckley v. Valeo* and defines "expressly advocating" as any communication that uses phrases such as "vote for the President," or "'support the Democratic nominee' . . . or communications of campaign slogan(s) or individual word(s) which in context can have no other reasonable meaning than to urge the election or defeat of one or more clearly identified candidate(s) . . . ."[5]  With this background we turn to the two brochures that were the subject of the complaint.

---

[2] The activity occurred prior to the effective date of the Bipartisan Campaign Reform Act of 2002 ("BCRA"), Pub. L. 107-155, 116 Stat. 81 (2002).  All references or statements of law herein regarding the Federal Election Campaign Act of 1971, as amended ("the Act"), pertain to that law as it existed before BCRA's effective date. All references to the Commission's regulations pertain to the 2002 edition of Title 11, published prior to the Commission's promulgation of its regulations implementing BCRA.  When the Commission considered this case, the Supreme Court was considering a challenge to BCRA it has since decided.  *McConnell v. FEC,* 540 U.S. __ (2003).

[3] 2 U.S.C. § 441b(a).

[4] *Buckley v. Valeo,* 424 U.S. 1, 44 n.52 (1976); *FEC v. Massachusetts Citizens for Life,* 479 U.S. 238, 249 (1986).  The Commission considered this MUR before the Court announced its opinion in *McConnell v. FEC,* 540 U.S. __ (2003).  Accordingly, the Commission evaluated this matter under the governing law that existed prior to *McConnell v. FEC.*  Prior to McConnell, several courts of appeals had held the express advocacy test to be an "irreducible constitutional minimum that no campaign finance restriction can diminish." *McConnell v. FEC,* 251 F.Supp. 2d 176, 363 (Henderson, C.J., concurring in the judgment in part and dissenting in part) (D.D.C. 2003); *prob. juris. noted,* 123 S.Ct. 2268.  *See California Pro-Life Council Inc. v. Getman,* 328 F.3d 1088, 1097 (9th Cir. 2002); *Chamber of Commerce v. Moore,* 288 F.3d 187, 190 (5th Cir. 2002); *Perry v. Bartlett,* 231 F.3d 155, 162 (4th Cir. 2000), *cert. denied,* 532 U.S. 905 (2001); *Vermont Right to Life Comm., Inc. v. Sorrell,* 221 F.3d 376, 386 (2d Cir. 2000); *Citizens for Responsible Gov't State Political Action Comm. v. Davidson,* 236 F.3d 1174, 1187 (10th Cir. 2000); *Iowa Right to Life Comm., Inc. v. Williams,* 187 F.3d 963, 969 (8th Cir. 1999); *FEC v. Christian Action Network, Inc.,* 110 F.3d 1049, 1051 (4th Cir.1997); *Faucher v. FEC,* 928 F.2d 468, 470-71 (1st Cir. 1991); *FEC v. Cent. Long Island Tax Reform Immediately Comm.,* 616 F.2d 45, 53 (2d Cir. 1980) (en banc).  District courts have also so held.  *See, e.g., Kansans for Life, Inc. v. Gaede,* 38 F.Supp.2d 928, 936 (D.Kan. 1999); *Right to Life, Inc. v. Miller,* 23 F.Supp.2d 766, 769 (W.D.Mich. 1998); *Planned Parenthood Affiliates, Inc. v. Miller,* 21 F.Supp.2d 740, 746 (E.D.Mich. 1998); *W. Virginians for Life, Inc. v. Smith,* 919 F.Supp. 954, 959 (S.D.W.Va. 1996).  Two state courts have followed.  *See Wash. State Republican Party v. Wash. State Pub. Disclosure Comm'n,* 4 P.3d 808, 824 (Wash. 2000); *Osterberg v. Peca,* 12 S.W.3d 31, 50-54 (Tex.), cert. denied, 530 U.S. 1244 (2000).

[5] 11 C.F.R. § 100.22(a).  The second prong of the Commission's regulation at 11 C.F.R. § 100.22(b) has been held unconstitutional.  *Virginia Society for Human Life v. FEC,* 264 F.3d 379 (4th Cir. 2001); *Maine Right to Life v. FEC,* 98 F.3d 1 (1st Cir. 1996).

Statement of Reasons
MUR 5024
Page 3

### B. Two Brochures

The first brochure shows two identical photographs of Tom Kean, Jr., a large one covering the whole page and a smaller photograph superimposed on the larger one. *See* Attachment 1. In both pictures, Tom Kean, Jr. is wearing a suit with a campaign button or sticker on the left breast pocket of his suit jacket, reading "Tom Kean Jr. for Congress." Superimposed over the photographs is the following text: "TOM KEAN JR. No experience. Hasn't lived in New Jersey for 10 years. It takes more than a name to get things done." The second page reads:

> NEVER. Never worked in New Jersey. Never ran for office. Never held a job in the private sector. Never paid New Jersey property taxes. Tom Kean Jr. may be a nice young man and you may have liked his dad a lot—but he needs more experience dealing with local issues and concerns. For the last 5 years he has lived in Boston while attending college. Before that, he lived in Washington. New Jersey faces some tough issues. We can't afford on-the-job training. Tell Tom Kean Jr. . . New Jersey needs New Jersey leaders.

"Paid for by the Accountability Project of the CRG," is the disclaimer at the bottom of this page.

The second brochure shows a full-page photograph of Tom Kean, Jr. on the first page. *See* Attachment 2. The photograph appears to be the same photograph used in the first brochure. Superimposed over the picture is the following text:

> For the last 5 years Tom Kean Jr. has lived in Massachusetts. Before that, he lived in Washington, D.C. And all the time Tom Kean lived in Massachusetts and Washington, he never held a job in the private sector. And until he decided to run for Congress—Tom never paid property taxes. No experience. TOM KEAN MOVED TO NEW JERSEY TO RUN FOR CONGRESS. New Jersey faces some difficult problems. Improving schools, keeping taxes down, fighting overdevelopment and congestion. Pat Morrisey has experience dealing with important issues. It takes more than a name to get things done. Tell Tom Kean Jr. . . . . NEW JERSEY NEEDS NEW JERSEY LEADERS.

"Paid for by the Accountability Project of the CRG," appears at the bottom of the first page.

The second page shows four tiled pictures: former professional basketball player Larry Bird, Senator Edward Kennedy, a statue of a Revolutionary War "Minuteman" and the photograph of Tom Kean, Jr. with the "Tom Kean Jr. for Congress" campaign button or sticker. Superimposed over the photographs is the following text: "What do all these things have in common? They all have homes in Massachusetts."

Statement of Reasons
MUR 5024
Page 4

## C. Analysis

### 1. Express Advocacy

Because both of the brochures contain pictures of a clearly identified candidate,[6] this matter turns on whether the brochures contain express advocacy. According to the complainants, the brochures are similar to the "vote Pro Life" flyer in *FEC v. Massachusetts Citizens for Life* ("*MCFL*")[7] because of the text, "New Jersey needs New Jersey leaders," and the identification of "Tom Kean [Jr.] as the candidate who does NOT have New Jersey 'experience'" (emphasis in original). The complainants further contend that the "Tell Tom Kean Jr." language, in essence, is an electoral directive like "vote Pro Life" in *MCFL* and that the brochures, like the *MCFL* flyer, should not be regarded "as a mere discussion of public issues that by their very nature raise the names of certain politicians."[8] Complainants assert that the brochures do not purport to discuss any issue other than Tom Kean Jr.'s qualifications to hold federal office.

We look to the language of the brochures to determine whether they contain express advocacy. The first brochure contains the text "Never" and "New Jersey needs New Jersey leaders," but the language fails the express advocacy test as established by *Buckley* and *MCFL* not only because they are not explicit words of advocacy but also because this language and the brochure's other text fails to exhort readers to vote for or against a candidate. The deduction that the reader must make to fill the gap between the campaign sticker on the front page, that places the brochure in the context of an election, and the only language that arguably approaches a call to action to vote against Mr. Kean, Jr. on the following page is fatal to the complainant's argument that the first brochure contains express advocacy.

As noted in CRG's response, "The fact that the communication [in *MCFL*] included an *explicit* term of advocacy, i.e., **VOTE**, and direct reference to those candidates that the electorate should vote *for* was precisely what rendered the [*MCFL*] communication 'express' advocacy" (emphasis in original). The connection between the language of the CRG brochure and the exhortation to vote, if any, is simply too fragile to support a finding of express advocacy. "Never" is very close to the language of *FEC v. Furgatch,* "Don't let him do it," but even if *Furgatch* guided our analysis its exhortation requirement is still not met because "never" is more naturally read in this brochure as an adjective modifying the itemized list of what Mr. Kean has allegedly never done in his life: namely, never worked in New Jersey,

---

[6]The term "clearly identified" is defined in the Act and Commission regulations. 2 U.S.C. § 431(18); 11 C.F.R. § 100.17.

[7] 479 U.S. 238 (1986).

[8] *MCFL,* 479 U.S. at 249 (1986).

Statement of Reasons
MUR 5024
Page 5

never ran for office, never held a private sector job, and never paid New Jersey property taxes.[9] Thus, the first brochure simply lacks any explicit exhortation to take electoral action.

The second brochure does not contain the word "Never" on its second page but, like the first, contains the purported slogan "New Jersey needs New Jersey leaders." But this slogan simply does not constitute a campaign slogan, such as "Dean for America," because there is no information that the slogan appearing in these brochures was employed or adopted by any of Kean's opponents as part of their campaigns. There is simply no basis to conclude that this slogan is identified with any campaign or that readers can perform this identification.

The complainant's other arguments in support of an express advocacy finding rest on factors that are simply insufficient to support such a finding: whether the ad discusses public policy issues or whether it addresses issues other than qualifications to hold federal office. Further, if a conclusion that this brochure contains express advocacy is based on a divining of CRG's intent in this manner without regard to the explicit language of the text, such a conclusion falls outside of the requirements of the express advocacy test, which excludes such analysis under established precedent.

As to both brochures, to the extent that the complainant or the Office of the General Counsel suggests that the sticker or button alone transforms the communication into express advocacy, the Commission's conclusion here comports with the disposition of a past case involving a communication containing a campaign sticker. Although in MUR 4313 (Coalition for Good Government) the Commission concluded that a Richard Lugar for President bumper sticker featured in a television advertisement provided a basis for an express advocacy finding by prominently displaying Senator Lugar's image and the campaign bumper sticker, as to two other bumper stickers appearing in the television advertisement the Office of the General Counsel noted that "[a]lthough the Dole bumper sticker which appears in the advertisement contains the words 'for President' and the Gramm bumper sticker contains 'President,' the message of the advertisement as to these two candidates is negative, thus making a finding of express advocacy as to their candidacies more problematic."[10]

This matter is the more problematic case, and unlike the more prominent bumper sticker in MUR 4313 that was "enhanced by the positive prominence given to Senator Lugar's stand on the sugar issue,"[11] at best the Kean sticker here merely places the picture in the context of an election. Because the principal effect of the sticker here is to put the communication in the context of an election, and Mr. Kean, Jr., is not the intended beneficiary of the ostensible express advocacy, CRG's brochures fail the express advocacy standard under

---

[9] *FEC v. Furgatch*, 807 F.2d 857 (9th Cir. 1987).

[10] First General Counsel Report in MUR 4313 dated Oct. 18, 1996 at 31 n.6. The full text of the television advertisement appears in the First General Counsel Report in MUR 4313 dated Oct. 18, 1996 at 11-12.

[11] First General Counsel Report in MUR 4313 dated Oct. 18, 1996 at 31.

all major cases except possibly *Furgatch*, and even under *Furgatch*, as described above, the call to action is too tenuous to support an express advocacy finding.[12]

When faced with "very close call[s]"[13] involving express advocacy, the Commission experiences the same predicament faced by judges in analyzing advertisements under this test.[14] In *FEC v. Christian Coalition*, for example, within the same case the court had several calls and came down on one side as to one communication and on another with respect to a different communication.[15] And as the opinion in *Furgatch* described, "Because of the unique nature of the disputed speech, each case so depends upon its own facts as to be almost *sui generis*, offering limited guidance for subsequent decisions."[16] This type of complex analysis is the natural result when decision makers are faced with politically volatile communications and must apply a judicially-created standard like the express advocacy test.

---

[12] *FEC v. Furgatch*, 807 F.2d 857 (9th Cir. 1987). *Furgatch* describes its standard as follows:

> We conclude that speech need not include any of the words listed in *Buckley* to be express advocacy under the Act, but it must, when read as a whole, and with limited reference to external events, be susceptible of no other reasonable interpretation but as an exhortation to vote for or against a specific candidate. This standard can be broken into three main components. First, even if it is not presented in the clearest, most explicit language, speech is "express" for present purposes if its message is unmistakable and unambiguous, suggestive of only one plausible meaning. Second, speech may only be termed "advocacy" if it presents a clear plea for action, and thus speech that is merely informative is not covered by the Act. Finally, it must be clear what action is advocated. Speech cannot be "express advocacy of the election or defeat of a clearly identified candidate" when reasonable minds could differ as to whether it encourages a vote for or against a candidate or encourages the reader to take some other kind of action.

*Id.* at 864.

[13] *FEC v. Christian Coalition*, 52 F. Supp.2d 45, 61 n.26 (D.D.C. 1999)(quoting *FEC v. Furgatch*, 802 F.2d 857, 861 (9th Cir. 1987)).

[14] In a matter under review considered around the same time as MUR 5024, the Commission divided along the same lines in a case involving allegations of interest group support of a Democratic candidate. On October 21, 2003, the Commission voted 6-0 to dismiss another express advocacy case, MUR 5154 (Sierra Club, Inc.), after a vote of 3-3 on the recommendations of the Office of the General Counsel. Federal Election Commission, Minutes of an Executive Session at 7 (Oct. 21, 2003) (motion by Commissioner Thomas to find reason to believe that Sierra Club, Inc. violated 2 U.S.C. § 441b(a) failed 3-3, Commissioners McDonald, Thomas, and Weintraub voting affirmatively, Commissioners Mason, Smith, and Toner dissented). *See* Statement of Reasons in MUR 5154 (Sierra Club, Inc.) of Commissioners Smith, Mason, and Toner dated Dec. 6, 2003.

[15] *See FEC v. Christian Coalition*, 52 F. Supp.2d 45, 64 (D.D.C. 1999) (the court provides analysis to describe its finding express advocacy in a letter referring to Newt Gingrich as a "Christian Coalition 100 percenter" and failing to find express advocacy in a "Reclaim America" mailing).

[16] *FEC v. Furgatch*, 807 F.2d 857, 861 (9th Cir. 1987).

Statement of Reasons
MUR 5024
Page 7

### 2. Political Committee Theory

The conclusion that these brochures lack express advocacy, and hence are not expenditures, requires that the Commission reject complainants' theory that CRG's major purpose is political activity and that it should therefore be forced to register with the Commission, disclose its donors, and observe the Act's contribution limits and prohibitions, as a political committee.[17]  The Commission thus rightly did not approve the Office of the General Counsel's request to conduct what could be an extensive investigation into the corporation's activity, including interrogatories, document subpoenas, and depositions to pursue this untenable theory, and closed the file in this matter.

January 13, 2004

_____
Bradley A. Smith
Chairman

_____
David M. Mason
Commissioner

_____
Michael E. Toner
Commissioner

---

[17] *FEC v. GOPAC*, 917 F. Supp. 851 (D.D.C. 1996).  See Statement of Reasons in Pre-MUR 395 (College Republican National Committee), Commissioners Mason, Smith, and Wold at 4 ("Thus, major purpose alone, however defined, is not enough to subject a group to the Act.").  The *McConnell* decision's declaration that the express advocacy doctrine was a statutory, rather than a constitutional, construction raises questions about whether the Commission may or should consider non-express advocacy communications in determining whether an organization's major purpose is the election or defeat of a candidate.  No such analysis was attempted here as the General Counsel's recommendation turned on the express advocacy determination consistent with the then-prevailing cases cited in footnote 4.



**Never worked
in New Jersey.**

**Never ran for office.**

**Never held a job
in the private sector.**

**Never paid New Jersey
property taxes.**

Tom Kean Jr. may be a nice young man
and you may have liked his dad a lot—
but he needs more experience dealing
with local issues and concerns.

For the last 5 years he has lived in
Boston while attending college.
Before that, he lived in Washington.

New Jersey faces some tough issues.

We can't afford on-the-job training.

Tell Tom Kean Jr. ...

New Jersey needs
New Jersey leaders.

PAID FOR BY THE ACCOUNTABILITY PROJECT OF THE CRO.

24.04.406.4458

Att. 1
p. 2 of 2

For the last 5 years Tom Kean Jr.
has lived in Massachusetts.

Before that, he lived in Washington, D.C.

And all the time Tom Kean
lived in Massachusetts and Washington,
he never held a job in the private sector.

And until he decided to run for Congress—
Tom never paid property taxes.

No experience.

**TOM KEAN MOVED TO NEW JERSEY
TO RUN FOR CONGRESS.**

New Jersey faces some difficult problems.
Improving schools, keeping taxes down,
fighting overdevelopment and congestion.

Pat Morrisey has experience
dealing with important issues.

It takes more than a name to get things done.

Tell Tom Kean Jr...

**NEW JERSEY NEEDS
NEW JERSEY LEADERS.**

PAID FOR BY THE ACCOUNTABILITY



# EXHIBIT 10



FEDERAL ELECTION COMMISSION
Washington, DC  20463

July 7, 2004

**MEMORANDUM**

TO:            The Commission
               General Counsel
               Staff Director
               Public Information
               Press Office
               Public Records

FROM:          Mai T. Dinh
               Assistant General Counsel

SUBJECT:       Transcript from the hearing on Political Committee Status

        Attached is the transcript from the April 14, 2004 hearing on Political Committee
Status.

Attachment

cc:  Deputy General Counsel
     Associate General Counsel
     Congressional Affairs Officer
     Executive Assistants

1

FEDERAL ELECTION COMMISSION
PUBLIC HEARING ON POLITICAL COMMITTEE STATUS

NOTICE OF PROPOSED RULEMAKING


999 E Street, N.W.
Ninth Floor Hearing Room Washington,
D.C.  20463

Wednesday, April 14, 2004


The hearing convened, pursuant to

notice, at 9:05 a.m.


COMMISSION MEMBERS PRESENT:


BRADLEY A. SMITH, Chairman

ELLEN WEINTRAUB, Vice Chair

DAVID M. MASON, Commissioner

DANNY McDONALD, Commissioner

SCOTT E. THOMAS, Commissioner

MICHAEL E. TONER, Commissioner

LAWRENCE H. NORTON, General Counsel

JAMES E. PEHRKON, Staff Director

2

## TABLE OF CONTENTS

Agenda Item                                    Page

    I.  Opening Statements..................  6

   II.  Panel I............................ 34
        - Jan Baran, Laurence Gold,
          Donald Simon, William Kirk

  III.  Panel II........................... 144

        - Nan Aron, Richard Clair,
          Craig Holman

   IV.  Panel III.......................... 209

        - Edward Foley, John Pomeranz,
          Donald Tobin, Michael Trister

    V.  Panel IV.......................... 300

        - Michael Boos, Wade Henderson,
     Greg Moore, J. Ward Morrow

1   Section 527[j] continues to be a critical mechanism

2   for campaign finance disclosure."

3           Well, now everybody is shocked to

4   discover that there are Section 527 organizations

5   out there engaging in political activity.  The very

6   statute that Congress enacted in 2000 and amended

7   in 2002 after BCRA to regulate by disclosure

8   Section 527 organizations was done against a

9   background of all sorts of publicity, testimony,

10  evidence about so-called stealth PACs.  This is not

11  some new problem so to speak.  This is not some new

12  phenomenon, and it's not a problem.  It's

13  independent organizations being able to do what the

14  tax code and Federal election law say they can do.

15          One of the fundamental flaws in the

16  argument that we're hearing is to mush together all

17  political activity.  Everything is now Federal.

18  Section 527 says influence--a primary purpose to

19  influence elections.  That's elections at all

20  levels.  The Federal Election Campaign Act can only

21  regulate entities that either do a $1,000 in

22  expenditures, a statutorily-defined term and Mr.

82

1  Baran has described, or make $1,000 in

2  contributions to candidates, also a familiar term.

3  The major purpose gloss that the Supreme Court

4  imposed or clarified, which neither Congress nor

5  the Commission has ever encoded in the statute in

6  regulations, is an effort to limit the reach of the

7  statute, not to expand it.

8         And, you know, this alternative 2[a]

9  this is buried in these proposals that Mr. Simon

10 has endorsed, that doesn't even purport to

11 recognize any kind of major purpose test.  It's an

12 any purpose test.  All 527s, according to it, are

13 Federal political committees, something that truly

14 is shocking, unless it satisfies one of four or

15 five exemptions, none of which--none of which--have

16 anything to do with Federal elections, any purpose,

17 any spending.

18        Mr. Simon just said if you spend $1,000

19 to promote, support, attack, or oppose a Federal

20 candidate, and your tax form is Section 527, then

21 your major purpose has been proven and your Federal

22 political committee status has been proven.  That

# EXHIBIT 11

Douglas Bailey                                          March 12, 2007
                          Washington, DC

---

Page 1

              IN THE UNITED STATES DISTRICT COURT

                 FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x

UNITY08, et al.,                    :

                Plaintiffs,    : No 1:07cv00043(RWR)

        vs.                         :

FEDERAL ELECTION COMMISSION,        :

                Defendant.     :  PAGES 1 - 134

- - - - - - - - - - - - - - - - x


            Deposition of DOUGLAS BAILEY, held at the

offices of Steptoe & Johnson, 1330 Connecticut Avenue,

N.W., Washington, D.C., commencing at 8:30 a.m.,

Monday, March 12, 2007, before Elizabeth Mingione,

Notary Public.

Douglas Bailey                                          March 12, 2007
                        Washington, DC

```
                                                            Page 2

   1   A P P E A R A N C E S   O F   C O U N S E L:

   2   ON BEHALF OF THE PLAINTIFFS:

   3          STEPTOE & JOHNSON, LLP

   4          BY:   ROBERT JORDAN, ESQUIRE

   5                RHONDA M. BOLTON, ESQUIRE

   6                JOHN DUFFY, ESQUIRE

   7          1330 Connecticut Avenue, N.W.

   8          Washington, D.C. 20036-1795

   9          (202) 429-6495

  10

  11   ON BEHALF OF THE DEFENDANTS:

  12          FEDERAL ELECTION COMMISSION

  13          BY:   STEVE N. HAJJAR, ESQUIRE

  14                DAVID KOLKER, ESQUIRE

  15                ADAV NOTI, ESQUIRE

  16          999 E Street, N.W.

  17          Washington, D.C. 20463

  18          (202) 694-1546

  19

  20

  21

  22
```

Douglas Bailey                                                March 12, 2007
                          Washington, DC

                                                                   Page 3

1                      C O N T E N T S

2    WITNESS:  DOUGLAS BAILEY

3    EXAMINATION BY:                                        PAGE

4        Mr. Hajjar ................................. 6

5        Mr. Jordan ............................... 130

6        Mr. Hajjar ............................... 132

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Douglas Bailey                                    March 12, 2007
                        Washington, DC

                                                        Page 9

1        Q.    Were you employed -- where were you

2    employed prior to your volunteer time with Unity08?

3        A.    How far back do you want me to go?

4        Q.    Let's just go the first one back, the first

5    one before joining the Unity08 efforts?

6        A.    Well, I had started writing a book for

7    about a year or six months prior to that with

8    Freedom's Answer which was a nonprofit effort that I

9    founded to engage young people into politics.

10       Q.    Okay.   I would now like to mark this for

11   identification as Bailey Exhibit 1.

12                    -   -   -

13            (A document was marked as Deposition

14   Exhibit Number 1)

15                    -   -   -

16            BY MR. HAJJAR:

17       Q.    I'll give you a few moments to look it

18   over.  Please let me know when you are finished

19   looking at it and prepared to answer questions about

20   it.

21       A.    Yes.

22       Q.    Are you familiar with this document?

Douglas Bailey                                                    March 12, 2007
                          Washington, DC

Page 10

1        A.    I've seen it before.  Yes.

2        Q.    Does it appear to be a true and accurate

3   copy of what it purports to be?

4        A.    Appears to be.  Yes.

5        Q.    Are you aware that you are here today as

6   the corporate designee of Unity08 to answer questions

7   on the topics listed there on pages 3 and 4?

8        A.    Yes.

9        Q.    Would it be fair to say that you have been

10  involved with Unity08 since its beginning?

11       A.    Yes.

12       Q.    And could you tell me how the idea came

13  about?

