## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITY08 et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) No.1:07-cv-00053 (RWR) |
| | ) |
| FEDERAL ELECTION COMMISSION, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## PLAINTIFFS' RESPONSE TO DEFENDANT FEDERAL ELECTION COMMISSION'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Robert E. Jordan III (D.C. Bar No. 15784)
John J. Duffy (D.C. Bar No. 170936)
Rhonda M. Bolton (D.C. Bar No. 455005)
Anthony A. Onorato (D.C. Bar No. 482074)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Tel: (202) 429-3000
Fax: (202) 429-3902
rjordan@steptoe.com
jduffy@steptoe.com
rbolton@steptoe.com
tonorato@steptoe.com

*Counsel for Plaintiffs*

May 3, 2007

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     THE COURT HAS SUBJECT-MATTER JURISDICTION OVER THIS SUIT ............. 5

        A.      Unity08 Has Standing To Pursue Its Claim That The FEC's Decision Is
                Unconstitutional. .................................................................................................. 5

                1.      Unity08's Injury-In-Fact Is Concrete and Not Speculative ........................ 6

                2.      Unity08's Injuries Are Traceable To The FEC's Decision ...................... 17

                3.      A Judgment Invalidating The FEC's Action Will Redress
                        This Injury ............................................................................................. 18

        B.      The Individual Plaintiffs Have Standing To Pursue This Claim ........................... 20

        C.      The FEC's AO Is Ripe For The Court's Review. .................................................. 22

                1.      There Is No Rule Or Precedent Rendering AOs Automatically
                        Unreviewable. ........................................................................................ 22

                2.      The FEC Erroneously Presumes That FECA Precludes Judicial Review of
                        AOs. ....................................................................................................... 27

III.    THE COMMISSION'S SUBSTANTIVE ARGUMENTS ESSENTIALLY IGNORE
        THE DEFINITIVE, AND CONSTITUTIONALLY-MANDATED INTERPRETATION
        OF THE FECA BY THE BUCKLEY, MACHINISTS, AND GOPAC COURTS .......... 32

        A.      Chevron Deference Does Not Apply Here. ........................................................... 32

        B.      The Commission's Argument That It Reasonably Determined That Unity08 Is A
                Political Committee And That Expenses for Ballot Access Are Expenditures
                Ignores The Plain Meaning Of The Limiting Language In Buckley, And The
                Definitive Interpretation Of That Language In
                Machinists And GOPAC .......................................................................................... 34

IV.     THE FEC'S CONTENTION THAT APPLICATION OF THE ACT'S LIMITATIONS
        ON CONTRIBUTIONS TO UNITY08 WOULD BE CONSTITUTIONAL IF UNITY08
        WERE A POLITICAL COMMITTEE IS IRRELEVANT SINCE UNITY08 IS NOT A
        POLITICAL COMMITTEE. ................................................................................... 41

V.      CONCLUSION .................................................................................................... 42

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

Abbott Laboratories v. Gardner,
387 U.S. 136 (1967)..........................................................................................13, 23, 27, 28

Akins v. FEC,
101 F.3d 731 (D.C. Cir. 1996), vacated on other grounds, 524 U.S. 11 (1998).............. passim

Am. Library Ass'n v. FCC, 401 F.3d 489 (D.C. Cir. 2005) ...........................................................6

Athens Lumber Co. v. FEC, 689 F.2d 1006 (11th Cir. 1982) .......................................................11

Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289 (1979)........................................11, 14

Block v. Community Nutrition Institute, 467 U.S. 340 (1984) ..........................................28, 29, 30

Buchanan v. FEC, 112 F. Supp. 2d 58 (D.D.C. 2000)..................................................................17

Buckley v. Valeo,
424 U.S. 1 (1976)............................................................................................................. passim

California Med. Ass'n v. FEC, 453 U.S. 182 (1981)......................................................................21

Carter-Mondale Reelection Committee, Inc. v. FEC, 642 F.2d 538 (D.C. Cir. 1980)............30, 31

Chamber of Commerce v. FEC, 69 F.3d 600 (D.C. Cir. 1995) ............................................ passim

Chevron U.S.A. Inc. v. National Resources Defense Council, Inc., 467 U.S. 837 (1984)32, 33, 34

Citizens Against Rent Control/Coalition for Fair Housing v. City of Berkeley, 454 U.S.
290 (1981)..........................................................................................................................21

Citizens for Responsibility and Ethics in Washington v. FEC,
401 F.Supp.2d 115 (D.D.C. 2005) ........................................................................................6, 17

Clean Air Implementation Project v. EPA, 150 F.3d 1200 (D.C. Cir. 1998) .................................24

Common Cause v. Bolger, 512 F. Supp. 26 (D.D.C. 1980), aff'd, 461 U.S. 911 (1983)..............17

Day v. Holahan, 34 F.3d 1356 (8th Cir. 1994) ............................................................................21

FEC v. GOPAC, Inc., 917 F. Supp. 851 (D.D.C. 1996)........................................................ passim

FEC v. Machinists Non-Partisan Political League, 655 F.2d 380 (D.C. Cir. 1981)............. passim

FEC v. Malenick, 310 F. Supp. 2d 230 (D.D.C. 2004).................................................................40

FEC v. Ted Haley Congressional Comm., 852 F.2d 1111 (9th Cir. 1988)...............................39, 40

First National Bank of Boston v. Bellotti, 435 U.S. 765 (1978) ....................................................11

Galliano v. U.S. Postal Service, 836 F.2d 1362 (D.C. Cir. 1988) ..................................................30

Int'l Ass'n of Machinists & Aerospace Workers v. FEC, 678 F.2d 1092 (D.C. Cir.), aff'd,
    459 U.S. 983 (1982)...............................................................................................................21

Japan Whaling Ass'n v. Am.Cetacean Soc'y, 478 U.S. 221 (1986)........................................26, 28

Kowal v. MCI Communications Corp., 16 F.3d 1271 (D.C. Cir. 1994) ..........................................6

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) ......................................................................6

Martin Tractor Co. v. FEC,
    627 F.2d 375 (D.C. Cir. 1980) ..............................................................................................32

National Conservative Political Action Committee v. FEC, 626 F.2d 953 (D.C. Cir. 1980)........25

Natural Law Party v. FEC, 111 F. Supp. 2d 33 (D.D.C. 2000) ..............................................15, 16

Pinar v. Dole, 747 F.2d 899 (4th Cir. 1984) ..................................................................................30

Republican Nat'l Comm. v. FEC,
    Nos. 98-5263 & 98-5264, 998 U.S. App. LEXIS 28505 (D.C. Cir. Nov. 6, 1998)................15

SEC v. Chenery Corp., 332 U.S. 194 (1947)..................................................................................20

Seegars v. Ashcroft, 396 F.3d 1248 (D.C. Cir. 2005)....................................................................14

Seegars v. Gonzales, 546 U.S. 1157 (2006) ..................................................................................14

Sierra Club v. EPA, 292 F.3d 895 (D.C. Cir. 2002) ........................................................................5

United States Defense Comm. v. FEC,
    861 F.2d 762 (2d Cir. 1988).................................................................................23, 25, 26, 27

United States v. Goland, 959 F.2d 1449 (9th Cir. 1992) ................................................................39

## CONSTITUTIONS

United States Constitution ...............................................................................................................3

**STATUTES**

2 U.S.C. § 431(8)(A)..............................................................................................................9

2 U.S.C. § 431(9)(A)..............................................................................................................3

2 U.S.C. § 437g(a)(4)(C) ......................................................................................................15

2 U.S.C. § 437g(a)(6)(C) (Supp. IV 2004) ...........................................................................21

2 U.S.C. § 437g(d)(1)(A) (Supp. III 2004) ..................................................................7, 9, 21

2 U.S.C. § 431(8) ..................................................................................................................38

2 U.S.C. § 437g(d) ................................................................................................................15

2 U.S.C. § 441b......................................................................................................................12

5 U.S.C. § 701(a)(1) (2000)..................................................................................................27

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 79-1980 (1946)..............................................................................................28

S. Rep. No. 79-752 (1945).....................................................................................................28

**REGULATIONS**

11 C.F.R. §§ 102.1 and 102.2 ..............................................................................................15

11 C.F.R. §§ 110.1(c) & (d)..................................................................................................16

**INTERNET**

http://www.fec.gov/press/press2006/ 20061213murs.html ..........................................................15

**MISCELLANEOUS**

"FEC Posts Record Year, Collecting $6.2 Million In Civil Penalties," FEC Press Release
(dated Dec. 13, 2006)..............................................................................................................15

Jaffe, Judicial Control of Administrative
Action 336, 359 (1965) ...........................................................................................................28

## I.    INTRODUCTION

Unity08 has ideas that are radical in the current American political landscape. Unity08 proposes to mobilize the political center of the electorate by presenting it with a ticket in the 2008 Presidential election that will consist of a Republican and a Democrat – a Unity ticket. Unity08 proposes to obtain "ballot access" as an organization in the approximately 37 states in which it can get a ballot line as an organization. Ballot access as an organization will allow Unity08's candidates – who will be chosen at its innovative online convention in June 2008 – to be automatically on the general election ballot in those 37 states. Unity08's ballot access will attract potential candidates to its nomination process, and thus make it a viable force in the 2008 election. It will also bring Unity08 only 13 states (plus the District of Columbia) shy of ballot access equality with the two major parties, whose candidates have automatic ballot access in all states.

Unity08 intends to choose its candidates at the first ever online convention where every person in the United States who is eligible to vote may participate simply by signing up as a delegate. Conducting an online convention of this magnitude requires that Unity08 solve a number of difficult technical problems, such as ensuring that the system is secure and invulnerable to hackers, eliminating the possibility of voter fraud, and providing a reliable mechanism for verifying the identities of the participating delegates and confirming that they are registered voters in their home state. Solving these technical problems requires expert advice, and, therefore, money. Such expenses will occur prior to and separate from the expenses for the operation of the convention and the campaign of whatever candidates may be nominated.

Unity08 also intends to create online, prior to the convention, an innovative method for its delegates to identify, discuss, and reach a consensus on which issues are the most crucial ones facing the United States. Through this process the delegates will have the chance to educate

themselves on these issues and to create questions for potential Unity08 nominees about these issues. Unity08 calls this initiative the American Agenda.

Unity08 will <u>not</u> provide any support to candidates for the Unity08 nomination, or to the ultimate Unity08 candidates.

Unity08 does not take donations from corporations, labor unions, government contractors, or foreign nationals. Unity08 started with the belief that it could finance its organization-building efforts with contributions of $5,000 per year or less, although even at the beginning Unity08 recognized that larger donations of "seed money" might well be necessary. On May 30, 2006, Unity08 filed an Advisory Opinion Request with the Federal Election Commission ("FEC" or "Commission") to confirm Unity08's belief that these pre-convention and pre-candidate organization-building activities, specifically ballot access, building the online convention infrastructure, recruiting delegates to its online convention, and developing the American Agenda, were not "expenditures" within the meaning of the Federal Election Campaign Act of 1971 ("FECA" or "Act"), as amended. On October 10, 2006, the Commission issued Advisory Opinion ("AO") 2006-20. In AO 2006-20, the Commission concluded that Unity08 was a "political committee" under the Act because: (1) its expenses for ballot access as an organization were "expenditures" under the Act, and (2) Unity08, in the Commission's opinion, satisfies the so-called "major purpose" test, a limiting construction that the Supreme Court in <u>Buckley v. Valeo</u>, 424 U.S. 1 (1976), placed on the applicability of the Act to political activity that is not conducted by a candidate or a candidate-controlled committee. Because Unity08 has found that it must obtain "seed money" quickly and in larger amounts in order to reach its goals by the 2008 election, Unity08 has filed this law suit, asking this Court to declare that the Commission's conclusion that it must register as a political committee, and limit

- 2 -

contributions, including loans, to the amounts allowed under the Act, is contrary to law,

including the First Amendment to the United States Constitution.

Unity08's Memorandum in Support of Its Motion for Summary Judgment ("Pls.' Mem.

Supp. Summ. J.") lays out Unity08's disagreements with the Commission's conclusions in AO

2006-20. The Commission's effort in this case to extend greatly the reach of the federal election

laws clashes with the constitutionally-mandated narrow construction given the scope of the Act

by Buckley, and by D.C. Circuit cases construing and applying Buckley in factual situations

similar to here, FEC v. Machinists Non-Partisan Political League, 655 F.2d 380 (D.C. Cir. 1981)

and FEC v. GOPAC, Inc., 917 F. Supp. 851 (D.D.C. 1996). Unity08's expenses for ballot access

as an organization are not "expenditures" under the Act. Ballot access expenses are not incurred

for "the purpose of influencing a federal election," which is the definition of "expenditure" in the

Act, see 2 U.S.C. § 431(9)(A); they are incurred to qualify for the election. More specifically,

they are not incurred to influence the outcome of the contest in the Presidential arena; rather,

they are necessary in order for Unity08 to get into the arena. In its combined responsive

pleading, the Commission seeks to direct attention away from the law dealing with

"expenditures" and focus attention on the law dealing with "contributions," which it believes to

be more favorable to it. As the Court noted in Machinists, however, the collection of money by a

group of people does not come within the Act's regulatory scope unless these people intend to

make "expenditures," i.e., to spend money in the arena, to nominate or elect a particular

candidate. In Machinists, the D.C. Circuit held that incurring expenses to "draft" Ted Kennedy

to run for President of the United States were not "for the purpose of influencing a federal

election" because Ted Kennedy had not decided to become a "candidate." He was not in the

"arena," and expenses incurred to bring him into the arena were not "for the purpose of

influencing a federal election." A fortiori, Unity08 expenses to obtain ballot access as an organization are not "expenditures" and, consequently, monies donated to advance this purpose are not "contributions."

The Commission's reliance on the "major purpose test" to conclude that Unity08 is a political committee is equally flawed. Buckley limited the Act's definition of a "political committee" to groups of persons under the control of candidates or "the major purpose of which was the nomination or election of a candidate. . . ." In Machinists, the Court of Appeals concluded that "candidate" in the Buckley decision meant an individual who had decided to be a candidate. In GOPAC, Judge Oberdorfer confirmed again that the term "candidate" in the major purpose test meant a particular candidate. Unity08 is raising and spending money to achieve ballot access as an organization. It does not have a candidate now and will not have a candidate until sometime in June 2008, more than a year from now. Until Unity08 has a candidate, it does not satisfy the major purpose test.

The Supreme Court in Buckley held that the term "political committee" could constitutionally encompass only organizations controlled by a candidate or "the major purpose of which was the nomination or election of a candidate." The Commission basically ignores the definitive interpretation of the term "candidate" in Machinists and GOPAC that the term "candidate" means an individual candidate. The Commission's broad reading of the term "candidate," which is supported by no authority, vitiates the explicit goal of the Buckley Court to narrow the scope of the definitional phrase "for the purpose of influencing a federal election" to avoid the fatal constitutional flaws of overbreadth and vagueness.

Following its usual litigation strategy, the Commission devotes a significant portion of its Memorandum[1] to arguments that this Court does not have jurisdiction to consider Unity08's request for a declaratory judgment freeing it from the threat of prosecution brought on by the Commission's erroneous Advisory Opinion. In essence, the Commission contends that it can cast a pall over Unity08's planned operation, hindering Unity08's exercise of its First Amendment rights of association and expression, and the American judicial system can provide no remedy. If this were so, it would be a strange result; but, in fact, it is not correct, as demonstrated below.

## II.    THE COURT HAS SUBJECT-MATTER JURISDICTION OVER THIS SUIT

The FEC's attack on the plaintiffs' standing as well as the finality and reviewability of its action need not detain the Court for long, because Unity08 and the individual plaintiffs easily meet the Constitutional requirements for standing and the Court may properly review the FEC's AO.

### A.    Unity08 Has Standing To Pursue Its Claim That The FEC's Decision Is Unconstitutional.

Unity08 challenges the action of an administrative agency that infringes upon Unity08's First Amendment rights and has a direct and immediate impact on Unity08's ability to exercise those rights. Accordingly, Unity08's standing is self-evident. As the D.C. Circuit explained in Sierra Club v. EPA, 292 F.3d 895, 899-900 (D.C. Cir. 2002):

> In many if not most cases the petitioner's standing to seek review of administrative action is self-evident. . . . In particular, if the complainant is 'an object of the action . . . at issue' – as is . . . nearly always [the case] in review of an adjudication – there

---

[1] Defendant Federal Election Commission's Memorandum In Support Of Its Motion For Summary Judgment And In Opposition To Plaintiffs' Motion For Summary Judgment (Apr. 11, 2007) ("FEC Mem.").

> should be 'little question that the action . . . has caused injury, and
> that a judgment preventing . . . the action will redress it.'

(quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 561-62 (1992)).[2] Nonetheless, Unity08

has set forth by affidavit and deposition testimony specific uncontroverted facts showing that it

has standing as an organization and that each individual plaintiff has standing in his own right

and by virtue of his position within the organization. These facts as to standing issues must be

taken as true by the Court. Defenders of Wildlife, 504 U.S. at 561 (at the summary judgment

stage, the plaintiff must set forth by affidavit or other evidence specific facts "which for purposes

of the summary judgment motion will be taken to be true.").[3]

### 1.    Unity08's Injury-In-Fact Is Concrete and Not Speculative

As Article III requires, the injury suffered by Unity08 as a result of the FEC's action is

concrete and is not speculative. See Defenders of Wildlife, 504 U.S. at 560-61 (setting forth

elements of Article III standing). Unity08 has actually been injured in a number of ways.

---

[2] There was nothing untoward about Unity08 not devoting a part of its summary judgment motion to standing as the FEC seems to suggest (see FEC Mem. at 7), because in this circuit, parties with self-evident standing are not required to do so. See Am. Library Ass'n v. FCC, 401 F.3d 489, 494 (D.C. Cir. 2005). Now that the FEC has questioned Unity08's standing, Unity08 will of course spell out its basis, although the fact that Unity08 does so is not a concession that its standing, and that of the individual plaintiffs, is anything less than self-evident.

[3] Moreover, because the FEC seeks summary judgment against the plaintiffs on the standing issue, the FEC's motion cannot be granted unless there is absolutely no set of facts that would support the plaintiffs' standing. Citizens for Responsibility & Ethics in Washington v. FEC, 401 F. Supp. 2d 115, 119 (D.D.C. 2005) ("CREW") ("A motion for summary judgment based on lack of subject matter jurisdiction should not be granted 'unless plaintiffs can prove no set of facts in support of their claim which would entitle them to relief.'") (quoting Kowal v. MCI Communications Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994)), aff'd, 475 F.3d 337 (D.C. Cir. 2007). As Unity08 demonstrates below, there are several factual bases supporting the plaintiffs' standing.

