## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITY08, *et al*., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 1:07-CV-0053 (RWR) |
| v. | ) | |
| | ) | |
| FEDERAL ELECTION COMMISSION, | ) | REPLY MEMORANDUM |
| | ) | |
| Defendant. | ) | |
| | ) | |

—————————————————————————

### DEFENDANT FEDERAL ELECTION COMMISSION'S REPLY MEMORANDUM
### IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
—————————————————————————

Thomasenia P. Duncan
General Counsel

David Kolker
Acting Associate General Counsel

Kevin Deeley
Acting Assistant General Counsel

Steve N. Hajjar
Attorney

Adav Noti
Attorney

FOR DEFENDANT
FEDERAL ELECTION COMMISSION
999 E Street, NW
Washington, DC 20463
(202) 694-1650

May 25, 2007

# TABLE OF CONTENTS

**Page**

I.  PLAINTIFFS DO NOT MEET THE CONSTITUTIONAL STANDING REQUIREMENTS ........................................................................................1

    A.  Unity08 Lacks Article III Standing Because It Has Not Suffered An Injury-In-Fact Traceable to AO 2006-20 .................................................1

        1.  Unity08's Alleged Inability to Receive Loans in Excess of $5,000 ...........2

        2.  Unity08's Alleged Inability to Raise and Spend Sufficient Funds to Gain Ballot Access .......................................................................................5

        3.  Unity08's Alleged "Competitive Political Disadvantage" ........................6

    B.  Unity08 Has Suffered No Injury Redressable By This Action ...............................9

    C.  The Individual Plaintiffs Do Not Have Standing ..................................................10

II.  AO 2006-20 IS NOT SUBJECT TO JUDICIAL REVIEW ..............................................10

    A.  AO 2006-20 Is Not Final Agency Action Under The APA ...................................11

    B.  FECA Precludes Judicial Review of Advisory Opinions .....................................15

III.  AO 2006-20 IS A REASONABLE CONSTRUCTION OF THE FECA .........................17

    A.  AO 2006-20 Is Entitled To Deference ..................................................................17

    B.  Unity08 Is No Different From Other Political Committees That Are Raising Funds to Support Particular Candidates Who Will Be Identified Between Now and Election Day ........................................................................19

    C.  Unity08 Continues to Misinterpret Supreme Court Precedent .............................22

IV.  CONCLUSION .................................................................................................................25

# TABLE OF AUTHORITIES

**Page**

## CASES

*Abbott Labs. v. Gardner*, 387 U.S. 136 (1967)................................................................. 11-12, 15

*Akins v. FEC*, 101 F.3d 731 (D.C. Cir. 1997), *vacated on other grounds*
  524 U.S. 11 (1998)........................................................................................................ 9-10

*Athens Lumber Co. v. FEC*, 689 F.2d 1006 (11th Cir. 1983) ..........................................8

*Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289 (1979)................................8

*Block v. Community Nutrition Inst.*, 467 U.S. 340 (1984).......................................... 15-16

*Buchanan v. FEC*, 112 F. Supp. 2d 58 (D.D.C. 2000) ...................................................6

*Buckley v. Valeo*, 424 U.S. 1 (1976) ...................................................... 6, 18, 22-24

*California Medical Ass'n v. FEC*, 453 U.S. 182 (1981)..................................................24

*Chamber of Commerce v. FEC*, 69 F.3d 600 (D.C. Cir. 1995) .................................. 4, 7-8, 11, 18

*Common Cause v. Bolger*, 512 F. Supp. 26 (D.D.C. 1980).............................................7

*Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984) ..............................................17, 19

*Citizens for Responsibility & Ethics in Wash. v. FEC*, 401 F. Supp. 2d 115 (D.D.C. 2005) ..........8

*Clean Air Implementation Project v. EPA*, 150 F.3d 1200 (D.C. Cir. 1998) ...............................11

*Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999)....................................4

*Diamond v. Charles*,  476 U.S. 54 (1986) ....................................................................7

*Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594 (1950)........................................12

*FEC v. GOPAC*, 917 F. Supp. 851 (D.D.C. 1996) .................................................. 21-22

*FEC v. Lance*, 635 F.2d 1132, 1142 (5th Cir. 1981) ......................................................5

*FEC v. Machinists Non-Partisan Political League*, 655 F.2d 380 (D.C. Cir. 1981)............... 20-21

*FEC v. Malenick*, 310 F. Supp. 2d 230 (D.D.C. 2004)..................................................22

*FEC v. Massachusetts Citizens For Life, Inc.,* 479 U.S. 238 (1986)...............................................23

*FEC v. Ted Haley Congressional Comm.*, 852 F.2d 1111 (9th Cir. 1988)................................5, 24

*FTC v. Std. Oil Co. of Cal.*, 449 U.S. 232 (1980).......................................................13

*Galliano v. United States Postal Serv.*, 836 F.2d 1362 (D.C. Cir. 1988) .....................................16

*Gottlieb v. FEC*, 143 F.3d 618 (D.C. Cir. 1998)...........................................................7

*In re Carter-Mondale Reelection Comm.*, 642 F.2d 538 (D.C. Cir. 1980)....................................16

*In re United States Catholic Conference*, 885 F.2d 1020 (2d Cir. 1989) .......................................7

*Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221 (1986)..........................................11, 15

*Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271 (D.C. Cir. 1994) ....................................................8

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ............................................................3-4, 9

*Martin Tractor Co. v. FEC*, 627 F.2d 375 (D.C. Cir. 1980)...........................................................17

*McConnell v. FEC*, 540 U.S. 93 (2003).....................................................................6

*National Conservative Political Action Comm. v. FEC*, 626 F.2d 953 (D.C. Cir. 1980)........11-12

*Natural Law Party of the United States of Am. v. FEC*, 111 F. Supp. 2d 33 (D.D.C. 2000).......7-8

*Pyramid Secs. Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114, 1123 (D.C. Cir. 1991) .........................4

*Rainey v. Am. Forest & Paper Ass'n,* 26 F. Supp. 2d 82, 95 (D.D.C. 1998)..................................4

*Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n,*
    324 F.3d 726 (D.C. Cir 2003).................................................................13

*Republican National Comm. v. FEC*, No. 98-5263, 1998 WL 794896
    (D.C. Cir. Nov. 6, 1998) ...................................................................8

*Scott v. Harris*, 127 S. Ct. 1769 (2007) ....................................................................8

*Seegars v. Gonzales*, 396 F.3d 1248 (D.C. Cir. 2005)......................................................8

*Shays v. FEC*, 414 F.3d 76 (D.C. Cir. 2005) ................................................................7

*Sierra Club v. EPA*, 292 F.3d 895 (D.C. Cir. 2002) ........................................................9

*United States v. Goland*, 959 F.2d 1449 (9th Cir. 1992) ...............................................24

*United States Defense Comm. v. FEC*, 861 F.2d 765 (2d Cir. 1988) ..........................8, 13-14, 17

## STATUTES AND REGULATIONS

Federal Election Campaign Act, 2 U.S.C. §§ 431-55 ..........................................................*passim*

2 U.S.C. § 431(4) ...............................................................................................18, 23

2 U.S.C. § 431(8)(B)(i) ................................................................................................10

2 U.S.C. § 431(8)(B)(vii) ..............................................................................................2

2 U.S.C. § 431(9) ........................................................................................................18

2 U.S.C. § 431(18) ......................................................................................................18

2 U.S.C. § 437f(a)(1) ..................................................................................................12

2 U.S.C. § 437f(b) ........................................................................................................8

2 U.S.C. § 437f(c)(2) ..................................................................................................12

2 U.S.C. § 437g(a)(2) ..................................................................................................13

2 U.S.C. § 437g(a)(4)(A)(i) ..........................................................................................13

2 U.S.C. § 437g(a)(6)(A) ............................................................................................13

2 U.S.C. § 437g(a)(8) ....................................................................................................8

5 U.S.C. § 701(a)(1) ...............................................................................................11, 15

5 U.S.C. § 704 ........................................................................................................11, 14

11 C.F.R. § 100.82 ........................................................................................................2

11 C.F.R. § 100.82(a) ....................................................................................................2

## MISCELLANEOUS

FEC Advisory Opinion 1985-33 ......................................................................................5

FEC Advisory Opinion 1984-11 ....................................................................................18

FEC Advisory Opinion 1994-5 .......................................................................................18

FEC Advisory Opinion 1996-35 .....................................................................................13

FEC Advisory Opinion 2001-13 ..................................................................................7, 13

FEC Advisory Opinion 2006-20 ............................................................................... *passim*

FED. R. CIV. P. 30(b)(6) ................................................................................................4

General Counsel's Report #2, MUR 5421 (approved Dec. 12, 2005) ...............................2