14       A.    Well, probably the first -- a very informal

15  step was that I had dinner with Jerry Rafshoon and

16  Hamilton Jordan and I -- when we agreed both that the

17  current system is -- seems to be broken and that there

18  needed to be an alternative, if one was possible.

19  Because at the time it was very short to get this --

20  the train back on the track.

21       Q.    What is Unity 08's principal objective?

22       A.    Its goal is to empower the American people

Douglas Bailey                                                March 12, 2007

Washington, DC

Page 11

1    to pick a Unity ticket representing more than one

2    party for President and Vice President and put it on

3    the ballot in 2008 and restore a sense of unity and

4    purpose to the leadership of the United States.

5         Q.    How does it plan on going about

6    accomplishing this principal objective?

7         A.    The principal vehicle is a on-line

8    convention by which the people of the United States

9    have the -- are enabled to pick that ticket and to

10   support their actions by taking whatever steps

11   necessary to put the ticket on, put the party, put the

12   entity on the ballot, achieve ballot access for that

13   ticket.

14        Q.    Are there any other objectives that Unity08

15   has that you haven't mentioned yet?

16        A.    I think it is fair to say also that the --

17   it has a goal of enabling the people to identify them,

18   the people as opposed to the politicians and to the

19   handlers and bunglers, advisors and so forth; the

20   people to identify the crucial issues in front of the

21   country and the questions that should be addressed to

22   the candidates running for President on those issues.

Douglas Bailey                                          March 12, 2007
                        Washington, DC

---

                                                         Page 12

 1       Q.    Does Unity08 want to win?

 2       A.    Indeed.

 3       Q.    Does Unity08 have any plans to become a

 4  permanent political party?

 5       A.    No.

 6       Q.    Has Unity08 made any efforts to elect

 7  individuals to state, local or political office?

 8       A.    No.

 9       Q.    Does it have any plans to do so?

10       A.    No.

11       Q.    Does Unity08 have a main office?

12       A.    Its main office is, yes, it has a main

13  office in Washington, D.C.

14       Q.    Who works there on a daily basis?

15       A.    I do.

16       Q.    Anyone else?

17       A.    I have a secretary there.  There are a

18  couple other people, Anya Harris, chief operating

19  officer works out of that office.

20       Q.    Can you tell me what Ms. Harris's

21  responsibilities are?

22       A.    Primarily fundraising.

---

Douglas Bailey                                                    March 12, 2007
                        Washington, DC

Page 13

1        Q.    Is she a paid employee?

2        A.    She is.

3        Q.    Does Unity08 have any other offices?

4        A.    Not that I -- no.

5        Q.    Is there anyone else involved in the

6    day-to-day management of Unity08 other than, say, you

7    and Ms. Harris?

8        A.    Well, there it depends a little bit upon

9    definitions of day-to-day.  The fact is that there are

10   a number of people like Jerry Rafshoon, Roger Craver

11   who are deeply involved on a day-by-day basis,

12   although perhaps not every day.  But they are not paid

13   employees of Unity08.

14       Q.    Who exactly is Jerry Rafshoon?

15       A.    Jerry Rafshoon was the Director of

16   Communications for the Carter presidential campaign in

17   1976 when John Deardourff and I were doing the

18   communications for the Ford campaign.

19       Q.    And how is he, to use your words, deeply

20   involved in Unity08?

21       A.    He spends most of his time as a volunteer,

22   as I do, working to support the cause, fundraising,

Douglas Bailey                                              March 12, 2007
                        Washington, DC

Page 14

1    planning, meeting with media, et cetera.

2         Q.    And who's Roger Craver?

3         A.    Roger Craver.  Roger Craver is the founder

4    of a company called Craver Matthews Smith which -- and

5    while he is retired from that company, Craver Matthews

6    Smith is an expert in small-volume fundraising via

7    direct mail and telephone and now on-line and web

8    operations and so forth.

9         Q.    Once again to use your phrase, how is

10   Mr. Craver deeply involved in Unity08?

11        A.    He is helping to oversee the effort to

12   recruit delegates via the web site and other ways and

13   to convert delegates and other supporters to small

14   dollar contributions.

15        Q.    Does Unity08 have an office in Denver?

16        A.    I'm sorry?

17        Q.    Does Unity08 have an office in Denver?

18        A.    We started with an office in Denver, and

19   that office essentially is not in operation anymore.

20        Q.    Are you familiar with a gentleman named Jim

21   Jonas?

22        A.    Yes.

Douglas Bailey                                                    March 12, 2007
                        Washington, DC

 1      Q.    How has Unity08 gone about raising its

 2   funds?

 3      A.    Two different ways.  It raises funds via

 4   small-dollar contributions on-line and with a variety

 5   of outreach programs to those who sign up on-line.

 6   Otherwise, it raises funds with personal visits

 7   seeking contributions up to $5,000.

 8      Q.    Does Unity08 use direct mail to raise any

 9   money?

10      A.    My impression is that it has -- I'm not

11   certain of that.  I know it has -- I shouldn't say

12   this.  I think it has tested some direct mail appeals.

13   And it would -- and that is a potential source of

14   fundraising, method of fundraising.

15      Q.    Would you be able to give me an estimate as

16   to how much money it's raised through that means?

17      A.    I would say it's very small.  I'm not

18   really certain, frankly, that there has been a

19   mailing.  We talk about it every once in awhile, but

20   my -- it's not my impression that there has been --

21   there may have been a mailing, but if there was, it

22   was a test mailing.  So the amount of money is very

Douglas Bailey                                      March 12, 2007
                        Washington, DC

Page 17

1    small.

2         Q.    Oak.  Any other media?  For example has

3    Unity08 used print ads to raise funds?

4         A.    No.

5         Q.    Radio ads?

6         A.    No.

7         Q.    Television ads?

8         A.    No.

9         Q.    What about from its web site?  Has Unity08

10   used its web site to raise funds?

11        A.    It certainly solicits in a general way on

12   its web site.  And it solicits from those who sign up

13   as supporters or delegates.

14        Q.    How much money has Unity08 raised through

15   its web site?

16        A.    I'm really not the right person to ask that

17   question.  I don't know.

18        Q.    Who might know that information?

19        A.    Either Anya Harris or Daniel Radek.

20        Q.    I now want to mark this for identification

21   as Bailey Exhibit 2, give you a few moments to look it

22   over and then let me know when you've finished and are

Douglas Bailey
March 12, 2007

Washington, DC

Page 23

```
1         A.      I think that number is close to $400,000.

2         Q.      What is said during those personal contacts

3    to persuade an individual to donate to Unity08?

4         A.      Basically what is said is that the country

5    is in trouble, that the two-party system doesn't seem

6    capable at the moment of being able to address the

7    crucial challenges in front of the country, that

8    the -- that there needs to be an alternative, that

9    Unity08 is designed to provide that alternative, and

10   that -- and that we are soliciting $5,000

11   contributions to what we call a bridge fund to help us

12   fund the time period between now and a point where

13   there are sufficient delegates to then be able to

14   convert a portion of those delegates to small dollar

15   contributors and fund the operation with much smaller

16   contributions.

17        Q.      Who has raised money for Unity08 through

18   this type of person-to-person contact?

19        A.      I have, Jerry Rafshoon, Anya Harris has

20   been the sort of organizer of that fundraising effort,

21   Peter Ackerman, Susan Cullman, C-U-L-L-M-A-N, George

22   Vradenburg, Sam Waterston, Hamilton Jordan, Angus
```

Douglas Bailey                                         March 12, 2007
                        Washington, DC

Page 26

1    the -- that it badly needs bipartisan leadership to

2    meet the challenges.  He has, I mean, that's it.

3         Q.    Has Unity08 held fundraising events?

4         A.    Oh, I think not in the traditional sense

5    that that term is used in politics.  We have had a

6    whole series of meetings.  They have been relatively

7    small, one-on-one meetings, sometimes dinner meetings,

8    dinners in people's homes with three or four couples

9    present, that kind of thing.  It has not been -- there

10   have not been large fundraising events, dinner, I mean

11   large ticketed dinners and that sort of thing.

12                        -   -   -

13            (A document was marked as Deposition

14   Exhibit Number 4)

15                        -   -   -

16            BY MR. HAJJAR:

17       Q.    I now want to mark this for identification

18   as Bailey Exhibit 4, give you a few moments to look it

19   over.  For the record, this is a two-page, well, this

20   exhibit consists of two pages.  Across the top of the

21   first page it reads, "Eighty-two percent of Americans

22   agree that America has," and runs Bates numbers 260 to

Douglas Bailey                                          March 12, 2007
                        Washington, DC

                                                            Page 28

 1    aware of, when I think back on it, one that I'm --

 2    that maybe there were more contributions made.

 3         Q.    How much money was raised?

 4         A.    One contribution of $5,000 and maybe --

 5    there might conceivably have been others that flowed

 6    out of that subsequently.

 7         Q.    Did anyone make a presentation at either of

 8    these events referred to on this first page?

 9         A.    Sure.  Yes is the answer.

10         Q.    Now, who made the presentation?

11         A.    I did.

12         Q.    And what did you say?

13         A.    I used a PowerPoint presentation that

14    explained rough -- in general terms what Unity08 is,

15    what its purpose is, what its intention is, how it

16    will operate, what it's looking for from potential

17    contributors; and it tries to answer the sort of first

18    half dozen predictable questions that people have

19    about what is this.

20         Q.    In the presentation or in the discussion

21    that, you know, accompanied this presentation, was

22    there any discussion of any specific potential

Douglas Bailey
                                                                March 12, 2007
                          Washington, DC

Page 29

1    candidates for federal office?

2         A.    There was a list of I don't remember

3    exactly how many but probably 60 different potential

4    candidates for president who had been mentioned to us

5    by various people as people who might -- wouldn't it

6    be great, people say, if So and So ran or, you know.

7    Doesn't mean that they are candidates but they are

8    mentioned to us.

9         Q.    Okay.  Now I want to mark for

10   identification this document as Bailey Exhibit 5, give

11   you a few moments to look it over.

12                    -   -   -

13        (A document was marked as Deposition

14   Exhibit Number 5)

15                    -   -   -

16        BY MR. HAJJAR:

17        Q.    For the record, across the top it reads,

18   Candidates Recommended to Us.  It's two pages, Bates

19   numbers 444 and 445.  Are you familiar with this

20   document?

21        A.    Yes.  I'm -- yeah.

22        Q.    Is this the document you just referred to?

Douglas Bailey                                          March 12, 2007
                          Washington, DC

Page 30

1        A.    The first page is.

2        Q.    Is it a true and accurate copy of what it

3   purports to be?

4        A.    The first page, let me say that this is a

5   list that we kept adding to as we proceeded.  So I'm

6   not sure this is exactly what was shown in Boston, but

7   it was similar to this and in other presentations.

8              I mean the PowerPoint presentation would

9   evolve over time but this is -- but this is certainly

10  a true and accurate representation at some point.

11       Q.    Okay.  And I am, just for the record,

12  referring to the first page.

13       A.    Right.

14       Q.    Were any of these candidates listed on this

15  first page recommended to you by anyone who expressed

16  an interest in donating more than $5,000 to Unity08?

17       A.    No.

18       Q.    Okay.  I now want to direct your attention

19  to the second page, Bates Number 445.  Are you

20  familiar with this document?

21       A.    Not in a paper -- yes, I am in a paper form

22  because we saw it on Thursday.  It had been sent to

Douglas Bailey                                          March 12, 2007
                          Washington, DC

Page 32

```
 1        A.    Let me explain what happens.  And I

 2   encourage you now or at any point to actually watch

 3   the PowerPoint to see what happens because the

 4   printout of the process is a little misleading or

 5   doesn't give the full picture.

 6             What we do in the presentation is to

 7   suggest that many, many names have been suggested to

 8   us.  And that was the first page in the document and

 9   that it -- to understand what we are talking about,

10   it's a worthwhile exercise and we encourage you, that

11   is everybody in the room, to go through the process

12   and match pairs up that are on this list.  One

13   Republican, one Democrat in whatever order.  For

14   example let us help you start that process in your

15   mind.

16             And what it shows first is Hagel-Warner.

17   And when it's printed out, that's what it appears to

18   be.  But Hagel-Warner then dissolves into Warner-Hagel

19   which then dissolves into Giuliani-Nunn, which then

20   dissolves into Brokaw and Danforth which then

21   dissolves into Bloomberg-Sibelius which then dissolves

22   into Mr. Smith who comes to Washington and Mrs. Smith
```

Douglas Bailey                                                March 12, 2007

Washington, DC

Page 33

1    who comes with him.

2             And then we reverse that order and do

3    Mrs. Smith and Mr. Smith so that what we are trying to

4    do is to suggest to people that the exercise, even the

5    exercise of thinking about marrying politically, if

6    you will, one Republican and one Democrat or to

7    present a bipartisan ticket simply so alters the

8    partisan and blame game nature of today's politics

9    that maybe in fact we could get some unity and some

10   civility in Washington that could accomplish solutions

11   to crucial issues.

12        Q.    Okay.  Mr. Bailey, you can put that exhibit

13   aside.  We can go back to what was marked as Bailey

14   Exhibit 4.

15        A.    Yeah.

16        Q.    And direct your attention to the second

17   page?

18        A.    Yes.

19        Q.    Bates number 261.

20        A.    Yes.

21        Q.    Are you familiar with this document?

22        A.    I am.

Douglas Bailey                                                    March 12, 2007
                         Washington, DC

Page 37

1              How would financial contributions help to

2    give Unity08 an opportunity to win the White House in

3    November 2008?

4         A.    Obviously the financial contributions go

5    toward the development of a convention to select a

6    ticket that would then be on the ballot in 2000 -- in

7    November 2008.

8         Q.    And any other ways?

9         A.    Well, to the degree that the growth of that

10   convention and the process of ballot access would in

11   turn cause candidates to want to seek the nomination,

12   that's an important part of this process.  In other

13   words, potential candidates to seek the nomination we

14   presume would inevitably look at progress that the

15   effort is making in achieving a significant body of

16   delegates to hold a convention and progress in

17   achieving ballot access.

18              Without those two things we -- with those

19   two things we can -- we believe we can expect

20   significant candidates to seek the nomination so that

21   the funding, to the degree that the funding supports

22   those two things, it helps.

Douglas Bailey                                               March 12, 2007
                          Washington, DC

Page 40

1    $5,000-per-person limit?

2         A.    We established a $5,000 contribution limit

3    virtually from the beginning.  While we recognize that

4    what we are starting here is sort of there isn't any

5    model in the law exactly for what we are doing.

6    Obviously we are doing things that haven't been done

7    before.

8              That didn't seem to us to be any excuse for

9    making the mistakes that others have made before, and

10   so we thought that a $5,000 contribution limit was

11   appropriate, and we established it voluntarily.

12        Q.    And when you say "we" you are referring to?

13        A.    Unity08.

14        Q.    Was the decision made by the board?

15        A.    Yes.

16        Q.    Would Unity08 like to raise more than

17   $5,000 from certain contributors?

18        A.    What we'd like to be able to do, frankly,

19   is to raise via loans the funds that are necessary to

20   achieve the objectives which we have and then to be

21   able to pay back those loans with funds from

22   contributions of $5,000 or less.

Douglas Bailey                                          March 12, 2007
                        Washington, DC

                                                            Page 41

1        Q.     Why did you decide you needed to look into

2    accepting these loans?

3        A.     I think it's very clear that the

4    requirements on the organization, particularly in

5    relation to ballot access, are significant and may

6    prove to be very significant depending upon the

7    challenges which might be anticipated from both

8    parties, in other words the legal cause engaged in

9    ballot access.  It's not so much the collection of the

10   signatures which is the cause.  It's the legal cost of

11   defending against challenges from both parties which

12   can't be anticipated.

13            And at a time when, as you know, ballot

14   access is determined by 50 state, different state

15   laws.  Many of those laws are related to the timing of

16   the primaries in the states.  This morning's New York

17   Times reports 23 states moving their primary up to the

18   fifth of March.

19            Of course aside from whether that's a good

20   idea or a bad idea and, by the way, it's a bad idea.

21   Quite aside from that, it speeds the process up and

22   presents us with frankly a significant challenge in

Douglas Bailey                                                    March 12, 2007
                              Washington, DC

                                                                    Page 42

 1    terms of ballot access.  And so I think realistically

 2    the capacity to secure funding for that in the way of

 3    loans subsequently repaid by contributions of $5,000

 4    or less is -- would be if not essential, desirable.

 5         Q.    What is your basis, what is the basis for

 6    your belief which you expressed that you might --

 7    Unity08 might face legal challenges from the parties

 8    in terms of ballot access?

 9         A.    Without meaning any disrespect to the

10    Federal Elections Commission, the political system as

11    it exists in this country, not just at the national

12    level but at the state level is at least partly if not

13    largely shaped by the decisions of the two parties

14    themselves.  The FEC is a classic example of that.

15              At the state -- and it has been my own

16    personal experience, and I think it's reasonably

17    obvious that neither party likes a challenge to the

18    existing structure because it represents some form of

19    risk.  And, therefore, it is reasonably predictable

20    that to the degree that Unity08 is perceived as

21    something that is a risk to one or both of the

22    parties, that one or both of the parties will

Douglas Bailey                                    March 12, 2007
                    Washington, DC

Page 43

1    challenge, will seek to impede, will seek to slow down

2    efforts of ballot access.  To the degree that we can't

3    achieve ballot access, the risk in their mind might

4    recede.

5             So that frankly is a realistic expectation,

6    I think.

7        Q.    Does Unity08 face any present legal

8    challenges to its ballot access efforts?

9        A.    Not that I'm aware of.

10       Q.    So your prediction is that Unity08 will

11   face these legal challenges and incur these costs

12   defending them.  So that's based upon your

13   professional experience and expertise?

14       A.    And reading of history and what happens.

15   And the record of the parties in many states is

16   reasonably clear that they don't like challenges.

17   They don't like risks.  They don't like the system

18   that allows them to operate with impunity.

19             They don't like that to be changed.  So

20   it's -- I think it's perfectly predictable.

21       Q.    Okay.  But your prediction is not based yet

22   on anything the parties have done yet specifically

Douglas Bailey                                      March 12, 2007
                        Washington, DC

                                                        Page 44

 1    regarding your ballot access efforts?

 2         A.    Not on what the parties have done to us.

 3         Q.    Are you aware of anyone who right now wants

 4    to loan Unity08 more than $5,000?

 5         A.    No.

 6         Q.    Has Unity08 been prevented from doing

 7    anything that it wants to do because of the $5,000

 8    limitation?

 9         A.    Yes.

10         Q.    And what would that be?

11         A.    I think it's fair to say that there are a

12    host of steps in terms of web development and delegate

13    recruitment that we'd like to be able to take but we

14    have not been able to take because the funds are

15    limited.  I think it is fair to say -- not only fair

16    to say, it's a fact that organizing for ballot access

17    has been slowed.

18              I shouldn't say it that way.  Stated more

19    positively, that ballot access would be further along

20    with access to more funding.

21         Q.    Notwithstanding this belief, the board is

22    still voluntarily sticking with the $5,000 limit.  Is

Douglas Bailey                                      March 12, 2007
                        Washington, DC

Page 45

1    that correct?

2         A.    Yes.    Because it's the right thing to do,

3    $5,000 contribution limit.    And I stress that our

4    interest in loans and intention in loans is to repay

5    the loans with contributions of $5,000 or from funds

6    from contributions of $5,000 or less.

7         Q.    How much more do you think Unity could

8    raise through these funds if they went ahead and

9    accepted these loans over $5,000?

10        A.    I'm going to have to ask you to restate

11   that one please.

12        Q.    Sure.    Let me try to do it with a little

13   more clarity.    How much additional money could Unity08

14   raise from loans if it abandoned the $5,000 limitation

15   with respect to these loans?

16        A.    I really don't know the answer to that.

17        Q.    Has the $5,000 limitation affected

18   Unity08's ability to get its message out?

19        A.    I think the answer to that is yes.

20        Q.    And how so?

21        A.    Well, as we were talking about before,

22   the -- if only in the sense of the web site, if you

Douglas Bailey                                              March 12, 2007
                            Washington, DC

Page 46

1    are -- if you cannot spend funding to communicate your

2    message because you don't have adequate personnel to

3    maximize the opportunity, then you are not getting

4    your message out.  And in that sense, the answer is

5    yes.

6         Q.    Okay.  Mr. Bailey, you can set aside that

7    particular exhibit.  I believe that was Number 7.

8              Are you interested in a break now or do you

9    want to go a little longer?

10             MR. JORDAN:  Any time we all want to break,

11   that's fine with us.  We are all trying to keep breaks

12   as short as we could to achieve as much as possible.

13             MR. HAJJAR:  Are you okay continuing?

14             THE WITNESS:  I am fine.

15             MR. HAJJAR:  Okay.  I'll continue.

16             MR. JORDAN:  I thought we'd probably try to

17   take a quick one, you know, 10:30 or something like

18   that.  That will split the morning and then do one in

19   the afternoon, unless somebody has a need to do

20   otherwise.

21             MR. HAJJAR:  That sounds fine.  But if

22   someone wants to take a break, go ahead and holler.

Douglas Bailey

March 12, 2007

Washington, DC

Page 62

1   example, direct mail versus person-to-person contacts?

2        A.    It's my impression that that may be so, but

3   again I'm not the best -- I'm not the best source to

4   answer that.

5        Q.    Is it your understanding that money raised

6   by Unity08 for ballot access specifically has been

7   kept distinct from money raised for other types of

8   expenses?

9        A.    No.

10        Q.    Does Unity08 have any plans to separate the

11   money it plans to spend -- actually, strike that.

12   Does Unity08 plan to spend money directly supporting

13   its eventual nominees after the convention?

14        A.    No.

15        Q.    I now want to mark this for identification

16   as Bailey Exhibit 9.  I'll give you a few moments to

17   look it over.

18                    -   -   -

19            (A document was marked as Deposition

20   Exhibit Number 9)

21                    -   -   -

22            BY MR. HAJJAR:

Douglas Bailey                                                March 12, 2007
                          Washington, DC

Page 77

1    operate and how can we be sure that you are doing what

2    you say you are doing and all those things.  And we

3    try to answer all those questions.

4              To the best of my knowledge, not only to

5    the best of my knowledge, it's never in any of those

6    meetings been any request of anybody to run or

7    encouragement of them to run.  There has been in all

8    the meetings an encouragement of them to be aware of

9    what we are doing and to watch us so that they can

10   make their own judgment as to what to do about it.

11        Q.    These discussions with current candidates,

12   staffs and potential candidates, were any of these

13   discussions initiated by either the candidate, the

14   current candidate, the staff of the potential

15   candidate?

16        A.    Yes.  I take that back.  If you are asking

17   were they initiated by a current candidate?

18        Q.    If you want, we can --

19        A.    It's just, I mean, are we lumping them all

20   together or are we separating current candidates?  It

21   becomes a little --

22        Q.    Why don't I go ahead and separate them out

Douglas Bailey                                          March 12, 2007
                        Washington, DC

Page 81

1    current candidates, or widely known to be a candidate,

2    or potential candidates did any of the -- or their

3    staffs -- did anyone express an interest in becoming

4    the Unity08 nominee?

5         A.    I think it's fair to say that they alluded

6    to the possibility in some instances.  That's

7    different from saying that they said we want to do

8    this.  I think in almost every instance these meetings

9    if they were at their initiative was to find out more

10   about the process, more of what were our plans, what

11   was our timing, what was the process, what are you

12   really talking about in this convention how the rules

13   are going to work and how you are going to achieve

14   ballot access.  Are you going to do this, are you

15   going to that, that kind of stuff.

16        Q.    Okay.  Looking at a broader definition, say

17   potential candidates, in any of these discussions did

18   anyone associated with Unity08 encourage them to

19   ultimately seek the Unity08 nomination?

20        A.    I'm not aware of a single instance in which

21   anybody in Unity08 has encouraged anybody to seek the

22   Unity08 nomination in any form in any direct way.

Douglas Bailey                                                                            March 12, 2007
                                      Washington, DC

Page 87

 1      A.    Not that I'm aware.

 2      Q.    Okay.  Mr. Bailey, you can put that exhibit

 3  aside.  Unity08 plans on holding an on-line

 4  convention; correct?

 5      A.    Yes, sir.

 6      Q.    And when will that be?

 7      A.    Well, we are not locked in concrete but we

 8  expect it to be in June of 2008.

 9      Q.    And why are you thinking at this point it's

10  probably going to be June or possibly June?

11      A.    Well, it has been our plan from the outset

12  to hold it at a time when it seemed likely that the

13  two party nominees would already have been selected

14  and that there was enough opportunity from the time

15  that the two party nominees were selected for others

16  to get -- other potential candidates to survey the

17  field and to make a decision as to whether they wish

18  to seek this nomination.