First, the FEC's decision to classify Unity08 as a political committee[4] has hampered Unity08's ability to participate in the political arena, which involves core First Amendment activities including communicating directly with members of the public on matters relating to governance and political philosophy, and making independent expenditures. See Akins v. FEC, 101 F.3d 731, 741 (D.C. Cir. 1996) (en banc) ("independent expenditures are the most protected form of political speech because they are closest to pure issue discussion") (citing Buckley, 424 U.S. at 19-23, 78-81), vacated on other grounds, 524 U.S. 11 (1998)). Since its inception in the spring of 2006, Unity08 has sought to raise money to finance its ballot access, agenda dissemination, and online convention efforts. The declarations of Douglas L. Bailey, Unity08's President and Chief Executive Officer, and Roger M. Craver, a Unity08 founder and professional fundraising consultant, which were submitted with Unity08's Motion for Summary Judgment, describe the importance of fundraising to Unity08's efforts. See generally Declaration of Douglas L. Bailey ¶ 49 ("Bailey Decl.") (appended as Exh. 1 to Pls.' Mem. Supp. Summ. J.); Declaration of Roger M. Craver ("Craver Decl.") (appended as Exh. 2 to Pls.' Mem. Supp. Summ. J.).

The money Unity08 will spend on ballot access will facilitate its qualification in the 37 jurisdictions that allow political organizations to qualify for a ballot position in the 2008 presidential election. See Bailey Decl. ¶¶ 20-28. Ballot access requirements vary, but in most states a new political organization must submit petitions containing a substantial number of registered voters (typically in the tens of thousands) who support its place on the ballot. Id. ¶ 22.

---

[4] Section 441a(a)(1)(C) of the Act limits contributions to "political committees" that are not connected to a candidate to a maximum of $5,000 per year. Failure to comply with FECA contribution limits can lead to FEC enforcement action, criminal penalties, and/or civil penalties. See 2 U.S.C. § 437g(d)(1)(A) (Supp. III 2004). Moreover, individuals who make contributions in excess of $5,000 subject themselves to possible civil or criminal penalties. Id.

Obviously, this process must be started without delay if Unity08 hopes to gather the necessary signatures in time for the 2008 election. Id. ¶ 23; Craver Decl. ¶¶ 6-9. Very significant financial resources will be required for Unity08 to fund its petition-gathering and organizing efforts in each state. Bailey Decl. ¶ 28 (estimating that approximately $7 million will be needed for ballot access). Unity08 also needs significant resources to finance its American Agenda initiative, which seeks to communicate Unity08's views to the public and facilitate voters' discussion of crucial issues, id. ¶¶ 34-37, and its online convention, which will allow registered voters to sign up on the Internet to participate in a virtual nominating convention to select the Unity08 ticket for President and Vice-President. Id. ¶¶ 38-48. Unity08 estimates that the total amount of money it needs to fund all three of its initiatives is $10-12 million. Id. ¶ 53.

However, as Messrs. Bailey and Craver explained in their Declarations, the FEC's ruling that Unity08's present activities are "expenditures" under FECA rendering it subject to a $5,000 annual individual contribution limit has delayed, and threatens to prevent, Unity08 from achieving the nation-wide ballot access it needs to compete with the major political parties in the 2008 election. Unity08's efforts to implement its American Agenda program and develop the technology necessary for its online nominating convention have also been delayed due to a lack of funding. Bailey Decl. ¶ 30; Craver Decl. ¶ 6; Deposition of Douglas Bailey ("Bailey Dep. Tr.") at pp. 17-22 (relevant excerpts of the transcript are appended as Exh. 11 to Pls.' Mem. Supp. Summ. J). Although Unity08 had hoped at the outset that it could timely raise the necessary funds through donations of $5,000 or less, it subsequently concluded that it would need to raise several million dollars on a more rapid timetable than is possible if it is limited to $5,000 annual individual donations. Bailey Decl. ¶ 52. Accordingly, in late 2006 Unity08 decided to seek loans of more than $5,000, which it would repay through subsequent individual

donations of $5,000 or less. Id. ¶ 53; see also Compl. ¶ 15; Reply Declaration of Douglas L.

Bailey ¶ 7 ("Bailey Reply Decl.") (appended hereto as Exh. 1).

As a result of the $5,000 individual contribution limit imposed by FEC's AO, however, Unity08,

despite seeking large loans from a number of potential lenders, has not obtained loans in excess

of $5,000.[5] See Bailey Reply Decl. ¶¶ 8-10. Under FECA, individuals who make contributions

in excess of $5,000 subject themselves to possible civil or criminal penalties.

2 U.S.C. § 437g (d)(1)(A). Potential lenders are, therefore, understandably reluctant to risk

prosecution by the FEC.

     The FEC suggests that Unity08's injury is speculative because Unity08 produced no

evidence that anyone was willing to lend it more than $5,000 at the time the complaint was filed

or since. See FEC Mem. at 9-10. The FEC ignores the evidence. For example, Mr. Bailey

stated that he had already contributed $5,000 to Unity08 and would lend Unity08 more than

$5,000 but for fear of prosecution by the FEC and the attendant possibility of civil and criminal

penalties. Bailey Decl. ¶ 64; see also Compl. ¶ 18 (stating that each plaintiff would lend or

contribute more than $5,000 to Unity08); Reply Declaration of Roger M. Craver ¶¶ 3-4 ("Craver

Reply Decl.") (appended hereto as Exh. 2); Declaration of Gerald Rafshoon ¶ 12 ("Rafshoon

Decl.") (appended hereto as Exh. 3).

     The fact that Unity08 already has at least one person willing to lend it more than $5,000

negates the FEC's further argument about whether Unity08 could get loans of greater than

$5,000 in the future. See FEC Mem. at 9. Even so, Unity08's assertion that it could get loans in

the future but for the FEC's ruling is not mere conjecture. Unity08 has embarked on a formal

campaign to solicit loans of more than $5,000. See Bailey Reply Decl. ¶ 9. As part of this

---

    [5] Under FECA, "loans" fall within the definition of "contribution" and are therefore
subject to the same monetary limitations. 2 U.S.C. § 431(8)(A).

campaign, Unity08 has solicited several individuals to provide such loans. See id. While a number of individuals expressed a willingness to lend Unity08 more than $5,000, those who are willing and able to do so have not because they fear prosecution by the FEC. See id. ¶ 12. In the meantime, Unity08 has "delayed and scaled back its ballot access initiative due to inadequate funding." Bailey Decl. ¶ 32; see also Compl. ¶ 19. Its development of the technology necessary to implement the American Agenda has been slowed because of a lack of money. Bailey Decl. ¶ 37. And planning and implementation for the online convention has been "considerably slowed by the present lack of funds to pay for the necessary technology to build [Unity08's] online convention site." Id. ¶ 48.

There are several reasons why it is important for Unity08 to jump start these efforts immediately. First, it must gather tens of thousands of signatures to get on the ballots in the jurisdictions that will allow it to do so. Id. ¶¶ 22-24. Before it can even really begin the signature collection process, Unity08 must recruit paid and volunteer directors and staffs in the target states and regions to organize and run the ballot access effort, put together the necessary materials, and also secure legal counsel in every state to address the inevitable challenges to its ballot access efforts. Id. ¶¶ 26-27. Unity08 must accomplish all of this in about a year's time – before states begin holding their presidential primaries. The fact that several states have recently moved up their primaries to earlier in 2008 only adds to the sense of urgency, because the dates by which petitions must be submitted are often tied to primary dates –the earlier the primary, the sooner the petitions must be submitted. Id. ¶ 25. Speed is also important to establish the credibility of Unity08 – if it does not appear on the ballot quickly in the first 37 states, people may conclude that the ultimate goal of the Unity Ticket qualifying in all fifty states and the District of Columbia cannot be achieved. And that in turn may deter qualified candidates from

seeking the Unity08 nomination at the online convention. Bailey Decl. ¶ 24; <u>see also</u> Craver Decl. ¶ 7. Yet every day that Unity08 remains under-funded while it litigates with the FEC over the organization's classification puts Unity08's political aspirations further out of reach.

In sum, the Commission's limit on the amount of money Unity08 can raise at this time – <u>when Unity08 is merely a nascent political movement without a candidate</u> – restricts Unity08's ability to raise the funds it needs to conduct its constitutionally protected political activities, and may even prevent Unity08 from engaging in these activities altogether. The FEC's action therefore, inflicts a concrete injury upon Unity08.

Unity08 has also sustained a concrete injury because the threat of prosecution by the FEC if Unity08 exceeds the $5,000 limit burdens Unity08's First Amendment rights. Where a plaintiff can demonstrate that it intends to engage in a course of conduct arguably affected with a constitutional interest but allegedly proscribed by statute, and there exists a credible threat of prosecution, the plaintiff has standing to challenge the statute's operation or enforcement. <u>See Babbitt v. United Farm Workers Nat'l Union</u>, 442 U.S. 289, 298 (1979); <u>see also Athens Lumber Co. v. FEC</u>, 689 F.2d 1006, 1012 (11th Cir. 1982) (citing <u>Babbitt</u> and discussing standing based on the "threat of prosecution theory" as "implicitly recognized in <u>First National Bank of Boston v. Bellotti</u>, 435 U.S. 765 (1978)").

The D.C. Circuit's decision in <u>Chamber of Commerce v. FEC</u>, 69 F.3d 600 (D.C. Cir. 1995), dealt with a situation nearly identical to the one here, and plainly spells out why the injury suffered by Unity08 satisfies the Article III criteria. The plaintiffs in <u>Chamber of Commerce</u> sought an Advisory Opinion from the FEC concerning the meaning of the word "member" in FECA section 441b(b), which section generally prohibits corporations and labor organizations from making contributions or expenditures in connection with elections but provides an

exception for membership entities allowing them to solicit their "members." See 2 U.S.C. §§ 441b(4)(A) & (C). As "member" is not defined in the statute, it had been defined by FEC regulation which changed from time to time. Upon the FEC's adoption of a new, seemingly more restrictive, definition in the regulation limiting its application to organizations where the individuals connected to the organization could vote for at least one member of the organization's highest governing body, the plaintiffs (U.S. Chamber of Commerce and the American Medical Association) sought the FEC's guidance concerning whether their "members" (most of whom had no such voting rights) could still receive the plaintiffs' political communications and solicitations without running afoul of FECA.

While awaiting the FEC's opinion, the plaintiffs ceased making political communications and solicitations to individuals and groups whose status as "members" was in dispute. A tie vote among the Commissioners prevented the FEC from adopting a draft AO that had recommended that the tens of thousands of individuals and organizations in the plaintiffs' groups were not "members" and thus could not receive political messages and solicitations from the plaintiffs. But four of the six Commissioners did agree that the plain terms of the rule compelled the result recommended by the draft AO.

The plaintiffs then sought a declaratory judgment that the rule was invalid and an injunction against its enforcement. The FEC argued that the plaintiffs lacked standing because they suffered no cognizable injury, and that the controversy was not ripe for review. Since no AO had issued, the FEC reasoned, the plaintiffs were not faced with any present danger of an enforcement proceeding because such an action would require a majority vote of the Commissioners just as an AO would. While the district court agreed with the FEC, the D.C.

Circuit reversed, characterizing this line of reasoning as "weak." 69 F.3d at 603. A cognizable

injury existed in this case because:

> Nothing . . . prevents the Commission from enforcing its rule at
> any time with, perhaps, [a] . . . change of mind of one of the
> Commissioners. The rule constitutes the purported legal norm that
> binds the class regulated by statute. . . . [A]ppellants, not
> surprisingly, felt constrained to alter their prior practice – they
> ceased political communications with those constituents who did
> not qualify as 'members' under the Commission's new rule. And
> counsel for the Commission agreed at oral argument – as he really
> had to – that he would not advise the [appellants] to ignore the
> rule. All of this would seem to confer standing on the appellants,
> <u>but there is much more</u>.

<u>Id.</u> (emphasis added).

The "much more" flows from the unique aspect of FECA that allows a third party to

challenge the legality someone's actions under FECA even if the FEC does not. Because the

plaintiffs were "subject to litigation challenging the legality of their actions if contrary to the

Commission's rules," even in the absence of an FEC enforcement action, the court held that the

plaintiffs were faced with a sufficiently imminent harm. <u>Id.</u> Indeed, the court went on to state:

> We must bear in mind also that appellants claim that the rule
> infringes on their First Amendment rights. A party has standing to
> challenge, pre-enforcement, even the constitutionality of a <u>statute</u>
> if First Amendment rights are arguably chilled, so long as there is a
> credible threat of prosecution.

<u>Id.</u> at 603-04 (emphasis in original). The court then cited the holding in <u>Abbott Laboratories v.</u>

<u>Gardner</u>, 387 U.S. 136 (1967) ("<u>Abbott Labs</u>") that "an agency rule, unlike a statute, is typically

reviewable without waiting for enforcement . . . this case is <u>a fortiori</u> to the statutory cases."

<u>Chamber of Commerce</u>, 69 F.3d at 604 (citing <u>Abbott Labs</u>, 387 U.S. at 139-41).

The same facts that persuaded the <u>Chamber of Commerce</u> court that a concrete, imminent

injury existed are present in Unity08's case. First, Unity08 needs and intends to fund its political

activities with loans in excess of $5,000, <u>see</u> Bailey Reply Decl. ¶ 6, a course of conduct that

- 13 -

implicates its First Amendment rights.  Second, as the FEC reads Buckley and other cases interpreting FECA, however, Unity08's acceptance of such loans would be prohibited under FECA.  And finally, there is a credible threat that the FEC will prosecute Unity08 for accepting loans from individuals in excess of $5,000.

The FEC will probably contend that this injury is speculative because there has been no enforcement action against Unity08 and the agency could decide not to enforce by exercising its prosecutorial discretion.  See FEC Mem. at 14 n.10.  But it is well-settled that a party "does not have to await the consummation of threatened injury to obtain preventive relief."  Babbitt, 442 U.S. at 298 (citation and internal quotation marks omitted).

The Supreme Court has instructed that a credible threat of prosecution exists where the prosecuting authority "has not disavowed any intention of invoking the criminal penalty provision" against potential targets, Babbitt, 442 U.S. at 302; see also Seegars v. Ashcroft, 396 F.3d 1248, 1252 (D.C. Cir. 2005) ("[Babbitt] appeared to find a threat of prosecution credible on the basis that plaintiffs' intended behavior is covered by the statute and the law is generally enforced.  Courts have often found that combination enough, especially where plaintiffs seek to engage in activities possibly protected by the First Amendment. . . .) (citing cases), cert. denied sub nom., Seegars v. Gonzales, 546 U.S. 1157 (2006).  The FEC certainly has not "disavowed any intention" of prosecuting Unity08 for accepting loans in excess of $5,000.  Indeed, as discussed in more detail below with respect to the question of ripeness, there is no indication that the FEC will not pursue enforcement efforts against Unity 08 in light of the conclusions expressed in its AO.[6]

---

[6] One need only look to public reports of recent FEC enforcement actions to conclude that Unity08's fear of prosecution is far from insubstantial.  For example, on December 13, 2006, the Commission announced that it had imposed $630,000 in civil penalties on three Section

Furthermore, Unity08 has not registered with the FEC nor has it filed reports of receipts and expenditures, as it would be required to do if it were a political committee. See 2 U.S.C. §§ 433 and 434; 11 C.F.R. §§ 102.1 and 102.2. Failure to register with the FEC and file the required reports constitutes a civil violation of the Act punishable by monetary penalties, see 2 U.S.C. § 437g(a)(4)(C), and failure to report potentially carries criminal penalties, 2 U.S.C. § 437g(d). Consequently, Unity08 also faces a credible threat of prosecution by the FEC because Unity08 has not registered or filed reports.

But even if the FEC committed today that it would never prosecute Unity08, the AO still poses harm to Unity08 because a third party could challenge the FEC's decision not to prosecute. See Chamber of Commerce, 69 F.3d at 603-04 (discussing FECA's "unusual" provision that allows a private party to challenge an FEC decision not to enforce, and holding that "even without a Commission enforcement decision, appellants are subject to litigation challenging the legality of their actions if contrary to the Commission's rule," and therefore, still suffered a threat of prosecution injury). "Each of these risks [FEC enforcement and competitor-initiated enforcement] qualifies as a burden on speech. . . . " Republican Nat'l Comm. v. FEC, Nos. 98-5263 & 98-5264, 998 U.S. App. LEXIS 28505, at *6 (D.C. Cir. Nov. 6, 1998); see also Natural

---

527 corporations which it deemed to be "political committees" in light of their activities during the 2004 presidential election. See http://www.fec.gov/press/press2006/ 20061213murs.html; see also Press Release, FEC, "FEC Posts Record Year, Collecting $6.2 Million In Civil Penalties,"(Dec. 28, 2006) at http://www.fec.gov/press/press20061228summary.html (reporting that collected civil penalties in 2006 were more than double the total amount of penalties of any other single year in the agency's 31-year history and quoting FEC Chairman Michael Toner as saying: "The Commission has demonstrated a renewed commitment to vigorous enforcement this year. Our performance this year sends a strong message that while we will do our best to encourage voluntary compliance, we will also seek significant civil penalties when we uncover serious violations of federal election laws.").

Law Party v. FEC, 111 F. Supp. 2d 33, 47 (D.D.C. 2000). Unity08 therefore has standing to challenge the FEC's AO based on the threat of prosecution thereunder.

A third source of injury to Unity08 from the AO is harm to its ability to compete against the major parties in the political arena. Because the Commission ruled that ballot petition expenses are "expenditures," and that Unity08 is a "placeholder" for a candidate and therefore is a "political committee" – a ruling that only applies to Unity08 and has never been applied to other political organizations, large or small – Unity08 will suffer a competitive political disadvantage relative to ballot-qualified parties. It takes time and money to raise money, as Mr. Craver explained in his Declaration. Craver Decl. ¶ 7. If it is limited to loans of $5,000 per individual per year, Unity08 will not be able to raise money fast enough to finance ballot access in 37 jurisdictions in time for the 2008 Presidential election. Id. ¶ 10. The major parties, of course, do not have this problem. Not only do they already have guaranteed ballot access in every jurisdiction which relieves them of the burden of having to raise money for that purpose, see Bailey Decl. ¶ 29, they also are not subject to a $5,000 contribution limit. See 11 C.F.R. § 110.1(c) & (d) (2006) (the current annual individual contribution limit for each major party's national committee (indexed for inflation) is $28,500; the limit for "other" political committees is $5,000).

The FEC's decision, therefore, systematically disadvantages Unity08 and other nascent political organizations like Unity08 (if there ever are any) that are attempting to get on the ballot. This competitive political disadvantage is sufficient in itself to confer standing. See Natural Law Party, 111 F. Supp. 2d at 44-46 (plaintiffs suffered a cognizable injury in the form of a "competitive political disadvantage relative to the major party candidates . . . [through the] 'relative diminution' of their political voices and an injury to their ability to influence the

- 16 -

political process."); see also Common Cause v. Bolger, 512 F. Supp. 26, 30 (D.D.C. 1980) (recognizing a competitive political disadvantage as basis for standing where agency action required plaintiff to "raise substantially greater funds than he otherwise would" to overcome unfair advantage), aff'd, 461 U.S. 911 (1983); Buchanan v. FEC, 112 F. Supp. 2d 58, 63-66 (D.D.C. 2000) (finding both competitor and informational standing and distinguishing D.C. Circuit precedent that had declined to find competitive disadvantage injury).