Political Committee Status Supplemental Explanation and Justification, 72 Fed. Reg.
     5595, 5602 (Feb. 7, 2007) ................................................................................... 24

U.S. CONST. art. III ............................................................................................ 1-3, 6, 10

Plaintiffs' response brief does not deny that Unity08's goal is to elect the next President and Vice President of the United States by, among other things, spending millions of dollars to obtain ballot access and then giving such access to its chosen candidates. Despite these uncontroverted facts, Unity08 now claims in its response (at 35) that it "does not seek to influence the contest in th[at] arena," although it also asserts, for standing purposes, that it competes with the major political parties and suffers injury from the Commission's conclusion in Advisory Opinion ("AO") 2006-20 that Unity08 will have to register as a political committee. Plaintiffs' arguments are inconsistent and largely fail even to respond to the arguments in the Federal Election Commission's ("Commission" or "FEC") opening brief. Plaintiffs devote most of their response brief to factually baseless and legally unsupported attempts to address the Commission's showing that jurisdiction and reviewability are each lacking here. Plaintiffs then repeat their misinterpretations of Supreme Court precedent — interpretations that would threaten the longstanding contribution limits in the Federal Election Campaign Act ("Act" or "FECA"), 2 U.S.C. §§ 431-55. In this reply memorandum, the Commission shows that plaintiffs have failed to demonstrate standing and that the challenged advisory opinion is not subject to judicial review. In the alternative, the Commission demonstrates that Advisory Opinion 2006-20 is entitled to deference and is a reasonable construction of the FECA. Accordingly, the Court should grant the Commission's motion for summary judgment and deny plaintiffs' motion.

I.    **PLAINTIFFS DO NOT MEET THE CONSTITUTIONAL STANDING REQUIREMENTS**

A.    **Unity08 Lacks Article III Standing Because It Has Not Suffered An Injury-In-Fact Traceable to AO 2006-20**

In its opening brief, the Commission demonstrated that Unity08 has voluntarily imposed a $5,000 limit on the contributions it accepts and has provided no evidence that anyone was willing to lend the organization more than $5,000 when the Complaint was filed. Def.'s Mem. in

Support of Its Mot. for Summ. J. and in Opp. to Pls.' Mot. for Summ. J. ("Mem.") at 8-10.

Accordingly, Unity08 has suffered no cognizable injury-in-fact from AO 2006-20, and any

"injury" Unity08 has incurred is traceable to its own actions or the actions of third parties, and

not to the advisory opinion.  In their response, however, plaintiffs allege that Unity08 has

suffered three injuries traceable to AO 2006-20:  (1) inability to receive loans in excess of $5,000

(Pls.' Resp. to Def.'s Mem. in Support of its Mot. for Summ. J. and in Opp. to Pls.' Mot. for

Summ J. ("Resp.") at 8-10); (2) inability to raise and spend sufficient funds to gain ballot access

for its presidential and vice-presidential nominees (*id*. at 7-8, 10-11); and (3) being placed at a

"competitive political disadvantage" relative to the major political parties (*id*. at 16-17).  As

explained below, none of these constitutes injury to Unity08 for purposes of standing under

Article III of the Constitution, nor is any traceable to AO 2006-20.

### 1.    Unity08's Alleged Inability to Receive Loans in Excess of $5,000

Unity08's primary allegation of injury — that AO 2006-20 has prevented it from

receiving loans in excess of $5,000 — is legally unfounded and factually unsupported.  As a

matter of law, FECA expressly permits Unity08 to obtain loans in any amount.  2 U.S.C.

§ 431(8)(B)(vii); 11 C.F.R. § 100.82.  The only relevant requirement is that these loans be made

by a bank "in the ordinary course of business."  11 C.F.R. § 100.82(a).  Indeed, political

committees frequently take out loans of millions of dollars, and the Commission has expressly

affirmed their permissibility.  *See*, *e.g.*, General Counsel's Report #2, MUR 5421, *available at*

http://eqs.sdrdc.com/eqs/searcheqs (approved Dec. 12, 2005) (finding Kerry for President

committee did not violate FECA by borrowing approximately $7 million).  It is, therefore,

indisputable that Unity08 is permitted to solicit and receive loans without fear of prosecution,

and plaintiffs' injury-in-fact argument must fail because nothing in AO 2006-20 provides (or

could provide) otherwise.  If Unity08 is unwilling to solicit a bank loan or unable to obtain one,

those decisions would reflect its own preferences or those of commercial lenders, not anything caused by AO 2006-20.

Unity08's argument regarding loans also fails because there is no evidence showing that, but for AO 2006-20, anyone would have loaned Unity08 more than $5,000 at the time the Complaint was filed in this case. Instead, on March 12, 2007, fully two months after the Complaint was filed, Unity08's Chief Executive Officer and Rule 30(b)(6) deponent testified that no such lender existed:

> Q.    Are you aware of anyone who right now wants to loan
>        Unity08 more than $5,000?
> A.    No.

Mem. Exh. 4 (Bailey Dep.) at 44:3-5. Three days later, Unity08's second Rule 30(b)(6) deponent agreed:

> Q.    As of today are there any individuals who have indicated
>        that they specifically intend to make a loan to Unity08 if
>        that's legally permissible?
> A.    Not that I'm aware of….

Mem. Exh. 14 (Radek Dep.) at 19:4-7. Thus, even as late as March 2007, Unity08's own corporate designees were unaware of anyone who wanted or intended to loan more than $5,000 to Unity08, regardless of whether such a loan was legal under FECA. Because injury-in-fact is determined at the time the complaint is filed, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 569 n.4 (1992), plaintiffs have failed to establish Article III injury.

Confronted with these deposition admissions, plaintiffs now rely upon (Resp. at 9) their own declarations written after the close of discovery, which, despite the benefit of late submission, still do not meet plaintiffs' burden. Mr. Bailey declares (¶ 64) that he "would" loan Unity08 more than $5,000, but nowhere states that he would have provided a loan as of the date of the Complaint. The Craver reply declaration (¶¶ 3-4) and the Rafshoon reply declaration

(¶12) state that the declarants have been willing to loan Unity08 more than $5,000 "since January 2007 (the time the complaint was filed in this court)." What these individuals have been willing to do "since" the complaint was filed, however, is irrelevant. *See Lujan*, 504 U.S. at 569 n.4 ("[P]laintiff cannot retroactively create jurisdiction based on postcomplaint litigation conduct."). Thus, despite submitting four new declarations on reply, Unity08 still has not provided factual evidence that, as of January 12, 2007, there was anyone who actually would have loaned Unity08 more than $5,000 but for AO 2006-20.[1]  Accordingly, plaintiffs fail to meet their burden of demonstrating injury-in-fact from an inability to obtain loans caused by AO 2006-20.[2]

Finally, despite plaintiffs' claim (Resp. at 18) that the Commission "ignores the factual distinction here between contributions and loans," it is Unity08 that has blurred this distinction. On the one hand, Unity08 has voluntarily decided not to accept contributions more than $5,000 (*see* Mem. at 8-10; FEC Facts ¶¶ 12-18), but, on the other hand, alleges that it wants large "loans" that are generally indistinguishable from the large contributions it purportedly does not want. Unity08's proposed "Loan Agreement" provides that Unity08 will not pay *any* interest on

---

[1]   Even if plaintiffs' vague reply declarations could be construed to refer to the declarants' intentions at the time the Complaint was filed, such declarations should be disregarded because they conflict with Unity08's Rule 30(b)(6) deposition testimony quoted above. As the Supreme Court has noted, there is "virtual unanimity [among courts] that a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition)." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999) (collecting cases); *Pyramid Secs. Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114, 1123 (D.C. Cir. 1991) ("Courts have long held that a party may not create a material issue of fact simply by contradicting its prior sworn testimony."). Such exclusion is even more appropriate where, as here, the original deposition testimony was given by the proffering party's own representative under Rule 30(b)(6). *Rainey v. Am. Forest & Paper Ass'n*, 26 F. Supp. 2d 82, 95 (D.D.C. 1998) (refusing to consider summary judgment affidavit that conflicted with party's 30(b)(6) deposition testimony).