19      Q.    If someone gets the major -- a major party

20  nomination, does that rule them out from getting the

21  Unity08 nomination?

22      A.    No.

Douglas Bailey                                                March 12, 2007
                          Washington, DC

                                                              Page 88

1        Q.    Does Unity08 plan on having a slate of

2   candidates prepared prior to the convention?

3        A.    Ask the question again.

4        Q.    Sure.  Does Unity08 plan on having a slate

5   of candidates available prior to the convention?

6        A.    I've got to tell you I don't know what the

7   question means.  If you wish me to, just --

8        Q.    No.  I will try to restate something.

9              MR. JORDAN:  I think the word slate may be

10  causing problems here.

11             BY MR. HAJJAR:

12       Q.    Will there be, to your understanding, any

13  narrowing down of candidates prior to the convention?

14       A.    Here's the process that we are going

15  through right now.  The rules committee is considering

16  that question and a number of others as to the

17  procedures to be followed that both make sense in

18  terms of what we are trying to do and make common

19  sense as well so that they can be easily understood.

20             It is my expectation that what they are

21  going to recommend is that prior to the convention

22  there be a maybe one, maybe two qualifying rounds in

Douglas Bailey                                           March 12, 2007
                            Washington, DC

Page 89

1    which delegates would pair the number of candidates,

2    assuming that we have lots of different candidates,

3    pair the candidates down to some manageable numbers so

4    that once the balloting begins at the convention

5    itself, we have a limited number of candidates, with

6    an understanding that eventually somebody has to get

7    50 percent of the voting delegates in order to win the

8    nomination.  So then you have a process of winnowing

9    down by ballots until you get a winner.

10        Q.    So correct me if I'm wrong, you said there

11   would be some type of winnowing down prior to

12   convention ballot?

13        A.    Yes.  I mean I am presuming now, and this

14   is the process yet for the Ts to be crossed and Is

15   dotted, but we anticipate that there are probably a

16   couple winnowing down votes in May of 2008 to get it

17   down to a manageable number of candidates that then

18   come June balloting keeps reducing the number by one

19   until there is somebody who achieves fifty percent

20   plus one of the voting delegates.

21        Q.    Who would be doing the winnowing down

22   voting, if any, prior to convention?

Douglas Bailey                                                    March 12, 2007
                            Washington, DC

Page 90

1        A.    The delegates.

2        Q.    Is it your understanding that Unity08 will

3    draft any specific candidates to become the nominee?

4        A.    Unity08?

5        Q.    Yes.

6        A.    Again we may have different definitions in

7    mind, but my answer to what I understand your question

8    to be is no.  I don't think Unity08 will draft a

9    candidate.  I do think it is entirely possible for

10   delegates, the people to draft people to become

11   candidates for the Unity08 nomination.

12             I do expect that the rules committee will

13   -- one of the products of the rules committee will be

14   a rule that suggests that no one who will end up on

15   the ballot when the convention actually gets to the

16   balloting phase who has not agreed in advance to

17   accept the nomination.

18       Q.    So as an organization Unity08 has no plans

19   on drafting any yet identified candidates to become

20   the nominee?

21       A.    I think that's -- I think that's a correct

22   statement.  The intention, however, is to enable the

Douglas Bailey                                                          March 12, 2007
                                        Washington, DC

Page 94

1    think that means media attention to the candidates.

2    Our purpose, frankly, is to focus on the opportunity

3    that Unity08 is trying to give to the public to

4    participate in a nominating process by which they

5    actually have some voice in putting somebody on the

6    ballot in November.  And, therefore, there will be a

7    good deal of exposure to the candidates.  But the fact

8    of the matter is that what we intend to do is to

9    provide exposure to the Unity08 process.

10              If, for example, let me give you an

11   example, it is very much in the interest perhaps of

12   the candidates but it is certainly in the interest of

13   the delegates and the people of Unity08 that there be

14   a television debate that goes beyond our rules.  But

15   it's not an inappropriate thing to happen and we'll

16   probably encourage it.

17        Q.    Is it your understanding that Unity08 will

18   in any way assist any potential candidates for the

19   Unity08 nomination with raising money prior to the

20   convention?

21        A.    No.

22        Q.    Let me direct your attention underneath the

Douglas Bailey                                             March 12, 2007
                        Washington, DC

                                                              Page 95

1    sentence we just looked at, the one that's labeled C,

2    where it begins, What services will Unity08.com

3    provide the candidates.

4              Is it your understanding that Unity08 will

5    provide any services such as discussed in that

6    sentence there to candidates prior to or during the

7    convention?

8        A.    I suppose it's a question as to whether we

9    will provide the services to the candidates or the

10   services to the delegates.  What we mean is to

11   facilitate the communication between the delegates and

12   the candidates and the candidates and the delegate

13   that enable the delegates to make a selection.

14             What I mean by that is it is our intention

15   on the web site to provide candidates with the

16   opportunity to -- of a web log so that it can

17   communicate to delegates.  It is our intention to

18   provide them an opportunity to answer specific crucial

19   issue questions that the delegates have specified

20   candidate to camera via video on demand and put that

21   on the web site.

22             It is our expectation to provide candidates

Douglas Bailey

March 12, 2007

Washington, DC

Page 96

1   the opportunity to communicate to delegates for

2   delegate support to the delegate list via e-mail in

3   some controlled fashion without giving them the list,

4   but nonetheless once a week or some such basis to

5   communicate to the delegates if the delegate -- as

6   long as the delegates don't X out that they don't want

7   to hear from the candidates or that particular

8   candidate or whatever.

9         So all of that is enhancing the delegates'

10  capacity to make a selection.  It is also at the same

11  time enhancing the candidates' capacity to communicate

12  to delegates.  But the purpose is to enable the

13  delegates to make the most responsible decision they

14  can make.

15      Q.    Okay.  Any of these means of facilitating

16  communication that you just mentioned, would these be

17  made -- does Unity08 plan on making these means of

18  communication available prior to the convention?

19      A.    Yes, indeed.

20      Q.    Has Unity08 already spent money preparing

21  for its on-line convention?

22      A.    Well, in one sense everything we do is

Douglas Bailey                                          March 12, 2007
                        Washington, DC

Page 97

1    preparing for the on-line convention.  It is the

2    center piece of what we are doing.  And that includes

3    a lot of the web development that it has undertaken.

4    But that also is a major investment which needs to be

5    made, investment may not be the right word, major

6    expenditure that needs to be made to develop what we

7    call convention hall.

8              If in fact -- and that's a major technology

9    challenge.  If in fact we are correct and can develop

10   a delegate base of somewhere between five and ten

11   million or more delegates, for them to be able to

12   participate in the convention and in activities

13   leading up to the convention, and to be able to devote

14   in a secure fashion, all of that is a major

15   technological undertaking and major expense.

16        Q.    How much do you expect the convention to

17   cost?

18        A.    We are starting now to have serious

19   conversations with technology partners to give us a

20   better handle on that.  But it is clearly a

21   multimillion dollar cost.

22        Q.    How much do you think it's going to cost,

Douglas Bailey                                                     March 12, 2007
                          Washington, DC

Page 107

1    any way outside using the web?

2         A.    Yeah.  It is increasingly doing just

3    exactly what I just described, which I obviously

4    didn't do very effective, a very effective job in

5    saying.

6         Q.    I'm sorry.  I thought I understood you as

7    having said that all of your delegate recruitment is

8    going through the internet of some sort.  How about --

9    maybe let me rephrase this.

10        A.    Okay.

11        Q.    Obviously.  Is it recruiting -- is Unity08

12   recruiting delegates outside of the internet, for

13   example, face-to-face or through phone calls or direct

14   mail or any other means that doesn't use the internet?

15        A.    It has not been doing that, but it will be

16   increasingly doing that.  I mean it has not been, for

17   example, making a major effort which is now just

18   starting to be underway to transfer its college

19   support which is a little more difficult for us to

20   communicate with, but its college support into

21   delegate support.

22        Q.    I want to mark for identification this

Douglas Bailey                                           March 12, 2007
                          Washington, DC

                                                          Page 111

1     funding that is possible once the delegates have been

2     recruited.  That's sort of the timing bind that we

3     find ourselves in that you never quite know when the

4     delegate base is going to be receptive to coming on

5     board.  And so if you don't know that, it's difficult

6     to project.  If you knew that, then you could project

7     a time line on funding which would be more reliable.

8             At the same time, the funding has been sped

9     up, the need for funding has been sped up for ballot

10    access because the states are moving their primary

11    dates forward to the point where in order to achieve

12    ballot access, while we have assumed that we would

13    prefer not ever to use paid signature collectors,

14    whatever the right term is, we may have to do that

15    simply because the timing has been sped up which

16    increases the funding up front.  So it's all -- all of

17    these things work together in a complicated way.

18       Q.    I now want to mark for identification this

19    document that is Bailey Exhibit 15, and give you a few

20    moments to take a look.

21                       -   -   -

22              (A document was marked as Deposition

Douglas Bailey                                              March 12, 2007
                          Washington, DC

                                                              Page 113

1    that.

2         Q.    Okay.   Well, let me ask you this question,

3    the second sentence says, "The party would assure the

4    slate that it would have 50-state ballot access and

5    what we estimate to be a 300-dollar-million -- $300

6    million campaign fund.

7         A.    Yeah.   I think what George is meaning to

8    say there, and I'm sure frankly that there are all

9    kinds of things written by supporters that wouldn't

10   necessarily be the way we would phrase it.   It

11   certainly is true that if we have ten million

12   delegates who vote to support and nominate a ticket,

13   we would be willing to, I believe, upon the advice of

14   counsel we would be willing to sell the delegate list

15   to that ticket so that it can solicit from that list

16   of delegates contributions.

17             And it has occurred to us, frankly, that it

18   is not inconceivable for 20, 25 percent, whatever, of

19   that list of delegates who have just nominated a

20   ticket to be supportive of that ticket in a financial

21   way.   And in that way, I believe that the candidates

22   may be in a position to have a start-up fund of their

Douglas Bailey                                      March 12, 2007
                        Washington, DC

Page 114

1    campaign from that point on that is significant, that

2    is funded by the delegates.  But they would do the

3    solicitation.  We would not.

4         Q.    Does Unity08 have any plans once its

5    nominee is selected to specifically raise funds from

6    its delegates that will be spent -- that would be

7    spent on behalf of its nominee?

8         A.    We have no such plans to do that.  Let me

9    say that we presume that once the convention is done,

10   that we would file as a committee and operate then as

11   a committee.  Because it is at that point that we

12   would have a candidate that we are supporting.  And at

13   that point we would do a variety of things in relation

14   to that candidate which we don't do now and wouldn't

15   do until that point.

16        Q.    Unity08 make any independent expenditures

17   on behalf of its candidates?

18        A.    I'm sorry?

19        Q.    Will Unity08 make any independent

20   expenditures on behalf of its candidate?

21        A.    It has no plans to do that.  I mean our

22   goal has been, I won't go through the litany again,

Douglas Bailey                                          March 12, 2007
                         Washington, DC

                                                          Page 118

1    Exhibit 16.  We'll mark it for identification, give

2    you a few moments to look it over.

3                        -  -  -

4              (A document was marked as Deposition

5    Exhibit Number 16)

6                        -  -  -

7              BY MR. HAJJAR:

8         Q.    For the record, across the top it says,

9    What Comes Next.

10        A.    Yeah.

11        Q.    Bates number 449.  Are you familiar with

12   this document?

13        A.    It's another slide from a PowerPoint

14   presentation.

15        Q.    Is it a true and accurate copy of that

16   slide?

17        A.    Yes.  I believe so.

18        Q.    Is this document still an accurate

19   reflection of Unity08's milestones for 2006 and '7?

20        A.    No.  It's -- and obviously from the timing

21   what you were provided is a version of the PowerPoint

22   that dates back to October.  And, by the way, at any

Douglas Bailey                                          March 12, 2007
                        Washington, DC

                                                           Page 119

 1    point we can give you any updated versions, if you

 2    wish.  But as you can imagine from this and perhaps

 3    from other slides too, it will vary from time to time

 4    as it is updated.

 5              I'm sorry.  I've lost track of your

 6    question.

 7         Q.    No.  I think that's fine.  Well, let me ask

 8    a different question.  Which of these benchmarks did

 9    Unity08 or milestones did Unity08 achieve by the date

10    listed there?

11         A.    In the first.

12         Q.    Actually --

13         A.    The second.  Tell you the truth, I'm not

14    really quite sure what the third is.  The fourth.  We

15    began delegate registration on February 6.  And brief

16    '08 candidates is ongoing.

17              So those were met in a timely way.  The

18    others including ballot access have been set back in

19    terms of time because of funding restrictions.

20         Q.    Are there any others that Unity08 has

21    achieved at this point, even if maybe not exactly on

22    the time line there?

Douglas Bailey                                           March 12, 2007
                          Washington, DC

Page 120

1        A.    I would think -- I would say that we have

2   made effective progress, have not achieved but have

3   made effective progress on all of them with the

4   exception of ballot access which we have not started

5   and cannot start without adequate funding.

6        Q.    Okay.  You can put that exhibit aside.

7             What type of organization do you think

8   Unity08 is?  How would you describe it?

9        A.    I'll go back to my political consulting

10  days.  It is at this point that I always put my hand

11  up and say, I'm not a lawyer.  So don't take this as a

12  legal description.

13            It's a third-force people's movement to

14  jolt the two parties into recognizing that without

15  some element of bipartisanship almost nothing serious

16  ever happens in solving crucial issues, and to prove

17  that point by the election of a President and Vice

18  President in the Unity ticket, chosen by an on-line

19  convention.

20       Q.    Do you think that Unity08 is similar to a

21  political party?

22       A.    Oh, I'm sure there's some similarities.

Douglas Bailey

March 12, 2007

Washington, DC

Page 130

1    seeking in order to permit you to proceed with your

2    program.  What is the current status of the loan

3    program?

4         A.    I think it's accurate to say, and I think

5    this is what the question was, have we sought any

6    loans, have we received any loans, have we sought any

7    loans.  And the answer to that is technically, no.  We

8    are developing documents now to put in front of a

9    variety of people who might provide loans to the

10   organization.

11        Q.    When do you expect to be able to do that?

12        A.    Well, that process is undergoing now, so it

13   wouldn't surprise me if by the end of this week we

14   have crossed the Ts and dotted the Is of those

15   documents and started the process of touching base

16   with potential lenders.

17        Q.    Okay.  There were several discussions of

18   ballot access process earlier today.  And one of those

19   discussions has to deal with the source probability

20   challenges.  Do you recall that?

21        A.    Yes, sir.

22        Q.    If you did not have challenges from a

Douglas Bailey                                          March 12, 2007
                        Washington, DC

                                                          Page 131

   1    financial cost standpoint, how substantial would the

   2    ballot access effort be?

   3        A.    Well, it would still be substantial because

   4    the thing that we have to deal with now, and I am not

   5    sure all of the states that are affected by this but

   6    if in fact there are 23 different states that are

   7    moving their primary to the fifth of February, then in

   8    most of those -- in many of those states the timing of

   9    ballot access would be affected by that change.

  10            For example, the state of California

  11    requires so many signatures or so many people to sign

  12    up to be -- indicate they want to be part of the

  13    Unity08 party, with a cutoff date of so many days

  14    before the California primary.  But if the California

  15    primary is moved from April or May or whatever it was

  16    previously intended to be up to the fifth of March,

  17    then the cutoff date for ballot access is moved up.

  18            All of that compresses the job and,

  19    therefore, increases the possibility, although we

  20    would prefer not to do it this way, the possibility of

  21    having to use paid collectors and gathering the

  22    signatures, all of which then increases the cost to do

Douglas Bailey                                           March 12, 2007
                          Washington, DC

                                                              Page 132

1    so.

2        Q.    Does Unity08 plan to have or intend to have

3    any funds that will be transferred to the nominees for

4    use in their campaign after the nomination process is

5    complete?

6        A.    No.  That's not part of the planning at

7    all.

8             MR. JORDAN:  Okay.  That's all I have.

9               REDIRECT EXAMINATION CONDUCTED

10            BY MR. HAJJAR:

11       Q.    I just have one follow-up question.  In

12   response to the last question I believe, again correct

13   me where I'm wrong, you said that any excess funds

14   that Unity08 might have at the closing of its

15   convention would not be transferred to its candidates.

16   Is that correct?

17       A.    I think what I was saying, and I frankly I

18   thought a lot about this, but I think what

19   Mr. Jordan's question was do we plan to transfer funds

20   to the candidate.  And the answer is no.  If we are in

21   a position to have surplus funds, frankly I haven't

22   even thought about that.

Douglas Bailey

March 12, 2007

Washington, DC

Page 134

```
1    UNITED STATES OF AMERICA  )

2                                ss:

3    DISTRICT  OF COLUMBIA      )

4

5           I, DOUGLAS BAILEY, the witness

6    herein, having read the foregoing testimony of the

7    pages of this deposition do hereby certify it

8    to be a true and correct transcript, subject to the

9    corrections, if any, shown on the attached page.

10                     -  -  -

11

12

13           _____

14                DOUGLAS BAILEY

15

16   Subscribed and sworn to before me

17   this _____day of_____, 2007

18   _____.

19

20

21

22
```

March 12, 2007

Douglas Bailey                    Washington, DC

Page 135

C E R T I F I C A T E

1

2    UNITED STATES OF AMERICA    )

3                                ss:

4    DISTRICT  OF COLUMBIA       )

5

6           I, ELIZABETH MINGIONE, Notary Public

7    within and for the District of Columbia do hereby

8    certify:

9           That the witness whose deposition is

10   hereinbefore set forth was duly sworn and that the

11   within transcript is a true record of the testimony

12   given by such witness.

13          I further certify that I am not related to

14   any of the parties to this action by blood or marriage

15   and that I am in no way interested in the outcome of

16   this matter.

17          IN WITNESS WHEREOF, I have hereunto set my

18   hand this _____day of_____, 2007.

19

20          _____

21   My Commission Expires:

22   April 14, 2010

# EXHIBIT 12

# STEPTOE & JOHNSON LLP
### ATTORNEYS AT LAW

John J. Duffy
202.429.8020
jduffy@steptoe.com

2006 MAY 30  P 4: 59

1330 Connecticut Avenue, NW
Washington, DC 20036-1795
Tel 202.429.3000
Fax 202.429.3902
steptoe.com

RECEIVED
FEC MAIL
2006 MAY 30  P 4: 45

May 30, 2006

Lawrence Norton, Esq.
Federal Election Commission
Office of the General Counsel
999 E Street N.W.
Washington, D. C. 20463

AOR 2006-20

Re:  **Request For An Advisory Opinion On The Obligation Of A Nascent Political Party To Register As A Political Committee**

Dear Mr. Norton:

Pursuant to Section 437g of Title 2 of the United States Code and Part 112 of Title 11 of the Code of Federal Regulations, I submit on behalf of Unity 08 a request for an Advisory Opinion on whether donations to it, and purchases of goods and services by it, are "contributions" or "expenditures" as those terms are defined by the Federal Election Campaign Act of 1971, as amended, (the "Act" or "FECA"), whether it is required to register as a "political committee" under the Act, whether it may incorporate for liability purposes, and the effect of its becoming a political party under the Act.

## Factual Background

Unity 08 is a not-for-profit corporation organized under the laws of the District of Columbia. A copy of Unity 08's Statement of Organization attached hereto as an Appendix. Unity 08 has applied to the Internal Revenue Service (the "IRS") for tax exempt status pursuant to Section 527 of the Internal Revenue Code.

Unity 08 consists of a group of citizens of different ages, backgrounds, and colors, many of whom have been active in the past in Presidential campaigns for one or the other of the major

STEPTOE & JOHNSON LLP

parties. They are deeply concerned that our political system is dysfunctional and that time is short to get things back on track. Rather than the battle for those "in the middle" that had characterized Presidential campaigns during most of the 20th Century, recent Presidential elections, have focused on turning out each party's special interest groups: their "base," with each "base" representing less than ten percent of the American people. Both parties have tended to pay little attention to *crucial problems,* issues on which the future safety and welfare of our nation and people depend, such as the need for energy independence, nuclear proliferation, global warming, the corruption of the political process by money, the caring for our older citizens, the education of our children, and the disappearance of the American Dream for so many of our people, in favor of issues with an appeal primarily to particular special interest groups, such as gun control, abortion, and gay marriage, which, while important and worthy of debate, will not determine the fate or future of the United States.

As a result, most Americans have not been enthusiastic about the choices for President and Vice-President in recent elections, the key issues on which they ran, or the manner in which the campaigns were conducted. Although Unity 08 believes that the leaders of both major parties are well intentioned, good, and honest people, they are trapped in a flawed system. The two major parties seem neither relevant to the issues and challenges of the 21st Century *nor* effective in addressing them. Major parties and all who have been active in them, including many of the participants in Unity 08, share responsibility for the current lack of confidence in our political system and the widespread belief that government -- as a problem-solver -- is no longer credible nor effective.

Unity 08, therefore, is committed to exploring whether a third alternative ticket can be presented to the American voters in 2008. Unity 08 has two goals:

♣    *Goal One* is to elect a Unity Ticket for President and Vice-President of the United States in 2008 that will have on the ticket a person from each of the two major parties. This Unity Ticket need not necessarily be the ticket of the Unity Party. Unity 08 might, for example, support such a ticket if offered by one or the other of the two major parties.

Lawrence Norton, Esq.                                        STEPTOE & JOHNSON LLP
Federal Election Commission
Page 3 of 9

❧    *Goal Two,* our *minimum* goal, is to effect *major* change and reform in the 2008 national

elections by influencing the major parties to adopt the core features of our national agenda.  By

organizing a group of voters who comprise at least 20% of the national electorate and committed

to our agenda, we feel confident that their voters will be *the balance* and ultimately *the*

*difference* in the 2008 national election.


Unity 08 intends to finance its activities by soliciting donations from individuals who

agree with its goals.  Donations of money or any other things of value will not be accepted

"prohibited sources," including corporations, foreign nationals, or government contractors.  In

addition, while limitations may be placed on the amount of donations that will be solicited or

accepted from individuals, the limitations may or may not conform with the limitations placed on

such donations by the regulations governing non-connected political committees.  Unity 08

intends to establish a web site and many, but not all of its solicitations are likely to be made over

the Internet; however, Unity 08 may also make use of other solicitation methods, including

telephone banks and mass mailings.  Unity 08 may also choose to raise money through the sale

of t-shirts, mugs, pens, bumper stickers, and other similar items marked with the Unity 08 logo

or identified with Unity 08 in some other fashion, such as a particular phase or slogan.


Unity 08 intends to purchase access to other media of mass communication to

communicate to the public its view that the two major parties have failed to address the critical

problems facing the United States today. Unity 08 intends to commission polls to assess public

support for its position that the two major parties offer no solution to the present crisis in

government, because of their focus on the needs of the "special interest" groups that constitute

their base and for its proposal to seek to bring about a Unity Ticket.  Unity 08 intends to explore

the feasibility of its goal of creating a Unity Ticket and to take steps to build, and demonstrate

the existence of, a substantial number of potential voters who support this goal.  Unity 08 intends

to try to influence the two  major parties to address the issues that Unity 08 believes are critical

to the future of the United States and to encourage the two major parties to adopt a Unity Ticket

themselves.  Unity 08 intends to qualify for ballot positions in certain key states for the offices of

President and Vice President of the United States through petitions, and if required, litigation,

Lawrence Norton, Esq.                                    STEPTOE & JOHNSON LLP
Federal Election Commission
Page 4 of 9

and, if necessary, to select, using a "virtual" convention conducted over the Internet, candidates

for the office of President and Vice-President of the United States to run in those ballot positions.

The virtual convention would be held in the Summer of 2008, before the conventions of the two

major parties, but after the likely nominees of the other parties have been identified.  All persons

who have signed up with Unity 08 as delegates on the Internet will be eligible to vote during the

virtual convention for the candidates they want to constitute the Unity 08 ticket.  Unity 08 does

not intend to promote, attack, support, or oppose the candidates of the major parties for public

office in the 2006 elections on the federal, state or local level, and it does not intend to support or

oppose candidates for Congress or State and local elections at any time.


**Advisory Opinions Requested**

1.      Donations to, or purchases made, by Unity 08 would not be "contributions" or
        "expenditures" under the Act prior to the time Unity 08 chooses a candidate to support.

2.      Unity 08's application of tax exempt status under Section 527 of the Internal Revenue
        Code does not require it to register as a "political committee" under the Act, and it does
        not have to register as a "political committee" until it has made "contributions" or
        "expenditures" under the Act.