The foregoing demonstrates that the AO's $5,000 contribution limitation has (1) injured Unity08's ability to exercise its First Amendment rights to engage in political communication and participate in the political arena by hindering it from financing those activities; (2) burdened Unity08's First Amendment rights through the threat of prosecution for accepting loans greater than $5,000; and (3) unfairly disadvantaged Unity08 as a political competitor of the major political parties. Each of these injuries being sufficiently concrete and particularized to satisfy Article III standing. Because each of these injuries directly and adversely affects Unity08's core organizational activities and discrete programmatic concerns in a way that threatens to delay, or even prevent, Unity08's achievement of its goals, Unity08 has satisfied the injury-in-fact requirement for organizational standing. CREW, 401 F. Supp. 2d at 120 ("To vindicate is own rights or entitlements, as opposed to those of its members, an organizational plaintiff must establish that its discrete programmatic concerns are being directly and adversely affected by the challenged action . . . ," a standard satisfied by showing that the organization "has suffered a concrete and demonstrable injury to its organizational activities, in conjunction with a depletion of resources, that constitutes more than a simple inconvenience to abstract social interests.") (citations and internal quotation marks omitted).

### 2.    Unity08's Injuries Are Traceable To The FEC's Decision

Unity08's injuries are directly traceable to the FEC's decision. Because of the $5,000 limit, Unity08's fundraising efforts have been severely hampered and, accordingly, it has had to delay and scale back its political activities. Bailey Decl. ¶¶ 32, 37, 48; see also Craver Decl. ¶ 12 ("Unity08 could . . . raise sufficient money to fund its efforts through loans of more than $5,000 from individuals, which could then be repaid with contributions of $5,000 or less.").

The FEC assails Unity08's standing on this prong of the Article III test by saying the organization's injuries are traceable instead to Unity08's voluntary decision to limit itself to $5,000 contributions. See FEC Mem. at 8-9. The FEC is again ignoring the facts.

First, the FEC ignores the factual distinction here between contributions and loans. While Unity08 has committed to limit itself to individual annual contributions of $5000 or less, it seeks to obtain loans greater than that amount (which would be repaid with smaller contributions) to help jumpstart its ballot access, American Agenda, and online convention efforts. Bailey Decl. ¶ 52; Compl. ¶ 18. Unity08 uses the terms "contribution" and "loan" here as they are used in common parlance, rather than the way FECA defines them (i.e., as synonymous). It follows that the harm is not self-inflicted because Unity08 is not limiting itself to $5,000 loans.

Further, those who are willing and able to loan Unity08 more than $5,000 have not done so for fear of prosecution by the FEC as a result of the conclusion it reached in the AO. See Bailey Reply Decl. ¶¶ 8, 12; Craver Reply Decl. ¶ 3; Rafshoon Decl. ¶ 12; Declaration of Peter Ackerman ¶ 4 ("Ackerman Decl.") (appended hereto as Exh. 4). It follows that Unity08's inability to secure loans from these individuals is unquestionably directly traceable to the FEC's decision.

### 3.    A Judgment Invalidating The FEC's Action Will Redress This Injury

The FEC argues that an order from this Court invalidating the AO cannot redress

Unity08's injury because the FEC could still deem Unity08 to be a political committee on a basis

other than that articulated in the AO. See FEC Mem. at 10-11. Putting aside the question of

whether the FEC could lawfully conclude that Unity08 is a political committee based on its

receipt of contributions (and it cannot lawfully do so), the Supreme Court and D.C. Circuit have

squarely held that the FEC cannot use this ploy to prevent a plaintiff from meeting the

redressability test.

In Akins, as here, the question at issue was whether an organization qualified as a

political committee under FECA. The plaintiffs in that case maintained that it did, and that the

organization was required to comply with FECA's reporting and disclosure requirements. The

FEC disagreed, with the implication that the organization had no obligation to disclose

information about its activities to the public. On appeal, the FEC contended that the plaintiffs'

"informational injury" claim could not be redressed by the Court because even if the agency

agreed that the organization was a political committee it could still decide not to require the

organization to disclose.

Characterizing this line of reasoning as a "breathtaking attack on the legitimacy of

virtually all judicial review of agency action," 101 F.3d at 738, the D.C. Circuit explained:

> [A]ll regulatory agencies enjoy some measure of enforcement
> discretion. If that factor were to mean that an agency's legal
> determination was not reviewable, that would virtually end judicial
> review of agency action. . . . Our job is limited to correcting a
> legal error – if error is committed – in the agency decision. The
> error must, of course, be one upon which the agency decision rests,
> an analytical precondition to agency action. If that is so, it has
> always been an acceptable feature of judicial review of agency
> action that a petitioner's 'injury' is redressed by the reviewing
> court notwithstanding that the agency might well subsequently
> legitimately decide to reach the same result through different
> reasoning.

Id. (emphasis in original) (citing SEC v. Chenery Corp., 332 U.S. 194, 196-97 (1947)).

The Supreme Court agreed, holding that just because an agency might reach the same outcome for a different reason, that possibility destroys neither causation nor redressability for the decision under review:

> If a reviewing court agrees that the agency misinterpreted the law, it will set aside the agency's action . . . even though the agency . . . might later, in the exercise of lawful discretion, reach the same result for a different reason. Thus, respondents' 'injury in fact' is 'fairly traceable' to the FEC's decision . . . even though the FEC might reach the same result exercising its discretionary powers lawfully. For similar reasons, the courts in this case can 'redress' respondents' 'injury in fact.'

Akins, 524 U.S. at 25 (citing Chenery).

It follows that Unity08 has standing to challenge the legal error the FEC made in the instant AO and this Court has the power to review it.

## B.    The Individual Plaintiffs Have Standing To Pursue This Claim

The individual plaintiffs likewise have been harmed by the Commission's ruling and, therefore, have standing to challenge it. The individual plaintiffs' injuries consist of: (1) the harm to their personal First Amendment rights; (2) the threat of enforcement against each of them if they contribute more than the individual limit; and (3) the stake they have in the controversy as board members and officers of Unity08.

First, each individual plaintiff's speech and associational rights are infringed by the Commission's ruling. In 2006, plaintiffs joined together for the purpose of building the Unity08 organization to disseminate political ideas and achieve political aims. Bailey Decl. ¶¶ 8-10; Craver Decl. ¶ 5; Rafshoon Decl. ¶ 5; Bailey Depo. Tr. at pp. 10-11. By forcing them to scale back and delay Unity08's ballot access, American Agenda and online convention initiatives, the cap on donations hinders the individual plaintiffs' personal efforts in these regards, diminishing

- 20 -

their political voices, and harming their right to associate for their stated purposes. See Int'l

Ass'n of Machinists & Aerospace Workers v. FEC, 678 F.2d 1092 (D.C. Cir.) (plaintiff-

members of a union also had Article III standing to raise constitutional claims on an individual

basis where they alleged that they suffered "a relative diminution in their political voices – their

influence in federal elections" – as a direct result of a challenged provision of FECA), aff'd, 459

U.S. 983 (1982); Day v. Holahan, 34 F.3d 1356, 1365 (8th Cir. 1994) (limits on contributions

both by and to political organizations affect "not only free political speech but also free

association, the 'tradition of volunteer committees for collective action. . . . [B]y collective

effort individuals can make their views known, when, individually, their voices would be faint or

lost.'") (quoting Citizens Against Rent Control/Coalition for Fair Housing v. City of Berkeley,

454 U.S. 290, 294 (1981) and accord, Buckley, 424 U.S. at 22, 25-26).

   Second, each individual plaintiff is willing to lend Unity08 more than the $5,000 limit.

Bailey Decl. ¶ 64; Bailey Reply Decl. ¶ 8; Craver Reply Decl. ¶ 3; Rafshoon Decl. ¶ 12.

Individuals that make loans in excess of $5,000 to political committees subject themselves to

possible civil or criminal penalties. See 2 U.S.C. § 437g(d)(1)(A) (Supp. IV 2004); 2 U.S.C. §

437g(a)(6)(C) (Supp. IV 2004).  Accordingly, the individual plaintiffs are faced with a specific,

credible threat of FEC enforcement against them as a result of the AO.  For the same reason that

the threat of prosecution burdens Unity08's constitutional interests and confers standing upon it

as an organization, each individual plaintiff has standing on this basis.  See discussion supra in

Part II.A.1

   Third, harm to the organization constitutes harm to the individual plaintiffs as the

organization's board members and officers. See California Med. Ass'n v. FEC, 453 U.S. 182,

188 n.6 (1981) (as members and officers of the complaining organizations, the individual

- 21 -

plaintiffs were held to have "a sufficiently concrete stake in this controversy to establish standing to raise the constitutional claims at issue here."). And as leaders of the organization who are fervently working toward its success, each individual plaintiff has a sufficient concrete, personal stake in the controversy to support his individual standing.

Finally, the injury suffered by each individual plaintiff is directly traceable to the FEC for the same reason that Unity08's injuries are, and likewise, the individuals' claims are redressable for the same reason that Unity08's claims can be redressed by the Court. For all of the foregoing reasons, Unity08 and each individual plaintiff all have standing to pursue this claim challenging the constitutionality of the FEC's decision.[7]

### C.    The FEC's AO Is Ripe For The Court's Review.

The FEC also contends that this case should be dismissed because the AO is not final agency action. The Court can dispense with this argument as easily as the attack on the plaintiffs' standing.

#### 1.    There Is No Rule Or Precedent Rendering AOs Automatically Unreviewable.

The FEC argues that an AO, particularly a "negative opinion," is unreviewable in every circumstance. Thus, even if (a) the AO was adopted unanimously or by a clear majority of the Commissioners, (b) there is no indication that the FEC will alter its position, (c) there is every indication that the FEC will prosecute based on the position adopted in the AO, and (d) no matter

---

[7] Although the FEC does not argue that the plaintiffs lack prudential standing (and would now be precluded from doing so first time in a reply brief), it should be noted that the plaintiffs also satisfy the prudential standing requirements. See Akins, 524 U.S. at 20 (prudential standing is satisfied when the injury asserted by a plaintiff arguably falls within the zone of interests to be protected or regulated by the statute in question) (citations omitted). The asserted injuries of the plaintiffs – to their ability to raise funds and participate in the election process – are matters directly regulated by FECA, so there can be no question that they fall within the "zone of interests" protected or regulated by the statute.

how much a party suffers harm or reins in lawful conduct while awaiting the chance for legal redress, a party must wait to see if and when the FEC decides to enforce that determination against it. This is not the rule in this Circuit for reviewability of FEC determinations embodied in AOs.

In support of its contention that an AO is never reviewable, the FEC relies heavily on a Second Circuit case, United States Defense Committee v. FEC, 861 F.2d 765 (2d Cir. 1988) ("USDC"). However, as explained further below, that decision only held that an FEC advisory opinion was not "automatically" reviewable, id. at 772-73; it did not hold that no FEC advisory opinion could ever be reviewable. The more recent D.C. Circuit Chamber of Commerce case provides the best guidance concerning the reviewability of AOs and demonstrates that there is no hard and fast rule precluding review. Rather, the determination is to be made on a case-by-case basis using the well-established principles articulated by the Supreme Court in Abbott Labs that are generally applicable to any question concerning pre-enforcement review of agency action.

As discussed above, the plaintiffs in Chamber of Commerce sought an AO from the FEC concerning the meaning of the word "member" in FECA section 441b(b). A tie vote among the Commissioners prevented the FEC from adopting a draft AO concluding that the tens of thousands of individuals and organizations in the plaintiffs' groups were not "members" and thus could not receive political messages and solicitations from the plaintiffs, but four of the six Commissioners did agree that the plain terms of the rule compelled the result recommended by the draft AO. In concluding that the FEC's action was reviewable, the court referenced Abbott Labs' teaching that "an agency rule, unlike a statute, is typically reviewable without waiting for enforcement . . . this case is a fortiori to the statutory cases," 69 F.3d at 604 (citing Abbott Labs, 387 U.S. at 139-41), and applied the test for reviewability articulated therein.

Under <u>Abbott Labs</u> the factors to consider in determining whether judicial review must await further action by the agency are the fitness of the issues for judicial decision (that is, whether the issue is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final) and the hardship to the parties of withholding court consideration. <u>Clean Air Implementation Project v. EPA</u>, 150 F.3d 1200, 1204-05 (D.C. Cir. 1998) (citing <u>Abbott Labs</u> and other cases).

In the case of the <u>Chamber of Commerce</u> plaintiffs, it appears that the harm to their First Amendment speech and associational rights, the fact that construction of the term "member" was a purely legal matter that would not benefit from subsequent enforcement proceedings, and the fact that the FEC had definitively announced its view of the meaning of the term were enough to warrant judicial review <u>even prior to the agency adopting an AO</u>. In fact, the court declared that the FEC's standing claim was "weak and we easily reject it. For similar reasons, we discard the Commission's even weaker claim that the question of the validity of the rule is not ripe." 69 F.3d at 605.

The FEC's ripeness argument should be rejected here for the same reason as in <u>Chamber of Commerce</u>. The question here – the meaning of "political committee" under Supreme Court precedent – is a purely legal one and will not benefit from further development in enforcement proceedings. The FEC's action is sufficiently final. The AO was adopted by a 5 to 1 majority, after an extensive administrative process – Unity08 twice supplemented the record that formed the basis for the AO, there were two public Commission hearings on the AO, comments on Unity08's AO request were filed by the public, and the Commissioners twice asked for extensions of the statutory time limit for rendering a decision. <u>See</u> Plaintiffs Statement of Material Facts Not in Dispute ¶¶ 4-11. The AO was not tentative and gave no indication that

- 24 -

more facts were necessary, or that a different conclusion might be reached with additional facts. There is absolutely no indication that the FEC can "later be convinced to change its mind," a factor that seemed to concern the Second Circuit in USDC.

In fact, the posture of Unity08's AO case is more similar to National Conservative Political Action Committee v. FEC, 626 F.2d 953 (D.C. Cir. 1980), in which NCPAC challenged an AO that would allow the Democratic National Committee to solicit unlimited contributions to retire pre-1975 campaign debts. Holding that the AO was final agency action, the D.C. Circuit observed that:

> [T]he Commission did not reserve the possibility that it might reach a contrary position on the basis of as yet unknown or undisclosed facts. Here, the Commission did not resolve a merely abstract question. Instead, the Commission passed upon the legality of a concrete solicitation proposed in some detail. . . .
>
> The stage has been set for the solicitation itself, and nothing in the record suggests that any intervening events have occurred to render the Commission's action less final than when it was taken.

Id. at 958. In these circumstances, the court held that the AO was ripe for review.

Significantly, the USDC decision does not even go as far as the FEC tries to stretch it here. The conclusion in that case, as stated by that court, was it was not "persuade[d] . . . that an advisory opinion by the FEC is automatically ripe for review." 861 F.2d at 772 (emphasis added). If an AO is not "automatically" ripe, it follows that it also is not "automatically" unripe. Clearly some analysis must come into play as to when and FEC advisory opinion is sufficiently final and ripe, and the appropriate framework for that review is provided by Abbott Labs.

In USDC the Second Circuit found grounds in FECA's administrative review framework and legislative history to support an argument that Congress did not intend for AOs to be reviewed. But there is no explicit statement of such intent in FECA and the court's conclusory statements about reviewability are not grounded in FECA. A presumption that judicial review is

- 25 -

not available under the APA when a statute does not explicitly provide for it is simply not warranted.. In fact, there is ample precedent in which courts have taken the opposite tack – presuming that judicial review is available. See, e.g., Japan Whaling Ass'n v. Am.Cetacean Soc'y, 478 U.S. 221, 230 n.4 (1986) ("the rule is that the cause of action for review of such action is available absent some clear and convincing evidence of legislative intent [ ] to preclude review.") (citing cases).

In any event, it is clear that the particular factual circumstances in USDC were critical to the court's decision, and those facts are radically different from the ones in the instant case. The matter at issue in USDC was a series of draft letters discussing the records of congressional candidates that the plaintiff, an advocacy group, wanted to disseminate using funds provided in part by corporations. The FEC was asked to determine whether, given the substance of the letters and the sources of the plaintiff's funding, plaintiff's dissemination of the letter would amount to indirect corporate involvement in election activities in violation of FECA. See 861 F.2d at 765-70. The content of draft letters and the sources of an organization's funding are highly fact-specific matters that can easily and quickly change. The language in proposed letters, in particular, is something that is easily susceptible to negotiation. These facts lend themselves very well to continued negotiation through the FEC's post-AO conciliation processes, which were highlighted by the court. See id. at 772. The court also noted that the FEC was in the middle of a rulemaking that could alter the regulations that were relevant to these issues. Id. And significantly, the plaintiff dropped its constitutional claim, see id. at 769, so the harm faced by the plaintiff while awaiting judicial resolution of its claim did not rise to constitutional proportions. Given these facts, it was not unreasonable for the court to ask "[h]ow may we call

an advisory opinion 'final' if the FEC might later be convinced to change its mind and agree to a compromise?" Id. at 772.

The facts in the instant case differ significantly. As noted, the matter at issue here is a legal question, not a fact-specific one. The test for determining what is a "political committee" is not susceptible to negotiation or conciliation. Unity08's constitutional rights are at stake. Moreover, Unity08 cannot simply change its fundraising strategy the way the plaintiff in USDC could re-word a letter; the ability to obtain loans of more than $5,000 is critical to Unity08's success and probably, to its survival. When such factors are taken into account, as they should be, it becomes clear that judicial review of an AO must be appropriate in some cases, and this is such a case.

### 2.    The FEC Erroneously Presumes That FECA Precludes Judicial Review of AOs.

Although the general rule is that agency actions are reviewable under Section 702 of the APA, the FEC nevertheless seeks to persuade the Court that this case fits within the very narrow exception to that rule for instances where the relevant statute "preclude[s] judicial review. . . ." 5 U.S.C. § 701(a)(1) (2000). While it is true that the FECA does not expressly provide for judicial review of AOs, it also does not expressly preclude review.

In the absence of an explicit indication that review is precluded, courts should approach a preclusion claim with great caution because there is a very strong presumption that review should be allowed. As the Supreme Court explained in Abbott Labs, the question of pre-enforcement review is "phrased in terms of 'prohibition' rather than 'authorization' because a survey of our cases shows that judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." 387 U.S. at 140 (citing cases). Significantly, the Court quoted a portion of the

- 27 -

legislative history of the APA that is instructive in cases where the statute does not explicitly

preclude review:

> "To preclude judicial review under this bill a statute, if not specific
> in withholding such review, must upon its face give clear and
> convincing evidence of an intent to withhold it. The mere failure
> to provide specially by statute for judicial review is certainly no
> evidence of intent to withhold review."

Id. at 141 n.2 (quoting H.R. Rep. No. 79-1980, at 41 (1946) (emphasis added) and also citing S.