[2]   Because FECA permits Unity08 to receive loans, plaintiffs' reliance (Resp. at 11-16) on *Chamber of Commerce v. FEC*, 69 F.3d 600 (D.C. Cir. 1995), is misplaced. Unlike the *Chamber of Commerce* plaintiff, which was injured by a regulation that specifically *prohibited* its course of conduct, Unity08 is entitled to a safe harbor under a statute and regulation that expressly *permit* the activity Unity08 claims to desire — *i.e.*, to seek bona fide loans.

the borrowed funds and, in fact, will not repay the loan at all unless "*in its absolute discretion*" it

chooses to do so.  UNI 1551-53 at 1551 ¶¶ 2, 4 (Exh. 31) (emphasis added).  An interest-free

loan that need not be repaid is not commercially available from any bank, and therefore plaintiffs

are attempting to claim injury from Unity08's alleged inability to receive what are actually large

contributions while Unity08 simultaneously continues to pledge — both publicly and in sworn

declarations to this Court — never to accept contributions in excess of $5,000.  *See FEC v. Ted*

*Haley Congressional Comm.*, 852 F.2d 1111, 1115 (9th Cir. 1988) (holding that loan guarantees

by individuals constituted non-bank loans, and therefore contributions, under FECA); Advisory

Opinion 1985-33, http://ao.nictusa.com/ao/no/850033.html (Nov. 22, 1985) (advising that loans

from individuals to committee would be contributions under FECA); *see also FEC v. Lance*, 635

F.2d 1132, 1142 (5th Cir. 1981) (en banc) (rejecting constitutional challenge to FECA provision

that bank loans outside ordinary course of business are contributions).

### 2. Unity08's Alleged Inability to Raise and Spend Sufficient Funds to Gain Ballot Access

Unity08's second alleged injury — its purported inability to spend the $10-$12 million it

believe it needs to achieve its goals (Resp. at 8) — fails because there is no expenditure limit at

issue here.  The Supreme Court has repeatedly distinguished between contribution and

expenditure limits and held that FECA's limits on individual contributions constitute neither a

limit on the recipient's total fundraising nor a restriction on its expenditures.[3]  *See* Mem. at 38-39

& cases cited therein.  Thus, despite Unity08's continuing attempts to equate contribution limits

with expenditure restrictions, neither AO 2006-20 nor FECA prohibits Unity08 from raising the

---

[3]    Indeed, six different presidential candidate committees, which are subject to lower
contribution limits than those that would be applicable to Unity08 as a political committee,
raised over $12 million during the first three months of 2007 alone.  *See* FEC, Summary Reports
Search, http://www.fec.gov/finance/disclosure/srssea.shtml.

funds it needs and spending them as it wishes to, and accordingly Unity08 has suffered no cognizable spending-related injury.[4]

### 3.    Unity08's Alleged "Competitive Political Disadvantage"

Similarly, Unity08's third alleged injury — its purported "competitive political disadvantage" (Resp. at 16-17) relative to the major parties — cannot provide standing under Article III. As the Commission explained in its opening brief (at 40-41), the Supreme Court expressly considered in *Buckley* the argument that FECA's contribution limits would harm minor parties and independent candidates, but the Court nonetheless upheld the contribution limits, finding that "any attempt to exclude minor parties and independents en masse from the Act's contribution limitations overlooks the fact that minor-party candidates may win elective office or have a substantial impact on the outcome of an election." *Buckley v. Valeo*, 424 U.S. 1, 33-35 (1976); *see also* Mem. at 40-41 & cases cited therein.[5] The Court then reaffirmed this holding in *McConnell*, noting that the purposes behind FECA "appl[y] as much to a minor party that manages to elect only one of its members to federal office as it does to a major party whose members make up a majority of Congress." *McConnell v. FEC*, 540 U.S. 93, 159 (2003). There is thus no precedent supporting Unity08's argument that the Act imposes a greater financial burden on Unity08 than it does on any other political committee.[6]

---

[4]    In addition, Unity08's argument fails as a factual matter because, by its own continuing admission, Unity08's operations were unaffected by AO 2006-20. Don't Tolerate "Official Washington" Trying to Stand in the Way of Unity08!, http://www.unity08.com/takeaction/fec (last visited May 22, 2007) (Exh. 32) ("[T]he FEC put in place a strict $5,000 limit on any contribution to Unity08 …. Of course, Unity08 had long ago voluntarily instituted a $5,000 cap as part of our promise to reduce the influence of money on politics. And as you know, Unity08 refuses to take money from corporations or special interests. So nothing about our operations will change.").

[5]    The Court expressed further doubt as to whether minor parties were harmed by contribution limits at all, given that, prior to FECA, major parties received substantially more contributions above the then-$1,000 limit than did minor parties and independents. *Buckley*, 424 U.S. at 33.

[6]    Indeed, none of the cases that Unity08 cites in support of its argument (Resp. at 16-17) even relates to contribution limits or expenditures. *See Buchanan v. FEC*, 112 F. Supp. 2d 58 (D.D.C.

Unity08's alleged (Resp. at 16) "competitive political disadvantage" is also belied by its own express disavowal of any desire or intent to become a national political party (FEC Facts ¶ 31),[7] or to "provide any support to candidates for the Unity08 nomination, or to the ultimate Unity08 candidates" (Resp. at 2). These disavowals are dispositive, because Unity08 cannot demonstrate standing as a "competitor" of the national parties unless it competes in the same electoral "arena" as those parties. *Gottlieb v. FEC*, 143 F.3d 618, 621 (D.C. Cir. 1998); *see Shays v. FEC*, 414 F.3d 76, 87 (D.C. Cir. 2005); *In re United States Catholic Conference*, 885 F.2d 1020, 1029 (2d Cir. 1989); *see also infra* p. 19. In effect, therefore, Unity08 seeks standing as a competitor of the political parties to request that this Court issue a declaratory judgment finding that Unity08 will *not* be competing with those parties. But plaintiffs cannot have it both ways: Unity08's purported "competitive" standing is contrary to plaintiffs' own theory of their underlying cause of action and therefore bears no logical "nexus" to that action.[8] *See Diamond v. Charles*, 476 U.S. 54, 70 (1986) ("Art. III standing requires an injury with a nexus to the substantive character of the statute or regulation at issue.").

Finally, plaintiffs' extensive reliance (Resp. at 11-16) on *Chamber of Commerce* and the "threat of prosecution" at issue there is misplaced. That case involved a challenge to a final regulation, not an advisory opinion. 69 F.3d at 601. The court neither decided nor addressed whether a plaintiff would have standing to challenge an AO, which, in contrast to a regulation,

---

2000) (challenging exclusion from presidential debates); *Natural Law Party of the United States of Am. v. FEC*, 111 F. Supp. 2d 33, 46 (D.D.C. 2000) (same); *Common Cause v. Bolger*, 512 F. Supp. 26, 30 (D.D.C. 1980) (challenging franking statute).

[7]  A national political party is an organization that, *inter alia*, fields candidates for multiple federal offices in multiple states. *See* Advisory Opinion 2001-13 at 2, http://saos.nictusa.com/aodocs/2001-13.pdf (Nov 8, 2001).

[8]  This disconnect is further highlighted by Unity08's requested relief, which is not to be subject even to the political party contribution limits; instead, Unity08 seeks to avoid being subject to any contribution limits whatsoever. *See* Compl. at 11, Prayer for Relief ¶ b (seeking injunction against contribution limits).

does not create a "rule of law."  *Compare* 2 U.S.C. § 437f(b) (providing that Commission may not create "rule of law" through advisory opinions), *with Chamber of Commerce*, 69 F.3d at 603 ("The [challenged] rule constitutes the purported legal norm that binds the class regulated by statute."); *see also United States Defense Comm. v. FEC* ("*USDC*"), 861 F.2d 765, 771 (2d Cir. 1988) (discussing § 437f(b)); Mem. at 12-15 (demonstrating that negative AO is not binding or final agency action).[9]  Plaintiffs' citations to *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289 (1979), *Seegars v. Gonzales*, 396 F.3d 1248 (D.C. Cir. 2005), and *Athens Lumber Co. v. FEC*, 689 F.2d 1006 (11th Cir. 1983), are even more attenuated, as those cases involved challenges to the constitutionality of federal statutes — two of them criminal statutes — that on their face created a threat of prosecution.  Because Unity08 does not claim to challenge the FECA or the Commission's regulations, none of plaintiffs' cases is on point, and plaintiffs' claim of injury fails for the reasons stated above and in the Commission's opening brief.[10]

---

[9]    For the same reason, plaintiffs' argument (Resp. at 13, 15-16) that Unity08 is injured by the potential for a third-party challenge to Unity08's activities under 2 U.S.C. § 437g(a)(8) is irrelevant.  *Chamber of Commerce* found that the Commission's potential decision not to enforce the regulation at issue in that case would be contrary to the Commission's enforcement obligations and therefore subject to reversal in a later suit under section 437g(a)(8).  Here, in contrast, Unity08 challenges an advisory opinion, which the Commission has no legal obligation to enforce and therefore could not give rise to a successful section 437g(a)(8) action.  The two other cases plaintiffs cite for their section 437g(a)(8) argument are also irrelevant:  *Natural Law Party*, 111 F. Supp. 2d at 46, involved the propriety of a plaintiff's standing *under* section 437g(a)(8), not *because of* that section, and *Republican National Comm. v. FEC*, No. 98-5263, 1998 WL 794896 (D.C. Cir. Nov. 6, 1998), despite plaintiffs' creative alteration of a quotation from the case, has nothing to do with section 437g(a)(8).  *See id.* at *2.