3.      Unity 08 may incorporate for liability purposes.


**Analysis**

1.      **Donations to, or purchases made, by Unity 08 would not be "contributions" or
        "expenditures" under the Act prior to the time Unity 08 chooses candidates to
        support for the Office of President and Vice-President of the United States.**

        In *Buckley v. Valeo*, 424 U.S. 1, 74-82 (1974), the Supreme Court held that the operative

phrase in the Act's definitions of "contribution and "expenditure," *i.e.* "for the purpose of

influencing any election for Federal office," raised constitutional problems as applied to

donations received, or expenses incurred by, organizations other than candidates or candidate

controlled political committees.  To avoid the vagueness and potential over breadth of the

statutory definition, *Buckley* adopted a narrowing construction so that the Act's definition of

"expenditure" reached "only funds used for communications that expressly advocated the

Lawrence Norton, Esq.                                  STEPTOE & JOHNSON LLP
Federal Election Commission
Page 5 of 9

election or defeat of a clearly identified candidate." *Id.* at 79-80. *See also* McConnell v. Federal
Election Comm'n, 540 U.S. 93, 126 (2003).[1]

Since *Buckley*, courts have repeatedly reaffirmed that an organization that collects
donations and incurs expenses for political purposes does not receive "contributions" or make
"expenditures" under the Act, unless and until the organization seeks to influence the election or
defeat of a *identified* candidate for a federal office. *See* Machinists, 655 F.2d at 394 (the Act's
provisions do not extend to organizations whose contributions and expenditures "do not related
to an identifiable 'candidate'"). In *Machinists*, the FEC claimed that payments made by the
Machinists separate segregated fund to various groups that had as their goal the persuasion of
Senator Ted Kennedy to run for President were "contributions" in excess of the amounts allowed
under the Act. *Id.* at 390. The D.C. Circuit Court of Appeals, however, held that moneys given
to groups were not "contributions" or "expenditures" because the groups' activities were not
related in any way to a person who has decided to become a candidate." *Id.* at 392. The court
reasoned, "[d]raft groups [] have one thing in common ... they aim to produce some day a
candidate acceptable to them, but they have not yet succeeded. Therefore, none are promoting a
"candidate" for office, as Congress uses that term in the FECA." *Ibid.* Unity 08 is in an even
more preliminary position. It has not yet even identified a potential candidate, and indeed the
selection of such a preferred choice will not occur until the summer of 2008 at its virtual
convention. Until that time, we submit that the donations received and the expenses incurred in
the pursuit of its goals do not constitute "contributions" or "expenditures" under the Act.

Nothing in the Bipartisan Campaign Reform Act of 2002 (BCRA) or the Supreme
Court's decision in *McConnell* is to the contrary. In the BCRA, Congress legislated narrowly

---

[1]     Donations made to an organization that does not make "expenditures" can not
constitute "contributions." Consequently, the status of an organization's expenses determine
whether donations to it are contributions. *See* Federal Election Comm'n v. Machinists Non-
Partisan Political League, 655 F.2d 380, 392-94 (Ct. App. D.C. 1981) (holding that the FEC had
no jurisdiction to investigate alleged violations of the contribution limitations by draft
committees since the expenditures of the committee were not under the control of or made with
the major purpose of electing an identified candidate), *cert. denied*, 454 U.S. 897 (1981).

Lawrence Norton, Esq.
Federal Election Commission
Page 6 of 9

STEPTOE & JOHNSON LLP

with respect to the receipt or expenditure of money for political purposes by groups not controlled by a candidate. In *Buckley*, the Court limited the definitions of the phrases "expenditure" and "contribution" to "express advocacy," *i.e.* language that expressly advocates or opposes a clearly identified candidate. 424 U.S. at 43-44. In so doing, the *Buckley* Court also established a "magic words" test to determine whether advocacy was express and, therefore, subject to regulation by the FEC. *Ibid.* (stating that in order to be express advocacy the terms "vote for," "support," "vote against" etc. must be used). This test was replaced by the FEC after the adoption of BCRA by the term "electioneering communications," which broadens the scope of the regulation of express advocacy to communications *referring to* a "clearly identified candidate." *See* Shays v. Federal Election Comm'n, 414 F.3d 76, 82 (D.C. Ct. App. 2005) (the BCRA "replaced the 'magic words' standard for issue ads with a more robust concept termed 'electioneering communication'"); McConnell, 540 U.S. at 189-90. The application on the restrictions for "electioneering communications" is limited, however, to certain times in relation to a primary or general election. *See* 2 U.S.C. § 434(f)(3)(A)(i). Thus, the core component of the *Buckley* decision and its progeny remains intact — that in order to make an "expenditure" or "contribution" there must be a clearly identified candidate. With this understanding of express advocacy, the Supreme Court found constitutional Congress' regulation of two types of activities addressed in BCRA: "Federal election activity," as defined in 2 U.S.C. § 431(20), and "electioneering communication," as defined in 2 U.S.C. § 434(f)(3)(A)(i). *See* McConnell, 540 U.S. at 159-173 and 186-209.

2.  **Unity 08's application of tax exempt status under Section 527 of the Internal Revenue Code does not require it to register as a "political committee" under the Act, and it does not have to register as a "political committee" unless and until it receives donations or incurs expenses for the purpose of influencing the election of an *identified* candidate.**

The Supreme Court in *Buckley v. Valeo* explained that to fulfill the purposes of the Act, the definition of political committee "need only encompass organizations that are under the control of a candidate or *the major purpose of which is the nomination or election of a candidate*," and that the regulations do not "reach groups engaged purely in issue discussion." 424 U.S. at 79 (emphasis added). The Supreme Court reaffirmed, and expanded, the "major

STEPTOE & JOHNSON LLP

purpose" test in *Federal Election Comm'n v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 263 (1986) ("*MCFL*"). In that case, Massachusetts Citizens for Life, a non-profit advocacy corporation whose "central organizational purpose" was issue advocacy had, nevertheless, paid a substantial amount of money for the preparation and public distribution of a newsletter that advocated the election or defeat of *particular* candidates for federal offices. *Id.* at 242-44. The Supreme Court held that Massachusetts Citizens did not meet the definition of a political committee, notwithstanding that it was not engaged "solely" in issue advocacy because its "major purpose" was not the nomination or election of specific candidates. *Id.* at 252-53, n.6. Had Massachusetts Citizens not made its "expenditures," however, the question of its major purpose would not have been considered. *See id.* at 251-52. The definition of "political committee" for organizations not controlled by federal candidates has, therefore, two requirements: (1) the making of expenditures sufficient to meet the annual threshold and (2) the major purpose test.

As *Buckley* held, and as we have discussed previously, "expenditures" require, as a prerequisite, a particular *identified* candidate. In *Federal Election Comm'n v. GOPAC*, 917 F. Supp. 851, 859 (D.D.C. 1996), the District Court construed the *Buckley* addition to the definition of a political committee -- that a groups "*major purpose ... is the nomination or election of a candidate*" -- *to mean a particular candidate or candidates.* GOPAC's stated mission was: "to create and disseminate the doctrine which defines a caring, humanitarian, reform Republican Party in such a way as to elect candidates, capture the U.S. House of Representatives and become a governing majority at every level of government." *Id.* at 854. Although GOPAC's sole purpose was to advocate the election of Republicans as a class of candidates, the court held that the definition of "political committee" was limited by *Buckley* to groups whose major purpose was the election of a *particular* federal candidate or candidates.[2] *Id.* at 859 ("even if the organization's major purpose is the election of a federal candidate, the organization does not

---

[2]    Advisory Opinion 2003-23 is inapposite. The Opinion was limited to the issue of identification for earmarking. WE LEAD's political committee status was *not* at issue. Advisory Opinion 1977-16 is likewise inapposite. The Commission stated that the organization that requested the Opinion could operate as a political committee, not that it had to do so.

Lawrence Norton, Esq.
Federal Election Commission
Page 8 of 9

STEPTOE & JOHNSON LLP

become a 'political committee' unless or until it makes expenditures to support a 'person who has decided to become a candidate' for federal office").

Unity 08's decision to apply for tax exempt status under Section 527 of the Internal Revenue Code does not change the result of this analysis. Unity 08 has received legal advice that its request for tax exempt status should be made under Section 527, but this request does not alter the nature of its proposed actions, which as we have shown above, are too preliminary to require it to register as a "political committee" under the Act. Indeed, this Commission has previously rejected attempts to construe Section 527 as in itself creating "political committees" under the Act, most recently in 2004. *See* 67 Fed. Reg. 225, 68065 (November 23, 2004); *see also* Comm'rs Mason, Smith and Wold's Statement of Reasons for Pre-MUR 395 (February 27, 2002).[3]

3.    **Unity 08 may incorporate for liability purposes.**

Unity 08 is a not for profit corporation organized under the laws of the District of Columbia. Unity 08 has also applied to the Internal Revenue Service for tax exempt status under 26 U.S.C. § 527. Section 441b of the Act prohibits corporations from making "contributions" or

---

[3]    Moreover, the definitions of "contribution" and "expenditure" as applied to I.R.C. § 527 are different than the definitions of those terms under FECA. Specifically, the I.R.C.'s definitions contain no requirement that the contributions or expenditures be made for the purpose of influencing a federal election. *Compare* 26 U.S.C. § 271(b)(2) (stating that the term "contribution" "includes a gift, subscription, loan, advance, or deposit, of money, or anything of value, and includes a contract, promise, or agreement to make a contribution, whether or not legally enforceable"), *with* 2 U.S.C. § 431(8)(A) (stating that the term "contribution" includes: "(i) any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office; or (ii) the payment by any person of compensation for the personal services of another person which are rendered to a political committee without charge for any purpose"). *Compare* 26 U.S.C. § 271(b)(3) (stating that the term "expenditure" "includes a payment, distribution, loan, advance, deposit, or gift, of money, or anything of value, and includes a contract, promise, or agreement to make an expenditure, whether or not legally enforceable"), *with* 2 U.S.C. § 431(9)(A) (stating that the term "expenditure" includes: "(i) any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office; and (ii) a written contract, promise, or agreement to make an expenditure").

Lawrence Norton, Esq.                                         STEPTOE & JOHNSON LLP
Federal Election Commission
Page 9 of 9

"expenditures" "in connection with any election to any political office." *Accord* 11 C.F.R. § 114
*et seq.* The terms "contribution" and "expenditure" are defined by the Act as the payment or
receipt of anything of value "for the purpose of influencing any election for Federal office." 11
C.F.R. §§ 100.52, 100.111. As previously explained, Unity 08 will not be making
"expenditures" or "contributions" under the Act and, therefore, would not be subject to the
prohibitions on corporate contributions and expenditures. Accordingly, until such time that
Unity 08 engages in "electioneering communications" it may raise and spend money as an
incorporated entity without contravening any of the prohibitions in 2 U.S.C. § 441b and 11
C.F.R. § 114 *et seq.* [4]

Sincerely,

John A. Duffy

---

[4]        The Court's decision in *Federal Election Comm'n v. Beaumont*, 539 U.S. 146
(2003), is inapposite as it applies only to direct contributions by nonprofit advocacy
corporations.

# APPENDIX

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
DEPARTMENT OF CONSUMER AND REGULATORY AFFAIRS



# CERTIFICATE

**THIS IS TO CERTIFY** that all applicable provisions of the District of Columbia NonProfit Corporation Act have been complied with and accordingly, this *CERTIFICATE OF INCORPORATION* is hereby issued to:

**UNITY 08**

**IN WITNESS WHEREOF I** have hereunto set my hand and caused the seal of this office to be affixed as of the  24th  day of  May ,2006 .

Patrick J. Canavan, Psy. D.
Director

Business and Professional Licensing Administration

Patricia E. Grays
Superintendent of Corporations
Corporations Division

Anthony A. Williams
Mayor

### ARTICLES OF INCORPORATION

### OF

### UNITY 08

To:   Department of Regulatory Affairs
Business Regulation Administration
Corporations Division
941 North Capital Street, N.E.
Washington, DC 20002

We, the undersigned natural persons of the age of twenty-one years or more, acting as incorporators of a corporation under the District of Columbia Nonprofit Corporate Act (D.C. Code, 1981 Edition, Title 29, Chapter 3), adopt the following Articles of Incorporation.

**FIRST:**  The name of the corporation is Unity 08 (the "Corporation").

**SECOND:**  The period of the Corporation's duration is perpetual.

**THIRD:**  The Corporation shall have no stock.

**FOURTH:**  The Corporation is organized and shall be administered and operated exclusively to operate as a political organization within the meaning of Section 527 of the Internal Revenue Code of 1986, as now in effect or may hereafter be amended (the "Code"), including the following:

1.   To engage in any and all lawful activities as permitted for organizations qualifying as "political organizations" under Section 527 of the Code except as restricted herein; and

2.   To engage in any lawful act or activity for which corporations may be organized under the District of Columbia Nonprofit Corporation Act.

In order to accomplish the foregoing purposes, and for no other purpose or purposes, the Corporation shall also have the power to:

(a)  sue and be sued;

(b)  make contracts;

(c)  receive property by devise or bequest, subject to the laws regulating the transfer of property by will, and otherwise acquire and hold all property, real or personal, including shares of stock, bonds and securities of other corporations;

MAY 2 4 2006

 FILE COPY

(d) act as trustee under any trust whose objects are related to the principal objects of the Corporation, and to receive, hold, administer and expend funds and property subject to such trust;

(e) convey, exchange, lease, mortgage, encumber, transfer upon trust or otherwise dispose of all property, real or personal;

(f) borrow money, contract debts and issue bonds, notes, and debentures, and secure the payment of any performance of its obligations; and

(g) do all other acts necessary or expedient for the administration of the affairs and attainment of the purposes of the Corporation; provided, however, that the Corporation shall not, except to an insubstantial degree, engage in any activities or exercise any powers that are not in furtherance of the primary purposes of the Corporation.

**FIFTH:** The Corporation shall have no members.

**SIXTH:** Notwithstanding any other provision of these Articles, the Corporation shall not conduct or carry on any activities not permitted to be conducted or carried on by an organization exempt under Section 527 of the Code.

**SEVENTH:** Upon the dissolution of the Corporation or the winding up of its affairs, the assets of the Corporation shall be distributed exclusively for purposes described as permitted under the Code for organizations which are then exempt from federal tax under Section 527 of the Code.

**EIGHTH:** These Articles of Incorporation, and the Bylaws of the Corporation, may be amended by a vote of a majority of the Directors then in office.

**NINTH:** The number of Directors constituting the initial Board of Directors is four (4), and the names and addresses, including street and number, of the persons who are to serve as the initial Directors until the first regular meeting of the Board of Directors, or until their successors be appointed and qualified are as follows:

Douglas L. Bailey
1200 North Nash Street, #1114
Arlington, Virginia 22209

Zachary Clayton
2404 Ridge Road
Raleigh, North Carolina 27612

Gerald Rafshoon
3123 Dumbarton Street
Washington, DC 20007

Lindsay Ullman
14 Knollbrook Lane East
Painted Post, New York 14870

The Board of Directors shall at all times consist of at least three (3) directors. The number of directors shall be fixed by the Bylaws of the Corporation, except as to the number of the first Board of Directors, which is set forth above. Directors shall be elected or appointed in the manner provided in the Bylaws of the Corporation.

- 2 -

**TENTH:**  The names and addresses, including street and number of the incorporators are:

Douglas L. Bailey                      Zachary Clayton
1200 North Nash Street, #1114          2404 Ridge Road
Arlington, Virginia 22209              Raleigh, North Carolina  27612


Gerald Rafshoon                        Lindsay Ullman
3123 Dumbarton Street                  14 Knollbrook Lane East
Washington, DC  20007                  Painted Post, New York  14870

**ELEVENTH:**  The address, including the street and number, of the Corporation's initial registered office is 1090 Vermont Avenue, N.W., Washington, D.C. 20005, and the name of its initial registered agent is Corporation Service Company.

IN WITNESS WHEREOF, the undersigned subscribe these Articles of Incorporation this _19th_ day of ____May____, 2006.

_Douglas L. Bailey_
Douglas L. Bailey

Date: _May 19, 2006_

)
) SS. _District of Columbia_
)

I, _Jacqueline Wells Meering_, a notary public, hereby certify that on the _19th_ day of _May_, 2006, personally appeared before me _Douglas L. Bailey_, who being first duly sworn, signed the foregoing document as incorporator and averred that the statements therein contained are true.

_Jacqueline Wells Meering_
Notary Public

SEAL

JACQUELINE WELLS MEERING
Notary Public, District of Columbia
My Commission Expires August 31, 2009

- 3 -

_____
Zachary Clayton

Date: May 22, 2006

                     )
                     ) SS.
                     )

I, Natalie M. Francis notary public, hereby certify that on the 22 day of May, 2006, personally appeared before me Zachary Clayton, who being first duly sworn, signed the foregoing document as incorporator and averred that the statements therein contained are true.

_____
Notary Public

SEAL



Gerald Rafshoon

Date: May 22, 2006

          )
          ) SS.
          )

I, Clemmie Wilson, a notary public, hereby certify that on the 22nd day of May, 2006, personally appeared before me Gerald Rafshoon, who being first duly sworn, signed the foregoing document as incorporator and averred that the statements therein contained are true.

Notary Public

SEAL

Clemmie Wilson
Notary Public, District of Columbia
My Commission Expires 02-14-2011

- 5 -

_Lindsay E. Ullman_
Lindsay Ullman

Date: _May 22, 2006_

_State of New York_ }
_County of Steuben_ } ss.

I, _Sue L. Stephens_ a notary public, hereby certify that on the _22nd_ day of _May_, 2006, personally appeared before me _Lindsay E. Ullman_ who being first duly sworn, signed the foregoing document as incorporator and averred that the statements therein contained are true.

_Sue L. Stephens_
Notary Public

**SEAL**

SUE L. STEPHENS
Notary Public, State of New York
No. 01ST6010036
Commission Expires July 6, 20 _06_

- 6 -



**DEPARTMENT OF CONSUMER AND REGULATORY AFFAIRS**
**BUSINESS AND PROFESSIONAL LICENSING ADMINISTRATION**
**CORPORATIONS DIVISION**

Government
Of the District of Columbia
DCRA
Corporations Division
P.O. Box 92300
WASHINGTON, D.C. 20090

## WRITTEN CONSENT TO ACT AS REGISTERED AGENT

**TO:**
The Superintendent of Corporations
Department of Consumer and Regulatory Affairs
Business and Professional Licensing Administration,

**(A) BY A DISTRICT OF COLUMBIA RESIDENT**
PURSUANT TO D.C. CODE TITLE 29, and TITLE 41
I, .

_____

A Bona fide Resident of the District of Columbia Herein Consent to Act as a Registered
Agent For:

_____

Name of Business
**SIGNATURE OF REGISTERED AGENT**

_____

DATE: _____
**(B) BY A LEGALLY AUTHORIZED CORPORATION**
**THE CORPORATION HEREIN NAMED IS:**
CORPORATION  SERVICE  COMPANY
_____

An Authorized Corporate Registered Agent in the District of Columbia, per Signatures of
its President/Vice-President and Secretary/Assistant Secretary, Herein Consents to Act as
Registered Agent
For:
UNITY 08
_____

NAME OF COMPANY
SIGNATURE: _____ OF PRESIDENT OR VICE-
PRESIDENT
ATTEST: _____ OF SECRETARY OR ASSISTANT
SECRETARY
DATE: May 17, 2006
For General Information Call:
The Corporations Division - (202) 442-4432

# EXHIBIT 13

July 13, 2006

### *AO DRAFT COMMENT PROCEDURES*

The Commission permits the submission of written public comments on draft advisory opinions when proposed by the Office of General Counsel and scheduled for a future Commission agenda.

Today, DRAFT ADVISORY OPINION 2006-20 is available for public comments under this procedure. It was requested by, John J. Duffy, Esq., on behalf of Unity 08

Proposed Advisory Opinion 2006-20 is scheduled to be on the Commission's agenda for its public meeting of Thursday, July 20, 2006.

Please note the following requirements for submitting comments:

1) Comments must be submitted in writing to the Commission Secretary with a duplicate copy to the Office of General Counsel. Comments in legible and complete form may be submitted by fax machine to the Secretary at (202) 208-3333 and to OGC at (202) 219-3923.

2) The deadline for the submission of comments is 12:00 noon (Eastern Time) on July 19, 2006.

3) No comments will be accepted or considered if received after the deadline. Late comments will be rejected and returned to the commenter. Requests to extend the comment period are discouraged and unwelcome. An extension request will be considered only if received before the comment deadline and then only on a case-by-case basis in special circumstances.

4) All timely received comments will be distributed to the Commission and the Office of General Counsel. They will also be made available to the public at the Commission's Public Records Office.

## _CONTACTS_

Press inquiries:                     Robert Biersack  (202) 694-1220

Commission Secretary:                Mary Dove (202) 694-1040

Other inquiries:

> To obtain copies of documents related to AO 2006-20, contact the Public Records
> Office at (202) 694-1120 or (800) 424-9530.

> For questions about comment submission procedures, contact
> Rosemary C. Smith, Associate General Counsel, at (202) 694-1650.

## _MAILING ADDRESSES_

> Commission Secretary
> Federal Election Commission
> 999 E Street, NW
> Washington, DC 20463

> Rosemary C. Smith
> Associate General Counsel
> Office of General Counsel
> Federal Election Commission
> 999 E Street, NW
> Washington, DC 20463

AGENDA DOCUMENT NO. 06-50

RECEIVED
FEDERAL ELECTION
COMMISSION
SECRETARIAT

2006 JUL 13 P 3: 54



**FEDERAL ELECTION COMMISSION**
Washington, DC 20463

July 13, 2006

## MEMORANDUM

**AGENDA ITEM**
For Meeting of: 07-20-06

TO:             The Commission

THROUGH:        Patrina M. Clark PMC-kv
                Staff Director

FROM:           Lawrence H. Norton
                General Counsel

                Rosemary C. Smith RCS by ALR
                Associate General Counsel

                Amy L. Rothstein ALR
                Acting Assistant General Counsel

                Ron B. Katwan RBK by ALR
                Attorney

                Esa L. Sferra ELS
                Attorney

Subject:        Draft AO 2006-20

      Attached is a proposed draft of the subject advisory opinion. We request
that this draft be placed on the agenda for July 20, 2006.

Attachment

1   ADVISORY OPINION 2006-20
2
3   John J. Duffy, Esq.
4   Steptoe & Johnson LLP                        DRAFT
5   1330 Connecticut Avenue, NW
6   Washington, DC 20036-1795
7
8   Dear Mr. Duffy:

9       We are responding to your advisory opinion request on behalf of Unity 08,

10   concerning the application of the Federal Election Campaign Act of 1971, as amended

11   (the "Act"), and Commission regulations to Unity 08's status as a political committee.

12   The Commission concludes that Unity 08 must register as a political committee and

13   therefore is subject to the reporting requirements and limitations and prohibitions of the

14   Act.

15   *Background*

16       The facts presented in this advisory opinion are based on your letter received on

17   May 30, 2006 and on information from Unity 08's website.[1]

18       Unity 08 is organized under the laws of the District of Columbia as a not-for-

19   profit corporation and under Section 527 of the Internal Revenue Code.

20       Unity 08 describes itself as a "nascent political party" that "will act to assure that

21   an alternative ticket is presented to the American voters in 2008." Unity 08 was founded

22   by individuals who have been involved in political campaigns at the State and national

23   levels, including political consultants and media advisors, and by individuals who have

24   served in high government positions, including a former State Senator, former White

25   House Chief of Staff, former White House communications director, former State

---

[1] *See* <http://www.unity08.com> (last visited 6/13/06).

AO 2006-20
Draft
Page 2

1   Governor, and former heads of State agencies.  Unity 08 aims to build a "solidly-funded

2   movement of up to 20,000,000 Americans . . . in order to nominate a Unity Ticket of their

3   choice for 2008."

4           Unity 08 states that it has two goals: (1) "to elect a Unity Ticket for President and

5   Vice President of the United States in 2008"; and (2) a "*minimum* goal" of "organizing a

6   group of voters who comprise at least 20% of the national electorate" and whose

7   commitment to the Unity 08 agenda will have to be accounted for by the major parties if

8   they are to be successful in the 2008 presidential election.  The Unity 08 nominees may

9   consist of candidates from either or both of the two major political parties, or of

10  independent candidates.  Although Unity 08 may support the candidates offered by one of

11  the two major parties, it plans to hold an online nominating convention in the summer of

12  2008, during which Unity 08 delegates will vote via the Internet to nominate candidates

13  for the Unity 08 ticket.  Unity 08 does not intend to support or oppose candidates in the

14  2006 elections or in any congressional, State, or local election at any time.