Rep. No. 79-752, at 26 (1945)); accord Japan Whaling Ass'n, 478 U.S. at 230 n.4 ("the rule is

that the cause of action for review of such action is available absent some clear and convincing

evidence of legislative intent [ ] to preclude review." (citing cases). Abbott Labs went on to cite

a leading administrative law authority in further support of this proposition:

> The mere fact that some acts are made reviewable should not
> suffice to support an implication of exclusion as to others. The
> right to review is too important to be excluded on such slender and
> indeterminate evidence of legislative intent.

387 U.S. at 141 (citing Jaffe, Judicial Control of Administrative Action 336, 359 (1965)).

It is against this backdrop that courts have subsequently explained the circumstances

under which a silent statute may be said to withhold judicial review of a particular administrative

action. At times courts have held that preclusion was implicit in the "detail of the legislative

scheme" even though an omission is to be regarded warily, as noted above. The FEC hangs its

hat on these cases to argue that the legislative scheme of FECA, with its detailed provisions for

administrative complaints and investigations, omits a provision for judicial review of AOs and

accordingly, must preclude such review. FEC Mem. at 15-18 (citing cases). However, these

cases are distinguishable from the instant case.

In Block v. Community Nutrition Institute, 467 U.S. 340 (1984), the question was not

whether judicial review of the Department of Agriculture's milk marketing orders was available,

but who could seek such review. The Court found that milk producers and handlers, but not consumers, could seek judicial review of milk marketing orders based on the structure of the statute, which provided for milk producers and handlers, but not consumers, to participate in the agency's process for developing milk marketing orders. See id. at 346-47. The Court also discerned from the statutory structure that Congress intended milk producers and handlers to obtain expeditious judicial review because this would ensure realization of the statute's objective, which is to maintain producer prices at a high enough level to keep competition stable. Id. at 342-43 (citing legislative history). In this context, the Court concluded that consumers could not be "relied upon to challenge agency disregard of the law," id. at 351, and a multiplicity of consumer suits could be disruptive to the statutory objective of creating an administrative scheme designed to allow milk handlers and producers expeditiously to test the validity of milk marketing orders, see id. at 348. Consumer concerns would not be left completely unvindicated, however, because milk handlers' interest in having a reliable, inexpensive milk supply was aligned with consumers' interests. Id. at 352.

By comparison, any intention in FECA to limit judicial review of AOs is far less clear. For example, there are no categories of participants who are expressly excluded from proceedings at the agency level as in the Block case; nor does the legislative history offer any clues about why a particular judicial review framework would best serve the statute's overall objectives. There is only, as the FEC points out, a provision for judicial review in two very limited contexts – where the FEC dismisses or fails to act on a complaint, or in connection with the assessment of fines. See FEC Mem. at 16. Under the FEC's logic, only those very narrow categories of actions would be susceptible to expeditious judicial review. It is difficult to see why Congress would as a rule, immunize such a wide swath of the FEC's substantive activity

from review. The preclusion of review is a far more difficult proposition to accept than the mere question of which category of petitioners would be in the best position to vindicate statutory objectives, as in <u>Block</u>. The structure of FECA, therefore, leaves substantial doubt as to whether judicial review of AOs is categorically precluded. The court should, therefore, heed the <u>Block</u> court's admonition that "where substantial doubt about congressional intent exists, the general presumption favoring judicial review of administrative action is controlling." <u>Id.</u> at 351.

<u>Galliano v. U.S. Postal Service</u>, 836 F.2d 1362 (D.C. Cir. 1988), is inapposite because its focus was on whether review of First Amendment-sensitive issues involving naming of certain political committees and disclaimers on their publications must be channeled through the FEC's administrative processes rather than through those of the Postal Service. The court held that such questions must be directed to the FEC because Congress specifically set up FECA to govern such issues. <u>See id.</u> at 1368. The question there was not whether court review of the FEC's actions should be cut off.

The circumstances in <u>Pinar v. Dole</u>, 747 F.2d 899 (4th Cir. 1984), are not relevant here because the only type of personnel actions omitted by the Civil Service Reform Act's judicial review provisions were ones so modest in effect that they did not even qualify as "adverse" or "prohibited." <u>See id.</u> at 912-13. Thus, the <u>Pinar</u> court appeared to have little difficulty finding that this omission evidenced Congressional intent to preclude the most minor personnel actions from review. Here, in contrast, the question of whether Unity08 is a political committee is far from minor.

Finally, <u>Carter-Mondale Reelection Committee, Inc. v. FEC</u>, 642 F.2d 538 (D.C. Cir. 1980), was in a completely different procedural posture than here. Judicial review was sought in that case when an administrative complaint had been filed and the FEC had not even completed

its investigation of the complaint. The facts had not been fully developed, and because the FEC

had not yet resolved the complaint, the possibility remained that "the FEC's resolution of this

matter may be satisfactory to all concerned." Id. at 542. There was no indication that the FEC

had previously considered the facts or legal matters at issue in an Advisory Opinion. In this

circumstance, the court held that judicial review would be premature. The court added,

significantly, that "[s]ince this case is based upon a complaint filed with the Commission any

discussion of the authority and duty of the FEC in other circumstances is not called for and

would constitute pure dictum." Id. It follows that Carter-Mondale can provide no  guidance in a

case, such as here, where the facts have been fully developed and the FEC has reached a

definitive legal conclusion in the context of an AO proceeding.

A practical perspective on what the FEC requests should be kept in mind. The Court is

being asked to interpret the FECA as precluding, across the board, review of the agency's

advisory opinions. The FEC goes on in great detail about the "elaborate" and complex

administrative enforcement process provided by FECA, and the "multiple opportunities" a party

is afforded to "respond to the allegations against them" and for conciliation. See FEC Mem. at

17-18. The FEC maintains that judicial review of advisory opinions would bring issues to court

"unnecessarily and prematurely," creating an "end run" around FECA's enforcement scheme.

See id.

But what good are the so-called elaborate administrative procedures when purely legal

issues are in dispute and the FEC has made its position clear on the matter? In a case such as

Unity08's, where there is no need for additional factual development, where the legal questions

have been crystallized on both sides through the AO process, and where the FEC's determination

is having immediate real world consequences on a group's exercise of rights protected by the

First Amendment, it is neither premature, nor an "end run" around the administrative process, to permit judicial review of the AO at issue. As the D.C. Circuit has recognized, the advisory opinion mechanism can be a "controversy-ripening tool." Martin Tractor Co. v. FEC, 627 F.2d 375, 388 (D.C. Cir. 1980) (in order to be ripe the issues must first be "crystallized in some fashion before we rule and the AO mechanism affords a relatively riskless way of doing this.")

The alternative in this case would be to force parties whose constitutional rights have been infringed by an FEC determination to violate that determination and wait for the FEC to seek civil or criminal sanctions against them in order to challenge that determination. And even if the FEC does not bring suit, a third party may file a complaint with the FEC if Unity08 accepts a loan larger than $5,000 (which is likely, given that two parties vigorously opposed Unity08's position in the AO proceeding. In either case, "reason to believe," "probable cause," and conciliation proceedings would ensue, all purportedly addressed to trying to resolve a matter that turns on interpretation of the Constitution and Supreme Court cases. Withholding judicial review in such a circumstance makes no sense and would simply exacerbate the injury to Unity08's constitutional rights. This Court should not hold that FECA precludes judicial review of AOs. Instead, the reviewability of AOs must be determined on a case-by-case basis, consistent with the factors articulated by the Supreme Court in Abbott Labs.

**III.    THE COMMISSION'S SUBSTANTIVE ARGUMENTS ESSENTIALLY IGNORE THE DEFINITIVE, AND CONSTITUTIONALLY-MANDATED INTERPRETATION OF THE FECA BY THE BUCKLEY, MACHINISTS, AND GOPAC COURTS**

**A.    Chevron Deference Does Not Apply Here.**

The FEC's plea for deference can be easily dispatched. The framework for deference articulated in Chevron U.S.A. Inc. v. National Resources Defense Council, Inc., 467 U.S. 837 (1984), applies to certain agency interpretations of statutes. It does not apply to agency

interpretations of Supreme Court precedent and when this Circuit has rendered a definitive

interpretation of the term "political committee" as relevant in the instant context. And that is

precisely what is in dispute here – the scope of the interpretations of FECA made by the

Supreme Court in Buckley and a succession of other cases in the Supreme Court and the D.C.

Circuit limiting the statute's regulation of organizations' political activity.

Moreover, the D.C. Circuit has squarely addressed the role of deference in cases such as

this. In Akins, the issue was also whether an organization was a political committee within the

meaning of FECA, but oddly enough, the FEC was arguing that under Buckley and its progeny,

the organization's expenditures did not render it a political committee. The FEC maintained that

its interpretation was entitled to deference because at a minimum, the cases had created an

ambiguity in the definition of political committee. This request was rejected by the court as

"doctrinally misconceived," explaining:

> [T]he statutory language is not in issue, but only the limitation – or
> really the extent of the limitation – put on this language by
> Supreme Court decisions. We are not obliged to defer to an
> agency's interpretation of Supreme Court precedent under Chevron
> or any other principle. . . . agencies have no special qualifications
> of legitimacy in interpreting Court opinions. There is therefore no
> reason for the courts – the supposed experts in analyzing judicial
> decisions – to defer to agency interpretations of the Court's
> opinions. This is especially true where, as here, the Supreme Court
> precedent is based on constitutional concerns, which is an area of
> presumed judicial competence.

101 F.3d at 740 (emphasis in original) (citation omitted). This opinion is directly on point and

disposes of the FEC's Chevron deference argument. This Court must review the parties'

arguments de novo, giving no special weight to the FEC's interpretations. See also GOPAC, 917

F. Supp. at 860 (refusing to accord Chevron deference to the FEC's definition of political

committee in three prior AOs it relied on to support its position because the AOs were "based

upon the Commission's interpretation of the Constitution as construed by the Supreme Court and our Court of Appeals.").

Even if Chevron deference were appropriate, the FEC's decision here would not qualify because it is unreasonable – it raises significant First Amendment concerns, as Unity08 demonstrates below.  See id. (a Commission construction of FECA that raises serious First Amendment difficulties is not entitled to Chevron deference) (citing Chamber of Commerce, 69 F.3d at 605).

**B.**    **The Commission's Argument That It Reasonably Determined That Unity08 Is A Political Committee And That Expenses for Ballot Access Are Expenditures Ignores The Plain Meaning Of The Limiting Language In Buckley, And The Definitive Interpretation Of That Language In Machinists And GOPAC**

The FEC insists (FEC Mem. at 19-21) that it "reasonably determined" that Unity08's major purpose was the "nomination or election of a candidate for federal office" even though Unity08 does not have a candidate that it seeks to nominate or elect.  The Commission points to Unity08's statement that its goal is to elect a Unity ticket for President and Vice-President, but the D.C Circuit held in Machinists that such ultimate future intentions do not make an organization a political committee.  The Draft Kennedy Committee's ultimate goals were to have Senator Kennedy receive the Democratic nomination and win the Presidency, but these ultimate goals did not make the Draft Kennedy Committee a "political committee."  The Draft Kennedy Committee was not organized to influence the contest between the candidates for the Democratic nomination, except indirectly, by adding Mr. Kennedy to the candidate mix.  The Draft Kennedy Committee was not, to use an analogy, seeking to influence the outcome of the contest in the arena; it was trying to get its preferred fighter into the arena.  The D.C. Circuit held that such efforts do not evidence a purpose to nominate or elect a candidate.

- 34 -

Similarly, in GOPAC, the organization's "mission statement" provided that GOPAC's ultimate objective was to capture the U.S. House of Representatives and become a governing majority at every level of government, and GOPAC's direct mail fundraising efforts reinforced and reiterated GOPAC's statement of its "mission," but GOPAC's ultimate objective to elect a Republican House of Representative did not, as Judge Oberdorfer held, relying on Machinists, make GOPAC a political committee.

Unity08 does not seek to influence the contest in the arena either. Unity08 has stated that it will not use any of the money it intends to raise to assist any of the candidates that seek its nomination or to aid its candidates for President and Vice-President during the general election. See Bailey Decl. ¶¶ 57-62. Unity08 seeks to achieve ballot access as an organization without a particular identified candidate, which does not constitute a "purpose" to nominate or elect a candidate as that term is used in Buckley, any more than the Draft Kennedy Committee's efforts to introduce Mr. Kennedy into the candidate mix for the Democratic nomination constituted a purpose to nominate a candidate, or GOPAC's goal to elect a Republican House of Representative constitute a purpose to elect a candidate. In this Circuit, the meaning of the term "candidate" in the major purpose test is settled: it means a particular person who is running for office.

The Commission asserts that Unity08's arguments suffer from a "fatal flaw," the assumption that it is not a "political committee" because it does not seek to nominate or elect a particular candidate. FEC Mem. at 26. The Supreme Court held, however, that to avoid constitutional infirmity, the definition of "political committee" could encompass only organizations under the control of a candidate (which is not Unity08) or the major purpose of which was the nomination or election of a candidate. In this Circuit, the meaning of the

"candidate" in the major purpose test is settled: it means a particular person who is running for office and so Unity08 does not fall into the second group of organizations either. The Commission's argument is with the Supreme Court, the D.C. Circuit, and this Court, not with Unity08. The Commission also asserts that it properly concluded that monies spent by Unity08 to obtain ballot access through petition drives will be "expenditures" under the Act. FEC Mem. at 23. This is also incorrect. When an organization does not fall within either of the two categories set forth in Buckley, its expenses are not "expenditures" under the Act. See Buckley, 424 U.S. at 79-80; Machinists, 655 F.2d at 391 n.23; GOPAC, 917 F. Supp. at 859. To support its conclusion that Unity08 expenses are "expenditures" under the Act the Commission relies on AO 1994-05 and AO 1984-11. See FEC Mem. at 22-23. The Commission's reliance on those AOs is misplaced for three reasons. First, even if these advisory opinions were on point, which they are not, they would not be entitled to any particular weight or deference. As noted in Part III.A. above, the Commission has no particular expertise in interpreting the language in Buckley limiting the scope of the FECA's definition of "political committee. Moreover, this language has been authoritatively interpreted by the D.C. Circuit in Machinists and by another judge of this Court in GOPAC to require a purpose to nominate or elect a specific candidate. Second, the two AO's are not on point. Both involve efforts by particular individuals to obtain ballot access for themselves; neither of them address the situation presented in this case of an organization seeking to obtain ballot access as an organization without a specific candidate in mind. Nothing in the AOs is inconsistent with Unity08's position, based on Buckley, Machinists, and GOPAC, that because it is not seeking to nominate or elect a particular candidate, it is not subject, and can not constitutionally be made subject, to the FECA. Finally, neither of these advisory opinions

discusses Buckley or Machinists and their relationship to the issues presented in the advisory opinions.

The Commission's attempt to distinguish Machinists on the ground that Unity08 is not a "draft group" that seeks to "draft" a candidate for the nomination is specious. See FEC Mem. at 38-41. Machinists construed the "major purpose" language in Buckley to refer to the contests for "nomination" or "election" between announced "candidates." Activities prior in time to the candidate's announcement do not fall within the regulatory scope of the FECA. Expenses incurred in connection with such activities are not "expenditures" under the Act, and donations to organizations incurring such expenses are not "contributions" under the Act.

The FEC states incorrectly that Unity08 is already engaged in work to support activities "beyond the precise point where a true draft group's activities end." FEC Mem. at 36. Actually, the opposite is true. Unity08's proposed activities – like achieving ballot access as an organization, and establishing the mechanism for its online convention – are prior in time, way prior in time and legal effect, to the "precise point where a true draft group's activities end." The Draft Kennedy Committee did not need to concern itself with ballot access; at the time it was acting to persuade Mr. Kennedy to run for the Democratic nomination for President, the Democratic Party already had access to the ballot in all fifty states and the District of Columbia. The Draft Kennedy Committee's efforts to persuade Mr. Kennedy to run for the Democratic nomination for President no doubt benefited from Mr. Kennedy's knowledge that the nomination came with ballot access in all fifty states. Until the convention has been concluded, Unity08 will not have a candidate. Unity08 will not assist the candidates for its nomination. It expects that they will form candidate committees, register with the Federal Election Committee as candidates, file reports of receipts and expenditures, and observe the contribution limitations and other

federal election laws. After its candidates for President and Vice President are nominated, Unity08 expects them to form a general election committee, file reports of receipts and expenditures, and observe the contribution limitations and other federal election laws. Unity08 also proposes after the nomination to register as a political committee and consequently submit itself voluntarily to the Act.

The Commission relegates its attempt to distinguish GOPAC to a footnote, see FEC Mem. at 36 n.23, a placement consistent with its having nothing significant to say in that regard. The Commission's suggestion here that the GOPAC court's interpretation "cannot be reconciled with the language and logic of Buckley" is strange, since, as Unity08 noted in its Memorandum in Support of Summary Judgment, the Commission itself has repeatedly applied the GOPAC rationale. See Pls.' Mem. Supp. Summ. J. at 22.

The FEC devotes most of the remainder of its Memorandum to rebutting arguments that Unity08 did not make or making comparisons between Unity08 and organizations to which Unity08 cannot meaningfully be compared. See FEC Mem. at 28 et seq. The FEC attacks, for example, Unity08's alleged claim that "donations to political committees cannot be 'contributions.'" Unity08 does not, however, make such a claim. Nowhere does Unity08 discuss the relationship between donations to registered political committees and contributions, because that analysis is entirely irrelevant to the issue at hand. Unity08 is not a political committee. Donations to or expenses incurred by an organization such as Unity08 that is not a political committee are not "contributions" or "expenditures."

The Commission states that "[n]owhere in the Act's definition of 'contribution,' 2 U.S.C. § 431(8), is there any limiting language stating that candidates must be specified or clearly identified in order for 'anything of value' to be given for the 'purpose of influencing any election

for Federal office'" begs the question because it ignores the limiting interpretation that <u>Buckley</u>, <u>Machinists</u>, and <u>GOPAC</u> placed on that language through the limitation of "political committee." <u>See</u> FEC Mem. at 30.

The FEC argues that concluding that incurring expenses for ballot access without a candidate does not make Unity08 a political committee means that the Republican and Democratic Parties – both of which have guaranteed ballot access and no need to expend money for this purpose – will no longer be "political committees." <u>See</u> FEC Mem. at 29. Similarly, non-connected political committees, such as PACs, register with the FEC and collect "hard money" donations that qualify under the Act as contributions, even thought they do not know the specific candidate they will support, because they know they want to use the money for the purpose of supporting or opposing the nomination or election of particular candidates. Unity08, on the other hand, does not intend to use money it collects for such purposes. It intends to use its funds only to qualify for the ballot as an organization, to create the technical mechanism for its online convention, and to establish its delegate education efforts.

The Commission also cites <u>FEC v. Ted Haley Congressional Comm.</u>, 852 F.2d 1111 (9th Cir. 1988) and <u>United States v. Goland</u>, 959 F.2d 1449 (9th Cir. 1992). <u>See</u> FEC Mem. at 33-34. In both cases, the courts considered the receipt of contributions by actual candidates. In <u>Goland</u>, a criminal case in which the state of mind of the defendant-contributor was the central issue, not only was there a candidate indirectly receiving funds as Goland intended, but he was doing so in a corrupt and illegal way. In <u>Haley</u>, the issue was whether a candidate who takes money after a campaign to retire debts is taking contributions. That case "concern[ed] contributions to a candidate committee whose sole purpose for existence was to support the election of a single candidate [Ted Haley] for federal office, which funds were used to retire campaign expenses."