[10]   Plaintiffs, quoting *Citizens for Responsibility & Ethics in Wash. v. FEC*, 401 F. Supp. 2d 115, 119 (D.D.C. 2005) ("*CREW*"), assert that the Commission's motion for summary judgment "cannot be granted unless there is absolutely no set of facts that would support the plaintiffs' standing."  Resp. at 6 n.3.  The *CREW* court, however, erred by quoting this language from *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994), in which the "no set of facts" standard applied because the case was decided on a motion to dismiss.  In contrast, the well-established standard for summary judgment provides that courts "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion," *Scott v. Harris*, 127 S. Ct. 1769, 1774 (2007) (quotation marks and alterations omitted), but, as with all jurisdictional matters, the plaintiff must provide "specific facts" demonstrating

**B.     Unity08 Has Suffered No Injury Redressable By This Action**

In its opening brief (at 10-11), the Commission explained that Unity08's purported injuries are not redressable because evidence before this Court demonstrates that Unity08 has accepted more than $1,000 in contributions and has thus become a political committee for reasons separate and apart from those relied upon in the AO. Therefore, even if the Court were to overturn the AO, that decision would not change Unity08's status as a political committee. Rather than deny that Unity08 has received contributions (*see* Resp. at 19), plaintiffs respond only by citing *Akins v. FEC*, 101 F.3d 731 (D.C. Cir. 1997), *vacated on other grounds* 524 U.S. 11 (1998), for the proposition that "just because *an agency* might reach the same conclusion for a different reason, that possibility destroys neither causation nor redressability for the decision under review." Resp. at 19-20 (emphasis added).

The principle for which plaintiffs cite *Akins* is accurate, but irrelevant. In both the D.C. Circuit and Supreme Court, the question was whether redressability was absent where, even if the basis for Commission's decision not to enforce the Act's political committee requirements against an organization were overturned, the Commission might on remand exercise its prosecutorial discretion and come to the same decision for different reasons. The courts found that the *agency's* prerogative to reach the same result for other legitimate reasons could not defeat plaintiffs' showing of redressability. But here, the Commission is not arguing that its own potential determination about Unity08's contributions is what defeats plaintiffs' claim of redressability. Rather, *this Court* can make that determination because it has sufficient undisputed evidence — obtained in discovery and not available to the Commission during the AO process — to decide

---

that it has standing. *Lujan*, 504 U.S. at 561; FEC Mem. at 7-8 (setting forth standard of review). Plaintiffs' citation to dictum from *Sierra Club v. EPA*, 292 F.3d 895, 899-900 (D.C. Cir. 2002), for the proposition that their standing is so "self-evident" so as to not require evidence is unavailing, for the court in that case found that the plaintiffs did *not* have standing and explicitly held that a plaintiff "must substantiate its standing 'with the manner and degree of evidence required at the successive stages of litigation.'" *Id.* (quoting *Lujan*).

itself that Unity08 solicited and received over $1,000 in contributions after AO 2006-20 was issued. *See* FEC Facts ¶¶ 32-39. The reasoning of *Akins* is thus inapposite here. Because this Court can determine that vacating the AO would not change Unity08's status as a political committee, plaintiffs cannot meet the redressability requirement under Article III.

## C. The Individual Plaintiffs Do Not Have Standing

The individual plaintiffs, who serve as Unity08's directors and volunteer on the organization's behalf, allege that they have been injured by AO 2006-20's purported restrictions on their "personal efforts" to further "Unity08's ballot access, American Agenda, and online convention initiatives." Resp. at 20-21. The advisory opinion, however, placed no limit on the individuals' "personal efforts," which are not subject to restriction under FECA or the Commission's political committee regulations. *See* 2 U.S.C. § 431(8)(B)(i) ("The term 'contribution' does not include … the value of services provided without compensation by any individual who volunteers on behalf of a … political committee."). This allegation, therefore, is simply incorrect and cannot serve as the basis for the individual plaintiffs' standing.

The individual plaintiffs also claim injury from purportedly being prohibited from loaning Unity08 more than $5,000. Resp. at 20-21. But, as discussed *supra* pp. 3-5, this argument is belied by the record, which shows only that, since the Complaint was filed, individual plaintiffs may have wished to make large contributions in the form of "loans" that do not have to be repaid, *i.e.,* the kind of donation that Unity08, for reasons preceding and unrelated to the advisory opinion, voluntarily refuses to accept. *See* Mem. at 8-10; FEC Facts ¶¶ 12-18.[11]

## II. AO 2006-20 IS NOT SUBJECT TO JUDICIAL REVIEW

Plaintiffs concede (Resp. at 27) that FECA does not explicitly provide for judicial review of advisory opinions, and therefore AO 2006-20 may be subject to judicial review only if the

---

[11]  The individual plaintiffs' purported injury also is not redressable because Unity08 has accepted over $1,000 in contributions and has thus become a political committee for alternative reasons. *See supra* p. 9.

Administrative Procedure Act ("APA") authorizes such review and FECA does not preclude it. *See* 5 U.S.C. § 701(a)(1). As the Commission explained in its opening brief, however, the advisory opinion does not meet the APA's finality requirement, 5 U.S.C. § 704, and FECA precludes judicial review of advisory opinions. Mem. at 11-18.

### A.    AO 2006-20 Is Not Final Agency Action Under The APA

In its opening brief, the Commission explained that AO 2006-20 is not "final agency action" subject to review under the APA because, as a negative advisory opinion, it neither determines the "rights and obligations" of Unity08 nor binds the Commission to take any enforcement action in the future. Mem. at 12-15. In response, Unity08 argues that AO 2006-20 is "final" because it represents a legal conclusion of the Commission that is not fact specific, that is unlikely to change in the future, and that the Commission probably cannot be dissuaded from enforcing. Resp. 22-27. None of these arguments is valid, and their reliance on speculation demonstrates precisely why negative advisory opinions are not "final agency action."

Plaintiffs do not cite a single case standing for the proposition that negative advisory opinions are reviewable under the APA. Instead, plaintiffs rely (Resp. at 24-25) upon cases challenging fully-promulgated regulations, which, of course, are final for APA purposes. *Abbott Labs. v. Gardner*, 387 U.S. 136 (1967) (challenging Food and Drug Commission regulation); *Clean Air Implementation Project v. EPA*, 150 F.3d 1200 (D.C. Cir. 1998) (challenging EPA regulation); *Chamber of Commerce* (challenging FEC regulation).[12] The sole advisory opinion case that plaintiffs cite, *National Conservative Political Action Comm. v. FEC*, 626 F.2d 953 (D.C. Cir. 1980) ("*NCPAC*"), was a third-party challenge to a permissive advisory opinion, *i.e.*, an opinion finding that the requester's proposed activity was lawful. Because such an AO

---

[12]    Plaintiffs also cite a footnote from *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221 (1986), in which there was no dispute regarding the finality of the agency's quasi-adjudicatory action. *See id.* at 230 n.4.

precludes the Commission from later bringing an enforcement action against the requester

regarding the proposed activity, 2 U.S.C. § 437f(c)(2), *NCPAC* is inapposite to the negative AO

at issue here.  (In addition, *NCPAC* involved a challenge to the *process* by which the AO was

issued, and the court did not address the merits of the AO itself.  *NCPAC*, 626 F.2d at 959.)

Plaintiffs also rely (Resp. at 24) upon *Abbott Labs* for a purported list of "factors to

consider" in determining finality.  However, even if that decision's ripeness analysis were fully

relevant, application of those factors would demonstrate why the kind of negative AO at issue

here is not final agency action.  When the Court found that the final regulation at issue in *Abbott

Labs* was reviewable, it distinguished *Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594

(1950), in which the Court had found an agency's pre-enforcement, probable cause

determination unreviewable:

> [T]he determination of probable cause in *Ewing* ha[d] no effect in and of
> itself; only some action consequent upon such a finding could give it legal
> life…. The [plaintiff] in *Ewing* was quite obviously seeking an unheard-of
> form of relief which, if allowed, would have permitted interference in the
> early stages of an administrative determination as to specific facts, and would
> have prevented the regular operation of … procedures established by the
> [agency's enabling act].

*Abbott Labs*, 387 U.S. at 147-48.  Unity08's claim, much like that in *Ewing*, seeks judicial

review of a non-binding, fact-specific agency determination based on proposed future activity —

a form of review that continues to be "unheard-of," as evidenced by plaintiffs' inability to cite

any relevant authority to the contrary.