15          Unity 08 will finance its activities with solicitations of funds and sales of t-shirts,

16  mugs, pens, bumper stickers, and other similar items.  Unity 08 is currently soliciting

17  funds using the Internet and intends to make solicitations using telephone banks and mass

18  mailings.  Unity 08's website proposes that supporters give specific monetary amounts

19  ranging from ten dollars to $5,000, with an option to give any amount of the supporter's

20  choosing.  Unity 08's online solicitation form includes the following language: "To

21  succeed we don't have to match the massive war chests of either party.  And, like other

22  successful citizens' movements before us, we can raise the funds we need to build a lean

23  and effective movement if each of us simply does our part. . . . Please do your part.  The

AO 2006-20
Draft
Page 3

1    stakes for our country have never been higher." The movement for which Unity 08 is

2    soliciting money is to "select and elect a Unity Ticket to the White House." Elsewhere

3    on the website, this language is repeated: "In 2008, we'll select and elect a Unity Ticket

4    to the White House . . . Our success depends on small gift contributions from all of us."

5        Unity 08 does not accept money or any other thing of value from corporations,

6    foreign nationals, or government contractors. Unity 08 does not place a limit on the

7    amount of donations it solicits or accepts, although it may do so in the future.

8        In attempting to elect presidential and vice-presidential candidates in 2008, Unity

9    08 plans to purchase access to mass media and commission polls, and to "qualify for

10   ballot positions in certain key states for the offices of President and Vice President of the

11   United States through petitions, and if required, litigation."

12   *Questions Presented*

13        1.    *Will Unity 08 accept "contributions" or make "expenditures"?*

14        2.    *Must Unity 08 register as a political committee?*

15        3.    *May Unity 08 incorporate for liability purposes?*

16   *Legal Analysis and Conclusions*

17   *Question 1: Will Unity 08 accept "contributions" or make "expenditures"?*

18        Yes, for the reasons stated below, Unity 08 will accept "contributions" and make

19   "expenditures" as defined under the Act and FEC regulations.

20   *I. Contributions*

21        A "contribution" is a "gift, subscription, loan, advance, or deposit of money or

22   anything of value made by any person for the purpose of influencing any election for

AO 2006-20
Draft
Page 4

1    Federal office." 2 U.S.C. 431(8)(A)(i); 11 CFR 100.52(a).  The Act does not define the

2    phrase "for the purpose of influencing any election for Federal office."

3        Drawing on *FEC v. Survival Education Fund*, [2] Commission regulations provide

4    that funds received in response to solicitations must be treated as contributions "if the

5    communication indicates that any portion of the funds received will be used to support or

6    oppose the election of a clearly identified Federal candidate." 11 CFR 100.57(a); *see*

7    *also Political Committee Status, Definition of Contribution and Allocation for Separate*

8    *Segregated Funds and Nonconnected Committees; Final Rules*, 69 FR 68056, 68057

9    (Nov. 23, 2004) ("*Political Committee Status Final Rules*").  The Commission has

10   determined that in certain circumstances the definition of a "clearly identified" candidate,

11   *see* 11 CFR 100.17, is satisfied when "candidates were identifiable as to specific office,

12   party affiliation, and election cycle, although names of the eventual nominees were  not

13   known."  Advisory Opinion 2003-23 (WE LEAD) (a reference to office, party affiliation,

14   and election cycle satisfied the requirement of a clearly identified candidate in the

15   definition of "earmarked" contribution in 11 CFR 110.6(b)(1)); *see also* Advisory

16   Opinions 1982-23 (Westchester Citizens for Good Government) and 1977-16 (Iowa 1980

17   U.S. Senate Campaign Committee).

18       Unity 08's communications indicate that funds received will be used to support

19   the election of the Unity 08 presidential ticket.  For example, Unity 08's website states:

20   "In 2008, we'll select and elect a Unity Ticket to the White House . . . Our success

21   depends on small gift contributions from all of us."  While Unity 08 has not yet named its

---

[2] *FEC v. Survival Education Fund*, 65 F.3d 285 (2d Cir. 1995).  In that case, the court stated that "[e]ven if a communication does not itself constitute express advocacy, it may still fall within the reach of [2 U.S.C.] 441d(a) if it contains solicitations clearly indicating that the contributions will be targeted to the election or defeat of a clearly identified candidate for federal office." *Id.* at 295.

AO 2006-20
Draft
Page 5

1   candidates, it identifies its candidates by office (*i.e.*, President and Vice President), party

2   affiliation (*i.e.*, the Unity 08 ticket), and election year (*i.e.*, 2008). Thus, Unity 08 intends

3   to use the funds received in response to its solicitations to support the election of clearly

4   identified candidates for President and Vice President.[3]

5        In addition, the Commission has emphasized that "[a] solicitation that states that

6   the funds received will be used to influence Federal elections will generate FECA

7   contributions, *see* 11 CFR 102.5(a)(2)(ii), even though such a communication would not

8   be subject to new section 100.57 because it does not mention a clearly identified Federal

9   candidate." *Political Committee Status Final Rules*, 69 FR at 68058.[4] Unity 08's

10  solicitations, which explicitly state that the organization's goal is to "select and elect a

11  Unity Ticket to the White House," indisputably indicate that the funds received will be

12  used to influence a Federal election, namely to support the election of Unity 08's

13  candidates for President and Vice President. Thus, under either analysis – (i) the

14  communication indicates that any portion of the funds received will be used to support or

15  oppose the election of a clearly identified Federal candidate, 11 CFR 100.57, or (ii) the

16  communication states that the funds received will be used to influence Federal elections,

17  11 CFR 102.5(a)(2)(ii) – funds received by Unity 08 in response to its solicitations will

18  constitute contributions under the Act and Commission regulations.

---

[3] Unity 08 does not ask and the Commission does not address whether Unity 08 qualifies as a "political party" under the Act and Commission regulations. The Commission notes, however, that to be a "political party," an organization must "actually obtain ballot access for one or more Federal candidates." Advisory Opinion 2004-34 (Libertarian Party of Virginia); *see* 2 U.S.C. 431(16) and 11 CFR 100.15.

[4] As the Commission noted, "New Section 100.57 provides one example of communications that can generate contributions; it is not an exhaustive list. The rule addresses communications that indicate that the funds received in response will be used to support or oppose the election of a clearly identified Federal candidate. Other communications that do not include such an indication may also generate contributions under FECA." *Political Committee Status Final Rules*, 69 FR at 68058.

AO 2006-20
Draft
Page 6

1     *II. Expenditures*

2          An "expenditure" is a "purchase, payment, distribution, loan, advance, deposit, or

3      gift of money or anything of value, made by any person for the purpose of influencing

4      any election for Federal office." 2 U.S.C. 431(9)(A)(i); 11 CFR 100.111(a). Examples

5      of expenditures are listed in the Commission regulations at 11 CFR 100.110 through

6      100.114, and have also been recognized through Commission precedent, as discussed

7      below. The amounts Unity 08 spends on expenses such as qualifying candidates for

8      ballot positions through petition drives and holding an online nominating convention will

9      be expenditures under the Act and Commission regulations.

10          A. *Ballot access costs*

11          The Commission has previously determined that expenses incurred in gathering

12      signatures to qualify for a ballot for Federal office are expenditures. *See* Advisory

13      Opinion 1994-05 n.1 (William White) ("[E]xpenditures to influence your election would

14      include amounts you spend . . . to promote yourself for the general election ballot by

15      seeking signatures on nomination petitions"). Unity 08 plans to qualify its candidates for

16      ballots through petition drives, and this activity is for the purpose of influencing a Federal

17      election. Therefore, any expenses paid by Unity 08 for its activities to qualify candidates

18      for ballot access through petitions will constitute expenditures.[5]

19          B. *Online nominating convention costs*

20          The Commission has determined that expenses for holding an online nominating

21      convention are in connection with a Federal election. In Advisory Opinion 2000-06

---

[5] The Commission notes that "payments made to the appropriate State official of fees collected from candidates or their authorized committees as a condition of ballot access are not expenditures." 11 CFR 100.150.

AO 2006-20
Draft
Page 7

1    (Reform Party), the Commission stated that the costs of compiling a computer database

2    of members eligible to vote in the convention and mailing ballots for a convention where

3    members vote via email, phone, or mail, is a permissible use of convention funds under

4    the Presidential Election Campaign Fund Act, 26 U.S.C. 9001, *et seq*., because the

5    convention is how the party chooses and announces its presidential candidate.  Because

6    Unity 08's online nominating convention will be the manner in which it nominates

7    presidential and vice-presidential candidates, the purpose of the convention will be to

8    influence a Federal election, and Unity 08's expenses for the convention will be

9    expenditures under the Act.

10         Therefore, Unity 08 will make expenditures when gaining ballot access and when

11   preparing for its convention.

12   *Question 2: Must Unity 08 register as a political committee?*

13         Yes, for the reasons stated below, Unity 08 must register as a political committee

14   when it receives more than $1,000 in contributions or makes more than $1,000 in

15   expenditures.

16         The Act and Commission regulations, with certain exceptions, define a "political

17   committee" as "any committee, club, association, or other group of persons which

18   receives contributions aggregating in excess of $1,000 during a calendar year or which

19   makes expenditures aggregating in excess of $1,000 during a calendar year." 2 U.S.C.

20   431(4)(A); 11 CFR 100.5(a).  Under the Act and Commission regulations, political

21   committees are subject to certain registration and reporting requirements, as well as limits

22   and prohibitions on contributions received and made, and on expenditures made.  As the

23   Commission stated previously, "[a]ny funds that are 'contributions' by operation of new

AO 2006-20
Draft
Page 8

1    section 100.57 are contributions for purposes of the 'political committee' definition in 2

2    U.S.C. 431(4)(A) and 11 CFR 100.5(a) . . . ." *Political Committee Status Final Rules*, 69

3    FR at 68058.  Once Unity 08 receives over $1,000 in contributions, or makes over $1,000

4    in expenditures, it will satisfy the statutory definition of "political committee," *see* 2

5    U.S.C. 433.

6         However, the Supreme Court concluded that, "[t]o fulfill the purpose of the Act

7    [the term 'political committee'] need only encompass organizations that are under the

8    control of a candidate or *the major purpose of which is the nomination or election of a*

9    *candidate*." *Buckley v. Valeo*, 424 U.S. 1, 79 (emphasis added).

10        An organization's "major purpose" may be established through its own public

11   statements. *See e.g.*, *FEC v. Malenick*, 310 F. Supp. 2d 230, 234-36 (D.D.C. 2004)

12   (finding the organization evidenced its "major purpose" through its own materials which

13   stated the organization's goal of supporting the election of Republican Party candidates

14   for Federal office and through efforts to get prospective donors to consider supporting

15   Federal candidates); *FEC v. GOPAC*, 917 F. Supp. 851, 859 (D.D.C. 1996) (finding that

16   the "organization's [major] purpose may be evidenced by its public statements of its

17   purpose or by other means. . . .").

18        Unity 08 satisfies the major purpose test.  Unity 08 makes clear in its Advisory

19   Opinion request and through its solicitations and other statements that its goal is to elect

20   candidates to the Offices of President and Vice President.  While Unity 08 has a

21   subsidiary objective of influencing the major parties to adopt, in connection with the

22   2008 national elections, the core positions of Unity 08 supporters, your letter of May 30

23   states that Unity 08's first goal is the election "of a Unity Ticket for President and Vice-

AO 2006-20
Draft
Page 9

1    President of the United States in 2008." Thus, Unity 08's self-proclaimed major purpose

2    is the nomination and election of its candidates for Federal office, specifically President

3    and Vice President of the United States.

4        Therefore, once Unity 08 receives over $1,000 in contributions or makes over

5    $1,000 in expenditures, it must register as a political committee with the Commission by

6    filing a statement of organization within ten days, *see* 2 U.S.C. 433, 11 CFR 102.1 and

7    102.2, and will be subject to the provisions of the Act and Commission regulations

8    applicable to political committees.[6]

9    *Question 3: May Unity 08 incorporate for liability purposes only?*

10       Yes, Unity 08 may incorporate for liability purposes only.  Under Commission

11   regulations, a political committee may incorporate for liability purposes only without

12   running afoul of the Act's prohibitions and limitations on corporate contributions and

13   expenditures.  *See* 11 CFR 114.12.  Thus, Unity 08 may incorporate for liability purposes

14   without being subject to the corporate prohibitions and limitations in 2 U.S.C. 441b and

15   11 CFR part 114.

16       This response constitutes an advisory opinion concerning the application of the

17   Act and Commission regulations to the specific transaction or activity set forth in your

---

[6] In its advisory opinion request, Unity 08 cites *Machinists' Non-Partisan Political League v. FEC*, 655 F.2d 380 (D.C. Cir. 1981), to support its assertion that Unity 08 is not a political committee.  In *Machinists'*, the Court of Appeals for the D.C. Circuit held that so-called "draft groups" were not political committees under the Act.  655 F.2d at 392.  Unity 08, however, is not a draft group.  Draft groups do not promote the election of certain candidates for Federal office, but have the more limited aim of convincing individuals who are not yet candidates to run for office.  By contrast, the declared purpose of Unity 08 is not to "draft" candidates but to get its chosen presidential and vice-presidential candidates on the ballot, and to raise and spend funds in support of its candidates.  Moreover, *Machinists'* expressly left open the question of whether draft groups could be treated as political committees for purposes of the Act's contribution limits after Congress's 1979 amendments to the Act.  655 F.2d at 396.

AO 2006-20
Draft
Page 10

1    request.  *See* 2 U.S.C. 437f.  The Commission emphasizes that, if there is a change in any

2    of the facts or assumptions presented, and such facts or assumptions are material to a

3    conclusion presented in this advisory opinion, then the requestor may not rely on that

4    conclusion as support for its proposed activity.

5
6                                                    Sincerely,
7
8
9
10                                                   Michael E. Toner
11                                                   Chairman
12
13   Enclosures (Advisory Opinions 2004-34, 2003-23, 2000-06, 1994-05, 1982-23,
14   and 1977-16)

# EXHIBIT 14



<u>**AGENDA DOCUMENT NO. 06-52**</u>
<u>**APPROVED AUGUST 3, 2006**</u>

**MINUTES OF AN OPEN MEETING**

**OF THE**

**FEDERAL ELECTION COMMISSION**

<u>**THURSDAY, JULY 20, 2006**</u>

**PRESENT:**          **Michael E. Toner, Chairman, presiding**

                 **Robert D. Lenhard, Vice Chairman**

                 **David M. Mason, Commissioner**

                 **Hans A. von Spakovsky, Commissioner**

                 **Steven T. Walther, Commissioner**

                 **Ellen L. Weintraub, Commissioner**

                 **Patrina M. Clark, Staff Director**

                 **Lawrence H. Norton, General Counsel**

                 **Mary W. Dove, Secretary**

**Federal Election Commission**                                   Page 2
**Minutes of an Open Meeting**
**Thursday, July 20, 2006**

---

Chairman Michael E. Toner called the Federal Election

Commission to order in an open meeting at 10:05 A.M. on Thursday,

July 20, 2006, with a quorum present.

Chairman Toner introduced and welcomed the new Staff Director

at the Federal Election Commission, Ms. Patrina M. Clark, who began on

July 10, 2006.

The Chairman recognized Mr. Robert Costa, Deputy Staff Director

for Audit and Review, who has served as the Acting Staff Director since

October 2005, and will be retiring this month after 31 years of dedicated

service to the Commission.

I.      <u>CORRECTION AND APPROVAL OF MINUTES</u>

<u>Minutes for June 22, 2006</u>
<u>Agenda Document No. 06-48</u>

Chairman Toner recognized Vice Chairman Lenhard, who

MOVED to approve the minutes for the
Open Meeting of June 22, 2006, as set
forth in Agenda Document No. 06-48.

<u>The motion carried on the vote of 6-0</u> with Commissioners

Lenhard, Mason, Toner, von Spakovsky, Walther, and Weintraub voting

affirmatively.

**Federal Election Commission**                                          **Page 3**
**Minutes of an Open Meeting**
**Thursday, July 20, 2006**

---

**II.    DRAFT ADVISORY OPINION 2006-20**

      **Unity08, Inc. by counsel, John J. Duffy**

       **Agenda Document No. 06-50**

      Chairman Toner recognized Ms. Esa Sferra of the General Counsel's Office who presented draft Advisory Opinion 2006-20, concerning the application of the Federal Election Campaign Act of 1971, as amended (the "Act"), and Commission regulations to Unity08's status as a political committee.

      Following discussion, _it was agreed without objection_ to hold this matter over for further consideration at an open meeting the end of August.

**III.    ROUTINE ADMINISTRATIVE MATTERS**

      The Chairman recognized Staff Director Clark for announcements.

      The meeting adjourned at 10:50 A.M.

                        **Signed:**

                        **Michael E. Toner**
                        **Chairman of the Commission**

**Attest:**

**Mary W. Dove**
**Secretary of the Commission**

# EXHIBIT 15

# EXTENSION-AOR 2006-20

---- Forwarded by Amy Rothstein/FEC/US on 07/31/2006 03:56 PM ----



"Duffy, John"
<JDuffy@steptoe.com>

07/31/2006 03:52 PM

To  ARothstein@fec.gov

cc  rsmith@fec.gov, RKatwan@fec.gov, ESferra@fec.gov, "Desch, Xan" <xdesch@steptoe.com>, "Collier, Thomas" <TCollier@steptoe.com>

Subject  RE: Unity 08 extension

Amy:  This is to confirm that on behalf of Unity08 I have granted the Commission a 30 day extension, up to and including August 30 to respond to Unity08's request for an Advisory Opinion.

I hope to be able to get together with Ms Smith before Friday to discuss the OGC's concerns and to see if we can resolve them or at least focus our disagreement.

> **From:** ARothstein@fec.gov [mailto:ARothstein@fec.gov]
> **Sent:** Monday, July 31, 2006 3:21 PM
> **To:** Duffy, John
> **Cc:** rsmith@fec.gov; RKatwan@fec.gov; ESferra@fec.gov
> **Subject:** Unity 08 extension
>
>
> Dear Mr. Duffy --
>
>
> Please confirm by return e-mail that, on behalf of Unity 08, you have granted the Commission a 30-day extension, until August 30, 2006, to respond to Unity 08's pending request for an advisory opinion.  Thank you.
>
>
> Amy L. Rothstein
> Acting Assistant General Counsel - Policy
> Federal Election Commission
> Office of General Counsel
> 999 E Street, NW
> Washington, DC  20463
> 202/694-1650

# EXHIBIT 16

# STEPTOE & JOHNSON LLP

### ATTORNEYS AT LAW

Supplement to
AOR 2006-20

John J. Duffy
202.429.8020
jduffy@steptoe.com

Xan Kaitlin Desch
202.457.8339
xdesch@steptoe.com

1330 Connecticut Avenue, NW
Washington, DC 20036-1795
Tel 202.429.3000
Fax 202.429.3902
steptoe.com

August 16, 2006

Lawrence Norton, Esq.
Federal Election Commission
Office of the General Counsel
999 E Street N.W.
Washington, D. C. 20463

Re:   **Supplement to Advisory Opinion Request 2006-20**

Dear Mr. Norton:

        In light of issues and concerns raised by the OGC and the Commission in response to its

Advisory Opinion Request, Unity08 submits this supplement to clarify some of the factual

misconceptions and address issues raised by the Office of the General Counsel ("OGC") in Draft

Advisory Opinion 2006-20 and by the Commissioners during the public hearing on July 20,

2006.  Specifically, in response to the OGC's argument under Section 100.57, Unity08 has

added a disclaimer to its website and mailings that make clear that any money raised now would

not be used to support a candidate, but would be used for party building activities.  In addition,

we clarify that Unity08 currently plans to gain ballot access only as an organization -- not for a

candidate -- in those states that allow it to do so.  While we don't agree with the OGC's

arguments that disbursements made for its online convention or to gain ballot access for a

candidate constitute expenditures, such activities will not occur (if ever) for over two years.

Therefore, it is not necessary for the Commission to decide those issues in the current Advisory

Opinion.  Unity08 recognizes that before engaging in those activities it will be necessary to seek

another Advisory Opinion.

Lawrence Norton, Esq.                                    STEPTOE & JOHNSON LLP
Federal Election Commission
August 16, 2006
Page 2 of 23

## FACTUAL SUPPLEMENT

On its website, Unity08 sets forth three goals. *Goal One* is to elect a ticket for President and Vice-President of the United States that will be comprised of a person from each of the two major parties. *Goal Two* is for the American people to pick that Unity Ticket in the first half of 2008 via a virtual and secure online convention in which all American voters will be qualified to vote. And, *Goal Three* provides that Unity08's "minimum goal" is "effect major change and reform in the 2008 national elections by influencing the major parties to adopt the core features of [Unity08's] national agenda." *See* http://www.unity08.com/believe#3. To accomplish its goals, Unity08 anticipates four phases of organizational activity: (1) exploration and development; (2) ballot access as a party organization; (3) nomination of a candidate through an online convention; and (4) the general election campaign. Unity08 only seeks an Advisory Opinion with respect to Phases I and II, as further described below, and will file another Advisory Opinion Request with respect to the activities described in Phases III and IV.

**Phase I - Exploration and Development:** Unity08's current activities are centered on establishing an organization and exploring the viability of a third alternative ticket in 2008. Its focus is on the dissemination of its analysis that the country needs to focus on crucial issues; creation and operation of its website that will serve as a forum for the development and dissemination of its ideas; and the establishment of a plan to qualify for the ballot in fifty states and the District of Columbia. While its website is the main source of information, Unity08 may purchase access to other media to communicate to the public its view that the two major parties have failed to address the critical problems facing the United States today. Unity08 also intends to commission polls to assess public support for its position that the two major parties offer no solution to the present crisis in government and for its proposal for a Unity Ticket. In addition, Unity08 will explore the feasibility of its goal of creating a Unity Ticket and take steps to bring together, and demonstrate the existence of, a substantial number of potential voters who support this goal. Ultimately, Unity08 hopes to influence the two major parties to address the issues that

Lawrence Norton, Esq.                                    STEPTOE & JOHNSON LLP
Federal Election Commission
August 16, 2006
Page 3 of 23

Unity08 believes are critical to the future of the United States and to encourage the two major
parties to adopt a Unity Ticket themselves.

   **Phase II - Ballot Access as a Party:**  Unity08 plans to qualify in the approximately
thirty jurisdictions that will allow it to qualify without a candidate.  Ballot access efforts include
petition drives and filing fees.  In its Draft Advisory Opinion the OGC argued that Unity08
would make expenditures in its efforts "to qualify its *candidates* for ballots."  Draft AO 2006-20,
p. 9 (emphasis added).  However, during this phase Unity08's ballot activities would be *focused
solely on ballot access for the organization* -- not identifiable candidates.  At the present time,
Unity08 has not qualified on the ballot in any state.

   **Financing for Phases I - II:**  Unity08 intends to finance its activities conducted in
Phases I and II by soliciting donations from individuals who agree with its goals.  As previously
noted, donations will not be accepted from "prohibited sources," including corporations, foreign
nationals, or government contractors.  In addition, while limitations may be placed on the
amount of donations that will be solicited or accepted from individuals, the limitations may or
may not conform with the limitations placed on such donations by the regulations governing
non-connected political committees.  Unity08 has established a website and many, but not all of
its solicitations are likely to be made over the Internet; however, Unity08 may also make use of
other solicitation methods, including telephone banks and mass mailings.  Unity08 may also
choose to raise money through the sale of t-shirts, mugs, pens, bumper stickers, and other similar
items marked with the Unity08 logo or identified with Unity08 in some other fashion, such as a
phrase or slogan.

   As noted its Advisory Opinion Request, Unity08 does not intend to promote, attack,
support, or oppose the candidates of the major parties for public office in the 2006 elections on
the federal, state or local level, and it does not intend to support or oppose candidates for
Congress or State and local elections at any time.  Because of issues raised by the OGC in its
Draft Advisory Opinion, Unity08 has added clarifying language to its website to make clear that
any monies raised now will not go to support a clearly identified candidate, but will be used for

Lawrence Norton, Esq.                                        STEPTOE & JOHNSON LLP
Federal Election Commission
August 16, 2006
Page 4 of 23

the party building activities described above.  The donations page of the website now reads:
"Donations made on this website will not be used to support or oppose any federal candidates,
but will be used to support Unity08's organizational building efforts." http://www.unity08.com
(go to Donations page).


      **Phase III - Convention:**  If necessary, Unity08 intends to select, via a "virtual"
convention conducted over the Internet, candidates for the office of President and Vice-President
of the United States to run in those ballot positions.  The virtual convention would be held in the
Summer of 2008, before the conventions of the two major parties, but after the likely nominees
of the other parties have been identified.  All persons who have signed up with Unity08 as
delegates on the Internet will be eligible to vote during the virtual convention for the candidates
they want to constitute the Unity08 ticket.