Id. at 1116. The issue did not involve the constitutional parameters of settled Supreme Court and D.C. Circuit precedent. See id.

The FEC also cites FEC v. Malenick, 310 F. Supp. 2d 230, 236 (D.D.C. 2004), a decision that actually supports plaintiffs' position. See FEC Mem. at 34. As the court noted in that case: "[E]ven if the organization's major purpose is the election of a federal candidate or candidates, the organization does not become a 'political committee' unless or until it makes expenditures in cash or in kind to support a 'person who has decided to become a candidate' for federal office." 310 F. Supp. 2d at 234-35 (citing GOPAC, 917 F. Supp. at 859, which in turn discusses Machinists, 655 F.2d at 392). In Malenick, the court found Triad to be a political committee because it funneled money directly to individual candidates, sent fax alerts advocating the election of named candidates, and had no other purpose other than to support such candidates. Id.

Bereft of law to support its position – i.e., law contradicting Buckley, Machinists, GOPAC, Malenick, and similar decisions – the FEC resorts to hyperbolic rhetoric. But no "nightmare" will be created if the Court rules in plaintiffs' favor because nothing will change with regard to the thousands of entities that have properly registered as political committees because their major purpose is the support of a specific, particular candidate. In addition, there will be no "vast hole in the Act's regulatory framework" as the FEC suggests. FEC Mem. at 27. The GOPAC court explicitly rejects the argument that the FEC makes here. In GOPAC, the court considered the FEC's argument that "Buckley does not require the Commission to show that GOPAC's 'major purpose' was the election of a particular, identified candidate or candidates." 917 F. Supp. at 859. The court stated that:

> The Commission argues here for a broader – and troubling –
> interpretation of the Act. Under the Commission's interpretation,

> an organization need not support the 'nomination or election of a
> candidate,' [in order to be a "political committee"] but need only
> engage in 'partisan politics' or 'electoral activity.' The
> Commission defends this interpretation on the ground that a
> 'loophole' would be opened if an organization could make
> unreported expenditures for partisan political purposes, so long as
> they were not traceable to a federal candidate.

Id. at 859-60. The court rejected this argument as well as the FEC's other "loophole argument"

– that there would be a "loophole in which "partisan political groups . . . could hide their

contributors' identities and their partisan electoral activities by artfully avoiding naming a

particular federal candidate." Id. at 861. In so doing, the court stated that "in this sensitive

political area where core First Amendment values are at stake, our Court of Appeals has shown a

strong preference for 'bright-line' rules" including, specifically, that "an organization is a

'political committee' under the Act if it received and/or expended $1,000 or more and had as its

major purpose the election of a particular candidate or candidates for federal office." Id. at 862.

## IV.   THE FEC'S CONTENTION THAT APPLICATION OF THE ACT'S LIMITATIONS ON CONTRIBUTIONS TO UNITY08 WOULD BE CONSTITUTIONAL IF UNITY08 WERE A POLITICAL COMMITTEE IS IRRELEVANT SINCE UNITY08 IS NOT A POLITICAL COMMITTEE.

In Part IV of its Memorandum, the FEC attempts to rebut an argument that plaintiffs did

not make and fails to respond to the real point plaintiffs made in Part III.B of their Memorandum

in Support of Summary Judgment.

Unity08 has not argued that the contribution limitations in the FECA would be

unconstitutional as applied to Unity08, if Unity08 were a political committee. Unity08 has

argued that an organization like Unity08 that engages in various activities that do not involve

support or opposition for the nomination or election of a specific candidate does not fall within

the definition of "political committee" and, consistent with the constitutional limitations on the

application of FECA laid down in Buckley, Machinists, and GOPAC, cannot be treated as a

political committee. The FEC's discussion of cases that have upheld "limitations on contributions to all manner of entities that fall within the Act's regulatory ambit," is irrelevant to any argument made here by the plaintiffs. FEC Mem. at 40-42 (emphasis added). The activities in which Unity08 intends to engage are "not within the Act's regulatory ambit" because Unity08 does not have the purpose of supporting or opposing a particular candidate. Similarly, the FEC's contention that "unlimited contributions to Unity08 . . . would clearly pose a threat of corruption," FEC Mem. at 41, ignores the holding of Buckley that a sufficient threat of corruption to justify regulation is not presented by organizations that do not support or oppose the nomination or election of particular candidates

Part III.B of plaintiffs' Memorandum did no more than point out that "First Amendment law outside the campaign setting – relating to initiatives, referenda, recalls and the like – is consistent with the First Amendment concerns that drove Buckley to its limitations on the federal election law." Pls.' Mem. Supp. Summ. J. at 24 (emphasis added). The FEC did not address, much less rebut, that contention.

## V.    CONCLUSION

Despite the need for bright line limits that the Supreme Court articulated in Buckley when it limited the definition of political committee, and despite the counsel of the Court of Appeals in Machinists that "[i]n this delicate first amendment area, there is no imperative to stretch the statutory language . . . achieving a reasonable, constitutionally sound conclusion . . . requires just the opposite," 655 F.2d at 394, the Commission has issued an Advisory Opinion that concludes that Unity08 is a "political committee" notwithstanding that its major purpose is not the nomination or election of any specific candidate. The fundamental flaw in the agency's AO and in its Memorandum to this Court is its failure to appreciate the impact of the decisions in Buckley, Machinists, or GOPAC, on the scope of the FECA's constitutionally-permitted ambit.

- 42 -

Instead, the Commission relies solely on two Advisory Opinions that were not on point. Its actions have severely impacted that ability of Unity08 to achieve its political goals – goals that are protected from government interference by the First Amendment. It is not inappropriate to note that the Federal Election Commission is selected by representatives of the two major parties and that five-sixths of its Commissioners are members of one or the other of the two major parties. If the First Amendment rights of the plaintiffs and the millions of voters who wish to take advantage of the unprecedented opportunities Unity08 seeks to provide are to be protected, it will only be through the action of this Court.

Respectfully submitted,

_Robert E. Jordan III_

_____

Robert E. Jordan III (D.C. Bar No. 15784)
John J. Duffy (D.C. Bar No. 170936)
Rhonda M. Bolton (D.C. Bar No. 455005)
Anthony A. Onorato (D.C. Bar No. 482074)
STEPTOE & JOHNSON LLP
1330 Connecticut Ave., NW
Washington, DC  20036
Tel:  (202) 429-3000
Fax:  (202) 429-3902
rjordan@steptoe.com
jduffy@steptoe.com
rbolton@steptoe.com
tonorato@steptoe.com

*Counsel for Plaintiffs*

May 3, 2007

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITY08, <u>et al.</u>, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )   Civil Action No. 07-00053 (RWR) |
| | ) |
| FEDERAL ELECTION COMMISSION, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## REPLY TO DEFENDANT'S RESPONSE TO PLAINTIFFS' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE IN DISPUTE

Pursuant to Local Civil Rules 7(h) and 56.1, Plaintiffs Unity08, <u>et al.</u>, submit the following Reply to Defendant's "Statement of Genuine Issues," <u>i.e.</u>, Defendant's response to Plaintiffs' Statement of Material Facts As To Which There Is No Genuine Issue in Dispute ("Pls.' Statement of Facts").

1.    DEFENDANT'S RESPONSE:  The political beliefs of Unity08's members are irrelevant and immaterial to these proceedings.  Nonetheless, in contrast to how plaintiffs characterize Unity08 in Paragraph 1, Unity08 described itself during the administrative proceedings before the Commission as a "nascent political party."  <u>See</u> Letter from John J. Duffy to Lawrence Norton, Request for an Advisory Opinion on the Obligation of a Nascent Political Party to Register as a Political Committee, at 1 (May 30, 2006) (hereinafter "advisory opinion request") (Exh. 2).

   **REPLY:**  Defendant does not object to any specific fact in Plaintiffs' statement.

Unity08 did refer to itself in the "Re: line" of its Advisory Opinion Request as a "nascent political party," and has described itself as a "nascent political movement," Bailey Decl. ¶ 8, both of which are accurate, and not inconsistent with how Unity08 describes itself in ¶ 1.

2.    DEFENDANT'S RESPONSE:  Although Paragraph 2 accurately reflects two of Unity08's three objectives, it is misleading in that it omits Unity08's primary goal: "[T]he election of a Unity Ticket for President and Vice-President of the United States in 2008."  UNI 217-18 at 217 (Exh. 15); Exh. 11; Exh. 2 at 2; Select & Elect a Unity Ticket in the 2008 Presidential Race, http://www.unity08.com/ (last visited Apr. 9, 2007) ("Our Three Goals[:] 1. Elect a truly bipartisan Unity Ticket to the White House team in 2008.") (Exh. 16); UNI 145-47 at 145 "Unity08 has three specific goals: 1. Elect a Unity Ticket to the White House in 2008 ....") (Exh. 17); We Need Your Support To Keep This Movement Growing, https://secure.ga6.org/08/unity08donate (last visited Apr. 9, 2007) (noting Unity08's "goal of electing a bi-partisan Unity Ticket in the 2008 presidential election") (Exh. 18).

**REPLY:**  There is nothing "misleading" about Plaintiffs' accurate statement that Unity "seeks to:  (1) ensure that an alternative ticket for President and Vice-President is available to the American voters on the November 2008 ballot, which ticket offers a choice to independent voters and those in the middle in both of the major parties; and (2) select candidates for that ticket in June 2008 in an on-line convention that will be open to every registered voter who also properly registers as a delegate to the convention.  See Deposition of Douglas Bailey ("Bailey Dep.") at 10, line 21-p. 11, line 22 (excerpts at Ex. 11)."  One goal of Unity08 is the election of a Unity ticket for President and Vice President in 2008.  At a minimum, though, Unity's goal is to jolt the two major parties out of the current partisan political deadlock that stands in the way of

meaningful change in our country's governance. See Pls.' Statement of Facts ¶ 3; Bailey Decl. ¶ 8.

    3.    DEFENDANT'S RESPONSE:  No response.

        **NO REPLY.**

    4.    DEFENDANT'S RESPONSE:  To the extent that plaintiffs seek to summarize or characterize the advisory opinion request, that document speaks for itself.

        **REPLY:** Defendant does not object to any specific fact in Plaintiffs' statement. Defendant does not demonstrate that Plaintiffs' characterization of the document is inaccurate.

    5-6.    DEFENDANT'S RESPONSE:  As pre-decisional, deliberative portions of the administrative record, the draft advisory opinion and recording and minutes of the July 20, 2006 meeting are irrelevant and immaterial to these proceedings. See FEC's Mem. of L. at 40 n.28 & cases cited therein. Furthermore, to the extent that plaintiffs seek to summarize or characterize these records, they speak for themselves.

        **REPLY:** Defendant does not object to any specific fact in Plaintiffs' statement.

        To the extent Defendant characterizes the draft advisory opinion as "pre-decisional, deliberative . . . irrelevant and immaterial," that is a legal conclusion. The draft advisory opinion is a part of the administrative record, as identified in the FEC's Statement of Facts at n.3. ("The full administrative record of the proceedings before the Commission is available online by entering advisory opinion number 2006-20 into the Commission's advisory opinion database at http://saos.nictusa.com/saos/searchao.").

    7.    DEFENDANT'S RESPONSE:  The time extension is irrelevant and immaterial to these proceedings.

        **REPLY:** Defendant does not object to any specific fact in Plaintiffs' statement.

8.    DEFENDANT'S RESPONSE:  To the extent that plaintiffs seek to summarize or characterize Unity08's supplemental submissions, these documents speak for themselves. Furthermore, to the extent that the second sentence of the statement implies that contributions to Unity08 are not used to support the election of Unity08's candidates, that implication is contradicted by the record.  See infra ¶ 18.

**REPLY:** Defendant does not demonstrate that Plaintiffs' characterization of the document is inaccurate.

With regard to the second sentence, Defendant's response to ¶ 18 does not support its assertion.  See Reply to ¶ 18, infra.  In addition, the record states that Unity will achieve ballot access as an organization in the 37 states which, by state law, permit an organization to secure ballot access without having a candidate.  Bailey Decl. ¶ 20; Craver Decl. ¶ 5; Pls.' Statement of Facts ¶ 31; Compl. ¶ 13.  It is incorrect and a legal conclusion for the FEC to state Unity08 contributions are "used to support the election of Unity08's candidates."  Unity does not have any candidate, Pls.' Statement of Facts ¶¶ 16, 17, and will not provide support for any of nominees or candidates prior to or after the convention, id. ¶¶ 18-22.

9.    DEFENDANT'S RESPONSE:  The time extension is irrelevant and immaterial to these proceedings.

**REPLY:** Defendant does not object to any specific fact in Plaintiffs' statement.

10.    DEFENDANT'S RESPONSE:  See supra ¶¶ 5-6.

**REPLY:** See Reply to ¶¶ 5-6, supra.  To the extent Defendant characterizes the second draft advisory opinion as "pre-decisional, deliberative . . . irrelevant and immaterial," that is a legal conclusion.  The draft advisory opinion is a part of the administrative record, as identified in the FEC's Statement of Facts at n.3.

- 4 -

11.    DEFENDANT'S RESPONSE: No response to the first sentence. As to the

second sentence, see supra ¶¶ 5-6. In addition, the second sentence is contradicted by the record:

The Commission did not "reject" any portion of the draft advisory opinion or make any findings

as to the interpretation of 11 C.F.R. 100.57, but rather directed the General Counsel to delete a

portion of the draft advisory opinion that was "unnecessary to the result." Audio recording:

Advisory Opinion 2006-20, http://www.fee.gov/agenda/2006/agenda20061004.shtml (Oct. 4,

2006).

**REPLY:** No reply to the first sentence. As to the second sentence, the

Commission concluded Unity08 was not receiving "contributions" because the reference to the

Unity ticket did not meet the definition of "clearly identified candidate." See

http://www.fec.gov/audio/2006/20061004_02.mp3.

12.    DEFENDANT'S RESPONSE: No response.

**NO REPLY.**

13.    DEFENDANT'S RESPONSE: To the extent that plaintiffs seek to summarize or

characterize Advisory Opinion 2006-20, that document speaks for itself. FEC Advisory Opinion

2006-20 (Oct. 10, 2006) (Exh. 3).

**REPLY:** No reply except to state Defendant does not demonstrate that Plaintiffs'

characterization of the document is inaccurate.

14.    DEFENDANT'S RESPONSE: See supra ¶ 13. In addition, Advisory Opinion

2006-20 did not find that Unity08's major purpose is "campaign activity," but rather "the

nomination and election of a presidential candidate and a vice-presidential candidate." Exh. 3 at

5.

**REPLY:** <u>See</u> Reply to ¶ 13, <u>supra</u>. As for the second sentence, Plaintiffs' characterization in its statement of the basis for the Advisory Opinion is a reasonable interpretation.

15-16. DEFENDANT'S RESPONSE: No response.

**NO REPLY.**

17. DEFENDANT'S RESPONSE: It is unclear what the phrase "has no candidates" means in the context of Paragraph 17. Unity08 is currently preparing to nominate its candidates for President and Vice President of the United States. <u>See</u> Bailey Dep. at 96:22-97:2 ("[I]n one sense, everything we do is preparing for the on-line convention. It is the center piece of what we are doing."), 119:7-120:5 (noting "effective progress" on eleven of twelve goals leading to nomination) (Exh. 4); Unity08 Facts ¶ 50 ("Contributions are expended for ... systems to hold the online nominating convention ...."). At least one person has already declared his candidacy for Unity08's nomination (Exh. 4 at 83:16-21), and Unity08 has compiled lists of other potential candidates and briefed some of these candidates regarding the nomination process. <u>Id.</u> at 73:11-20; UNI 753-83 at 762-772 (listing "candidates recommended" to Unity08) (Exh. 22); <u>see also</u> Chat Transcript: Doug Bailey and Jerry Rafshoon, http://www.unity08.com/iivechat/trans_021607 (Feb. 16, 2007) ("We have made great strides in presenting our case to potential candidates . . .") (Exh. 23).

**REPLY:** Unity08 has no candidates, exactly as it has stated. <u>See</u> Bailey Decl. ¶ 15, 16, 42; Pls.' Statement of Facts ¶¶ 16, 17. Unity08 has not asked any Presidential candidate to run or to consider running. <u>Id.</u> ¶ 77. To the extent that it is "unclear" what this means to the FEC, Plaintiffs have no reply.

- 6 -

Plaintiff are preparing for the on-line convention where a candidate will be nominated, but it is not "preparing to nominate its candidates" as Defendant alleges. The fact that one person has unilaterally declared his candidacy for the Unity nomination is irrelevant and immaterial. The fact that Unity has discussed Unity08's purpose and nomination process with individuals – at their request – is irrelevant and immaterial.

18-21. DEFENDANT'S RESPONSE:  Plaintiffs' statements are contradicted by the record. The funds Unity08 has received have been and will be used to support Unity08's nominees, who have already been clearly identified by party affiliation (i.e., Unity08), office sought (i.e., President and Vice President of the United States), and election cycle (i.e., 2008). See supra ¶ 2. In fact, Unity08's solicitations explicitly state that contributions to the organization will be used to fund Unity08's "goal of electing a bi-partisan Unity Ticket in the 2008 presidential election." We Need Your Support To Keep This Movement Growing, https://lsecure.ga6.org/08/unity08donate (last visited Apr. 9, 2007) (Exh. 18); see also UNI 020-23 at 022 (soliciting funds "for the 2008 presidential election") (Exh. 26); UNI 214 ("Your donation will go directly to support our ... efforts to make our shared vision of a bi-partisan Unity Ticket in the 2008 presidential election a reality.") (Exh. 25). Furthermore, Unity08's nominees will receive things of significant value from Unity08, including ballot access in the general election (Unity08 Facts ¶¶ 24, 32; Exh. 22 at UNI 773), and Unity08's delegate list. Exh. 4 at 113:13-16. Unity08 also intends to support the candidates for its nomination with things of significant value, including e-mail access to its delegates. Unity08 Facts ¶ 58.

REPLY:  Defendant's response to ¶¶ 18-21 is misleading, and a legal conclusion. See Reply to ¶ 8, supra.

In addition, with regard to the third sentence, Unity08 explicitly states on its website "Donations will not be used to support or oppose any Federal candidates, but will be used to support Unity08's organization building efforts, including ballot access."
https://secure.ga6.org/08/unity08donate.

In addition, with regard to the fourth sentence ("Furthermore, Unity08's nominees . . ."), Defendant's statement is a legal conclusion.

With regard to the last sentence, Defendant mischaracterizes the record. Unity08 intends for the delegates to be able to ask questions which the candidates can answer and permit the candidates the limited opportunity to explain their issue positions to the delegates through Unity08, not provide "e-mail access" generally to its delegates. See Pls.' Statement of Facts ¶ 58.