Plaintiffs' specific arguments for APA finality are also based on faulty factual premises.

First, contrary to plaintiffs' assertion (Resp. at 24-25) that there is "no indication … that a

different conclusion [regarding Unity08's political committee status] might be reached with

additional facts," AO 2006-20 is, by statute, confined to the particular facts that were before the

Commission when it issued the opinion.  2 U.S.C. § 437f(a)(1) (authorizing Commission to issue

advisory opinion "with respect to a specific transaction or activity"); *see also* AO 2006-20 at 6 (Mem. Exh. 3) (noting that AO "constitutes an advisory opinion concerning … the specific transaction or activity set forth in your request"); Mem. at 12-15.[13]  Second, in response to the Commission's argument that AO 2006-20 does not bind the Commission to commence an enforcement action against Unity08 at any time, plaintiffs argue that there is "every indication that the FEC will prosecute based on the position adopted in the AO."  Resp. at 22.  Regardless of whether any such "indication" exists, however, the FECA establishes a multi-stage enforcement process, and each stage requires a majority vote of the Commission to proceed. 2 U.S.C. § 437g(a)(2) (reason-to-believe determination); § 437g(a)(4)(A)(i) (probable cause determination); § 437g(a)(6)(A) (commencement of enforcement action in district court).  Thus, as a matter of law, AO 2006-20 simply does not require the Commission ever to find reason to believe that Unity08 has violated FECA, much less to make a probable cause determination or commence a civil enforcement action.  Accordingly, the advisory opinion does not determine the Commission's enforcement obligations and cannot be deemed final for APA purposes.[14]

Finally, when confronted with the holding of *United States Defense Comm. v. FEC* ("*USDC*"), 861 F.2d 765 (2d Cir. 1988), plaintiffs concede that the Second Circuit explicitly rejected the claim that negative advisory opinions are sufficiently final to be reviewable.  *Id*.

---

[13]  Indeed, the Commission has reached differing conclusions in advisory opinions regarding the same entity where relevant facts had changed between the advisory opinion requests.  *Compare* Advisory Opinion 1996-35, http://ao.nictusa.com/ao/no/960035.html (Nov. 18, 1996) (denying national party status to Green Party), *with* Advisory Opinion 2001-13, http://ao.nictusa.com/ao/no/010013.html (Nov. 8, 2001) (granting national party status to Green Party).

[14]  To the extent that Unity08 implies that the AO is "final" simply because it has been approved by a majority of Commissioners (*see* Resp. at 22, 24), this argument is meritless.  Not all actions approved by the Commission are final; for example, the votes of four Commissioners are necessary to find reason to believe that an entity has violated FECA, 2 U.S.C. § 437g(a)(2), but an agency's reason-to-believe finding is not "final agency action."  *FTC v. Std. Oil Co. of Cal.*, 449 U.S. 232, 241 (1980); *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726 (D.C. Cir. 2003).

at 771.[15]  Plaintiffs respond (Resp. at 25) to this holding by stating — with no support from the legislative history, statutory text, or case law — that the Second Circuit's "conclusory statements about reviewability are not grounded in FECA."  To the contrary, however, the *USDC* court carefully examined not only FECA's advisory opinion provisions, but also its enforcement and conciliation provisions and legislative history, and found that considering an advisory opinion to be final agency action would lead to multiple, duplicative, premature litigation, which is precisely what 5 U.S.C. § 704 was intended to prevent.  *See USDC*, 861 F.2d at 770-72.

Unable to support their claim that *USDC* was wrongly decided, plaintiffs attempt to distinguish it on the grounds that the *USDC* plaintiff may have been able to change its conduct to conform to the AO it had received, while Unity08 "cannot simply change its fundraising strategy" because "the ability to obtain loans of more than $5,000 is critical to Unity08's success and probably, to its survival."[16]  Resp. at 27.  But nowhere did the *USDC* court rely on (or even mention) the plaintiff's ability to alter its conduct such that this purported difference between the cases would be grounds for distinguishing *USDC*.  Furthermore, plaintiffs' assertion is factually unfounded, for neither AO 2006-20 nor any FECA provision prohibits Unity08 from "obtain[ing] loans of more than $5,000," and so plaintiffs need not abandon their putative "fundraising strategy."  *See supra* pp. 2-5.  In sum, plaintiffs provide no basis in law or fact for disregarding the plain and persuasive holding of *USDC*, or any of the other authority discussed in

---

[15]   Plaintiffs' claim (Resp. at 25) that the Second Circuit limited its holding by stating that an advisory opinion is not "automatically" ripe for review ignores the context of that statement; the court was simply rejecting the *USDC plaintiff's* argument regarding "automatic" ripeness.  *See USDC*, 861 F.2d at 772-73.

[16]   Unity08's additional argument (Resp. at 27) that *USDC* is distinguishable because the AO in that case was "fact-specific," while AO 2006-20 involved a "legal question," fails because AO 2006-20 — like all advisory opinions — was decided upon the particular facts presented to the Commission in the advisory opinion request.  *See supra* pp. 12-13.

the Commission's opening brief (Mem. at 12-15) showing that AO 2006-20 is not final agency action under the APA.

###### B.     FECA Precludes Judicial Review of Advisory Opinions

In its opening brief, the Commission demonstrated Congress's intent to preclude direct judicial review of advisory opinions.  In response, plaintiffs cite (Resp. at 27-28) *Abbott Labs* and *Japan Whaling* for the proposition that "clear and convincing evidence" is required to demonstrate preclusion under 5 U.S.C. § 701(a)(1).  The Supreme Court "has, however, never applied [*Abbott Labs'*] 'clear and convincing evidence' standard in the strict evidentiary sense …. Rather, the Court has found the standard met … whenever the congressional intent to preclude judicial review is 'fairly discernable in the statutory scheme.'"  *Block v. Community Nutrition Inst.*, 467 U.S. 340, 350-51 (1984) (citation omitted).

As the Commission has explained (Mem. at 15-18), congressional intent to preclude judicial review of advisory opinions is "fairly discernable" in the text, structure, and history of the FECA.  Plaintiffs provide no contrary authority, and admit that FECA provides for review "only … in two very limited contexts."  Resp. at 29.  Plaintiffs claim, however, that "it is difficult to see why Congress" would not subject other Commission actions, such as advisory opinions, to judicial review.  The Commission's opening brief demonstrated precisely why Congress did so:  to prevent both circumvention of the Act's enforcement mechanisms and duplicative, premature legal actions.

In addition, plaintiffs' efforts to distinguish the Commission's supporting case law are unsuccessful.  The question addressed in *Block* was whether a statute that permitted certain challenges to agency action precluded, under 5 U.S.C. § 701(a)(1), a type of challenge to which the statute was silent.  *Block*, 467 U.S. at 348-53.  Contrary to plaintiffs' assertion that this was merely an inquiry into *who* might bring suit, the Court examined the structure and purpose of the statute and found that the proposed cause of action *itself* would "frustrate achievement of

statutory purposes" and "undermine the congressional preference for administrative remedies" by interfering with "the complex [regulatory] scheme enacted by Congress" and "provid[ing] a mechanism for disrupting administration of the congressional scheme." *Id.* at 352. This rationale applies fully to the instant case, where the structure and history of FECA manifest "fairly discernable" congressional intent to establish a complex regulatory scheme and preclude attempts to circumvent that scheme through litigation over non-binding advisory opinions.

Similarly, the D.C. Circuit's opinions in *In re Carter-Mondale Reelection Comm.*, 642 F.2d 538 (D.C. Cir. 1980), and *Galliano v. United States Postal Serv.*, 836 F.2d 1362 (D.C. Cir. 1988), make clear that FECA vests its civil enforcement power solely in the Commission, and so, when the Commission's enforcement proceedings have not yet run their course, judicial review of the Commission's action is unavailable under the statute. As *Galliano* notes, the civil enforcement provision of FECA "was enacted by Congress to make clear that only the FEC, and no other *governmental* authority, would have jurisdiction to enforce the civil provisions of FECA." 836 F.2d at 1368 (emphasis in original; quotation marks omitted). Therefore, as plaintiffs admit, civil enforcement of FECA "must be directed to the FEC because Congress specifically set up FECA to govern such issues" (Resp. at 30 (discussing *Galliano*)), and cannot be brought to the courts prematurely. Accordingly, Unity08's attempt to circumvent the Commission's enforcement authority with a suit that precedes and precludes any of the investigations, determinations, and votes that FECA requires the Commission to make during the statutory process should be rejected for the reasons set forth in *Carter-Mondale* and *Galliano*.[17]

---

[17]    Plaintiffs claim (Resp. at 31) that *In re Carter-Mondale* is inapposite because, in that case, the Commission had not yet acted on the administrative complaint that was the subject of the lawsuit. The Commission does not disagree with this characterization of *Carter-Mondale*; indeed, it demonstrates *a fortiori* that AO 2006-20 is not reviewable, for Unity08 does not allege that any complaint has yet been filed against it, and therefore this lawsuit comes even earlier in the administrative process than did the suit that *Carter-Mondale* found premature.