      **Phase IV - General Election Campaign:**  During this phase, Unity08 plans to help the
nominated candidate gain ballot access in those states that did not allow it to qualify as a party  At
this time, however, Unity08 will file another Advisory Opinion Request.


## ANALYSIS

### POINT I

### UNITY08 IS NOT ASKING FOR A DISPENSATION --
### THE ELECTION REGULATIONS DO NOT APPLY.


      During the public hearing on Draft AO 2006-20, one of the Commission's major
concerns was that Unity08 was requesting a dispensation from the regulations.  This is not the
case.  In fact, Unity08 requested an advisory opinion because it seeks to follow the law in every
instance and seeks the opinion of the Federal Elections Commission to interpret the law where it
is breaking new ground.  However, after careful analysis, it is apparent that Unity08's current
activities do not make it a political committee under the Act.

Lawrence Norton, Esq.                                          STEPTOE & JOHNSON LLP
Federal Election Commission
August 16, 2006
Page 5 of 23

     The fundamental difficulty with the question posed is that FECA and its corresponding regulations were not designed to deal with an organization, like Unity08, that is not yet a party and does not yet have a candidate, but may nominate a candidate in the future. As Commissioner Mason mentioned during the hearing on Draft AO 2006-20, FECA and the regulations were designed to address the major parties, party organizations that were candidate driven, or parties built from the local level up, so that the organizations were clearly functioning in support of an actual candidate or were established political parties by the time they participated in federal elections. Unity08, however, is an organization seeking to form a party first at the national level prior to having an identified candidate on its ticket.

     But this is not merely a drafting issue. The government's right to limit the ability of citizens to join together in an organization to raise and spend money in order to advance political ideas is narrow, and justified only by the government's right to prevent the appearance of corruption. *See* Buckley v. Valeo, 424 U.S. 1, 28 (1976); McConnell v. FEC, 540 U.S. 93, 291 (2003). The Court has determined that the corruption rationale is at its strongest where the organization is controlled by or has as its major purpose the support of an *identified candidate*. With respect Unity08's activity, the rationale is attenuated to the point of invisibility because Unity08 has no party nor elected officials in office to be corrupted, nor does it promote or oppose the election of any actual candidates.

     The Bipartisan Campaign Reform Act of 2002 (BCRA) and *McConnell* did not change this. While the Court in *McConnell* recognized that political parties were subject to the Act, it recognized that such regulation does not apply until an organization gains official status. *See* McConnell, *supra*, 540 U.S. at 159 ("[N]othing … prevents individuals from pooling resources to start a new national party. *Only when an organization has gained official status*, which carries with it significant benefits for its members, will the proscriptions of [this section] apply.") (emphasis added). As demonstrated below, the Act and the corresponding regulations do not neatly (or otherwise) apply to Unity08.

Lawrence Norton, Esq.                                    STEPTOE & JOHNSON LLP
Federal Election Commission
August 16, 2006
Page 6 of 23

**A.    Unity08 is Not a "Political Party" Until it has a Candidate on the Ballot.**

While Unity08 has referred to itself as a "nascent political party," the Commission has made clear that Unity08 cannot be a "political party," as that term is defined by the Act, until it has placed a candidate on the ballot. The regulations define "political party" as "an association, committee, or organization *which nominates or selects a candidate* for election to any Federal office, *whose name appears on an election ballot as the candidate of the association, committee, or organization.*" 11 C.F.R. § 100.15 (emphasis added). The Commission has interpreted this definition to require that an organization has at one time (past or present) placed an actual candidate on the ballot. *See* AO 2004-9 (the term political party "requires that the party organization *actually* obtain ballot access for one or more federal candidates") (emphasis added); AO 1980-3 (committee did not qualify as a political party until it had satisfied the ballot access requirements noting that while the committee intends to nominate candidates for federal office, the nominating process is in the early stages and no individuals have been nominated as candidates of the party). Thus, even if Unity08 achieves ballot access as an organization in a number of states, it will not be a "political party" -- and be subject to the limitations or get the benefits of such designation -- until it has selected its candidate and placed its nominated candidate on the ballot in any state. *See* AO 2002-3.

**B.    Unity08 Cannot Have a National Committee and, Thus, Unity08 is Robbed of the Benefits Conferred on the Major Parties.**

Even if Unity08 becomes a "political party," Unity08 can *never* become a national committee under the Commission's current interpretation of the Act and Unity08, therefore, is denied the significant benefits afforded to the national committees of the major parties. The Act defines a "national committee" as "the organization which, by virtue of the bylaws of a political party, is responsible for the day-to-day operation of such political party at the national level, as determined by the Commission." 2 U.S.C. § 431(14); *accord* 11 C.F.R. § 100.13. In determining whether an organization is a "national committee," the Commission looks to see whether the party has established a sufficient national presence. The Commission has

Lawrence Norton, Esq.                                    STEPTOE & JOHNSON ᴸᴸᴾ
Federal Election Commission
August 16, 2006
Page 7 of 23

determined that "national presence" is evidenced by a variety of factors, including: the
nominating of qualified candidates for President and various Congressional offices in numerous
states; engaging in certain activities -- such as voter registration and get-out-the-vote drives -- on
an ongoing basis; publicizing the party's supporters and primary issues throughout the nation;
holding a national convention; setting up a national office; and establishing state affiliates.
However, the Commission has also stated that an organization cannot be a national committee if
that organization focuses solely on the Presidential and Vice Presidential elections. *See* AO
1980-131; AO 1988-45; AO 1995-16. *See also* AO 1996-35 ("most important element in
determining the extent of a committee or party's national activity is the degree to which the
organization successfully attains ballot access for its Presidential *and* Congressional candidates")
(emphasis added).

     Thus, Unity08 is denied the significant benefits of national committee status and is at a
severe disadvantage against the major parties. The "national committees" of the major parties
are allowed a contribution limit that is more than "five times" the contribution limit ($26,700)
that would be applicable to a non-candidate political committee ($5,000). And, if the OGC's
argument -- that Unity08 already has a "clearly identified candidate" -- is taken to its full extent
it would be a single candidate committee with a contribution limit less than one-twelfth ($2,100)
of that of the national committees of the major parties. *See* Point II.B, *infra*. Moreover, Unity08
is deprived of public convention funding because it cannot be a national committee. *See* AO
2002-1; 11 C.F.R. § 9008.3.[1]

---

[1]    The argument that Unity08's position that it is not a political committee would cause the
major parties to abandon their status so they could be outside regulation is disingenuous. The
argument ignores the obvious fact that, unlike those organizations, Unity08 is not a party under
the Act. In addition, as noted above, the major parties enjoy significant benefits from their
status, including having a guaranteed place on the election ballot in every State in the Union;
while Unity08 does not have a place on the ballot of any State.

Lawrence Norton, Esq.                                    STEPTOE & JOHNSON LLP
Federal Election Commission
August 16, 2006
Page 8 of 23

**C.      Unity08's Funding and Activities will not go Unreported.**

Another concern raised by the Commission during the public hearing was the perceived

lack of transparency if Unity08 was not somehow regulated by the FEC as a political committee.

But, as a non-political committee Unity08's activities will not go unreported or unnoticed. As a

527 organization, Unity08 is required to file disclosure reports with the IRS. *See* 26 U.S.C. §

527(j)(3)(A) (527 organizations must file a report disclosing all expenditures that aggregate to

more than $500 per person per calendar year and contributions that aggregate to more than $200

per person per calendar year); *cf.* 11 C.F.R. § 104.7 (requiring political committees to provide

similar disclosure for its "best efforts" requirement). *See also* 26 U.S.C. § 527(k) (527

organizations must make all their filings available for public inspection). In addition, although it

does not intend to at this time, *if* Unity08 makes any independent expenditures or electioneering

communications it would be required to report such expenses to the Commission. *See* 11 C.F.R.

§ 100.29 (electioneering communications must be reported within 24 hours if they exceed

$10,000); 11 C.F.R. § 109.10 (reporting requirements for independent expenditures).


**POINT II**

**UNITY08 IS NOT MAKING "EXPENDITURES" OR ACCEPTING
"CONTRIBUTIONS" AS DEFINED BY THE ACT.**

**A.      Donations to, or purchases made by, Unity08 would not be "contributions" or
"expenditures" under the Act prior to the time Unity08 identifies candidates to
support for the Office of President and Vice-President of the United States.**

In *Buckley*, the Supreme Court held that the operative phrase in the Act's definitions of

"contribution and "expenditure" -- "for the purpose of influencing any election for Federal

office" -- raised constitutional problems as applied to donations received, or expenses incurred

by, organizations other than candidates or candidate controlled political committees. 424 U.S. at

74-82. To avoid the vagueness and potential over breadth of the statutory definition, *Buckley*

adopted a narrowing construction so that the Act's definition of "expenditure" reached "only

Lawrence Norton, Esq.                                        STEPTOE & JOHNSON LLP
Federal Election Commission
August 16, 2006
Page 9 of 23

funds used for communications that expressly advocated the election or defeat of a clearly
identified candidate." *Id.* at 79-80. *See also* McConnell, 540 U.S. at 126.[2]

      Since *Buckley*, courts have repeatedly reaffirmed that an organization that collects
donations and incurs expenses for political purposes does not receive "contributions" or make
"expenditures" under the Act unless and until the organization seeks to influence the election or
defeat of *an actual* candidate for a federal office. *See* Machinists, *supra*, 655 F.2d at 394 (the
Act's provisions do not extend to organizations whose contributions and expenditures "do not
related to an identifiable 'candidate'"). In *Machinists*, the FEC claimed that payments made by
the Machinists separate segregated fund to various groups that had as their goal the persuasion of
Senator Ted Kennedy to run for President were "contributions" in excess of the amounts allowed
under the Act. *Id.* at 390. The D.C. Circuit Court of Appeals, however, held that moneys given
to the groups were not "contributions" or "expenditures" because the groups' activities were not
related in any way *to a person who has decided to become a candidate.*" *Id.* at 392 (emphasis
added). The court reasoned, "[d]raft groups [] have one thing in common ... they aim to produce
some day a candidate acceptable to them, but they have not yet succeeded. Therefore, none are
promoting a 'candidate' for office, as Congress uses that term in the FECA." *Ibid.* Unity08 is in
an even more preliminary position. It has not even identified a potential candidate yet, and
indeed the selection of such a preferred choice will not occur until the summer of 2008 at its
virtual convention. Therefore, until that time, the donations received and the expenses incurred
in the pursuit of its goals do not constitute "contributions" or "expenditures" under the Act.

      Nothing in the BCRA or *McConnell* is to the contrary. In BCRA, Congress legislated
narrowly with respect to the receipt or expenditure of money for political purposes by groups not

---

    [2]       Donations made to an organization that does not make "expenditures" can not
constitute "contributions." Consequently, the status of an organization's expenses determines
whether donations to it are contributions. *See* Federal Election Comm'n v. Machinists Non-
Partisan Political League, 655 F.2d 380, 392-94 (Ct. App. D.C. 1981) (holding that the FEC had
no jurisdiction to investigate alleged violations of the contribution limitations by draft
committees since the expenditures of the committee were not under the control of, or made with,
the major purpose of electing an identified candidate), *cert. denied*, 454 U.S. 897 (1981).

Lawrence Norton, Esq.                                      STEPTOE & JOHNSON ᴸᴸᴾ
Federal Election Commission
August 16, 2006
Page 10 of 23

controlled by a candidate.  In *Buckley*, the Court limited the definitions of the phrases
"expenditure" and "contribution" to "express advocacy," *i.e.* language that expressly advocates
or opposes a clearly identified candidate.  424 U.S. at 43-44.  In so doing, the *Buckley* Court also
established a "magic words" test to determine whether advocacy was express and, therefore,
subject to regulation by the FEC.  *Ibid.* (stating that in order to be express advocacy the terms
"vote for," "support," "vote against" etc. must be used).  This test was broadened by BCRA to
include communications *referring to* a "clearly identified candidate," but only with respect to
communications made in close proximity to a primary or general election.  *See* 2 U.S.C. §
434(f)(3)(A)(i).  *See also* Shays v. Federal Election Comm'n, 414 F.3d 76, 82 (D.C. Ct. App.
2005); McConnell, *supra*, 540 U.S. at 189-90.  Thus, the core component of the *Buckley* decision
and its progeny remains intact -- that in order to make an "expenditure" or "contribution" there
must be a clearly identified candidate.[3]

**B.**     **Unity08 is not Accepting "Contributions" Under Section 100.57.**

        In the Draft Advisory Opinion, the OGC relied on relatively new Section 100.57 for its
contention that Unity08 is accepting contributions under the Act.  Section 100.57 states that "a
gift, subscription, loan, advance, or deposit of money or anything of value made by any person in
response to any communication is a contribution to the person making the communication if the
communication *indicates that any portion of the funds received will be used to support or oppose
the election of a clearly identified Federal candidate.*"  11 C.F.R. § 100.57 (emphasis added).
The OGC does not dispute that a clearly identified candidate is required under this section, but
instead attempts to apply this to Unity08's requests for funds to finance its preliminary
organizational efforts based on the assertion that the phrase "clearly identified candidate" may be
satisfied if the solicitation identifies not a candidate, but only a specific office, party affiliation,
and election cycle.

---

        [3]     BCRA also imposed limitations on the raising and spending of soft money by
national, state and local party committees.  As mentioned above, however, Unity08 is not a party
under the Act.

Lawrence Norton, Esq.                                    STEPTOE & JOHNSON ⁿᵖ
Federal Election Commission
August 16, 2006
Page 11 of 23

The Commission drew support for Section 100.57 from *FEC v. Survival Education Fund, Inc.*, 65 F.3d 285 (2d Cir. 1995), which actually supports Unity08's position that the solicitation must indicate support for an actual candidate. *See* 69 Fed. Reg. 225, 68057 (Nov. 23, 2004). There, the court found that a 1984 letter from two nonprofit organizations solicited contributions because it included a statement that left "no doubt that the funds contributed would be used to *advocate President Reagan's defeat at the polls*." *Id.* at 295 (emphasis added). As noted by the Commission in adopting Section 100.57, the critical statement, as found by the court, indicated that the money would be used to communicate to the voting public that "Ronald Reagan and his anti-people politics must be stopped." *Id.* at 289, *quoted in* 69 Fed. Reg. 225, 68057 (Nov. 23, 2004). Indeed, the examples cited by the Commission in its Explanation and Justification all identify actual candidates like "the President" or "electing Joe Smith." 69 Fed. Reg. 225, 68057 (Nov. 23, 2004). Moreover, as Commissioner Toner noted during the hearing, this situation is different than stating the "Democratic nominee" because such a candidate is "virtually assured." Public Hearing 7/20/06.

The OGC's reference to Section 100.17 does not support its contention that "in certain circumstances" the Commission has determined that candidates are sufficiently identified when identified as to specific office, party affiliation and election cycle "although [the] names of the eventual nominees were not yet known." Draft Advisory Opinion, at p. 4. The Act's definition, which Section 100.17 was based upon, clearly contemplates an actual candidate. Section 431(18) defines "clearly identified" as (1) "the name of the candidate involved;" (2) "a photograph or drawing of the candidate;" or (3) "the identity of the candidate is apparent *by unambiguous reference*." 2 U.S.C. § 431(18) (emphasis added). The wording of the regulations and the examples cited in the Explanation and Justification for Section 100.17 make clear that the focus is on *actual candidates* for Federal office -- *not hypothetical or potential candidates*, as the OGC contends.[4]

---

[4]     Section 100.17 defines "clearly identified" as a "candidate's name, nickname, photograph, or drawing appears, or the identity of the candidate *is otherwise apparent through an unambiguous reference* such as 'the President,' 'your Congressman,' or 'the incumbent,' or

Lawrence Norton, Esq.                                    STEPTOE & JOHNSON LLP
Federal Election Commission
August 16, 2006
Page 12 of 23

The advisory opinions cited by the OGC in support of its broadening of the phrase "clearly identified" are also inapposite as they are limited to whether identification is sufficient for the purposes of earmarking -- not for purposes of political committee status. *See* AO 2003-23 (WE LEAD); AO 1982-23 (Westchester Citizens for Good Government). To apply such a construction to the determination of whether an organization is a political committee is directly contrary to the court's holding in *FEC v. GOPAC*, 917 F. Supp. 851, 862 (D.D.C. 1996), which requires the major purpose of the organization to be the nomination or election of a particular, identified federal candidate. *See also* Machinists, *supra*, 655 F.2d at 394 (determining that a group that raised money for an identified possible candidate (which was also identifiable by a specific office, party and election cycle) was not a political committee because there was no clear candidate). Indeed, the earmarking regulations cannot be neatly applied to the determination of political committee status as the OGC suggests because earmarked contributions are contingent on the condition of the earmarking (e.g. the nomination of the Democratic nominee for President) taking place. For example, in WE LEAD, the Commission held that the nature of that contribution could not be determined until the actual nomination of the candidate by a particular time period. If the determining event did not occur, the contributions would be made to the Democratic Party and, therefore, would be subject to different contribution limits. *See* AO 2003-23. Moreover, earmarked contributions are not treated as contributions to the organization who receives the contribution, but to the particular candidate for whom the contribution is earmarked. Therefore, even if Unity08 accepted money "on behalf as the presumptive nominee of the Unity08 ticket" it would not be accepting contributions under the Act.[5]

---

through an *unambiguous reference* to his or her status as a candidate such as 'the Democratic presidential nominee' or 'the Republican candidate for Senate in the State of Georgia.'" 11 C.F.R. § 100.17 (emphasis added).

[5]        The OGC cites AO 1977-16, which held that it was *permissible* for a local search committee to accept contributions on behalf of an undetermined Federal candidate. Notably, the Commission did not engage in a discussion about the requirements for political committee status. But, more importantly, AO 1977-16 was decided before the court's decision in *Machinists*, which held that such draft organizations were *not* political committees under the Act. *See* Machinists, *supra*, 655 F.2d at 394. *See also* 11 C.F.R. § 100.72 and 11 C.F.R. § 100.131

Lawrence Norton, Esq.                                    STEPTOE & JOHNSON LLP
Federal Election Commission
August 16, 2006
Page 13 of 23

Nevertheless, in order to clarify that Unity08 is not currently raising money to support a candidate for office, Unity08 has added a disclaimer on its website clearly indicating that all money raised "will not be used to support or oppose any federal candidates, but will be used to support Unity08's organizational building efforts." http://www.unity08.com (go to Donations page). Unity08 understands that if this should change, an additional Advisory Opinion request will be necessary.[6]

**C.      Unity08 is not Accepting Contributions under Section 102.5.**

The OGC also argued that Unity08 would be receiving contributions under the solicitation rules set forth in 11 C.F.R. § 102.5(a)(2)(ii), which classifies as contributions money received in response to solicitations "which expressly state[] that the contribution will be used *in connection with a Federal election*." (Emphasis added). This section, however, only applies to organizations *already* classified as political committees. *See* 11 C.F.R. § 102.5(a). In accordance with *Buckley* and its progeny, the Commission has made clear that the governing regulation with respect to non-political committees is 11 C.F.R. § 100.57, which requires a clearly identified candidate. *See* 69 Fed. Reg. 225, 68058 (Nov. 23, 2004). Therefore, Section 102.5(a)(2)(ii) is inapplicable in this instance.

---

(exempting payments from the definitions of contributions and expenditures monies used to determine whether an individual would like to run for office); 11 C.F.R. § 110.2(l) (making certain contributions by a multicandidate committee to pre-candidate committees in-kind contributions under certain circumstances).

[6]      In the Draft Advisory Opinion, the OGC cited language on Unity08's website that stated "In 2008, we'll select and elect a Unity Ticket to the White House ... Our success depends on small gift contributions from all of us." As we noted in our response, that specific language no longer appears on the website.

Lawrence Norton, Esq.
Federal Election Commission
August 16, 2006
Page 14 of 23

STEPTOE & JOHNSON LLP

**D.    Monies spent or raised for the on-line convention are not "expenditures" or "contributions" under the Act.**

The OGC argued in the Draft Advisory Opinion that funds spent on Unity08's convention would be expenditures under the Act based upon what constitutes a "qualified expense" under the regulations governing public convention funds, 11 C.F.R. § 9008 *et seq. See* Draft AO 2006-20, pp. 9-10 *and* AO 2000-6 (cited by the OGC).    Those regulations establish a system of "qualified expenses" and prohibited uses for public money separate and apart from the general regulations regarding contributions and expenditures in Parts 100-116. The Commission of course has a tighter grip on the use of public money by recognized political parties such as the Reform Party.    As noted in our initial response and as recognized by the Commissioners, that does not necessarily mean that authorized expenses under Section 9008 are "expenditures" as defined in Section 100.110.[7]

It is our position that money spent on the convention is not in support of a particular candidate and, thus, cannot be expenditures under the Act, since it is more in the nature of the general party support distinguished by the courts. *See GOPAC, supra,* 917 F. Supp. at 862. *See also* AO 2000-38 (holding that only those funds used to send delegates to a national convention to vote for a particular candidate were expenditures); AO 1978-46 (only convention expenses that involve "(1) the solicitation, making or acceptance of contributions to a campaign for Federal office, or (2) any communication expressly advocating the election or defeat of a clearly identified candidate for Federal office" would be expenditures). *Cf.* AO 2000-6 and 11 C.F.R. § 9008.7(b) (prohibiting convention committees that receive public funds from making expenditures to defray the expenses of any particular candidate).

---

[7]    Even if Unity08 was a political committee or party committee it would not be eligible for convention funding. *See* AO 2002-1 (only the national committee of a major or minor party is eligible for convention funding; thus, a prerequisite for convention funding is the existence of a national committee of a political party); AO 1996-22.

Lawrence Norton, Esq.                          STEPTOE & JOHNSON LLP
Federal Election Commission
August 16, 2006
Page 15 of 23

In any event, as discussed previously, the Unity08 convention will not take place for at least two years and Unity08 will seek an Advisory Opinion from the Commission in connection with that effort.

**E.    Monies spent or raised for ballot access are not "expenditures" or "contributions" under the Act.**

**1.    Monies spent or raised to place *the organization* on State ballots are not "expenditures" or "contributions" under the Act.**

Contrary to the assumption by the OGC that Unity08 is seeking ballot access for a candidate, Unity08 currently plans to qualify for ballot access only in those states that permit an organization to qualify for ballot access prior to the selection of a candidate. Because ballot qualification is a prerequisite to the possibility of candidacy, the Commission has not, to our knowledge, ever considered money spent by a political party to qualify for ballot access as an organization, including money spent for litigation to get on the ballot, to be an "expenditure" under the Act. In the Draft Advisory Opinion, the OGC assumed that ballot access petitions would contain the name of the candidate, and relied on a footnote in an otherwise inapposite Advisory Opinion to conclude that "seeking signatures on nomination petitions" to get on the general election ballot would constitute a "promotion" of the requestor's candidacy for election to the office sought and consequently an "expenditure. The OGC's analysis and the authority on which it relied do not apply, however, to Unity08's present ballot access activity. Since this activity does not involve any candidate promotional activity, it cannot constitute an expenditure even under the OGC's dubious legal analysis. *See* AO 1994-05 (The individual had actually filed a Statement of Candidacy and declared his intent to run for U.S. Senate). Unity08's present efforts to get on the ballot as a party do not require a candidate and, thus, do not constitute an "expenditure."

Strong policy reasons also mitigate against a Commission decision to convert ballot access into an "expenditure." New political organizations have an extremely difficult time getting on the ballot in Presidential elections. The cost of qualifying in every state, which

Lawrence Norton, Esq.                                    STEPTOE & JOHNSON llp
Federal Election Commission
August 16, 2006
Page 16 of 23

usually involves the collection of signatures from tens of thousands of registered voters in each state, is 3-4 million dollars. Additional expenses may result from the need to challenge a state's refusal to qualify a political organization for the ballot or to defend a challenge to a ballot qualification. Sufficient money to defray these expenses would be very difficult to raise under the limitations applicable to a non-connected political committee. A Commission decision that produced such a result would effectively cripple attempts to start a new political organization. The Act allows the national committee of an established party to accept contributions of $26,700 per year from individuals, but these organizations have "automatic" ballot access, and any payments required to be made by candidates for that access are not "expenditures." *See* 11 C.F.R. § 100.150.