22.    DEFENDANT'S RESPONSE: Whether or not Unity08 will make monetary contributions to its nominees after its convention is immaterial to these proceedings.

**REPLY:** Plaintiffs disagree, and contend that the purpose for which funds are being or have been sought and spent is material.

23.    DEFENDANT'S RESPONSE: Although it is immaterial to these proceedings whether Unity08 will "become involved" in candidate solicitations, Paragraph 23 is contradicted by the record: Unity08 intends to solicit its delegates to contribute to its presidential nominee. Questions and Answers About Unity08's Clean Money Pledge,
http://www.unity08.com/takeaction/cleanmoney_FAQ (last visited Apr. 9, 2007) ("[W]e do plan to ask all Unity08 delegates after they nominate their ticket to contribute $100 to the ticket. if we have ten million delegates and if 25% give, that will mean a campaign fund of $250,000,000 for

the Unity08 ticket....") (Exh. 27); see also Exh. 22 at UNI 773 (referring to $200,000,000 campaign fund).

**REPLY:** Defendant mischaracterizes Plaintiffs' Statement in ¶ 23, in which Plaintiffs state that "Unity08 will not become involved in [the] process" of "Unity08 nominees solicit[ing] money from Unity08 delegates . . . ."

24-25. DEFENDANT'S RESPONSE: No response.

**NO REPLY.**

26.    DEFENDANT'S RESPONSE: Paragraph 26 is contradicted by the record. Shortly after its inception, Unity08 unilaterally decided that it would not accept contributions in excess of $5,000 because "[Unity08] thought that a $5,000 contribution limit was appropriate, and Unity08 established it voluntarily." Exh. 4 at 40:3-11; see Unity08 Facts ¶ 66; see also UNI 378-81 at 381 ("[A] 527 may receive any donation in any amount. However, we have voluntarily put a limit of $5,000 on any individual contribution.") (Exh. 7); UNI 406-417 at 417 ("'Founder' investments are limited to $5000 ... to avoid the appearance of big money ownership of the process or the party.") (Exh. 5); UNI 553-54 at 553 ("[U]nder the law we can ask for and receive contributions of unlimited amount, but frankly we don't want to slip into the mistakes that the rest of politics has embraced. So we are sticking to the $5000 per person limit ....") (Exh. 8). Unity08 continues to impose this $5,000 limit, not because of the Advisory Opinion, but "[b]ecause it's the right thing to do." Exh. 4 at 44-45; see also Our Beliefs, Our Goals, & Why We'll Succeed, http:/iwww.unity08.com/believe (last visited Apr. 9, 2007) ("Unity08 intends to fix this broken system by electing a bipartisan 'Unity Ticket' .. *funded solely by small-dollar donations* from everyday Americans.") (emphasis added) (Exh. 11). Instead of exceeding the $5,000 limit, Unity08 has intended since its inception to finance its activities by soliciting

200 donors of $5,000 each, which would create a fund sufficient to support Unity08's operations until smaller contributions from delegates rendered the organization self-supporting UNI 432-33 at 432 ("We need to raise a one million dollar bridge fund (in contributions of $5000) to finance operations until ... small online contributions from the delegates mak[e] it self-financing.") (Exh. 9); see also Unity08 Facts ¶ 72.  Because of this self-imposed limit, the issuance of the Advisory Opinion did not affect Unity08's fundraising or operations in any way.  UNI 030-33 at 032 ("Of course, Unity08 had long ago voluntarily instituted a $5,000 cap as part of our promise to reduce the influence of money on politics.... So nothing about our operations will change.") (Exh. 13).  Furthermore, as of March 12, 2007, Unity08 had not identified any individual who wished to loan Unity08 more than $5,000. Exh. 4 at 44:3-5; see also Radek Dep. at 19:4-8 (Exh. 14).

　　　　　**REPLY:** Defendant's responses are argument, not statements of fact.

　　　　　Plaintiffs' ¶ 26 states that "since the issuance of the Advisory Opinion 2006-20 on October 10, 2006, Unity08 has had to alter its plans and scale back and delay its ballot access effort." That statement is not contradicted, but rather supported, by the record.  See, e.g., Compl. ¶¶ 15, 16, 18, 19, 31, 32; Pls. Statement of Facts ¶¶ 26, 28, 29, 37-42, 47, 52, 66, 68; Bailey Decl. ¶¶ 31, 32, 52, 55, 63, 64; Reply Declaration of Douglas L. Bailey ¶ 13 ("Reply Bailey Decl.").

　　　　　It is fact that Unity08 would take loans greater that $5,000 if not for the legal limit and the threat of prosecution. Unity08 imposed the $5,000 limit because of the threat of prosecution by the FEC for potential violation of the campaign finance laws. See Compl. ¶¶ 16 (stating imposed on advice of counsel), 18; Reply Bailey Decl. ¶ 4; see also Bailey Decl. ¶ 64; Declaration of Peter Ackerman ¶ 4 ("Ackerman Decl."); Declaration of Gerald Rafshoon ¶¶ 12, 13 ("Rafshoon Decl."); Reply Declaration of Roger M. Craver ¶ 3 ("Reply Craver Decl.").  To

the extent Defendant seeks to characterize other non-legal factors which contributed to Unity08's decision to impose a limit, they are irrelevant and immaterial to this action. The FECA also requires a "political committee" to register and report receipts and expenses. 2 U.S.C. 433, 11 CFR 102.1 and 102.2. Unity08 has not been willing to register or file reports because it does not believe it is a "political committee."

To the extent Defendant suggests that Unity08 intended to finance its operation solely through 200 donations of $5,000 each, the portion of the record cited by Defendant does not support its statement. Further, Unity08 intended to and did take small contributions. In addition, Unity08 has intended, since at least late 2006, to obtain loans of greater than $5,000 from individuals, including the individual Plaintiffs. See Compl. ¶¶ 15, 18; Pls.' Statement of Facts ¶¶ 47, 49; Ackerman Decl. ¶ 4; Rafshoon Decl. ¶ 8; Reply Bailey Decl. ¶ 7; Reply Craver Decl. ¶ 3. These loans would be paid back through subsequent donations of $5,000 or less. See Bailey Decl. ¶ 53.

There are people who wished to lend money to Unity08, but who were not willing to lend because of the threat of prosecution. See Bailey Decl. ¶¶ 63, 64; Compl. ¶¶ 15, 18; Ackerman Decl. ¶ 4; Rafshoon Decl. ¶ 12; Reply Bailey Decl. ¶ 8; Reply Craver Decl. ¶¶ 3, 4.

27.    DEFENDANT'S RESPONSE: Unity08's beliefs are entirely speculative and irrelevant to these proceedings.

REPLY: Defendant does not object to any specific fact in Plaintiffs' statement.

28-29. DEFENDANT'S RESPONSE: See supra ¶ 26.

REPLY: See Reply to ¶ 26, supra.

30-33. DEFENDANT'S RESPONSE: No response.

NO REPLY.

- 11 -

34.    DEFENDANT'S RESPONSE:  Whether or not Unity08 has already gained ballot access for its candidates is irrelevant and immaterial to these proceedings.

REPLY: Defendant does not object to any specific fact in Plaintiffs' statement.

As for "gaining ballot access for its candidate," this is an incorrect statement. Unity intends to achieve ballot access as an organization in the 37 states which, by state law, permit an organization to secure ballot access without having a candidate. Bailey Decl. ¶ 20; Craver Decl. ¶5; Pls.' Statement of Facts ¶ 31; Compl. ¶ 13. Further, Plaintiffs do not agree that the extent of ballot access is immaterial. The extent of ballot access gained is material to Unity08's reason for needing to obtain loans in amounts in excess of $5,000. See Pls.' Statement of Facts ¶¶ 24, 25, 30, 33, 35, 36.

35.    DEFENDANT'S RESPONSE:  No response, except that to the extent plaintiffs seek to summarize or characterize state ballot-access laws, those laws speak for themselves.

REPLY: Defendant does not demonstrate that Plaintiffs' characterization is inaccurate.

36.    DEFENDANT'S RESPONSE:  Unity08's estimates regarding the cost of ballot access for major parties and Unity08 are irrelevant and immaterial to these proceedings.

REPLY: Defendant does not object to any specific fact in Plaintiffs' statement.

Plaintiffs contend that the costs of ballot access are material, and a valid element of predicted costs. Plaintiffs' estimates are based on the judgments of seasoned political professionals. See Pls.' Statement of Facts ¶¶ 61-64; Bailey Decl. ¶¶ 4-7; Craver Decl. ¶¶ 3-5; Rafshoon Decl. ¶¶ 3-4.

37-39. DEFENDANT'S RESPONSE:  See supra ¶ 26.

REPLY: See Reply to ¶ 26, supra.

- 12 -

40.    DEFENDANT'S RESPONSE:  No response, except that plaintiffs' statement regarding "adequate funding" is entirely speculative and vague.

REPLY:  Defendant does not object to any specific fact in Plaintiffs' statement.

41.    DEFENDANT'S RESPONSE:  See supra ¶ 26.

REPLY:  See Reply to ¶ 26, supra.

42.    DEFENDANT'S RESPONSE:  See supra ¶ 26.  In addition, there is no support in the record for the assertion that Unity08's volunteer activities have been hampered by funding restrictions, and the specific evidence cited by Plaintiffs does not relate to that proposition.  See Exh. 4 at 107:11-16 ("Q... [Its Unity08 recruiting delegates outside of the internet, for example, face-to-face or through phone calls or direct mail or any other means that doesn't use the internet?  A. It has not been doing that, but it will be increasingly doing that.").

REPLY:  See Reply to ¶ 26, supra.  In addition, Defendant's response that "there is no support in the record for the assertion that Unity08's volunteer activities have been hampered" is contradicted by the record.  See Pls.' Statement of Facts ¶ 41 ("At this time, because of the contribution limitation directly resulting from the FEC's ruling, Unity08 has delayed and scaled back its ballot access initiative due to inadequate funding.  More specifically, Unity08 has been severely hampered in its effort to finalize and distribute its ballot access materials, and its efforts to train and deploy volunteers to the states where it needs petition signatures to get on the ballot.  For the same reasons, Unity08 has also delayed hiring state ballot access directors and regional coordinators.  See Bailey Decl. ¶ 32."); see also Bailey Dep. at 64, line 11-p. 65 line 4 ("Are Unity08 volunteers presently gathering signatures?  In an extremely limited way. . . .").

- 13 -

43.    DEFENDANT'S RESPONSE: Unity08's "funds requirements" are immaterial to these proceedings. In addition, plaintiffs' characterization of certain costs as "significant" is vague and ambiguous. Finally, plaintiffs' statements regarding challenges to Unity08's ballot access are irrelevant, immaterial, and speculative.

**REPLY:** Defendant does not object to any specific fact in Plaintiffs' statement. Plaintiff contends that the funding requirements are material, that the cost of legal challenges is significant and a valid element of predicted costs, and that "significant" is a proper characterization. See Pls.' Statement of Facts ¶ 27. Plaintiffs' estimates are based on the judgments of seasoned political professionals. See Reply to ¶ 36, supra. Further, the funding requirements are material to Unity08's reason for needing to obtain loans in amounts in excess of $5,000.

44-45. DEFENDANT'S RESPONSE: The "factor and expense" of ballot access is immaterial to these proceedings. In addition, plaintiffs' characterization of certain expenses as "significant" is vague and ambiguous. Finally, plaintiffs' statements regarding primary election dates are entirely speculative.

**REPLY:** Defendant does not object to any specific fact in Plaintiffs' statement. Plaintiffs contend that the factor and expense of ballot access are material and that "significant" is a proper characterization. Plaintiffs' analysis is based on the judgments of seasoned political professionals. See Reply to ¶ 36, supra. Further, the factor and expense of ballot access are material to Unity08's reason for needing to obtain loans in amounts in excess of $5,000.

As for primaries moving up, Unity08's statements are not speculative, and are based on reported state actions. E.g., Kathy Barks Hoffman, "Mich. GOP May Hold Primary Before Feb. 5," Washington Post (Apr. 14, 2007) at http://www.washingtonpost.com/wp-

- 14 -

dyn/content/article/2007/04/14/AR2007041401039.html ("A dozen other states, including California, New York and New Jersey, have already moved their primaries or caucuses to Feb. 5. Still more states are considering such moves, setting the stage for what some are calling 'Super-Duper Tuesday' just 22 days after the leadoff Iowa caucuses."); see Bailey Decl. ¶ 25.

46.   DEFENDANT'S RESPONSE: The means by which Unity08 may choose to seek ballot access are immaterial to these proceedings, and plaintiffs' statements regarding these means are entirely speculative. In addition, aside from plaintiffs' own conclusory assertions, there is no support in the record for the proposition that Unity08 "must" follow the procedures listed in Paragraph 46.

REPLY: Defendant does not object to any specific fact in Plaintiffs' statement. The means by which Unity08 is doing ballot access are material to Unity08's reason for needing to obtain loans in amounts in excess of $5,000. Plaintiffs' statements are not speculative because they are stating how they intend to and are in fact seeking to achieve ballot access. Plaintiffs' strategies are based on the judgments of seasoned political professionals. See Reply to ¶ 36, supra.

47.   DEFENDANT'S RESPONSE: See supra ¶ 26. In addition, Unity08's ability to defray its expenses is immaterial to these proceedings. Furthermore, aside from plaintiffs' own conclusory assertions, there is no support in the record for plaintiffs' speculative statement regarding the "impossibility" of raising funds.

REPLY: See Reply to ¶ 26, supra. Regarding the second sentence, see Reply to ¶¶ 43-46, supra.

48.   DEFENDANT'S RESPONSE: See supra ¶ 26. In addition, the portion of the record cited by plaintiffs does not support the assertion that "[l]oans to be repaid by contributions

- 15 -

are essential to raising the needed money." See Exh. 4 at 42:1-4 ("I think realistically the capacity to secure funding ... in the way of loans subsequently repaid by contributions of $5,000 or less is—would be if not essential, desirable."). Furthermore, plaintiffs' assertion that loans are "essential" is entirely speculative.

REPLY: See Reply to ¶ 26, supra; Bailey Decl. ¶ 52; Craver Decl. ¶¶ 10, 12; Pls.' Statement of Facts ¶ 47, 49; Reply Bailey Decl. ¶ 6.

49.    DEFENDANT'S RESPONSE: Plaintiffs' statement regarding what Unity08 "could" do is entirely speculative. That statement is also contradicted by the record: As of March 12, 2007, Unity08 had not identified any individual who wished to loan Unity08 more than $5,000. Exh. 4 at 44:3-5.

REPLY: See Reply to ¶ 26, supra. "Plaintiffs' statement about its ability to raise sufficient money to fund its efforts through loans of more than $5,000" is not speculative and is based on the on the judgments of seasoned political professionals. See Reply to ¶ 36, supra. As for the second sentence, it is Defendant's statement, not Plaintiffs', that is contradicted by the record. See Bailey Decl. ¶ 64; Compl. ¶ 18. In addition, the second sentence is not accurate because there are people who wished to lend money to Unity08, but who were not willing to lend because of the threat of prosecution. See Reply to ¶ 26, supra.

50.    DEFENDANT'S RESPONSE: No response, except that, to the extent plaintiffs' statement implies that contributions to Unity08 are not used to support the election of Unity08's candidates, that implication is contradicted by the record. See supra ¶ 18.

REPLY: See Reply to ¶¶ 18-21, supra. See also FEC Facts ¶ 23 (detailing Unity's expenditures specifically for convention planning), ¶ 25 (detailing Unity's expenditures specifically for ballot access).

51.    DEFENDANT'S RESPONSE: See supra ¶ 18.

REPLY: Defendant's response is non-responsive to Plaintiffs' statement. In any event, see Reply to ¶¶ 18-21, supra.

52.    DEFENDANT'S RESPONSE: See supra ¶ 26. In addition, to the extent that plaintiffs seek to summarize or characterize Advisory Opinion 2006-20, that document speaks for itself.

REPLY: See Reply to ¶ 26, supra. Defendant does not demonstrate that Plaintiffs' characterization of the document is inaccurate.

53-56. DEFENDANT'S RESPONSE: No response.

NO REPLY.

57.    DEFENDANT'S RESPONSE: See supra ¶ 18.

REPLY: See Reply to ¶¶ 18-21, supra.

58-59. DEFENDANT'S RESPONSE: No response.

NO REPLY.

60.    DEFENDANT'S RESPONSE: Unity08's Articles of Incorporation list the following founders of Unity08: Douglas Bailey, Gerald Rafshoon, Zachary Clayton, and Lindsay Ullman. Exh. 2 App. at 3.

NO REPLY.

61-66. DEFENDANT'S RESPONSE: No response.

NO REPLY.

67.    DEFENDANT'S RESPONSE: Unity08 has also raised at least $10,000 from paid telephone solicitations (Exh. 14 at 10:13-11:2), and an undetermined amount from direct mail

- 17 -

solicitations. Id. at 9:21-10:8. The primary website through which Unity08 has raised funds is http://www.unity08.com.

      **NO REPLY.**

68.    **DEFENDANT'S RESPONSE:** See supra ¶ 26. Furthermore, the phrase "fundraising limitations" (which differs from contribution limits) is vague, and, in any event, plaintiffs have not alleged any legal limits on their ability to engage in fundraising activities.

      **REPLY:** See reply to ¶ 26, supra.

69.    **DEFENDANT'S RESPONSE:** No response.

      **NO REPLY.**

70.    **DEFENDANT'S RESPONSE:** The statements in Paragraph 70 are entirely speculative, irrelevant and immaterial to these proceedings, and, aside from plaintiffs' conclusory assertions, without support in the record.

      **REPLY:** Plaintiffs contend that the statements in ¶ 70 regarding fundraising requiring seed money are material, and are based on the judgment of seasoned political professionals. See Reply to ¶ 36, supra.

71-79.    **DEFENDANT'S RESPONSE:** No response.

      **NO REPLY.**

Respectfully submitted,

Robert E. Jordan III

_____

Robert E. Jordan III (D.C. Bar No. 15784)
John J. Duffy (D.C. Bar No. 170936)
Rhonda M. Bolton (D.C. Bar No. 455005)
Anthony A. Onorato (D.C. Bar No. 482074)
STEPTOE & JOHNSON LLP
1330 Connecticut Ave., NW
Washington, D.C.  20036
Tel:  (202) 429-3000
Fax:  (202) 429-3902
rjordan@steptoe.com
jduffy@steptoe.com
rbolton@steptoe.com
tonorato@steptoe.com

*Counsel for Plaintiffs*

Dated:  May 3, 2007

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITY08, <u>et al.</u>, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )     Civil Action No. 07-00053 (RWR) |
| | ) |
| | ) |
| FEDERAL ELECTION COMMISSION, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S STATEMENT OF**
**MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE DISPUTE**

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rules 7(h) and 56.1,

Plaintiffs Unity08 <u>et al.</u> ("Unity08" or "Plaintiffs") submit the following Objections to the

Federal Election Commission's ("FEC," "Commission," or "Defendant") Statement of Material

Facts As To Which There Is No Genuine Dispute.