Finally, plaintiffs appeal for a "practical perspective" on their case, arguing that, although all other entities may be subjected to FECA's normal enforcement process, Unity08's particular claims warrant immediate judicial review.[18]  *See* Resp. at 31-32.  As the Commission has explained (Mem. at 40-42), however, despite plaintiffs' assertions about their own uniqueness, the Supreme Court has made it clear that the FECA can be lawfully applied to Unity08's activities.  Thus, regardless of how Unity08 characterizes itself, plaintiffs should not be permitted to circumvent the Act's enforcement procedures by requesting an advisory opinion and then challenging that non-binding opinion prematurely in federal court.

## III.    AO 2006-20 IS A REASONABLE CONSTRUCTION OF THE FECA

Unity08 continues to misinterpret Supreme Court precedent in its challenge to the Commission's reasonable interpretation that an organization avowedly committed to electing the next President and Vice President of the United States, and which disburses thousands of dollars toward that end, is required to register as a federal political committee.  In doing so, Unity08 obscures the fact that it is not materially different from regulated political committees that raise and spend millions of dollars to nominate or support their preferred candidates, even if those committees have not yet decided precisely which candidates they will nominate or support in the next election.

### A.    AO 2006-20 Is Entitled To Deference

As the Commission explained (Mem. at 18-19), its advisory opinions are entitled to substantial deference under *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984), and Unity08's argument (Resp. at 32-33) that *Chevron* deference does not apply to agency interpretations of

---

[18]   Plaintiffs' claim that the Commission is arguing for "across the board" preclusion of judicial review of advisory opinions is overbroad; the question of whether FECA precludes review of permissive advisory opinions is not at issue here.  In addition, plaintiffs' assertion that *Martin Tractor Co. v. FEC*, 627 F.2d 375 (D.C. Cir. 1980), stands generally for the proposition that an advisory opinion might "ripen[ ]" a matter sufficiently to warrant judicial review was explicitly considered and rejected in *USDC*, 861 F.2d at 772-73.

Supreme Court precedent does not alter the normal deference due in this case.  In AO 2006-20, the Commission concluded that Unity08 would meet the statutory definition of "political committee," 2 U.S.C. § 431(4), once it spent more than $1,000 to obtain ballot access because such expenses are for the purpose of influencing a federal election, and hence "expenditures," under the Act, 2 U.S.C. § 431(9).  Unity08 has presented no reason to disturb the Commission's decades-old determination that ballot access costs constitute "expenditures."[19]  *See* Mem. at 22. The simple application of that term to Unity08's activities did not require the Commission to interpret Supreme Court precedent, and the Commission did not purport to do so.[20]

Similarly, when the Commission applied the Supreme Court's "major purpose" test, *see Buckley*, 424 U.S. at 79, it did not purport to delineate the contours of the major purpose test or otherwise "attempt[] an 'exegesis'" of that test in a manner that would present "constitutional difficulties."  *Chamber of Commerce*, 69 F.3d at 604-05 (citation omitted).  Rather, the Commission merely applied the plain language of the major purpose test to the facts presented in Unity08's advisory opinion request and concluded that Unity08, whose avowed purpose is to

---

[19]  Both advisory opinions on which the Commission relied, AO 1994-5 and AO 1984-11, also involved straightforward applications of the statutory term "expenditure" and no application of Supreme Court precedent.  In addition, Unity08 mistakenly complains (Resp. at 36-37) that these two advisory opinions are not on point.  As the Commission has described (Mem. at 22-23), however, each advisory opinion involved a question strikingly similar to that presented by Unity08's advisory opinion request:  whether disbursements for ballot access count as expenditures for meeting one of the Act's definitional thresholds.

[20]  In AO 2006-20, the Commission also concluded (Mem. Exh. 3 at 4) that although Unity08 has not yet named its candidates, "it is, in effect, using its name as a placeholder for its candidates' names on the ballot."  As the Commission has explained (Mem. at 32 n.20), when candidates are identified as to specific office, party affiliation, and election cycle, they are "clearly identified" within the meaning of the Act.  Unity08 does not dispute this.  Thus, even if Unity08 were correct that expenditures (or the "major purpose" test) must be tied to a "clearly identified" candidate, the Commission's conclusion about the meaning of that statutory term, 2 U.S.C. § 431(18), is also due substantial deference under *Chevron*.

elect the next president and vice president, meets the test. *Chevron* deference is thus appropriate regarding that straightforward application of law to the facts.

In any event, the Commission's application of the major purpose test to Unity08 passes muster whether reviewed under a deferential or *de novo* standard. As the Commission has explained (Mem. at 20-21), the Commission was entitled to rely on Unity08's public statements of purpose, including that its "Goal One is to elect a Unity ticket for President and Vice-President of the United States in 2008," to conclude that Unity08's major purpose was the nomination and election of federal candidates. Unity08 does not dispute that an organization's major purpose may be established by, *inter alia*, its public statements of purpose (Mem. at 20). Rather, Unity08 attempts to walk away from its prior statements; it now claims (Resp. at 35) that "Unity08 does not seek to influence the contest in the arena." This unsupported argument, however, is belied not only by Unity08's AO request and other public declarations that Unity08 wants to win the next presidential election (FEC Facts ¶¶ 7a, 19), but also by testimony in this case that it wants to win the election (Mem. Exh. 4 (Bailey Dep.) at 12), as well as references in its opposition brief to its "political aspirations" (Resp. at 11) and alleged "competitive political disadvantage" relative to major party candidates (*id*. at 8, 16). *See supra* pp. 6-8. More fundamentally, as discussed below, spending millions of dollars to create an online nomination convention, obtain ballot access, and then give that access to its eventual nominees is unquestionably activity whose purpose is to nominate and elect federal candidates.

**B.     Unity08 Is No Different From Other Political Committees That Are Raising Funds to Support Particular Candidates Who Will Be Identified Between Now and Election Day**

Like the major and minor political parties — as well as some of the better-funded political committees such as EMILY's List or the NRA Political Victory Fund — Unity08 plans on spending millions of dollars to make possible the election of its favored candidates. Nonetheless, Unity08 argues (Resp. at 39) that it is unique and claims that it does not intend to use the

money it raises to support or oppose any candidate but intends instead "to use its funds only to qualify for the ballot as an organization, to create the technical mechanism for its online convention facility, and to establish its delegate education efforts."  The facts demonstrate otherwise.

What Unity08 does not deny is that *it also intends to allow its eventual nominees to use its ballot access*, free of charge, for the purpose of helping them get elected as the next President and Vice President of the United States.  That intention completely undermines Unity08's claim that it seeks "only" to *qualify* for ballot access and that it is materially different from other political committees.[21]  Indeed, Unity08 agrees (Resp. at 39) that other political committees are now collecting federal contributions "even though they do not know the specific candidate they will support, because they know they want to use the money for the purpose of supporting or opposing the nomination or election of particular candidates."  Unity08 thus concedes that *other* groups' status as political committees does not turn on whether they have yet selected their nominees or favored candidates, yet it provides no basis for not applying that same reasoning to its own conduct.

Because Unity08 will be nominating candidates and then giving its nominees the expensive ballot access it intends to obtain, its attempt to compare itself favorably to the draft groups in *FEC v. Machinists Non-Partisan Political League,* 655 F.2d 380 (D.C. Cir. 1981), must fail.  *See* Resp. at 37.  As the Commission explained (Mem. at 35-36), Unity08's activities clearly extend, in time and effect, far beyond a draft group's.  The draft-Kennedy groups in *Machinists* sought only to convince Senator Kennedy to run for president, not to nominate or

---

[21]    Other than a conclusory assertion that "Unity08 will not provide any support to candidates for the Unity08 nomination, or to the ultimate Unity08 candidate" (Resp. at 2), Unity08 has not explained how providing its candidates with ballot access — which Unity08 estimates will cost $7,000,000 — is not providing support, or something of value, to its candidates.  Nor has Unity08 explained how its eventual nominees would not feel indebted to the large contributors who made their appearance on the ballot possible.  *See* Mem. at 40-42 (explaining Supreme Court's anti-corruption rationale for upholding Act's contribution limits).

elect him — *i.e.,* for the limited purpose of "attempt[ing] to convince the voters — or [Senator] Kennedy himself — that he would make a good 'candidate,' or should become a 'candidate.'" 655 F.2d at 396.  Thus, once Senator Kennedy made his decision, the draft groups had exhausted their only purpose.[22]  Unity08, in contrast, will itself nominate candidates and then give its chosen candidates ballot access to run in the general election.  Moreover, Unity08 has admitted that it is not a draft group (Unity08 Facts ¶ 56), and it has also stated that it will "work with" and "support" its ticket after the nomination (Mem. Exh. 4 (Bailey Dep.) at 115-16).