2.    **Monies spent or raised to place the nominated candidate on the ballot in the remaining states are not "expenditures" or "contributions" under the Act.**

Ballot access is governed by state laws even when running for a Federal office. Therefore, just because an individual is a candidate in some states does not mean he is a candidate for all. He or she must qualify in each state to be a candidate in each state. In other words, the individual is not a "candidate" in New Jersey until he or she gets on the ballot regardless of whether the individual has gained ballot access in Maryland. Therefore, in our opinion, expenses incurred as a result of seeking to place the newly nominated candidate on the ballot in the states that would not allow Unity08 to qualify as a party would not be "expenditures" or "contributions" under the Act. This is because such funds would not be spend in support of a "clearly identified *candidate*" since ballot access is a prerequisite to candidacy. Indeed, a Unity08 disbursement cannot be for the purpose of "influencing" a federal election unless Unity08's participation in the election is at least possible. The Commission's regulations exempt ballot qualifying expenses of candidates from the two major parties from the definition of expenditure for similar reasons. *See* 11 C.F.R. 100.150. No rational distinction can be made for excluding these minor amounts and including the enormous amounts needed to be raised by a new party or independent candidate to qualify.

Lawrence Norton, Esq.                                           STEPTOE & JOHNSON LLP
Federal Election Commission
August 16, 2006
Page 17 of 23

The OGC cites Advisory Opinion 1994-05 to support its position that ballot access expenses are expenditures under the Act. However, in that opinion it was the candidate that sought to have the expenses classified as expenditures for the purpose of determining whether he met the definition of "candidate" under the Act. Notably, the Commission declined to address the specific issues and merely stated in a one sentence footnote that money spent on petition drives would be expenditures for purposes of whether the candidate hit the threshold.

Nevertheless, no activity will take place to gain ballot access for a candidate until after the convention -- over two years from now. Unity08 recognizes that prior to engaging in any activity to place the nominated candidate on the ballot (as opposed to the organization) another Advisory Opinion will be required.

## POINT III

## UNITY08 IS NOT A POLITICAL COMMITTEE.

In Draft AO 2006-20, the OGC argued that Unity08 is a political committee because it satisfies the so-called "major purpose" test, a judicial constraint that limits the reach of the statutory triggers in FECA for political committee status to organizations the major purpose of which is the support or opposition of a candidate. The courts have repeatedly construed the test to apply to an "identified candidate," *see GOPAC, supra*, 917 F. Supp. at 862, and have repeatedly rejected the OGC's proposed construction that would extend the reach of the trigger for political committee status to an organization, like Unity08, that merely expresses a goal of running candidates, who are as yet unknown, in a far-off future election. *See Machinists, supra*, 655 F.2d at 394. As further described below, the OGC's proposed application of the broad construction of the "major purpose" test to a political organization such as Unity08 is particularly inappropriate for both legal and policy reasons.

Lawrence Norton, Esq.                                    STEPTOE & JOHNSON LLP
Federal Election Commission
August 16, 2006
Page 18 of 23

The definition of "political committee" -- an organization that makes expenditures or receives contributions in excess of $1,000 in a year[8] -- is the same definition that the *Buckley* Court construed as vague and overbroad and, accordingly, limited its application to organizations "under the control of a candidate or *the major purpose of which is the nomination or election of a candidate*." *Supra*, 424 U.S. at 79 (emphasis added). The *Buckley* "major purpose test" was reaffirmed, and expanded, by the Court in *Federal Election Comm'n v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 263 (1986) ("*MCFL*"). In that case, Massachusetts Citizens for Life, a non-profit advocacy corporation whose "central organizational purpose" was issue advocacy had, nevertheless, paid a substantial amount of money for the preparation and public distribution of a newsletter that advocated the election or defeat of *particular* candidates for federal offices. *Id.* at 242-44. The Supreme Court held that Massachusetts Citizens did not meet the definition of a political committee, notwithstanding that it was not engaged "solely" in issue advocacy because its "major purpose" was not the nomination or election of specific candidates. *Id.* at 252-53, n.6.[9]

In *GOPAC*, the court clarified that the test requires as a prerequisite, an *actual identified* candidate. 917 F. Supp. 851, 859 (D.D.C. 1996). In that case, GOPAC's stated mission was: "to create and disseminate the doctrine which defines a caring, humanitarian, reform Republican Party in such a way as to elect candidates, capture the U.S. House of Representatives and become a governing majority at every level of government." *Id.* at 854. Although GOPAC's

---

[8]        *See* 11 C.F.R. § 100.5. The regulation also states that the term includes separate segregated funds established by political committees; certain local committees of a political party; and individual campaign committees. There is no dispute that none of these categories are applicable to Unity08.

[9]        Had Massachusetts Citizens not made its "expenditures," however, the question of its major purpose would not have been considered. *See id.* at 251-52. The definition of "political committee" for organizations not controlled by federal candidates has, therefore, two requirements: (1) the making of expenditures sufficient to meet the annual threshold and (2) the major purpose test. Thus, if the Commission determines that Unity08 would not be accepting contributions or making expenditures in excess of the annual threshold, it does not need to address whether Unity08 satisfies the major purpose test.

Lawrence Norton, Esq.                                      STEPTOE & JOHNSON LLP
Federal Election Commission
August 16, 2006
Page 19 of 23

sole purpose was to advocate the election of Republicans as a class of candidates, the court held

that the definition of "political committee" was limited by *Buckley* to groups whose major

purpose was the election of a *particular* federal candidate or candidates. *Id.* at 859 ("even if the

organization's major purpose is the election of a federal candidate, the organization does not

become a 'political committee' unless or until it makes expenditures to support a 'person who

has decided to become a candidate' for federal office").

In so holding, the court rejected the Commission's attempt to broaden the definition of

political committee to include all organizations engaged in "partisan politics" or "electoral

activity." *See* GOPAC, *supra,* 917 F. Supp. at 859. For example, the Commission argued that

organizations that "advocated the election of a specified class of candidates, such as all

Republicans," were political committees because their "expenditures [were] by definition

campaign related." *Id.* at 860 (the amicus Common Cause similarly argued that "electioneering"

communications such as "elect a Republican to the White House" were sufficient). In rejecting

this argument, the *GOPAC* Court noted that where First Amendment values are at stake it is

important to establish a "bright-line" rule. *Id.* at 861. The rule followed by *GOPAC* drew two

distinctions -- (1) between federal and state candidates and (2) "between an organization whose

major purpose was to support a particular federal candidate" and an organization, like Unity08,

"whose major purpose did not involve support for any *particular* federal candidates, **either**

**because there was no candidate running at the time** or because the support was not directed to

the election of any *particular* candidate but **was more in the nature of general party support."**

*Id.* at 862 (emphasis added, citations omitted) (citing Machinists, *supra,* 655 F.2d at 392).

Nothing has changed since the "bright-line" test espoused in *GOPAC*. Since 1996, the

Commission has continually reaffirmed the viability of the holding in *GOPAC* that the definition

of political committee requires the support or opposition of an actual, identified candidate. *See*

AO 2003-1. For example, in MUR 395, the Commission declined to continue enforcement

proceedings against the College Republican National Committee for failure to register as a

political committee. In so doing, Commissioners Mason, Smith and Wold stated that "we think

*GOPAC* is correct in holding that general expressions of support for candidates of a party do not,

Lawrence Norton, Esq.                                    STEPTOE & JOHNSON LLP
Federal Election Commission
August 16, 2006
Page 20 of 23

absent direct contributions to federal candidates or the presence of 'express advocacy' qualify as 'expenditures' under the Act." Statement of Reasons for Pre-MUR 395, p. 3-4 (2002). Indeed, they found that "[t]he idea that a group can be considered a political committee solely because its major purpose is campaign activity has no basis in law." *Id.* at 4. *See also* Statement of Reasons by Chairman Smith and Commissioners Mason and Toner for MUR 5024 (2004) (failing to find reason to believe that the Council for Responsible Government, Inc. was a political committee because its brochures referencing candidate Tom Kean, Jr. did not constitute express advocacy and, therefore, were not expenditures under the Act).

In 2004, the Commission again declined to expand the scope of the definition of "political committee." After receiving over 100,000 comments and holding hearings, the Commission decided against revising the definition of political committee as recommended by the OGC and reaffirmed its application of the major purpose test stating:

> The "major purpose" test is a judicial construct that limits the reach of the statutory triggers in FECA for political committee status. The Commission has been applying this construct for many years without additional regulatory definitions, and it will continue to do so in the future. [69 Fed. Reg. 225, 68065 (Nov. 23, 2004)].

As noted by a commentator during the hearings, "[t]he major purpose gloss that the Supreme Court imposed or clarified, which neither Congress nor the Commission has ever encoded in the statute [or] in [the] regulations is an effort to limit the reach of the statute, not to expand it." Transcript of Public Hearing on April 14, 2004 ("Hearing Transcript"), at T82:3-7 (comments by Mr. Gold of the AFL-CIO).

The Commission also expressly rejected the argument that all entities organized under Section 527 of the Internal Revenue Code are "political committees" subject to regulation under FECA. The Commission held that such a broad construction was not warranted nor mandated by Congress. *See* 69 Fed. Reg. 225, 68065 (Nov. 23, 2004) (stating such a rule would "affect[] hundreds or thousands of groups engaged in non-profit activity in ways that were both far-reaching and difficult to predict, and would have entailed a degree of regulation that Congress did not elect to undertake itself when in increased the reporting obligations of 527 groups in

Lawrence Norton, Esq.                                STEPTOE & JOHNSON LLP
Federal Election Commission
August 16, 2006
Page 21 of 23

2000 and 2002 and when it substantially transformed campaign finance laws through BCRA"). Indeed, as Mr. Gold from the AFL-CIO commented at the hearing on April 14, 2004, "Congress clearly has made decisions about what the governmental interest is in regulating the activities, the independent activities of independent groups. It did in FECA and it did it in BCRA and it limited it to express advocacy and electioneering communication." Hearing Transcript, at T60:8-14. *See also* Hearing Transcript, at T37:18 to T38:5 (comments by Mr. Baran from the Chamber of Commerce) ("In BCRA, Congress carefully regulated national and state party soft money and electioneering communications by certain groups at specific times. Congress did not change the definition of political committee or the more general definition of expenditure. Congress neither left gaps nor did it instruct the Commission to address those provisions ... even though Congress ordered FEC rulemaking in many other areas.").

       In addition, as commented on during the hearings on the proposed revisions, there are serious problems with applying the statutory definitions under the tax code to the regulatory scheme under FECA. The IRS definition of a "political organization" is *much* broader than FECA's definition of "political committee" and it has not been similarly constrained. As one commentator noted, "[w]hat you do when you file Form 8871 to say you are a 527 is you declare that your primary purpose is to conduct 'exempt function activities' as that phrase is defined in the Internal Revenue Code and has been conducted by the Internal Revenue Service over a period of many, many years." Hearing Transcript, at T224:19 to T225:13 (comments by Mr. Trister). *See also* Hearing Transcript, at T29:12-14 (comments by Chairman Smith) ("it's not clear to me that the tax status of the group should drive our campaign finance analysis"). Moreover, the definitions of contribution and expenditure are markedly different in the IRC and under FECA.[10]

---

       [10]     Specifically, the I.R.C.'s definitions contain no requirement that the contributions or expenditures be made for the purpose of influencing a federal election. *Compare* 26 U.S.C. § 271(b)(2) (stating that the term "contribution" "includes a gift, subscription, loan, advance, or deposit, of money, or anything of value, and includes a contract, promise, or agreement to make a contribution, whether or not legally enforceable"), *with* 2 U.S.C. § 431(8)(A) (stating that the term "contribution" includes: "(i) any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal

Lawrence Norton, Esq.                                    STEPTOE & JOHNSON LLP
Federal Election Commission
August 16, 2006
Page 22 of 23

Despite the Commission's history of affirming the test established in *Buckley* and its progeny, the OGC argued in its Draft Advisory Opinion for a broadening of the interpretation of the major purpose test to include not only those organizations that raise and expend funds to influence the election or defeat of a particular candidate but to encompass all organizations who participate in the political process by broadening the meaning of "clearly identified candidate" and applying the "in connection with a Federal election" standard under 11 C.F.R. § 102.5. However, this has not been the law for the last thirty years, and is not the law now.

### POINT IV

### UNITY08 CAN INCORPORATE FOR
### LIABILITY PURPOSES.

As noted by the Commission during the hearing, the question of whether Unity08 may incorporate of liability purposes is linked with the question of whether it is a political committee, as defined by the Act. If Unity08 is a political committee, which it disputes, it may incorporate without running afoul of the prohibitions of Section 441b (which prohibit a corporation from making "contributions" or "expenditures" in connection with any election) by virtue of 11 C.F.R. 114.12. On the other hand, if, as Unity08 contends, it is not a political committee, it is bound by the prohibitions of Section 441b to the extent it intends to make "expenditures" or "contributions" under the Act. As previously explained, however, Unity08 will not be making "expenditures" or "contributions" under the Act and, therefore, would not be subject to the

---

office; or (ii) the payment by any person of compensation for the personal services of another person which are rendered to a political committee without charge for any purpose"). *Compare* 26 U.S.C. § 271(b)(3) (stating that the term "expenditure" "includes a payment, distribution, loan, advance, deposit, or gift, of money, or anything of value, and includes a contract, promise, or agreement to make an expenditure, whether or not legally enforceable"), *with* 2 U.S.C. § 431(9)(A) (stating that the term "expenditure" includes: "(i) any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office; and (ii) a written contract, promise, or agreement to make an expenditure").

Lawrence Norton, Esq.                                    STEPTOE & JOHNSON ᴸᴸᴾ
Federal Election Commission
August 16, 2006
Page 23 of 23

prohibitions on corporate contributions and expenditures. Accordingly, as a non-political committee until such time that Unity08 engages in "electioneering communications" it may raise and spend money as an incorporated entity without contravening any of the prohibitions in 2 U.S.C. § 441b and 11 C.F.R. § 114 *et seq.* [11]

## CONCLUSION

We urge the Commission, for the reasons given here to reject the OGC's Draft Advisory Opinion and to find that none of the activities proposed by Unity08 would make it a political committee under the Act. As noted, Unity08 recognizes that it may, at a certain point in the future, have to establish a political committee to engage in activities covered by the Act, including the support of its candidates for President and Vice-President after their selection. Moreover, its candidates would have to establish a candidate committee. But, such matters lie in the future. At the present time, none of Unity08's activities have resulted in the receipt of "contributions" or the making of "expenditures" under the Act, and its articulation of a purpose to attempt to run candidates in a distant election for which it is not qualified at the present time does not itself make it a political committee.

Sincerely,

John J. Duffy

Xan Desch

---

[11]    The Court's decision in *Federal Election Comm'n v. Beaumont*, 539 U.S. 146 (2003), is inapposite as it applies only to direct contributions by nonprofit advocacy corporations.

# EXHIBIT 17

.09/21/2006 18:55 FAX                STEPTOE & JOHNSON                      002.006

# STEPTOE & JOHNSON LLP
### ATTORNEYS AT LAW

John J. Duffy                                                          1330 Connecticut Avenue, NW
202.429.8020                                                          Washington, DC 20036-1795
jduffy@steptoe.com                                                       Tel 202.429.3000
                                                                       Fax 202.429.3902
                                                                       steptoe.com

                              September 21, 2006

VIA FACSIMILE
Amy Rothstein, Esq.                    *Supplement to*
Office of the General Counsel
Federal Election Commission            *AOR 2006-20*
999 E Street N.W.
Washington, D. C. 20463

        Re:    AOR 2006-20

Dear Amy:

        This letter responds to the questions that you posed in our recent phone conversation.

A.      *What are the "organizational building efforts" referenced in Unity 08's disclaimer on
        its donations page of the website?*

        Unity08 has added a disclaimer on the donations page of the website that states:
"Donations made on this website will not be used to support or oppose any federal candidates,
but will be used to support Unity08's *organizational building efforts.*" http://www.unity08.com
(go to Donations page) (emphasis added). The disclaimer was added to address concerns
expressed by the General Counsel that Unity08's donation page could be construed as seeking
money for future federal candidates. Unity08 never had such an intention, and the disclaimer is
intended to make that clear.[1]  Unity08's principal organizational efforts at this stage are:

────────────────

        [1] As outlined in its previous filings, Unity08 believes that 11 C.F.R. § 100.57 (applies
only to solicitations that clearly seek support or opposition of an *actual candidate* for federal
office. *See* FEC v. Survival Education Fund, Inc., 65 F.3d 285, 295 (2d Cir. 1995) (statement
left "no doubt that the funds contributed would be used to *advocate President Reagan's defeat at
he polls*") (emphasis added); 69 Fed. Reg. 225, 68057 (Nov. 23, 2004) (the Explanation and
Justification examples all involve all solicitations for actual candidates like "the President" or
"electing Joe Smith").

Amy Rothstein, Esq.
September 21, 2006
Page 2 of 4

STEPTOE & JOHNSON LLP

1. *creation of its corporate status*, which includes development of corporate documents, registration to do business, application for tax exempt status, and submission of an Advisory Opinion Request to the FEC.

2. *ballot access* in those states that permit ballot access by a party without a candidate, which includes research of the state laws and regulations regarding ballot access as a party organization and evaluation of legal options in those states where access to the ballot as a party is unreasonably difficult. Unity08 intends to begin efforts shortly to comply with the requirements for ballot access as a party in the states that permit such access without a designated candidate. Such activities will include the organization of petition drives, which may be done by professionals, volunteers or a combination of the two.

3. *creation and operation of its website* to disseminate and encourage discussion of its idea that the country needs to focus on issues crucial to the nation.

4. *organization building*, which includes the identification of individuals who share Unity08's goals and the identification and organization of volunteers, *i.e.* people willing to help advance Unity08's ideas and to help Unity08 achieve ballot status in states where it can do so without a candidate.

5. Unity08 has done *public interviews* and *op-ed pieces* to define and promote Unity08's position.

6. Unity08 may commission polls to assess the public support for its position that the major parties do not adequately address the crucial issues.

7. Unity08 has arranged for high school students to circulate a "Unity Petition" to gather signatures of voters who believe that Congress is not adequately addressing the crucial issues America is facing. This petition will then be sent to the Congress. The petition does not reference Unity08 by name or the possibility of a Unity08 ticket in 2008, nor does it solicit funds for Unity08.

In connection with the above efforts, Unity08 maintains a small office in the District of Columbia and has contracted for the services of a law firm, a web consultant, and a public relations consultant, and a bookkeeper. Unity08 currently has a number of interns, most of whom are volunteers.

09/21/2006 18:55 FAX                STEPTOE & JOHNSON                    004/005

Amy Rothstein, Esq.                                    STEPTOE & JOHNSON LLP
September 21, 2006
Page 3 of 4

**B.    Has Unity 08 been doing anything differently with the money raised through the website before the disclaimer was placed on the website, i.e. has Unity 08 been segregating money raised before the disclaimer was placed on the website from money raised after?**

Unity08 has not segregated monies received prior to the addition of the disclaimer, nor has Unity08 changed, because it does not believe that 11 C.F.R. § 100.57 applies to an organization that has no candidate, no present ballot positions, and no history of having any candidate on the ballot in any state. *See, supra,* n.1. Unity08 has intended to use the money raised prior to the addition of the disclaimer in the same manner as money received after the addition of the disclaimer, *i.e.* to fund the organizational building efforts set forth above. Unity08 would segregate this money, return the money, or seek approval from the contributors for the use of these contributions for the organizational purposes set forth above, if the Commission believes that any of these steps was necessary to avoid the application of 11 CFR § 100.57.

**C.    Is Unity 08 raising money currently other than through the website?**

Other than the website, Unity08 currently receives donations only through infrequent personal communications by principals to potential donors. In these conversations, Unity 08 's principal donors are aware that monies raised now will be used to support Unity08's organizational building efforts and not for the support of future federal candidates. Unity08 has not engaged in any other types of fundraising. Unity08 has imposed a $5,000 limitation on donations from individuals. Unity08 does not accept donations from corporations, foreign nationals, or government contractors. Should Unity08 undertake to use other types of fundraising it will include a disclaimer that is in substance the same as the disclaimer used on the website.

Amy Rothstein, Esq.
September 21, 2006
Page 4 of 4

STEPTOE & JOHNSON ᴸᴸᴾ

You also a requested a copy of Unity08's bylaws, which were forwarded to you via email
on September 18, 2006.

Do not hesitate to contact me if you have any further questions.

Sincerely,

John Duffy

# EXHIBIT 18

# Extension on AOR 2006-20



"Duffy, John"
<JDuffy@steptoe.com>

08/22/2006 03:53 PM

To  ARothstein@fec.gov

cc  "Collier, Thomas" <TCollier@steptoe.com>, "Desch, Xan"
    <xdesch@steptoe.com>

Subject  Extension of Time

RECEIVED
FEDERAL ELECTION
COMMISSION
SECRETARIAT

2006 AUG 23  A 9: 32

Amy:

     I am been authorized by my client to agree to the Commission's request for an extension of
time, up to an including October 10, 2006, to act on Unity06's request for an Advisory Opinion.
Thanks for all of your help in this matter.

# EXHIBIT 19

September 29, 2006

## *AO DRAFT COMMENT PROCEDURES*

The Commission permits the submission of written public comments on draft advisory opinions when proposed by the Office of General Counsel and scheduled for a future Commission agenda.

Today, DRAFT ADVISORY OPINION 2006-20 is available for public comments under this procedure. It was requested by counsel, John Duffy, on behalf of Unity 08.

Proposed Advisory Opinion 2006-20 is scheduled to be on the Commission's agenda for its public meeting of Wednesday, October 4, 2006.

Please note the following requirements for submitting comments:

1) Comments must be submitted in writing to the Commission Secretary with a duplicate copy to the Office of General Counsel. Comments in legible and complete form may be submitted by fax machine to the Secretary at (202) 208-3333 and to OGC at (202) 219-3923.

2) The deadline for the submission of comments is 12:00 noon (Eastern Time) on October 3, 2006.

3) No comments will be accepted or considered if received after the deadline. Late comments will be rejected and returned to the commenter. Requests to extend the comment period are discouraged and unwelcome. An extension request will be considered only if received before the comment deadline and then only on a case-by-case basis in special circumstances.

4) All timely received comments will be distributed to the Commission and the Office of General Counsel. They will also be made available to the public at the Commission's Public Records Office.

## _CONTACTS_

Press inquiries:                    Robert Biersack  (202) 694-1220

Commission Secretary:              Mary Dove (202) 694-1040

Other inquiries:

> To obtain copies of documents related to AO 2006-20, contact the Public Records
> Office at (202) 694-1120 or (800) 424-9530.

> For questions about comment submission procedures, contact
> Rosemary C. Smith, Associate General Counsel, at (202) 694-1650.

## _MAILING ADDRESSES_

> Commission Secretary
> Federal Election Commission
> 999 E Street NW
> Washington, DC 20463

> Rosemary C. Smith
> Associate General Counsel
> Office of General Counsel
> Federal Election Commission
> 999 E Street, NW
> Washington, DC 20463

AGENDA DOCUMENT NO. 06-64



**FEDERAL ELECTION COMMISSION**
Washington, DC 20463

RECEIVED
FEDERAL ELECTION
COMMISSION
SECRETARIAT

2006 SEP 29  P 3: 05

September 29, 2006

## MEMORANDUM

TO:               The Commission

FROM:             Lawrence H. Norton
                  General Counsel

                  Rosemary C. Smith
                  Associate General Counsel

                  Amy L. Rothstein
                  Acting Assistant General Counsel

                  Ron B. Katwan
                  Attorney

                  Esa L. Sferra
                  Attorney

Subject:          Draft AO 2006-20

**AGENDA ITEM**
For Meeting of: 10-4-06
**SUBMITTED LATE**

        Attached is a proposed draft of the subject advisory opinion.  We request
that this draft be placed on the agenda for October 4, 2006.

Attachment

1 ADVISORY OPINION 2006-20
2
3 John J. Duffy, Esq.
4 Steptoe & Johnson LLP                                          **DRAFT**
5 1330 Connecticut Avenue, NW
6 Washington, DC 20036-1795
7
8 Dear Mr. Duffy:

9      We are responding to your advisory opinion request on behalf of Unity 08,

10 concerning the application of the Federal Election Campaign Act of 1971, as amended

11 (the "Act"), and Commission regulations to Unity 08's status as a political committee.

12 The Commission concludes that Unity 08 will have to register as a political committee

13 once it receives contributions or makes expenditures in excess of $1,000, and therefore

14 will be subject to the amount limitations, source prohibitions, and reporting requirements

15 of the Act.