**BACKGROUND**

1.      The Commission is an independent agency of the United States responsible for

the administration, interpretation, and civil enforcement of the Federal Election Campaign Act

("FECA"). <u>See</u> 2 U.S.C. 437c(b)(1), 437d(a),(e).

**NO OBJECTION.**

2.      Plaintiff Unity08 is a District of Columbia corporation organized under Section

527 of the Internal Revenue Code. Pls.' Statement of Material Facts As To Which There Is No

Genuine Issue in Dispute ¶ 59 ("Unity08 Facts").

**NO OBJECTION.**

3.      As a Section 527 organization, Unity08 is required to file with the Internal Revenue Service quarterly statements listing Unity08's donations received and disbursements made; Unity08 has made three such filings to date. UNI 231-59 (Exh. 1).[1] Unity08 also lists on its website each donation it receives of $200 or more. Unity08 Donors 2007, http://www.unity08.com/donors (last visited Apr. 9, 2007) (Exh. 10).

**NO OBJECTION.**

4.      Plaintiffs Douglas Bailey, Roger Craver, Hamilton Jordan, Angus King, and Jerry Rafshoon are or were members of Unity08's Board of Directors.[2] Compl. ¶¶ 4-8.

**NO OBJECTION.**

5.      On May 30, 2006, Unity08 filed with the Commission a "request for an advisory opinion on the obligation of a nascent political party to register as a political committee." Letter from John J. Duffy to Lawrence Norton, Request for an Advisory Opinion on the Obligation of a Nascent Political Party to Register as a Political Committee, at 1 (May 30, 2006) (hereinafter "advisory opinion request") (Exh. 2).

**NO OBJECTION.**

6.      The FECA defines political committee as "any committee, club, association, or other group of persons which receives contributions aggregating in excess of $1,000 during a calendar year or which makes expenditures aggregating in excess of $1,000 during a calendar year." 2 U.S.C. 431(4).

---

[1] All exhibits cited herein other than in the Objections are appended to the Commission's Memorandum of Law. Documents identified by the "UNI" prefix were produced by plaintiffs to the Commission during discovery.

[2] Subsequent to the filing of Plaintiffs' Motion for Summary Judgment, the parties stipulated to the voluntary dismissal of Plaintiff Carolyn Tieger from this action.

**OBJECTION**: To the extent Defendant seeks to characterize how "political committee" under the FECA has been interpreted, Defendant's statement is a legal conclusion. Otherwise, no objection.

7.    In its advisory opinion request, Unity08 presented the following facts to the Commission:[3]

      a.    Unity08's "Goal One is to elect a Unity Ticket for President and Vice President of the United States in 2008." Exh. 2 at 2 (emphasis in original).

      b.    "Unity08 intends to qualify for ballot positions in certain key states for the offices of President and Vice President of the United States ...." Id. at 3.

      c.    Unity08 intends "to select, using a 'virtual' convention conducted over the Internet, candidates for the office of President and Vice President of the United States to run in those ballot positions." Id. at 4.

      d.    Unity08 "does not intend to support or oppose candidates for Congress or State and local elections at any time." Id.

**OBJECTION**: The statements in Defendant's ¶ 7 are accurate, however, they are incomplete. Unity08 presented facts to the FEC in addition to those identified in ¶ 7. See Pls.' Exs. 12, 16, 17, http://saos.nictusa.com/saos/searchao?SUBMIT=ao&AO=331 (linking to the case record), and Objection to ¶ 9, infra. (All exhibits cited in the Objections are appended to Plaintiffs' Memorandum of Law).

8.    On October 10, 2006, the Commission issued an advisory opinion finding, inter alia, that "Unity08 will have to register as a political committee once it makes expenditures in

---

[3] The full administrative record of the proceedings before the Commission is available online by entering advisory opinion number 2006-20 into the Commission's advisory opinion database at http://saos.nictusa.com/saos/searchao. The key documents from this record have been submitted as exhibits to the parties' summary judgment motions.

excess of $1,000, and therefore will be subject to the amount limitations ... and reporting requirements of [the FECA]." FEC Advisory Opinion 2006-20, at 1 (Oct. 10, 2006) (Exh. 3).

**NO OBJECTION.**

9.    The Commission based its finding on the facts submitted by Unity08 in its advisory opinion request (see supra ¶ 7), as well as in Unity08's supplemental submissions to the Commission and Unity08's website. Exh. 3 at 1.

**OBJECTION:** In addition to the above, the Commission based its findings on the other facts submitted to the administrative record by Unity08, submissions by other groups, and the views of the Commissioners, staff, and General Counsel stated at the hearings. See additional materials at http://saos.nictusa.com/saos/searchao (2006-20).

10.    On January 10, 2007, Unity08 filed this action seeking direct judicial review of Advisory Opinion 2006-20 under the Declaratory Judgment Act and the Administrative Procedure Act. Compl. at 11 (Prayer for Relief).

**OBJECTION:** To the extent Defendant seeks to characterize Unity08's legal action, it mischaracterizes the record. On January 10, 2007, Unity filed this action seeking, inter alia, review of the infringement of Plaintiffs' constitutional rights by the FEC. Compl. ¶¶ 18, 19, 26-35, Prayer for Relief.

**THE ABSENCE OF INJURY TO UNITY08[4]**

11.    Political committees (other than federal candidate and political party committees) may accept contributions from individuals in amounts up to $5,000 per individual per year. 2 U.S.C. 441a(a)(1).

---

[4] Unity08 states that Defendant's section headers are irrelevant, immaterial and / or legal argument.

**OBJECTION:** No objection, provided "political committee" means "political committee" as interpreted by the FEC under the FECA.

12.     Shortly after its inception, and before it filed this action, Unity08 voluntarily instituted a $5,000 limit on donations it would accept because, in its view, "[w]hile ... we are doing things that haven't been done before ... [t]hat didn't seem to us to be any excuse for making the mistakes that others have made before, and so we thought that a $5,000 contribution limit was appropriate, and we established it voluntarily." Bailey Dep. at 40:3-11 (Exh. 4); see Unity08 Facts ¶ 66.

**OBJECTION:** The statements in Defendant's ¶ 12 are accurate, however, they are incomplete. Unity08 imposed the $5,000 limit because of the threat of prosecution by the FEC for potential violation of the campaign finance laws. See Compl. ¶¶ 16 (stating imposed on advice of counsel), 18; Reply Declaration of Douglas L. Bailey ¶ 4 ("Reply Bailey Decl."); see also Bailey Decl. ¶ 64; Declaration of Peter Ackerman ¶ 4 ("Ackerman Decl."); Declaration of Gerald Rafshoon ¶¶ 12, 13 ("Rafshoon Decl."); Reply Declaration of Roger M. Craver ¶ 3 ("Reply Craver Decl."). To the extent Defendant seeks to characterize other non-legal factors which contributed to Unity08's decision to impose a limit, they are irrelevant and immaterial to this action.

The FECA also requires a "political committee" to register and report receipts and expenses. 2 U.S.C. 433, 11 CFR 102.1 and 102.2. Unity08 has not been willing to register or file reports because it does not believe it is a "political committee."

13.     Unity08 also instituted a self-imposed contribution limit "to avoid the appearance of big money ownership of the process or the party" (UNI 406-17 at 417 (Exh. 5)), and because plaintiffs "want Unity08 to be funded by the people and not by special interests. Establishing

- 5 -

that limit helps ensure that goal." Transcript of Live Chat with Tom Collier on January 29, 2007,

http://www.unity08.com/livechat/tc_transcript (Exh. 6).

**OBJECTION:** See Objection to ¶ 12, supra.

14.    Unity08 instituted the self-imposed contribution limit before Advisory Opinion

2006-20 was issued, even though plaintiffs believed at that time that Unity08 was not subject to

FECA's contribution restrictions. See UNI 378-81 at 381 ("[A] 527 may receive any donation in

any amount. However, we have voluntarily put a limit of $5,000 on any individual

contribution.") (Exh. 7); UNI 553-54 at 553 ("[U]nder the law we can ask for and receive

contributions of unlimited amount, but frankly we don't want to slip into the mistakes that the

rest of politics has embraced. So we are sticking to the $5,000 per person limit ...:') (Exh. 8).

**NO OBJECTION.**

15.    From its inception, Unity08 intended to finance its initial activities by soliciting

200 donations of $5,000 each, thereby creating a fund sufficient to support Unity08's operations

until smaller contributions from delegates rendered the organization self-supporting. UNI 432-

33 at 432 ("We need to raise a one million dollar bridge fund (in contributions of $5,000) to

finance operations until ... small online contributions from the delegates mak[e] it self-

financing.") (Exh. 9); see also Unity08 Facts ¶ 72.

**OBJECTION:** The statements in Defendant's ¶ 15 are accurate, in so far as

Unity intended to solicit 200 donations of $5,000, however, they are otherwise incomplete. To

the extent Defendant suggests that Unity08 intended to finance its operation solely through 200

donations of $5,000 each, the portion of the record cited by Defendant does not support its

statement. Further, Unity08 intended to and did take small contributions. In addition, Unity08

has intended, since at least late 2006, to obtain loans of greater than $5,000 from individuals,

including the individual Plaintiffs. See Compl. ¶¶ 15, 18; Pls.' Statement of Facts ¶¶ 47, 49;

Ackerman Decl. ¶ 4; Rafshoon Decl. ¶ 8; Reply Bailey Decl. ¶ 7; Reply Craver Decl. ¶ 3.. These

loans would be paid back through subsequent donations of $5,000 or less. See Bailey Decl. ¶ 53.

     16.    After the Commission issued Advisory Opinion 2006-20, Unity08 continued to

impose the $5,000 limit, not because of the advisory opinion, but "[b]ecause it's the right thing

to do." Exh. 4 at 44:21-45:3; see also Exh. 10 ("[C]ontributions from individuals are voluntarily

capped at $5,000."); Our Beliefs, Our Goals, & Why We'll Succeed,

http://www.unity08.com/believe (last visited Apr. 9, 2007) ("Unity08 intends to ... elect[ ] a

bipartisan 'Unity Ticket' .., *funded solely by small-dollar donations* from everyday Americans:)

(emphasis added) (Exh. 11); Press Release, Unity08 Forms Advisory Council of Respected

Leaders, http://www.unity08.com/news/pr20070327 (Mar. 27, 2007) (noting plan to "fund

[Unity08] campaign through small-dollar gifts") (Exh. 12).

       **OBJECTION:** See Objection to ¶¶ 12, 15, supra.

    17.    Because of Unity08's self-imposed limit on contributions it accepts, Advisory

Opinion 2006-20 has not affected Unity08's fundraising or operations in any way. UNI 030-33

at 032 ("[T]he FEC put in place a strict $5,000 limit on any contribution to Unity08 .... Of

course, Unity08 had long ago voluntarily instituted a $5,000 cap as part of our promise to reduce

the influence of money on politics. And as you know, Unity08 refuses to take money from

corporations or special interests. *So nothing about our operations will change.*") (emphasis

added) (Exh. 13).

       **OBJECTION:** Defendant's first sentence is incorrect and contradicted by the

record. See, e.g., Compl. ¶¶ 15, 16, 18, 19, 31, 32; Pls. Statement of Facts ¶¶ 26, 28, 29, 37-42,

47, 52, 66, 68; Bailey Decl. ¶¶ 31, 32, 52, 55, 63, 64; Reply Bailey Decl. ¶ 13; Rafshoon Decl. ¶¶ 9, 11, 13; Reply Craver Decl. ¶ 4.

18.     As of March 12, 2007, Unity08 had not identified any person who wished to loan Unity08 more than $5,000. Exh. 4 at 44:3-5 ("Q. Are you aware of anyone who right now wants to loan Unity08 more than $5,000? A. No."); see also Radek Dep. at 19:4-8 (Exh. 14).

**OBJECTION:** Defendant's statement is contradicted by the record. See Bailey Decl. ¶¶ 64; Compl. ¶ 18. The first sentence is not accurate because there are people who wished to lend money to Unity08, but who were not willing to lend because of the threat of prosecution. See Bailey Decl. ¶¶ 63, 64; Compl. ¶¶ 15, 18; Ackerman Decl. ¶ 4; Rafshoon Decl. ¶ 12; Reply Bailey Decl. ¶ 8; Reply Craver Decl. ¶¶ 3, 4.

## UNITY08'S EXPENDITURES

19.     Unity08's primary goal is "the election of a Unity Ticket for President and Vice-President of the United States in 2008." UNI 217-18 at 217 (Exh. 15); Exh. 11; Exh. 2 at 2; Select & Elect a Unity Ticket in the 2008 Presidential Race, http://www.unity08.com/ (last visited Apr. 9, 2007) ("Our Three Goals[:] 1. Elect a truly bipartisan Unity Ticket to the White House team in 2008.") (Exh. 16); UNI 145-47 at 145 ("Unity08 has three specific goals: 1. Elect a Unity Ticket to the White House in 2008 ....") (Exh. 17); We Need Your Support To Keep This Movement Growing, Https://secure.ga6.org/08/unity08donate (last visited Apr. 9, 2007) (noting Unity08's "goal of electing a bi-partisan Unity Ticket in the 2008 presidential election") (Exh. 18).

**OBJECTION:** The statements in Defendant's ¶ 19 are accurate, however, they are incomplete. Unity08 has in its communications identified three specific goals: "(1) Elect a Unity Ticket to the White House in 2008, headed by a woman and/or man from each major political party or by an independent who presents a Unity Team from both parties. (2) Have the

- 8 -

American people choose that ticket via the first-ever virtual, secure online convention of millions of qualified American voters. Unity08 has no candidate – the Unity Ticket will be chosen online, by the people. [And,] (3) Effect major change and reform in the 2008 national elections by influencing the major parties to adopt the core features of Unity08's national agenda. Specifically, that means dividing the issues facing the nation into Crucial Issues (e.g., education, energy independence, deficit spending, global terrorism, health care, nuclear proliferation) and Important Issues (e.g., gay marriage, gun control, abortion rights), then focusing on the Crucial." Def's Exh. 18 (UNI 145).

20.    To achieve its goal of electing the next President and Vice President of the United States, Unity08 plans to (a) hold an online nominating convention; and (b) achieve ballot access for Unity08's nominee. Exh. 4 at 11:5-13 ("Q. How does [Unity08] plan on going about accomplishing [its] principal objective? A. The principal vehicle is a on-line convention .. [and] taking whatever steps necessary to ... achieve ballot access for that ticket.").

**OBJECTION:** Unity08 agrees that it plans to hold an on-line nominating convention. With regard to ballot access however, Unity08 disagrees it is achieving ballot access for its nominees. Unity intends to achieve ballot access <u>as an organization</u> in the 37 states which, by state law, permit an organization to secure ballot access <u>without having a candidate</u>. Bailey Decl. ¶ 20; Craver Decl. ¶5; Pls.' Statement of Facts ¶ 31; Compl. ¶ 13.

21.    Unity08 intends to hold its nominating convention in or around June 2008-after the major parties' nominees are known-so that "other potential candidates [can] survey the field and ... make a decision as to whether they wish to seek this [Unity08] nomination." <u>Id.</u> at 87:9-18.

**NO OBJECTION.**

- 9 -

22.    Unity08 has made and will continue to make disbursements for website technology and other online activities in preparation for the convention at which Unity's candidates for President and Vice President of the United States will be nominated. See id. at 96:22-97:2 ("[I]n one sense, everything we do is preparing for the on-line convention. It is the center piece of what we are doing."); Unity08 Facts ¶ 50 ("Contributions are expended for ... systems to hold the online nominating convention ...: ').

**NO OBJECTION.**

23.    Specifically, as of December 31, 2006 (the last date covered by Unity08's IRS filings), Unity08 had made the following disbursements in preparation for its convention:

   a.    Approximately $30,000 to Peak Creative Media for "website technology." Exh. 1 at UNI 249, 251, 258. Peak Creative Media was "instrumental in helping to set up the website" and maintaining it. Exh. 14 at 39:21-40:14, 60:2-3.

   b.    Approximately $45,000 to Beaconfire for "website technology." Exh. 1 at UNI 250-252. Beaconfire maintains and updates Unity08's website and provides advice regarding the content of that site. Exh. 14 at 42:6-17, 60:10-13.

   c.    Approximately $10,000 to Ms. Kate Farrar for "website technology." Exh. 1 at UNI 248, 250, 252, 258-59. Ms. Farrar maintains and updates Unity08's website. Exh. 14 at 602-8.

**NO OBJECTION.**

24.    Unity08 also has made and will continue to make disbursements to achieve ballot access on behalf of its nominees. Specifically, Unity08 is recruiting delegates to serve as an

"army" to achieve ballot access for Unity08's nominees. Exh. 4 at 66:14-67:5 ("[W]e equate in our own mind the recruitment of delegates as the same as building a potential army. It's from those delegates on the web site, as well as the college students who are gathering in Unity08 chapters, if you will, that's a potential drawing pool for recruiting petition passers or whatever the right term is. So you build an army of delegates, you are building at the same time what amounts to an army on the ground.")); The Governance of Unity08, http://www.unity08.com/about/governance (last visited Apr. 9, 2007) ("[T]he delegates ... will pick the nominees, and will get them on the ballot in all 50 states ... The army of delegates who pick the ticket will be the army of workers who get the petitions signed to be on the ballot in all 50 states.") (Exh. 19); Questions and Answers About Unity08, http://www.unity08.com/faq (last visited Apr. 9, 2007) ("[Q:] How would the ticket get on the ballot?  [A:] The millions of Unity08 convention delegates would be organized to get that job done, state by state.") (Exh. 20); What's Next, http://www.unity08.com/about/whatsnext_ballot_access (last visited Apr. 9, 2007) ("[A]s we build the army of Unity08 Delegates we will be building as well a team of volunteers in each state who will help us collect signatures [for ballot access petitions].") (Exh. 21).

**OBJECTION:** See Objection to ¶ 20, supra. As to the first sentence, Unity seeks to achieve ballot access as an organization in the 37 states which, by state law, permit an organization to secure ballot access without having a candidate. Bailey Decl. ¶ 20; Craver Decl. ¶5; Pls.' Statement of Facts ¶ 31; Compl. ¶ 13. It is incorrect for the FEC to state Unity08 has been or will continue to make disbursements to achieve ballot access "on behalf of its nominees." See Objection to ¶ 20, supra. Unity does not have any candidate and will not

provide support for any of nominees or candidates prior to the convention or in the general election. Pls.' Statement of Facts ¶¶ 15-23.

The second sentence is also incorrect. Volunteer recruits are pursuing ballot access for Unity08 as an organization, not "on behalf of Unity08's nominees." See, e.g., Bailey Decl. ¶¶ 17, 22.

25.    To help recruit delegates to place Unity08's nominees for President and Vice President of the United States on the general election ballot in every state (see Exh. 21), Unity08 has made the following disbursements:

a.    Approximately $85,000 to the contractors and vendors who maintain and update the content of Unity08's website. See supra ¶ 23.

b.    Approximately $18,000 to Democracy in Action and GetActive for maintaining Unity08's delegate list and sending communications to those members. Exh. 1 at UNI 248, 258; Ex. 14 at 31:3-32:20.

c.    Approximately $6,000 to Mr. Dane Anderson for "college website technology." Exh. 1 at UNI 236, 251, 258. Unity08's college website is used to organize college students who, along with Unity08's delegates, will help achieve ballot access on behalf of Unity08's nominees. Exh. 4 at 66:20-67:2.