Thus, rather than being akin to a draft group, Unity08 is no different from other political committees that are collecting contributions but that may not know which specific candidates they may ultimately nominate or support.  In the first quarter of 2007 alone, non-candidate political committees have raised and reported over 200 million dollars in contributions.  *See* Summary Reports Search, http://www.fec.gov/finance/disclosure/srssea.shtml (FEC search engine for political committee contributions and expenditures).  But under Unity08's interpretation of the statute, the majority of these contributions are not regulable because such organizations have generally not yet identified their preferred candidates.

In its opposition, Unity08 does not attempt to explain how its statutory interpretation and cramped theory of corruption would not, as the Commission explained (Mem. at 34-35), largely eviscerate the Act's contribution limits, other than to discuss (Resp. at 40-41) *FEC v. GOPAC*, 917 F. Supp. 851 (D.D.C. 1996).  But the court's concern in that case has no application here. As the Commission explained (Mem. at 36 n.23), *GOPAC* turned on the fact that GOPAC supported only candidates at the state and local level and "avoided directly supporting federal candidates."  917 F. Supp. at 857 (emphasis omitted).  Because the court noted, and the

---

[22]    Without citing anything specific in *Machinists*, Unity08 sweepingly asserts (Resp. at 37) that the decision held that activity prior to a candidate's announcement is not regulable.  Despite plaintiffs' assertion (*id.*), however, *Machinists* makes no mention of "contests … between announced candidates."

Commission conceded, that there was no evidence that GOPAC had made direct contributions to or expenditures for any federal candidates, *id.* at 857, the court found that the Commission had not proven that GOPAC had engaged in sufficient *federal* campaign activity to qualify as a political committee.[23]  Similarly, although the court noted that GOPAC hoped to eventually and indirectly influence the election of Republican candidates to Congress, GOPAC's actual activities demonstrated that its "immediate major purpose" during the years at issue "was to elect state and local candidates."  *Id.* at 851.  These facts stand in stark contrast to Unity08's stated purpose of electing the next president and vice president (and no other candidates) in the current election cycle and its plans to provide ballot access to its chosen candidates after its nominating convention.[24]

## C.    Unity08 Continues to Misinterpret Supreme Court Precedent

As the Commission explained (Mem. at 26-27 & n.19), Unity08 erroneously conflates the Supreme Court's "express advocacy" and "major purpose" tests; only the former must involve a "clearly identified" candidate.  In its opposition brief, without citing any specific language from *Buckley*, Unity08 repeatedly suggests (Resp. at 33, 35, 36, 41, 42) that *Buckley* limits the application of the Act's definition of political committee to organizations whose major purpose

---

[23]    Unity08 criticizes (Resp. at 38) the Commission for applying *GOPAC* in other contexts while pointing out in this case (FEC Mem. at 36 n.23) that, to the extent *GOPAC* interpreted the major purpose test to require support for a *particular* federal candidate, such dicta cannot be reconciled with the language and logic of *Buckley*.  There is nothing improper or inconsistent, however, in relying on those portions of the *GOPAC* decision that the Commission maintains were correctly decided, while also noting other aspects of the decision that were flawed.

[24]    Unity08 again mischaracterizes *FEC v. Malenick*, 310 F. Supp. 2d 230 (D.D.C. 2004).  Contrary to Unity08's claims (Resp. at 40), the district court in *Malenick* did not apply the *GOPAC* court's rationale to conclude that an organization does not become a political committee unless it makes expenditures in support of a person who has decided to become a candidate, or that Triad, the defendant organization, "funneled" money to candidates.  The *Malenick* court held that Triad satisfied the statutory definition of political committee because it had "received *contributions* aggregating more than $1,000 in 1996," even though the Court did not make any findings that the contributor knew that his donations would support or oppose any particular candidate.  *Malenick*, 310 F. Supp. 2d at 236 (emphasis added).

is to nominate or elect a *particular identified* candidate.  As the Commission explained (Mem. at 26-29), however, Unity08's flawed reading of *Buckley* is not supported by the opinion's plain language:  The major purpose test is satisfied if an organization's major purpose is "the nomination or election of a candidate."[25]  *Buckley*, 424 U.S. at 79.  The Commission further explained (Mem. at 19-20, 26-29) that *Buckley* and *FEC v. Massachusetts Citizens For Life, Inc.*, 479 U.S. 238 (1986), demonstrate that the Court adopted the major purpose test to limit the scope of the Act's definition of political committee to avoid improper regulation of groups engaged purely in issue discussion.  Unity08 does not dispute this or claim that it is primarily an issue advocacy group.

Unity08 also continues to rely on flawed reasoning that renders the Act's definition of "political committee" meaningless.  It asserts (Resp. at 38) that "[d]onations to or expenses incurred by an organization such as Unity08 that is not a political committee are not 'contributions' or 'expenditures.'"  The Act, however, defines a political committee as "any committee, club, association, or other group of persons which receives contributions or which makes expenditures aggregating in excess of $1,000 during a calendar year."  2 U.S.C. § 431(4).  The *first* step in determining whether an organization meets this standard, therefore, is to ascertain whether an organization has received more than $1,000 in contributions or made more than $1,000 in expenditures.  Yet Unity08's formulation puts the cart before the horse by first

---

[25]    The Commission previously explained (Mem. at 26-27) that Unity08's theory that an organization cannot become a political committee until it has actually selected its candidates effectively reads the phrase "nomination or" out of the major purpose test.  Unity08 does not dispute this point.  Nor does it explain how any organization that undertakes a competitive nomination process, such as the major political parties, could meet the major purpose test if that test required, as it would under Unity08's view, the organization to have already selected the "specific individual" it has yet to nominate.

requiring a determination that an organization is a political committee before being able to conclude that its donations and expenses are "contributions" or "expenditures."[26]

Finally, the Commission also explained at length (Mem. at 30-33, 38-41) that the Supreme Court has repeatedly upheld contribution limits to political intermediaries, and prophylactic measures designed to foreclose circumvention of those limits, even though such contributions do not flow directly to identified candidates. Unity08 disputes none of this. Indeed, other than a passing reference (Resp. at 21-22) in its standing argument, Unity08 make no mention of the most important case on this point, *California Medical Ass'n v. FEC* ("*CMA*"), 453 U.S. 182, 197-98 (1981). In *CMA*, the Court upheld the Act's $5,000 limit on contributions to multicandidate political committees to prevent circumvention of the contribution limitations upheld in *Buckley*, even though contributions to such organizations are not earmarked for particular candidates. Nonetheless, Unity08 makes no attempt to reconcile this dispositive precedent with plaintiffs' repeated claims that donations are not "contributions" unless they are given to support a specified candidate.[27]

---

[26]   In a recent Supplementary Explanation and Justification regarding one of its rulemakings, the Commission further clarified that it will analyze political committee status by first examining whether an organization has met the statutory criteria in 2 U.S.C. § 431(4). *See* Political Committee Status Supplemental Explanation and Justification, 72 Fed. Reg. 5595, 5602 (Feb. 7, 2007).

[27]   The lawful, prophylactic purpose of the contribution limitations is further demonstrated in *FEC v. Ted Haley Congressional Comm.*, 852 F.2d 1111 (9th Cir. 1988), and *United States v. Goland*, 959 F.2d 1449, 1453 (9th Cir. 1992), where the Ninth Circuit applied the definition of "contribution" in circumstances where the opportunity for corruption was attenuated because the contribution was made to a candidate after he lost the election, or because the recipient did not know the identity of the contributor. Unity08 points out (Resp. at 39-40) that both cases involved "actual" candidates, but does not suggest that this fact was material to the court's decisions or explain how it could undermine the broader anti-corruption principles of these cases and *CMA*.

**CONCLUSION**

For the foregoing reasons, the Commission respectfully requests that the Court grant summary judgment to the Commission and deny summary judgment to plaintiffs on each claim in plaintiffs' Complaint.