16 ***Background***

17      The facts presented in this advisory opinion are based on your letter received on

18 May 30, 2006, your comments received on July 19, supplemental submissions received

19 on August 16, September 18 and 22, telephone conversations with you, and information

20 from Unity 08's website.[1]

21      Unity 08 is organized under the laws of the District of Columbia as a not-for-

22 profit corporation and under Section 527 of the Internal Revenue Code. Unity 08

23 describes itself as a "nascent political party" that "will act to assure that an alternative

24 ticket is presented to the American voters in 2008." Unity 08 was founded by individuals

25 who have been involved in political campaigns at the State and national levels, including

---

[1] *See* <http://www.unity08.com> (last visited 9/18/06).

AO 2006-20
Draft
Page 2

1    political consultants and media advisors, and by individuals who have served in high

2    government positions, including a former State Senator, former White House Chief of

3    Staff, former White House communications director, former State Governor, and former

4    heads of State agencies.  Unity 08 aims to build a "solidly-funded movement of up to

5    20,000,000 Americans . . . in order to nominate a Unity Ticket of their choice for 2008."

6          Unity 08 states that it has three goals: (1) "to elect a Unity Ticket for President

7    and Vice-President of the United States" in 2008; (2) "for the American people to pick

8    that Unity Ticket in the first half of 2008" through an online nominating convention; and

9    (3) a "*minimum* goal" of "effect[ing] *major* change and reform in the 2008 national

10   elections" by "organizing a group of voters who comprise at least 20% of the national

11   electorate" and whose commitment to the Unity 08 agenda will have to be accounted for

12   by the major parties if they are to be successful in the 2008 presidential election.

13   (Emphasis in the original).  The Unity 08 nominees may consist of candidates from either

14   or both of the two major political parties, or of independent candidates.  Although Unity

15   08 may support the candidates offered by one of the two major parties, it plans to hold an

16   online nominating convention in the summer of 2008, during which Unity 08 delegates

17   will vote via the Internet to nominate candidates for the Unity 08 ticket.[2]  Unity 08 does

18   not intend to support or oppose candidates in the 2006 elections or in any congressional,

19   State, or local election at any time.

20         Unity 08 will finance its activities with solicitations of funds and sales of t-shirts,

21   mugs, pens, bumper stickers, and other similar items.  Unity 08 is currently soliciting

---

[2] In your supplemental submission, you indicated that Unity 08 will hold the online nominating convention only if necessary, and if it does become necessary you will file another advisory opinion request. Accordingly, the Commission does not address Unity 08's activities regarding an online nominating convention.

AO 2006-20
Draft
Page 3

1    funds using the Internet and intends to make solicitations using telephone banks and mass

2    mailings.  Unity 08's website proposes that supporters give specific monetary amounts

3    ranging from ten dollars to $5,000, with an option to give any amount of the supporter's

4    choosing.  Unity 08's online solicitation form includes the following language: "To

5    succeed we don't have to match the massive war chests of either party.  And, like other

6    successful citizens' movements before us, we can raise the funds we need to build a lean

7    and effective movement if each of us simply does our part. . . . Please do your part.  The

8    stakes for our country have never been higher."  The movement for which Unity 08 is

9    soliciting money is to "Select and Elect a Unity Ticket in the 2008 Presidential Race,"

10   which also appears as the header on the online solicitation form.  Elsewhere on the

11   website, this language is repeated:  "Unity 08 is a citizens' movement to get our country

12   back on track by nominating and electing a Unity Ticket in the '08 presidential election

13   to promote leadership, not partisanship.  Every day – with your support – we're making

14   progress toward this goal."  The phrase "with your support" is a hyperlink to the online

15   solicitation form.  A disclaimer was recently added to Unity 08's online solicitation form,

16   stating that: "Donations made on this website will not be used to support or oppose any

17   federal candidates, but will be used to support Unity08's organizational building efforts."

18        Unity 08 does not accept money or any other thing of value from "any 'prohibited

19   source,'" including corporations, foreign nationals, or government contractors.  Although

20   Unity 08 did not initially place a limit on the amount of donations it solicits or accepts, it

21   recently imposed a $5,000 limitation on donations from individuals.

22        In attempting to elect presidential and vice-presidential candidates in 2008, Unity

23   08 plans to purchase access to mass media and commission polls, and to "qualify for

AO 2006-20
Draft
Page 4

1    ballot positions in certain key states for the offices of President and Vice President of the

2    United States through petitions, and if required, litigation." Specifically, Unity 08 plans

3    to obtain "ballot access as a 'party'" in approximately 37 States.

4    *Questions Presented*

5          1.    *Will Unity 08 receive "contributions" or make "expenditures"?*

6          2.    *Must Unity 08 register as a political committee?*

7          3.    *May Unity 08 incorporate for liability purposes only?*

8    *Legal Analysis and Conclusions*

9    *Question 1: Will Unity 08 receive "contributions" or make "expenditures"?*

10          Yes, for the reasons stated below, Unity 08 will receive "contributions" and make

11   "expenditures" as defined under the Act and Commission regulations.

12   *I. Contributions*

13          A "contribution" is a "gift, subscription, loan, advance, or deposit of money or

14   anything of value made by any person for the purpose of influencing any election for

15   Federal office." 2 U.S.C. 431(8)(A)(i); 11 CFR 100.52(a). The Act does not define the

16   phrase "for the purpose of influencing any election for Federal office."

17          Drawing on *FEC v. Survival Education Fund*,[3] Commission regulations provide

18   that funds received in response to solicitations must be treated as contributions "if the

19   communication indicates that any portion of the funds received will be used to support or

20   oppose the election of a clearly identified Federal candidate." 11 CFR 100.57(a); *see*

21   *also Political Committee Status, Definition of Contribution and Allocation for Separate*

---

[3] *FEC v. Survival Education Fund, Inc.*, 65 F.3d 285 (2d Cir. 1995). In that case, the court stated that "[e]ven if a communication does not itself constitute express advocacy, it may still fall within the reach of [2 U.S.C.] 441d(a) if it contains solicitations clearly indicating that the contributions will be targeted to the election or defeat of a clearly identified candidate for federal office." *Id.* at 295.

AO 2006-20
Draft
Page 5

1   *Segregated Funds and Nonconnected Committees; Final Rules*, 69 Fed. Reg. 68056,

2   68057 (Nov. 23, 2004) ("*Political Committee Status Final Rules*"). The Commission has

3   determined that in certain circumstances the definition of a "clearly identified" candidate,

4   *see* 11 CFR 100.17, is satisfied when "candidates were identifiable as to specific office,

5   party affiliation, and election cycle, although the names of the eventual nominees were

6   not known." Advisory Opinion 2003-23 (WE LEAD) (a reference to office, party

7   affiliation, and election cycle satisfied the requirement of a clearly identified candidate in

8   the definition of "earmarked" contribution in 11 CFR 110.6(b)(1)); *see also* Advisory

9   Opinions 1982-23 (Westchester Citizens for Good Government) and 1977-16 (Iowa 1980

10  U.S. Senate Campaign Committee).

11          Unity 08's communications on its website clearly indicate that funds received will

12  be used to support the election of the Unity 08 presidential ticket. The website states

13  prominently that "Unity 08 is a citizens' movement to get our country back on track by

14  nominating and electing a Unity Ticket in the '08 presidential election to promote

15  leadership, not partisanship. Every day – with your support – we're making progress

16  toward this goal." The phrase "with your support" is a hyperlink to the online solicitation

17  form, thereby indicating that monies given via the online form will be used to support the

18  nomination and election of Unity 08 candidates in the 2008 presidential election.

19  Additionally, Unity 08's first goal – "Select & Elect a Unity Ticket in the 2008

20  Presidential Race" – appears as the header on the online form. While Unity 08 has not

21  yet named its candidates, it identifies its candidates by office (*i.e.*, President and Vice

22  President), party affiliation (*i.e.*, the Unity 08 ticket), and election year (*i.e.*, 2008).

AO 2006-20
Draft
Page 6

1    The recent addition of a single-sentence disclaimer, which appears in small print

2    at the end of a paragraph at the bottom of Unity 08's online solicitation form, does not

3    change the result.  While a disclaimer may be relevant to determining if a communication

4    is soliciting contributions, it is not dispositive.[4]  Although the disclaimer on Unity 08's

5    online solicitation form states that funds received will be used for "organization building

6    efforts,"[5] this statement is not supported by the rest of Unity 08's website.  For example,

7    Unity 08's website repeatedly states that the organization's goal is to "select and elect a

8    Unity Ticket to the White House," and explicitly solicits support for Unity 08's efforts to

9    nominate and elect a Unity Ticket in the 2008 presidential election.  Additionally, 21 of

10   the 24 questions and answers in the FAQ section of Unity 08's website address the

11   identification, nomination, and election of Unity 08's presidential and vice-presidential

12   candidates.

13   Thus, notwithstanding the disclaimer on Unity 08's online solicitation form, the

14   website indicates that funds received will be used to support or oppose the election of a

15   clearly identified Federal candidate.  Accordingly, funds received in response to the

16   website communications will constitute contributions under the Act and Commission

17   regulations.

---

[4] See FEC v. Massachusetts Citizens for Life, Inc., 479 U.S. 238 (1986) (finding that a publication, which urged voters to "vote pro-life" and contained information about pro-life candidates, was expressly advocating the election of those candidates, despite a disclaimer stating that the publication "does not represent an endorsement of any particular candidate"); see also Advisory Opinions 2003-36 n.9 (Republican Governors Association) (a covered individual may not approve, authorize, agree, or consent to appear in publicity that would be a solicitation by the covered person of funds that exceed the limits or prohibitions of the Act, regardless of the appearance of a disclaimer in the solicitation) and 2003-03 (Cantor) (the use of a disclaimer to prevent solicitation of non-Federal funds "should not, however, be construed to permit a covered individual to inoculate a solicitation of non-Federal funds by reciting a rote limitation, but then encouraging the potential donor to disregard the limitation").

[5] You indicate that "organization building efforts" include identification of individuals who share Unity 08's goals, and identification and organization of volunteers to advance Unity 08's ideas and to help Unity 08 achieve ballot access.

AO 2006-20
Draft
Page 7

1

2    *II. Expenditures*

3        Monies spent by Unity 08 to obtain ballot access through petition drives will be

4    expenditures. An "expenditure" is a "purchase, payment, distribution, loan, advance,

5    deposit, or gift of money or anything of value, made by any person for the purpose of

6    influencing any election for Federal office."[6] 2 U.S.C. 431(9)(A)(i); 11 CFR 100.111(a).

7        The Commission has previously determined that expenses incurred in gathering

8    signatures to qualify for a ballot for Federal office are expenditures. *See* Advisory

9    Opinion 1994-05 n.1 (White) ("[E]xpenditures to influence your election would include

10   amounts you spend . . . to promote yourself for the general election ballot by seeking

11   signatures on nomination petitions"); *see also* Advisory Opinion 1984-11 (Serrette)

12   (determining that expenses made to collect petition signatures for the general election

13   ballot are expenditures, and therefore are, "qualified campaign expenses," which are

14   expenses made in connection with a candidate's campaign for nomination, *see* 11 CFR

15   9032.9).

16       Although Unity 08 plans to qualify for ballot access for itself as an organization,

17   but not yet for any named candidates, Unity 08 is, in effect, using its name as a

18   placeholder for its candidates' names on the ballot. Moreover, unlike organizations that

19   secure ballot access for themselves in order to field a slate of Federal and non-Federal

---

[6] The only exception in the Act from the definition of "expenditure" for ballot access costs applies to "payments received by a political party committee as a condition of ballot access which are transferred to another political party committee or the appropriate State official." 2 U.S.C. 431(9)(B)(x); *see also* 11 CFR 100.150. The purpose of this exception is to prevent a candidate or a candidate's authorized committee from having to exceed the limits on contributions to a State party committee in order to gain ballot access. *See FECA Amendments: Hearing Before the Committee on Rules and Administration, United States Senate*, 96th Cong. 4-25, app. at 21 (July 13, 1979) (Statement of Robert Tiernan, Chairman, Federal Election Commission).

AO 2006-20
Draft
Page 8

1    candidates, Unity 08 has announced that it will field only two candidates – for the offices

2    of President and Vice President – in the 2008 election only.  Thus, in promoting itself

3    through petition drives to obtain ballot access, Unity 08 is promoting its presidential and

4    vice-presidential candidates, and any payments by Unity 08 for these activities will

5    constitute expenditures.[7]

6        *Question 2: Must Unity 08 register as a political committee?*

7        Yes, for the reasons stated below, Unity 08 must register as a political committee

8    when it receives more than $1,000 in contributions or makes more than $1,000 in

9    expenditures.[8]

10        The Act and Commission regulations, with certain exceptions, define a "political

11    committee" as "any committee, club, association, or other group of persons which

12    receives contributions aggregating in excess of $1,000 during a calendar year or which

13    makes expenditures aggregating in excess of $1,000 during a calendar year." 2 U.S.C.

14    431(4)(A); 11 CFR 100.5(a).  Under the Act and Commission regulations, political

15    committees are subject to certain registration and reporting requirements, as well as

16    limitations and prohibitions on contributions received and made, and on expenditures

17    made.  As the Commission stated previously, "[a]ny funds that are 'contributions' by

18    operation of new section 100.57 are contributions for purposes of the 'political

19    committee' definition in 2 U.S.C. 431(4)(A) and 11 CFR 100.5(a) . . . ." *Political*

---

[7] The Commission's conclusion is restricted to the facts presented here: Unity 08 intends to support only two candidates, one for the office of President of the United States and one for the office of Vice President; it "does not intend to support or oppose candidates for Congress or State and local elections at any time"; and it is "not looking to build a new and permanent party."

[8] Unity 08 does not ask and the Commission does not address whether Unity 08 qualifies as a "political party" under the Act and Commission regulations.  The Commission notes, however, that to be a "political party," an organization must "actually obtain ballot access for one or more Federal candidates." Advisory Opinion 2004-34 (Libertarian Party of Virginia); *see* 2 U.S.C. 431(16) and 11 CFR 100.15.

AO 2006-20
Draft
Page 9

1  *Committee Status Final Rules*, 69 Fed. Reg. at 68058.  Once Unity 08 receives over

2  $1,000 in contributions, or makes over $1,000 in expenditures, it will satisfy the statutory

3  definition of "political committee," *see* 2 U.S.C. 433.

4  　　　　The Supreme Court has held that, "[t]o fulfill the purposes of the Act," and to

5  avoid "reach[ing] groups engaged purely in issue discussion," only organizations whose

6  major purpose is campaign activity can be considered political committees under the Act.

7  *See e.g., Buckley v. Valeo*, 424 U.S. 1, 79; *FEC v. Massachusetts Citizens for Life, Inc.*,

8  479 U.S. 238, 262 (1986).  An organization's "major purpose" may be established

9  through its own public statements.  *See e.g., FEC v. Malenick*, 310 F. Supp. 2d 230, 234-

10  36 (D.D.C. 2004) (finding the organization evidenced its "major purpose" through its

11  own materials which stated the organization's goal of supporting the election of

12  Republican Party candidates for Federal office and through efforts to get prospective

13  donors to consider supporting Federal candidates);  *FEC v. GOPAC, Inc.*, 917 F. Supp.

14  851, 859 (D.D.C. 1996) (finding that the "organization's [major] purpose may be

15  evidenced by its public statements of its purpose or by other means. . . .").

16  　　　　Unity 08's self-proclaimed major purpose is the nomination and the election of a

17  presidential candidate and a vice-presidential candidate.[9]  Unity 08 clearly states this goal

18  in its advisory opinion request and on its website.  While Unity 08 has a subsidiary

19  objective of influencing the major parties to adopt, in connection with the 2008 national

20  elections, the core positions of Unity 08 supporters, your letters of May 30 and August

21  16, as well as Unity 08's website, state that Unity 08's first goal is the election "of a

22  Unity Ticket for President and Vice-President of the United States in 2008."

---

[9] *See Buckley v. Valeo*, 424 U.S. 1, 79 (the term "political committee" encompasses organizations "the major purpose of which is the nomination or election of a candidate").

AO 2006-20
Draft
Page 10

1       Therefore, once Unity 08 receives over $1,000 in contributions or makes over

2   $1,000 in expenditures, it will become a political committee. As such, it must register

3   with the Commission by filing a statement of organization within ten days, and it will be

4   subject to the provisions of the Act and Commission regulations applicable to political

5   committees.[10] *See* 2 U.S.C. 433, 11 CFR 102.1 and 102.2.

6   *Question 3: May Unity 08 incorporate for liability purposes only?*

7       Yes, Unity 08 may incorporate for liability purposes only, once it becomes a

8   political committee. Under Commission regulations, a political committee may

9   incorporate for liability purposes only without running afoul of the Act's prohibitions on

10   corporate contributions and expenditures. *See* 11 CFR 114.12. Thus, Unity 08 may

11   incorporate for liability purposes without being subject to the corporate prohibitions in 2

12   U.S.C. 441b and 11 CFR part 114.

13

---

[10] In its advisory opinion request, Unity 08 cites *FEC v. Machinists Non-Partisan Political League*, 655 F.2d 380 (D.C. Cir. 1981), to support its assertion that Unity 08 is not a political committee. In *Machinists*, the Court of Appeals for the D.C. Circuit held that so-called "draft groups" were not political committees under the Act. 655 F.2d at 392. Unity 08, however, is not a draft group. Draft groups do not promote the election of certain candidates for Federal office, but have the more limited aim of convincing individuals who are not yet candidates to run for office. By contrast, the declared purpose of Unity 08 is not to "draft" candidates but to get its chosen presidential candidate and vice-presidential candidate on the ballot, and to raise and spend funds in support of its two candidates. Moreover, *Machinists* expressly left open the question of whether draft groups could be treated as political committees for purposes of the Act's contribution limits after Congress's 1979 amendments to the Act. 655 F.2d at 395-96.

AO 2006-20
Draft
Page 11

1         This response constitutes an advisory opinion concerning the application of the

2    Act and Commission regulations to the specific transaction or activity set forth in your

3    request. *See* 2 U.S.C. 437f. The Commission emphasizes that, if there is a change in any

4    of the facts or assumptions presented, and such facts or assumptions are material to a

5    conclusion presented in this advisory opinion, then the requestor may not rely on that

6    conclusion as support for its proposed activity.

7

8                            Sincerely,

9

10

11

12                           Michael E. Toner

13                           Chairman

14

15    Enclosures (Advisory Opinions 2004-34, 2003-36, 2003-23, 2003-03, 1994-05, 1984-11,

16    1982-23, and 1977-16)

# EXHIBIT 20

Depo - Radek - Rough.txt

                                                                    1

                              RADEK ROUGH DRAFT

      1           IN THE UNITED STATES DISTRICT COURT

      2               FOR THE DISTRICT OF COLUMBIA

      3      ------------------------------:
             UNITYO8, et al,                :
      4                                      :
                 Plaintiffs,                 :
      5                                      :
                 v.                          :   Case No.:
      6                                      :   1:07cv00053(RWR)
             FEDERAL ELECTION                :
      7      COMMISSION,                     :
                                             :
      8           Defendant.                 :
                                             :
      9      ------------------------------:

     10

     11                           Washington, D.C.
                                  March 15th, 2007
     12

     13   Deposition of:

     14                 DANIEL RADEK,

     15         Called for oral examination by counsel for

     16   Defendant, pursuant to notice, at the offices of

     17   Steptoe & Johnson, 1330 Connecticut Avenue, N.W.,

     18   7th Floor, Washington, D.C., beginning at 3:05 p.m,

     19   before Teague Gibson of Alderson Reporting, a Notary

     20   Public.

     21

     22

     23                   *    *    *    *    *

     24

     25

                                                                    2

                              RADEK ROUGH DRAFT

      1   ON BEHALF OF THE PLAINTIFF:

      2              JOHN J. DUFFY, ESQ.
                     Steptoe & Johnson
                            Page 1

```
                    Depo - Radek - Rough.txt
 3                  1330 Connecticut Avenue, N.W.,
                    7th Floor
 4                  Washington, D.C.  20036-1795
                    (202) 429-8020
 5
     ON BEHALF OF THE DEFENDANT:
 6
                        , ESQ.
 7

 8                           , STATE
                  (   )   -
 9

10
     ALSO PRESENT:  NAME
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

                                                    3

                            RADEK ROUGH DRAFT
 1                        C O N T E N T S
 2      EXAMINATION BY:                            PAGE
 3
 4
 5
 6
 7
                            Page 2

Depo - Radek - Rough.txt

8

RADEK ROUGH DRAFT

1    on his earlier deposition.

2        Q    Did you did you discuss the substance of

3    either his deposition or this deposition with

4    Mr. Bailey?

5        A    No, I didn't go over any specifics.

6        Q    Other than any documents that your lawyers

7    may have shown you did you have review or prepare

8    any documents in preparation for the deposition?

9        A    I've looked at things that have been given

10   to you before, just in the course of activities but

11   I did not take a thorough review of all

12   documentation that was provided, no.

13       Q    How much money has Unity08 raised since

14   its inception?

15       A    Through January approximately a half

16   million dollars.

17       Q    What methods has Unity08 used to raise

18   that money?

19       A    Can you specify methods in terms of the

20   answer you're looking for?

21       Q    Sure has Unity08 used direct mail to raise

22   money?

23       A    I believe there's been sampling but it han

24   been employed in mass, it's not something that is a

25   regular function that they've done.

9

RADEK ROUGH DRAFT

1        Q    What do you mean by sample?

2        A    I believe a few mailings have been sent

Page 7

Depo - Radek - Rough.txt

8     Q    For the record this is a document bearing

9  bates numbers 21 through 33.

10     Q    Have you is seen these documents before?

11     A    No.

12     Q

13     Q    Are you aware of any scripts being

14  prepared for paid telephone solicitors to raise

15  money?

16     A    Yes I knew of their existence but I've

17  never seen them before.

18     Q    Do you know do you know how many scripts

19  have been prepared?

20     A    Not off the top of my head.

21     Q    Do you know what the content of any of the

22  scripts?

23     A    Again I've never seen the scripts I knew

24  of their existence but I've never actually seen any

25  of them.

                        11

RADEK ROUGH DRAFT

1     Q    Is Unity08 currently using paid telephone

2  solicitors to raise money?

3     A    Yes.

4     Q    Do you know the name of vendor who

5  conducts the telephone solicitations?

6     A    The share group.

7     Q    Are there any other vendors who do that?

8     A    There is one other vendor I believe it's

9  direct access marketing they go by the initial DAM

10  But I don't believe they've done any substantial

11  work, share group has been the primary vendor.

Page 9

Depo - Radek - Rough.txt

12      Q     Has Unity08 raised inner money through
13   personal solicitations?

14      A     As in individuals soliciting others?

15      Q     Yes.

16      A     Yes.

17      Q     And how much money has been raised that
18   way?

19      A     Approximately $375,000 through January.

20      Q     Ask the court reporter to mark this
21   document as Radek Exhibit 3.

22      (NAME     Exhibit No.     was marked) Ford

23      Q     For the record this is a document bearing
24   bates numbers 434 through 454 are you familiar with
25   this document.

                                                    12

                    RADEK ROUGH DRAFT

1       A     Yes.

2       Q     What is it?

3       A     A PowerPoint presentation.

4       Q     What is it used for?

5       A     Various purposes.  I'm not actual eat one
6    that uses it so I can't tell you exactly where it's
7    been used butted I do know it's used in
8    presentations.

9       Q     Is it used in fund raising presentations?

10      A     I believe so.

11      Q     And who uses it for fund raising
12   presentations?

13      A     I've helped prepare the document in terms
14   of some doing some things within PowerPoint for Doug
15   and Anya but beyond that I can't say.

16      Q     Are there other presentations that are
                    Page 10

Depo - Radek - Rough.txt

21  at or after a meeting where this presentation was

22  shown?

23      A    To the best of my knowledge, yes A N Y A.

24      Q    Other than the document we just looked at

25  or the other documents that you referred to that

                                                            14

RADEK ROUGH DRAFT

1   have been shown as part of solicitations are the

2   solicitees told anything about how their donations

3   will be used?

4       MR. DUFFY:  He said he's not at the list.

5       A    I don't know what's communicated at those

6   meetings I have not participated in them so I can't

7   say.

8       Q    Does Unity08 raise funds through it its

9   website?

10      A    Yes there's a toe nation page on line.

11      Q    And how much money has Unity08 raised

12  through that page?

13      A    It's over a hundred thousand dollars I

14  can't tell you precisely.

15      Q    So just adding up here over a hundred

16  thousand from the website plus $375 roughly from the

17  personal solicitations and 10,000 plus from phone

18  calls that takes us roughly to the 500000 that you

19  mentioned at the beginning?

20      A    Roughly, yes.

21      Q    I'd like to ask the court reporter to mark

22  this document as Radek Exhibit 4, please.

23      (NAME    Exhibit No.    was marked)

24      Q    This is a document bearing Bates number

25  711.  Are you familiar with this document?

Page 12