**OBJECTION:** To the extent that Defendant seeks to characterize Unity08 as seeking ballot access "on behalf of Unity08's nominees," it is incorrect, and a legal conclusion. See Objections to ¶¶ 20, 24, supra. No objection as to the approximated expenditures.

26.    The purpose of the disbursements described in Paragraph 25, supra, is also to gain sufficient ballot access to entice candidates to seek Unity08's nomination. Exh. 4. at 37:9-17

- 12 -

("[T]o the degree that ... the process of ballot access would in turn cause candidates to want to seek the nomination, that's an important part of this process.")); UNI 753-83 at 773 (listing, as reason for candidates to seek Unity08 nomination, "Ballot Access in all 50 states") (Exh. 22).

**OBJECTION:** Unity08 agrees that one purpose, but not the only purpose, of these expenditures is attracting candidates to seek Unity08's nomination. The disbursements identified in ¶ 25 for "content of Unity08's website," "maintaining Unity08's delegate list and sending communications to those members," and "'college website technology' ... to organize college students," go to create communications platforms: the website, delegate list, and college program serve to disseminate Unity08's issue agenda, goals, recruit volunteers and petitioners, and multiple communications functions to link voters to Unity and each other.

27.    At least one person has already declared his candidacy for Unity08's nomination (Exh. 4 at 83:16-21), and Unity08 has compiled lists of other potential candidates and briefed some of these potential candidates regarding the nomination process. Id. at 73:11-20; Exh. 22 at UNI 762-72 (listing "candidates recommended" to Unity08)); see also Chat Transcript: Doug Bailey and Jerry Rafshoon, httpp:/hvww.unity08.com/livechat/trans_02160" (Feb. 16, 2007) ("We have made great strides in presenting our case to potential candidates ....") (Exh. 23).

**OBJECTION:** The fact that one person has unilaterally declared his candidacy for the Unity nomination is irrelevant and immaterial. The fact that Unity has discussed Unity08's purpose and nomination process with individuals – at their request – is irrelevant and immaterial.

28.    Among the potential candidates whom Unity08 has briefed are individuals "who are currently candidates for President of the United States." Exh. 4 at 75:22-76:4. Unity08 has

briefed two such candidates directly and has briefed staff members of approximately seven additional current candidates. Id. at 83:6-15.

**OBJECTION:** The statements in Defendant's ¶ 28 are accurate, however, they are incomplete. Unity08 has briefed several people, at their request, who are candidates or might be candidates (or their staff) for the presidential nomination of other parties on Unity08's purpose and nomination process. See Pls.' Statement of Facts ¶ 77; Bailey Decl. ¶ 16.

29.     The only candidates for whom Unity08 is establishing a delegate pool and achieving ballot access are Unity08's nominees for President and Vice President of the United States in 2008; Unity08 does not intend to nominate or support any candidate for any Congressional, state, or local election at any time. Unity08 Facts ¶ 16.

**OBJECTION:** The first part of Defendant's statement (to the semicolon) is incorrect. See Objections to ¶¶ 20, 24, 25, supra. No objection as to the second part of the statement.

30.     Unity08's nominees will receive things of significant value from Unity08, including ballot access in the general election (Unity08 Facts ¶¶ 24, 32; Exh. 22 at UNI 773), and Unity08's delegate list. Exh. 4 at 113:13-16 ("[U]pon the advice of counsel we would be willing to sell the delegate list to [the Unity081 ticket so that it can solicit from that list of delegates contributions."). Unity08 also intends to provide the candidates for its nomination with additional things of significant value, including e-mail access to its delegates. Unity08 Facts ¶ 58.

**OBJECTION:** With regard to the first sentence, Defendant draws a legal conclusion and asserts facts not supported by the record. See also Objections to ¶¶ 20, 24, 25, 29, supra. In addition, Unity08 has not stated it will give its delegate list to anyone, but rather

stated that depending "upon the advice of counsel we would be willing to sell the delegate list to [the Unity08] ticket so that it can solicit from that list of delegates contributions." Bailey Dep. at 113, line 21-p. 114, line 8; see Pls.' Statement of Facts ¶ 23.

With regard to the last sentence, Defendant mischaracterizes the record. Unity08 intends for the delegates to be able to ask questions which the candidates can answer and permit the candidates the limited opportunity to explain their issue positions to the delegates through Unity08, not provide "e-mail access" generally to its delegates. See Pls.' Statement of Facts ¶ 58.

31.    Unity08 has no current plan or intention to become a permanent political party. Exh. 4 at 12:3-5 ("Q. Does Unity08 have any plans to become a permanent political party? A. No."); Exh. 19 ("It is not our intention to become a permanent third party.")

**NO OBJECTION.**

**UNITY08'S CONTRIBUTIONS**

32.    Unity08 has raised approximately $375,000 through personal contacts. Exh. 14 at 12:12-19.

**NO OBJECTION.**

33.    As part of its effort to raise funds through personal contacts, Unity08 generally shows a PowerPoint presentation to its individual solicitees. See Exh. 4 at 108:20-109:1; Exh. 22. This presentation states that "Goal One" of Unity08 is to "[e]lect bipartisan Unity Ticket for President & Vice-President in 2008." Exh. 22 at UNI 758.

**NO OBJECTION.**

34.    The follow-up letter that Unity08 sends to individuals who have committed to contributing $5,000 but have not yet submitted their contributions (Exh. 4 at 36:2-4), states that

"[y]our financial contribution ... helps give us a good chance to win the White House in November 2008 with a Unity Ticket." UNI 596 (Exh. 24).

**NO OBJECTION.**

35.    Unity08 has raised approximately $100,000 through its website. Exh. 14 at 15:15-21.

**NO OBJECTION.**

36.    Unity08's online solicitation page states that contributions to the organization will be used to fund Unity08's "goal of electing a bi-partisan Unity Ticket in the 2008 presidential election." See Exh. 18.

**OBJECTION:** Defendant's statement in ¶ 36 is an accurate quote, but is incomplete in that Unity08 explicitly states on its website and in its mailings "Donations will not be used to support or oppose any Federal candidates, but will be used to support Unity08's organization building efforts, including ballot access." See
https://secure.ga6.org/08/unity08donate.

37.    The e-mail that Unity08 sends to individuals after they make contributions through the website states: "Your donation will go directly to support our ... efforts to make our shared vision of a bi-partisan Unity Ticket in the 2008 presidential election a reality." UNI 214 (Exh. 25).

**NO OBJECTION.**

38.    Unity08 has raised at least $10,000 through telephone solicitations. Exh. 14 at 10:13-11:12.

**NO OBJECTION.**

- 16 -

39.    Unity08's telephone solicitation script asks solicitees to donate "for the 2008 presidential election."  UNI 020-23 at 022 (Exh. 26).

**NO OBJECTION.**

Respectfully submitted,

Robert E. Jordan III (D.C. Bar No. 15784)
John J. Duffy (D.C. Bar No. 170936)
Rhonda M. Bolton (D.C. Bar No. 455005)
Anthony A. Onorato (D.C. Bar No. 482074)
STEPTOE & JOHNSON LLP
1330 Connecticut Ave., NW
Washington, D.C.  20036
Tel:  (202) 429-3000
Fax:  (202) 429-3902
rjordan@steptoe.com
jduffy@steptoe.com
rbolton@steptoe.com
tonorato@steptoe.com

*Counsel for Plaintiffs*

Dated:  May 3, 2007

# EXHIBIT 1

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITY08, et al.,                                )
                                                )
    Plaintiffs,                  )
                                                )
    v.                           )    No. 1:07-cv-00053 (RWR)
                                                )
FEDERAL ELECTION COMMISSION,                    )
                                                )
    Defendant.                   )
                                                )

## REPLY DECLARATION OF DOUGLAS L. BAILEY

I, Douglas L. Bailey, state that:

1.    I am over the age of twenty-one, and I am fully competent to testify to the matters set forth in this Declaration.

2.    I have submitted a prior Declaration in this Proceeding.

3.    The focus of Unity08's activities consists of: efforts to recruit volunteers to secure the needed signatures on ballot access petitions in the states; the operation and further development of its website to communicate its ideas about the need for the political system to focus on issues critical to the long-term safety and welfare of the country (the "American Agenda"); and developing the technology infrastructure and secure systems to hold the first-ever online nominating convention in the summer of 2008.

4.    Paying for Unity08's ballot access efforts and the technology infrastructure to hold its online nominating convention and facilitate creation of the American Agenda requires substantial financial resources. Since its inception in the spring of 2006, Unity08 has sought to finance its efforts by soliciting small donations from individuals. Unity08 limited itself to

donations of $5,000 per year from individuals because we believe it is the right thing for us to do, and also on the advice of counsel due to the threat of prosecution by the Federal Election Commission ("FEC") for potential violation of the campaign finance laws. Unity08 was concerned, however, from the beginning, that it might need initial donations in amounts larger than $5,000. To obtain a definitive determination that its ballot access efforts were not subject to the federal campaign finance laws and that it would not be prohibited by law from accepting donations larger than $5,000, Unity08 filed an Advisory Opinion request with the FEC.

5.      Unity08 subsequently recognized that to meet its goals it must raise millions of dollars on a more rapid timetable than is possible if it is limited to $5,000 annual donations from individuals.

6.      Unity08 believes that it can more rapidly raise the $10-12 million we estimate will be needed by obtaining loans of greater than $5,000 from individuals to build a pool of "seed money" to jumpstart Unity08's initiatives and to significantly ramp up our fundraising efforts so that we can raise the amount of money we need to fully fund our initiatives. Quite simply, these loans are essential to Unity08's ability to accomplish its political goals. The loans would be repaid through subsequent donations of $5,000 or less.

7.      Unity08 decided to accept loans of greater than $5,000 from individuals in late 2006. To ensure that such loans could be obtained, Unity08 challenged in court the FEC's Advisory Opinion ruling that Unity08's activities involve "expenditures" under the Federal Election Campaign Act ("FECA"), and that Unity08 accordingly qualifies as a "political committee" subject to the FECA's $5,000 per individual annual contribution limit.

- 2 -

8.    The other individual plaintiffs and I have each contributed $5,000 to Unity08, and have been willing to lend Unity08 more than $5,000 since at least January 2007 (the time we filed our complaint with the Court).

9.    In April 2007 we commenced a formal campaign to solicit loans in excess of $5,000 from individuals. We named this initiative the "Acceleration Fund," and our first goal is to secure a total of $2.5 million in loans to launch our initiatives and to significantly ramp up our fundraising efforts so that we can raise the amount of money we need to fully fund our initiatives.

10.    To date Unity08 has contacted individuals who we know to have an interest in Unity08's mission and the means to lend our organization more than $5,000.

11.    Unity08 discloses to potential lenders that the FEC has ruled in an Advisory Opinion that Unity08's activities involve "expenditures" under FECA, and that Unity08 accordingly qualifies as a "political committee" subject to the FECA's $5,000 per individual annual contribution limit.

12.    I have personally been informed by two individuals that they would lend Unity08 more than $5,000 but for fear of prosecution by the FEC and civil and criminal penalties in light of the FEC's ruling that FECA's $5,000 per individual annual contribution limit applies to Unity08.

13.    In sum, due to the $5,000 individual contribution limit that resulted from the FEC's ruling, Unity08 has been unable to obtain loans in excess of $5,000. The effect of the FEC's ruling on Unity08's political activities has been to hinder our efforts to commence in earnest our ballot access, American Agenda, and online convention initiatives, activities that go

- 3 -

to the core of our mission to jolt the two major political parties out of their paralyzing partisan

deadlock and give Americans a meaningful choice in the upcoming election.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 3, 2007.

Douglas L. Bailey

# EXHIBIT 2

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITY08, et al., | ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | No. 1:07-cv-00053 (RWR) |
| FEDERAL ELECTION COMMISSION, | ) ) | |
| Defendant. | ) ) ) | |

## REPLY DECLARATION OF ROGER M. CRAVER

I, Roger M. Craver, state that:

1.      I am over the age of twenty-one, and I am fully competent to testify to the matters set forth in this Declaration.

2.      Although I have already discussed Unity08's purpose and goals in my first Declaration supporting Unity08's Motion for Summary Judgment, I believe it is important to reiterate here that I and the other founders of Unity08 formed the organization to engage in political communication and other activities for the purpose of jolting the two major political parties out of their current partisan political deadlock.

3.      I have already contributed $5,000 to Unity08. I have been willing since January 2007 (the time the complaint was filed in this Court) to loan Unity08 more than $5,000 if I could do so without fear of prosecution and criminal and civil penalties as a result of the Federal Election Commission (FEC)'s ruling that Unity08's activities involve "expenditures" under the Federal Election Campaign Act ("FECA"), and that Unity08 accordingly qualifies as a "political committee" subject to the FECA's $5,000 per individual annual contribution limit.

4.    In sum, the FEC's ruling that Unity08 is subject to a $5,000 limit on annual contributions has deterred me from loaning the organization more than $5,000 for fear of prosecution under the FEC's ruling, and because I and other potential lenders have been deterred from loaning the organization more than $5,000, the effect of the FEC's ruling on our organization is that it has delayed, and may well prevent, Unity08 from engaging in its planned political activities.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 2, 2007.

_____
Roger M. Craver

**EXHIBIT 3**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITY08, et al., | ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | No. 1:07-cv-00053 (RWR) |
| FEDERAL ELECTION COMMISSION, | ) ) | |
| Defendant. | ) ) ) | |

## DECLARATION OF GERALD RAFSHOON

I, Gerald Rafshoon, state that:

1.    I am over the age of twenty-one, and I am fully competent to testify to the matters set forth in this Declaration.  This declaration is made pursuant to 28 U.S.C. § 1746.

2.    I am registered to vote in District of Columbia, and I am registered as a member of the Democratic Party.

3.    I served as Assistant to the President and Communications Director in the Carter White House and was the Media Director on all of Jimmy Carter's campaigns.  I have been involved in Democratic campaigns for 40 years.  I am also a film and television producer, and have produced a number of television movies including the Emmy Award winning "Joseph."

4.    I am one of the founders of Unity08.  I am also a member of its Board of Directors.  In my capacity as a member of the board of directors, I, along with the other board members, provide the overall guidance and strategic direction for the organization.  I engage in a significant amount of volunteer work for Unity08, helping to disseminate its message to the media and the general public, and to raise funds to support its mission.

5.    I will not provide a detailed description here of Unity08's purpose and goals, as I understand that such information is already a part of the record in this case having been provided to the Federal Election Commission in connection with Unity08's request for an Advisory Opinion and provided to this Court to support Unity08's Motion for Summary Judgment. I will underscore, however, that Unity08 is a nascent political movement of voters who desire to jolt the two major parties out of the current partisan political deadlock that stands in the way of meaningful change in our country's governance. I joined with the other founders of Unity08 – Douglas Bailey, Roger Craver, and Hamilton Jordan – to engage in political communication and other activities to achieve that aim.

6.    The focus of Unity08's activities at this time consists of:  ballot access programs to recruit delegates, volunteers, and petitioners to secure the needed signatures on ballot access petitions in the states; the operation and further development of its website to communicate its ideas about the need for the political system to focus on issues critical to the long-term safety and welfare of the country; and developing the technology infrastructure and secure systems to hold the first-ever online nominating convention in the summer of 2008.

7.    All of these activities, as well as the very significant startup costs that are associated with any new organization, will require substantial financial resources. Since its inception in the spring of 2006, Unity08 has sought to finance its efforts by soliciting small donations from individuals. More specifically, Unity08 voluntarily decided to restrict donations from individuals to $5,000 per year, and also voluntarily refused to accept contributions from corporations, labor unions, foreign nationals or government contractors.

8.    Although Unity08 voluntarily restricted its individual donations to $5,000 per year, Unity08 subsequently recognized that to meet its ballot access, communication, and online

- 2 -

convention goals it must raise several million dollars on a more rapid timetable than is possible if it is limited to $5,000 annual donations from individuals.

9.     Unity08 believes that it can more rapidly raise the $10-12 million estimated to be needed to jump start its ballot access, communication, and online convention initiatives by obtaining loans of greater than $5,000 from individuals, which loans would be paid back through subsequent donations of $5,000 or less.

10.     Unity08 is now in the process of soliciting loans of more than $5,000 from individuals.

11.     Due to the $5,000 individual contribution limit that resulted from the Federal Election Commission (FEC)'s ruling Unity08's activities involve "expenditures" under the Federal Election Campaign Act ("FECA"), and that Unity08 accordingly qualifies as a "political committee" subject to the FECA's $5,000 per individual annual contribution limit, however, Unity08 has not obtained loans in excess of $5,000.

12.     I have already contributed $5,000 to Unity08.  I have been willing since January 2007 (the time the complaint was filed in this Court) to loan Unity08 more than $5,000 if I could do so without fear of prosecution and criminal and civil penalties as a result of the FEC's ruling.

13.     In sum, the FEC's ruling that Unity08 is subject to a $5,000 limit on annual contributions has deterred me from loaning the organization more than $5,000 for fear of prosecution under the FEC's ruling, and because I and other potential lenders have been deterred from loaning the organization more than $5,000, the effect of the FEC's ruling on our organization is that it has delayed, and may well prevent, Unity08 from engaging in its planned political activities.

- 3 -

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 2, 2007.

Gerald Rafshoon

# EXHIBIT 4

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITY08, et al., | ) |
| Plaintiffs, | ) |
| v. | ) |
| FEDERAL ELECTION COMMISSION, | ) |
| Defendant. | ) |

No. 1:07-cv-00053 (RWR)

## DECLARATION OF PETER ACKERMAN

I, Peter Ackerman, state that:

1.     I am over the age of twenty-one, and I am fully competent to testify to the matters set forth in this Declaration.

2.     I am the Managing Director of Rockport Capital Inc. I am also Chairman of the Board of Trustees of Freedom House, and Chairman of the Board of Overseers of the Fletcher School of Law and Diplomacy at Tufts University

3.     I have been a supporter of Unity08 since its inception. I believe strongly in its goals, and I believe that its innovative on-line convention and delegate education process could revolutionize the conduct of future elections. I donated $5,000 in 2006 and in 2007.

4.     Unity08 asked me last year to make a loan significantly in excess of $5,000. I have the financial ability to make such a loan, and I have indicated the desire to do so. I have been advised, however, that making a loan to Unity08 would put me in breach of the FEC's imposed contribution limits and would make me subject to civil and criminal penalties. Because

of my concern about the possibility of civil or criminal penalties for an excessive contribution, I have reluctantly decided not to make the requested loan to Unity08. I would make a loan significantly in excess of $5000 to Unity08, if I could do so without fear of criminal and civil penalties.

5.    In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 3, 2007.

Peter Ackerman

- 2 -