Respectfully submitted,


_____/s/ Thomasenia P. Duncan_____
Thomasenia P. Duncan
General Counsel


_____/s/ David Kolker_____
David Kolker (D.C. Bar No. 394558)
Acting Associate General Counsel


_____/s/ Kevin Deeley_____
Kevin Deeley
Acting Assistant General Counsel


_____/s/ Steve N. Hajjar_____
Steve N. Hajjar
Attorney


_____/s/ Adav Noti_____
Adav Noti (D.C. Bar No. 490714)
Attorney


COUNSEL FOR DEFENDANT
FEDERAL ELECTION COMMISSION
999 E Street, NW
Washington, DC 20463
(202) 694-1650

May 25, 2007

**EXHIBIT 31**

unity08

## LOAN AGREEMENT

THIS LOAN AGREEMENT (this "Agreement"), is made this _____ day of
_____, 2007, by and among UNITY08 (hereinafter, known as "Borrower"), a
Corporation organized under the laws of the District of Columbia and
_____, (hereinafter, known as "Lender").  Borrower and Lender shall
collectively be known herein as "the Parties." In determining the rights and duties of the
Parties under this Loan Agreement, the entire document must be read as a whole.

NOW, THEREFORE, the Parties hereby agree as follows:

1.    Loan Amount: On _____, Lender shall provide to Borrower by check
or other negotiable instrument or by wire transfer to an account designated by Borrower the
sum of _____ dollars (hereinafter, "the Loan Amount").

2.    No Interest:  Borrower shall pay zero percent (0%) interest on the loan.

3.    Use of Loan Proceeds:  Borrower may use the proceeds of the loans for the
following purposes:

(a)    Ballot Access for Unity08 ("*Ballot Access Initiative*");

(b)    technology infrastructure and secure systems to hold the first-ever online
nominating convention ("*Convention Hall Initiative*");

(c)    web systems needed to implement the New American Agenda to define
the crucial issues facing our nation ("*American Agenda Initiative*"); and

(d)    general operating infrastructure to support these programs, including
but not limited to, fundraising costs necessary to accomplish the above purpose or purposes.

Borrower shall not expend any part of the loan proceeds to influence the
election or defeat of any clearly identified candidate for federal or state elected office.

4.    Loan Repayment Terms:  The Borrower shall determine, in its absolute
discretion, when the collection of contributions from other sources will enable it to repay the
loan, will notify the Lender of its intention to repay, and will specify the schedule of
repayments.

5.    Method of Loan Payment:  The Borrower shall make all payments called for
under this Agreement by sending check or other negotiable instrument made payable to the
following individual or entity at the address indicated:

**[Lender]**
[Address]
[Address]

**Page 32**

unity08

If Lender gives written notice to Borrower that a different address shall be used for making payments under this Agreement, Borrower shall use the new address so given by Lender.

6.    <u>Notice</u>:

(a)    Addressee and Address to give Borrower written notice:

Doug Bailey
Unity08
PO Box 12545
Arlington, VA 22219

With a copy to:

Tom Collier
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC 20036

(b)    Addressee and Address to give Lender written notice:

[Address]
[Address]

7.    <u>Parties That Are Not Individuals</u>:  If any Party to this agreement is other than an individual (i.e., a corporation, a Limited Liability Company, a Partnership, or a Trust), said Party, and the individual signing on behalf of said Party, hereby represents and warrants that all steps and actions have been taken under the entity's governing instruments to authorize the entry into this Agreement.

8.    <u>Integration</u>:  This Agreement sets forth the entire agreement between the Parties with regard to the subject matter hereof.  All prior agreements, representations and warranties, express or implied, oral or written, with respect to the subject matter hereof, are hereby superseded by this agreement.  This is an integrated agreement.

9.    <u>Severability</u>:  In the event any provision of this Agreement is deemed to be void, invalid, or unenforceable, that provision shall be severed from the remainder of this Agreement so as not to cause the invalidity or unenforceability of the remainder of this Agreement.  All remaining provisions of this Agreement shall then continue in full force and effect.  If any provision shall be deemed invalid due to its scope or breadth, such provision shall be deemed valid to the extent of the scope and breadth permitted by law.

10.    <u>Modification</u>:  Except as otherwise provided in this document, this Agreement may be modified, superseded, or voided only upon the written and signed agreement of the Parties.  Further, the physical destruction or loss of this document shall not be construed as a modification or termination of the agreement contained herein.

**Page 33**

unity08

11.    <u>Further Acts</u>: Each Party agrees to perform any further acts and execute any further agreements or papers of any character that may be necessary to fully and completely carry out the terms of this Agreement.

12.    <u>Counterparts</u>: This Agreement may be executed and delivered in multiple counterparts, each of which shall be regarded as an original and all of which together shall constitute but one and the same instrument.

13.    <u>State Law</u>: This Agreement shall be interpreted under, and governed by, the laws of the District of Columbia.

IN WITNESS WHEREOF and acknowledging acceptance and agreement of the foregoing, Borrower and Lender affix their signatures hereto.


**BORROWER: UNITY08**          **LENDER:**

By: _____          By: _____

Name:_____          Name:_____

Title: _____          Title: _____

# EXHIBIT 32

# Unity08. A people's movement to take our country back.

## DON'T TOLERATE "OFFICIAL WASHINGTON" TRYING TO STAND IN THE WAY OF UNITY08!

As you know, Unity08 is breaking new ground. Some months ago, we asked the Federal Election Commission (FEC), which oversees the implementation of election law, to provide guidance on how exactly we should be classified. The FEC's just-released answer is the first demonstration that the money-laden Washington establishment is uncomfortable with Unity08's potential to end the corruption and re-align our leadership with the will of the majority of American people.

**Click here to contribute to our campaign fund in preparation for "Official Washington's" next move to try to slow our momentum!**

**Click here to pass along this news and expose what Washington is trying to do...**

**Tell us what you think about the FEC decision and how we've presented it.**

The FEC shows itself as an agent of "Official Washington"

The FEC, the very agency that oversees a system that allows obscene amounts of special interest money to flow in favor of the two major parties, ruled to place strict limits on the money Unity08 can raise! Specifically, the FEC put in place a strict $5,000 limit on any contribution to Unity08, but leaves the limits for the Democratic and Republican parties at $25,000 per contribution – *that's five times as much!*

Of course, Unity08 had long ago voluntarily instituted a $5,000 cap as part of our promise to reduce the influence of money on politics. And as you know, Unity08 refuses to take money from corporations or special interests. So nothing about our operations will change.

**But this decision shows that "Official Washington" has taken notice and has begun to mobilize to keep this movement of American voters from shaking things up!**

Don't tolerate "Official Washington" trying to stand in our way!

Don't tolerate the Washington establishment trying to keep this movement from ending the influence of money on politics and the partisan bickering it creates!

Make an immediate contribution to fight back against Washington insiders and the other decisions like this that are sure to follow as we demonstrate that we will indeed win the White House with a

bipartisan Unity Ticket in 2008!

Email or phone two friends today and urge them to become a part of Unity08!

Remember, Unity08 will win the White House with a bipartisan Unity Ticket in 2008, regardless of the decisions of a Washington bureaucracy like the FEC. But we need your help to prepare for the next such self-protectionist move from "Official Washington"!

Why should you care what the FEC does?

It's no secret that the FEC is a key player in today's broken political system in which money corrupts all, and has incentive to protect it. With this decision, the FEC essentially said it's fine if the two big parties continue largely uninhibited in their creative fundraising regardless of their wanton abuse of rational limits on special interest money. But a people's movement to end money-driven, hyper-partisan politics? That looks like it could shake things up, so tie one hand behind its back, and fast!

The decision sends a startling signal to the American people that they dare not do anything that might disrupt the entrenched partisan party machinery in Washington, or come between it and the lobbyist dollars that feed it. The FEC has made clear to Americans that if they want to do anything other than sit idly by while destructive partisanship and corruption shape how we are governed, much less start their own political party to impart constructive change, the FEC will surely try to stand in the way.

The FEC is comprised of partisan political appointees beholden to the Washington establishment, an establishment that, with this decision, the FEC illustrates its fervor to protect. **This dynamic is one that Americans find so distasteful and that Unity08 is positioned to remedy.**

Clearly, with this opinion, the FEC hopes to hinder our goal of a ticket for the White House chosen not by a handful of partisans in New Hampshire, Iowa and South Carolina, which is what happens today, but by millions of Americans across the country, regardless of their party affiliation.

We will of course abide by the FEC ruling, but our success depends not on the decisions of a Washington bureaucracy, but on the will of the people to force constructive change.

**Click here to contribute to the Unity08 campaign fund.**

**Click here to pass this important news along to a friend or colleague.**

**Tell us what you think about the FEC decision and how we've presented it.**

About   Speak Out   Take Action   Donate   Buzzworthy   Contact   Privacy Policy   info@unity08.com

Paid for by Unity08 and not authorized by any candidate or candidate's committee.
Unity08, PO Box 12545 Arlington, VA 22219, www.unity08.com